## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND,<br>200 Saint Paul Place<br>Baltimore, Maryland 21202,<br><br>       Plaintiff,<br><br>   v.<br><br>KRISTI NOEM, Secretary of Homeland Security,<br>2707 Martin Luther King Jr. Ave. SE<br>Washington, D.C. 20528<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY,<br>2707 Martin Luther King Jr. Ave. SE<br>Washington, D.C. 20528<br><br>UNITED STATES IMMIGRATION AND<br>CUSTOMS ENFORCEMENT,<br>500 12th St., SW<br>Washington, D.C. 20536<br><br>TODD M. LYONS, Senior Official Performing<br>the Duties of the Director of Immigration and<br>Customs Enforcement,<br>500 12th St., SW<br>Washington, D.C. 20536,<br><br>      Defendants. | Civ. No. 1:26-cv-733 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     The State of Maryland brings this action seeking declaratory and injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, to halt Defendants' unlawful decision to establish a massive immigration detention facility in Washington County, Maryland.

2.      On January 16, 2026, Defendants U.S. Department of Homeland Security (DHS) and U.S. Immigration and Customs Enforcement (ICE) purchased a vacant commercial warehouse just outside of Williamsport, Maryland (the "Williamsport Warehouse")—a town with a population of just over 2,000 individuals—with the intention of converting it into an immigration detention facility outfitted with 1,500 beds (the "Project").[1]

3.      The decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility is part of Defendants' broader effort to create a mass immigration detention scheme.  Defendants are purchasing warehouses across the country and seeking to retrofit them into immigration detention and processing centers that can hold tens of thousands of immigrants, a change to meet ICE leadership's goal for the agency's deportation activities to operate "like (Amazon) Prime, but with human beings."

4.      Converting the Williamsport Warehouse into a massive immigration detention facility will have predictable impacts on the environmental, economic, and public health and safety interests of the State of Maryland.  Among other things, these actions are likely to harm the State's natural resources and environment—including a waterway that is a tributary to the Potomac River and important habitat to State protected species.  Further, public reporting of conditions in detention facilities around the country reveals concerning evidence of a measles outbreak, sewage problems, and generally unsanitary conditions—alarming data that would implicate State public health authorities as well.

---

[1] Plaintiff uses the term "detention facility" to refer to any facility intended to "house" noncitizens "to secure their presence for immigration proceedings or removal from the U.S." Dep't of Homeland Sec., Immigr. & Customs Enf't, *Detention Facilities*, https://perma.cc/JA5U-93Z3.  These facilities include "processing centers," which are intended to hold noncitizens for shorter periods of time, and other detention centers that are intended to hold noncitizens for longer periods of time.  Because ICE uses "processing centers" to hold individuals in civil detention, Plaintiff refers to "processing centers" and "detention centers" interchangeably.

5.     In their zeal to purchase and convert the Williamsport Warehouse into an immigration detention facility, Defendants have run roughshod over federal law and trampled on the State's interests.  The APA and NEPA serve to ensure federal agencies act in a transparent manner, engage in reasoned decision-making, and analyze feasible alternatives.  Specifically, NEPA requires federal agencies to prepare a detailed statement of environmental impacts *before* taking final action, ensuring both that environmental considerations are integrated into the decision-making process and that States, interested parties, and members of the public have access to relevant information so they may play an informed role in the decision-making process and implementation.  Likewise, the APA requires reasoned decision-making, including consideration of reasonable alternatives.

6.     Defendants have shown a complete disregard for these requirements.  DHS and ICE did not conduct a public NEPA review of the Project's likely impacts on the environment prior to purchasing the Williamsport Warehouse for the purpose of converting it into an immigration detention facility—a failure that is ongoing.  Similarly, in their haste to expand their detention capacity in Maryland, Defendants have failed to exhibit the reasoned decision-making required by the APA.  Despite the major nature of this undertaking, Defendants have provided little information to the State concerning its plans for the property, depriving the State of the information needed to fully assess the harm Defendants' actions will have on Plaintiff's sovereign interests.

7.     Defendants' actions are unlawful under the APA and NEPA.  This Court should vacate and set aside Defendants' decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility.  Moreover, this Court should enjoin any further implementation of the decision to convert the Williamsport Warehouse into an immigration

detention facility, including but not limited to any further activity related to construction or retrofitting of the Williamsport Warehouse.

## JURISDICTION AND VENUE

8.      Jurisdiction in this Court is proper under 28 U.S.C. § 1331.

9.      Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiff State of Maryland and its Attorney General reside in this District, and a substantial part of the acts or omissions giving rise to this action occurred in this District.

## PARTIES

**I.      Plaintiff**

10.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

**II.     Defendants**

11.     Kristi Noem is the Secretary of Homeland Security and the head of the U.S. Department of Homeland Security.  She is sued in her official capacity.

12.     The U.S. Department of Homeland Security is a department of the Executive Branch of the United States government.  DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

13.     Todd Lyons is the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity.

14.     ICE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is under the supervision of DHS.

## BACKGROUND

### I.  Legal Background

#### A. NEPA Requires Federal Agencies to Consider the Environmental Impacts of Major Federal Actions Before Making a Decision.

15.     NEPA establishes a national policy "to promote efforts which will prevent or eliminate damage to the environment and biosphere."  42 U.S.C. § 4321.  In recognizing "the profound impact of man's activity on the interrelations of all components of the natural environment," and "the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," Congress declared "that it is the continuing policy of the Federal Government, *in cooperation with State and local governments*, and other concerned public and private organizations, to use all practicable means and measures" to accomplish the Act's goals.  42 U.S.C. § 4331 (emphasis added).

16.     NEPA's goals are two-fold:  First, it "guarantees that an agency will take a hard look at environmental consequences before making a decision that may affect the environment," and second, it "ensures that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision." *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002) (citations and quotations omitted).  "The point . . . is not merely that an agency produce a report but 'that environmental concerns be integrated into the very process of agency decision-making.'" *Seven Cnty. Infrastructure Coal. v. Eagle County, Colo.*, 605 U.S. 168, 197–98 (2025) (Sotomayor, J., concurring) (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979)).

17.     NEPA accomplishes these goals by "mandat[ing] 'a set of "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences, . . . and that provide for broad dissemination of relevant environmental information.'" *Defs. of Wildlife v. N.C.*

*Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

18.     NEPA requires federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . reasonably foreseeable environmental effects of the proposed agency action."  42 U.S.C. § 4332(C)(i).

19.     This report, known as an Environmental Impact Statement (EIS), must also include discussions of:  "reasonably foreseeable adverse environmental effects which cannot be avoided"; "a reasonable range of alternatives" including a "no action alternative"; a discussion of "the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and an accounting of the "irreversible and irretrievable commitments of Federal resources" from the proposed action.  42 U.S.C. § 4332(C)(ii)-(v).

20.     The requirement to prepare an EIS is triggered whenever there is a (1) "major federal action"; (2) "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

21.     Major federal action is a broad term.  NEPA itself specifies only that a "major Federal action" is "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility."  42 U.S.C. § 4336e(10)(A).  According to DHS internal policies, "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, [or] executed by DHS under the direction of Congress."  Dep't of Homeland Sec., *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)*, at III-1 (Nov. 6, 2014), https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-

manual_023-01-001-01.pdf (hereinafter "DHS Instruction Manual"); *see also Environmental Planning and Historic Preservation Program*, 79 Fed. Reg. 70,538 (Nov. 26, 2014).

22.    Agencies must consider a broad range of effects when evaluating an action under NEPA.  DHS has specified that NEPA analysis includes consideration of "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" effects.  DHS Instruction Manual at II-2.

23.    If an agency does not expect a major federal action to have significant impacts on the environment, or if the significance of such effects is unknown, then the agency "*shall* prepare an environmental assessment" instead of an EIS.  42 U.S.C. § 4336(b)(2) (emphasis added).  An environmental assessment (EA), although less comprehensive than an EIS, nonetheless "shall be a concise *public* document" that either sets forth the basis for the agency's finding of no significant impact or a determination that an EIS is in fact required.  *Id.* (emphasis added).

24.    An agency can dispense with preparing an EIS or EA only if it finds that the proposed agency action fits within a duly adopted categorical exclusion or if it is excluded from environmental review by another provision of law.  *See* 42 U.S.C. § 4336(a)(2), (b)(2).

25.    A categorical exclusion is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of [42 U.S.C.] section 4332(2)(C)."  42 U.S.C. § 4336e(1).  DHS itself instructs that a categorical exclusion is only appropriate where an action "[c]learly fits the category described in the [categorical exclusion]," "[i]s not a piece of a larger action," and "[n]o extraordinary circumstances exist."  DHS Instruction Manual at V-4 to V-5.  The proposed action must "clearly meet all three conditions" in order to be categorically excluded.  *Id.*

26.     An agency must complete the NEPA process by preparing an EIS or EA or properly invoking a categorical exclusion before taking final action.  42 U.S.C. § 4332(C) (requiring that the "detailed statement" be included "in every recommendation or report on *proposals* for legislation and other major Federal actions significantly affecting the quality of the human environment" (emphasis added)); *see also Robertson*, 490 U.S. at 349 ("NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.").

27.     Also as part of the NEPA process, and "[p]rior to making any detailed statement, the head of the lead agency *shall* consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved."  42 U.S.C. § 4332(C) (emphasis added).  NEPA further requires that "[c]opies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public, as provided by [5 U.S.C. § 552]." *Id*.

28.     DHS's own manual on implementing NEPA affirms that "[o]pen communication, consistent with other Federal requirements, is DHS policy."  DHS Instruction Manual at IV-6. Such collaboration, DHS recognizes, "improve[s] the effectiveness of DHS missions and activities," and "build[s] trust between DHS and the communities it serves." *Id*.  In addition, DHS recognizes that "[c]ollaboration with other Federal, Tribal, State, and local agencies, as well as non-governmental organizations and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making," and that "[p]ublic involvement starts early and continues throughout the NEPA process." *Id.*

29.     The DHS Instruction Manual further specifies that "collaboration and public involvement in NEPA activities include the following three key elements: (1) seeking information from outside parties to help identify relevant issues; (2) presenting the results of an environmental impact evaluation for public review or comment, including a description of how the identified relevant issues were considered in the evaluation; and (3) providing a public notice of DHS's final decision, including consideration of relevant public comments." *Id.* at IV-6 to IV-7.

### B. The APA Requires Federal Agencies Engage in Reasoned Decision-Making.

30.     "The APA 'sets forth the procedures by which federal agencies are accountable to the public.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).  At its core, the APA "requires agencies to engage in 'reasoned decisionmaking,'" *id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)), and thus directs that agency actions be set aside if they are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A).

31.     Reasoned decision-making means an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  An agency fails to meet this standard if it "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

32.     Similarly, "[a]n agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. U.S. Dep't of Transp. & Fed. Aviation Admin.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021)

(quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008). "This principle goes to the heart of reasoned decisionmaking; it is not limited to rulemaking." *Id.*

33.     Further, when agency action breaks with a prior policy or decision, "the requirement that an agency provide reasoned explanation for its action . . . ordinarily demand[s] that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citations omitted).

34.     Failure to engage in reasoned decision-making runs afoul of the APA's prohibition against agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2).

## II.     Factual Background

### A.  ICE Adopts a Policy for Expanding Mass Detention

35.     Upon information and belief, DHS is working to expand its footprint across the United States through the purchase and conversion of industrial warehouses into processing and detention centers for mass immigration enforcement operations.  Douglas MacMillan & Jonathan O'Connell, *ICE Documents Reveal Plan to Hold 80,000 Immigrants in Warehouses*, Wash. Post (Dec. 24, 2025), https://perma.cc/LSH6-FJKQ.

36.     In recent history, ICE operated detention centers throughout the United States primarily in conjunction with private contractors and state and local government contracts.  Am. Immigr. Council, *Immigration Detention Expansion in Trump's Second Term* 7 (Jan. 2026), https://perma.cc/U599-95ZS.

37.    ICE has historically avoided expanding detention space through ICE-owned facilities "because of the substantial amount of time needed to design and construct such a facility." U.S. Gov't Accountability Off., *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13, 2021), https://www.gao.gov/assets/gao-21-149.pdf ("[O]fficials said that new contracts for ICE-owned service processing centers are not a viable option because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that ICE does not have construction authority.").

38.    DHS has previously reviewed the environmental impacts of detention facility construction and operation when under its substantial control.  *See, e.g.*, Dep't of Homeland Sec., *Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas* (April 2024), https://perma.cc/ZHH8-XH97.  ICE has also engaged in the NEPA process and reviewed the environmental impacts of immigration detention projects in the past.  In 2021, for example, ICE completed an EA for the El Paso Service Processing Center.  The Final EA discussed several opportunities for public involvement including letters sent to stakeholders and a draft EA published on the DHS website. The EA also included a description of the proposed action and three alternatives, including an analysis of the impact that each option would likely have on a broad array of resource areas including: land use, geology, topography and soils, water quality, biological resources, utilities and infrastructure, cultural resources, air quality and climate change, transportation and traffic, noise, aesthetics and visual resources, socioeconomics, environmental justice, and waste management and hazardous materials.  Dep't of Homeland Sec., Immigr. &

Customs Enf't, *Final Environmental Assessment for El Paso, Texas Service Processing Center* (Sept. 15, 2021), https://perma.cc/VED3-J4BP.

39.     In the past year, however, ICE has carried out its plan to purchase warehouses throughout the country and convert them into immigration detention and processing centers, without any regard for the NEPA process.

40.     As early as April 2025, ICE leadership described a goal for the agency's deportation activities to operate "like (Amazon) Prime, but with human beings," referring to the subscription service for rapid delivery of goods offered by Amazon.  Jerod Macdonald-Evoy, *ICE Director Envisions Amazon-Like Mass Deportation System: 'Prime, but with Human Beings'*, Ariz. Mirror (Apr. 8, 2025), https://azmirror.com/2025/04/08/ice-director-envisions-amazon-like-mass-deportation-system-prime-but-with-human-beings/.

41.     In July 2025, Congress appropriated $45 billion for ICE detention centers as part of the One Big Beautiful Bill Act (OBBA), to remain available until September 30, 2029. Pub. L. 119-21, § 90003, 139 Stat. 72, 358 (July 4, 2025).  Nothing in this appropriation excused ICE from complying with NEPA or any other legal requirement.

42.     On January 30, 2026, in response to a post on X (formerly known as Twitter) reporting that ICE had purchased massive warehouses to expand a nationwide detention network, including a $102 million site in Maryland, DHS confirmed that ICE "is actively working to expand detention space" and that the referenced property in Maryland would be a detention facility.  Dep't of Homeland Sec. (@DHSgov), X (Jan. 30, 2026, 1:14 PM), https://perma.cc/VL4Z-2P4W.



43. On February 12, 2026, following the testimony of Acting Director Todd Lyons at a U.S. Senate hearing about a potential ICE warehouse in New Hampshire, the Governor of New Hampshire released two documents that her office had received from DHS. Off. of Governor Kelly Ayote, Press Release, *DHS Releases New Documents on Merrimack Facility* (Feb. 12, 2026), https://perma.cc/LRC6-7S9C.

44. According to one document, labeled "ICE Detention Reengineering Initiative," ICE plans to use OBBA funding to "fully implement a new detention model by the end of Fiscal Year 2026," or September 30, 2026. U.S. Immigr. & Customs Enf't, *ICE Detention Reengineering Initiative* 1, https://www.governor.nh.gov/sites/g/files/ehbemt971/files/inline-documents/merrimack-detention-reengineering-initiative.pdf (last accessed February 23, 2026). This effort will purportedly "focus[] on non-traditional facilities built specifically to support ICE's

needs," including "the acquisition and renovation of eight large-scale detention centers and 16 processing sites, as well as the acquisition of 10 existing 'turnkey' facilities where ICE ERO already operates." *Id.* The goal of the "new model" is to "increase bed capacity to 92,600 beds." *Id.*

45.     The ICE Detention Reengineering Initiative claims that "ICE is complying with the National Environmental Policy Act (NEPA) to evaluate the impacts of proposed actions and their reasonable alternatives," that "NEPA surveys were also conducted for each site," and that "[a]ll detention infrastructure will comply with the latest ICE National Detention Standards (NDS), relevant federal regulations, environmental regulations, and industry best practices." *Id.* at 2-3.

46.     On the ground in Maryland, however, DHS and ICE appear to be moving at breakneck speed to implement its agenda, showing a complete disregard for federal law, including the obligation to engage in a legally sufficient NEPA process. Indeed, to Plaintiff's knowledge, there is no indication that Defendants have engaged in the NEPA process at all for the Williamsport Warehouse.

### B.  ICE Purchases a Maryland Warehouse to Convert into a Massive Immigration Detention Facility.

47.     In moving quickly to purchase a warehouse in Maryland and converting it into a massive immigration detention facility, Defendants have primarily operated behind closed doors, forcing Plaintiff to piece together factual developments from public reporting and limited available documentation.

48.     By December 24, 2025, DHS identified Hagerstown, Maryland, located within Washington County, as one of 23 general locations where contractors would be solicited by DHS to renovate warehouses into processing or detention centers. MacMillan & O'Connell, *supra.*

49.     On January 12, 2026, DHS sent letters to both the Maryland Historical Trust and the Washington County Historic District Commission indicating that ICE was "proposing to purchase, occupy and rehabilitate a 53.74-acre warehouse property in support of ICE operations." Exhibit A at 1.

50.     The purpose of the letters was to initiate consultation under Section 106 of the National Historic Preservation Act (NHPA). Exhibit A at 1.  NHPA requires that federal agencies consider the potential impact of federal projects on historic properties "*prior to* the approval of the expenditure of any Federal funds on the undertaking." 54 U.S.C. § 306108 (emphasis added). Regulations promulgated under NHPA thus require federal agencies to, among other things, consult with state agency officials, provide those officials at least 30 days to review and potentially object to the federal agency's initial identification of historic properties and determination of significant impacts, and make the federal agency's documentation available for public inspection. 36 C.F.R. §§ 800.3(c), 800.4(d), 800.5(c).

51.     Section 106 consultation is frequently integrated into the NEPA process and the DHS Instruction Manual clarifies that "DHS integrates the NEPA process with review and compliance requirements under other Federal laws" including NHPA.  DHS Instruction Manual at B-1.

52.     The January 12 letters stated that "ICE has determined that the undertaking will result in a finding of **No Historic Properties Affected**."  Exhibit A at 3.  The letters also identified the agency's obligation to invite local governments "to participate in consultation for this undertaking," and asked the consulting entities to "provide any comments on the undertaking and ICE's finding within 30 calendar days."  Exhibit A at 3.

53.     On January 16, 2026, just four days after initiating NHPA consultation, and without awaiting any response from the Maryland Historical Trust, ICE executed a General Warranty Deed purchasing the Williamsport Warehouse for $102.4 million.  The deed was recorded on January 22, 2026, and the property's acquisition was publicly reported on January 27, 2026.[2]  Exhibit B.

54.     On January 29, within the 30-day review period, the Maryland Historical Trust sent an initial letter concurring with DHS's proposed finding but reserving the right to request more information from DHS.  Exhibit C at 1.  Subsequently, but still within the 30-day window, the Maryland Historical Trust—after receiving comments calling into question DHS's initial description of the project's scope—sent a second letter to DHS requesting further information about the project and indicating that, depending on the information provided, it would provide "updated findings regarding the complete project's effects on historic properties and what, if any, cultural resources investigations may be necessary prior to construction."  Exhibit C at 2.

55.     Upon information and belief, DHS has not responded to the Maryland Historical Trust's request for more information.

56.     Other than the NHPA letters, Plaintiff is not aware of any other notice or consultation that Defendants have provided to meet their other legal requirements, such as compliance with NEPA.

---

[2] *See also* Scott Maucione, *DHS Buys Warehouse in Maryland to Possibly Hold Detained Immigrants*, WYPR News (Jan. 27, 2026), https://perma.cc/28B4-8U83; Ben Conarck, Daniel Zawodny & Giacomo Bologna, *Feds Purchase Warehouse Near Hagerstown, Fueling Talk of Immigration Detention Center*, Baltimore Banner (Jan. 27, 2026), https://perma.cc/LK8U-5PBE; Michael Wriston, *BREAKING: DHS Purchases Hagerstown Warehouse for $102.4 Million*, Project Salt Box (Jan. 27, 2026), https://perma.cc/9KZL-77MH.

**C. The Williamsport Warehouse is a Vacant Mega Warehouse that Would Require Significant Renovations to Accommodate 1,500 Beds.**

57.    According to the Maryland Department of Assessments and Taxation, the Williamsport Warehouse is approximately 54 acres and is located at 16220 Wright Road, Williamsport, Maryland, 21795.  The property type is listed as "MEGA WAREHOUSE" and includes an above grade area of 825,620 square feet.  Exhibit D.

58.    Upon information and belief, the Williamsport Warehouse is not currently designed or outfitted to house, feed, bathe, protect, or provide adequate care for people detained by ICE, let alone an estimated 1,500 people.

59.    The Williamsport Warehouse was constructed between 2021 and 2023 to serve commercial and logistics needs.  Mike Lewis, *Going Up: Firm Breaks Ground for $35M Warehouse; Wright Road to Reopen This Month*, Herald Mail Media (Sep. 14, 2021), https://perma.cc/KL3M-CMVP; Jeff Clabaugh, *Penzance Bets on Rising Online Sales with Big Md. Warehouse*, WTOP (Feb. 2, 2021), https://perma.cc/K8JC-PU8B.

60.    During the warehouse's initial construction, the county worked together with the developer to move part of Wright Road, which abuts the property, away from Semple Run, which had previously been a site of frequent flooding affecting motorists and public safety services.  *See* Julie E. Green, *D.C. Developer Buys Williamsport-Area Property Planned for Warehouse*, Hearld Mail Media (Jan. 31, 2021), https://perma.cc/8E7M-HFLT.

61.    According to a 2021 nontidal wetlands and waterways permit issued in relation to the warehouse's construction:  "[R]oad improvements and [a stormwater] outfall . . . will permanently impact 156 square feet of 25-foot nontidal wetland buffer and 503 square feet of 100-year nontidal floodplain."  Exhibit E.  The permit also noted that "[t]he project will temporarily

impact 5,707 square feet of 25-foot nontidal wetland buffer and 2,930 square feet of 100-year nontidal floodplain." Exhibit E.

62.    A permit issued in August 2021 describes the site as: "825,620 sq. ft. one story shell building to be used as a warehouse, fire pump room, and electrical room for future tenant, 84 future docks with overhead doors, 41 fully equipped dock doors, 41 dock doors with future levelers, 4 drive-in doors and mechanical dock levelers, 30 pole lights that are 40 ft. in height."  Washington Cnty. Div. Plan Rev. & Permitting, Permit Issuance Report at 3 (Aug. 1-31, 2021), https://perma.cc/D43B-6749.

63.    A brochure advertising the Williamsport Warehouse by previous owners describes the facility as an 825,000 square foot building with more than 400 parking spaces and more than 200 trailer spaces. The brochure details 2,400 square feet of existing office space within the footprint of the building and only four toilets and two water fountains. Exhibit F at 2-3.

64.    In its letter to the Maryland Historical Trust, ICE described the existing facility as a "modern industrial site" with images detailing office and warehouse space, parking lots, and truck bays. Exhibit A at 2, 9-12.  The same letter included a general, non-exhaustive list of possible site improvements that would be needed to convert the warehouse into an immigration detention facility including: "installing, upgrading, or rehabilitating existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, recreation areas, and cameras," installing "tentage and a guard shack," conducting exterior modifications such as "painting or sealing the exterior of the structure; installing, removing, or modifying bays (truck bays, window bays, or doors); repairing or replacing the existing roof or cladding materials; adding security equipment; or adding exterior personnel/guest access controls," and conducting interior renovations such as constructing

"holding and processing spaces, office space, public-facing visitor spaces, and installation of amenities, such as cafeterias, bathrooms, and health care spaces." Exhibit A at 1.

65.    Converting this currently vacant warehouse into a 1,500-bed detention facility could overwhelm the existing sewer lines serving the property. Using the Maryland Department of the Environment's Design Guidelines for Wastewater Facilities to estimate the average daily wastewater flow for an 825,620 square foot warehouse yields a flow projection of 24,768.6 gallons per day.[3] That is a fraction of the projected 90,000 gallons per day from a 1,500-person facility—assuming the same gallons per person per day used to estimate flow at a standard apartment building.[4]

66.    Upon information and belief, the Williamsport Warehouse is currently served by a six-inch lateral sewer line that connects to an eight-inch sewer main. The existing six-inch lateral sewer line is likely insufficient to accommodate this increased daily flow and the existing eight-inch sewer main may also be insufficient depending on flow from other facilities. Inflow and infiltration issues (i.e. water leaking into the pipe) may also affect the sewer main's capacity to handle increased flow.

67.    Overloading these pipes beyond their capacity would result in sewage overflows and backups. An issue with the six-inch lateral line that connects the warehouse to the eight-inch sewer main would result in overflows at the property—likely at its external cleanout valve first

_____

[3] *See* Md. Dep't of the Env't, *Design Guidelines for Wastewater Facilities* 5 tbl. II (2021), https://perma.cc/2KZS-PS23 (indicating that the average daily flows for warehouses should be calculated by multiplying the facility's gross square feet by 0.03). The warehouse is 825,620 square feet and 825,620 x 0.03 = 24,768.6 gallons per day.

[4] *Id.* at 4 tbl. I (estimating flow of 60 gallons per person per day for "multiple family dwellings (apartments)").

and then inside the facility. An issue along the eight-inch sewer main could result in backups at the facility or backups affecting other users of the main.

68.     Upon information and belief, ICE will need to conduct significant renovations to convert the warehouse into an immigration detention facility outfitted with 1,500 beds.

69.     Upon information and belief, ICE is in the process of identifying contractors to complete this project by September 2026, if not sooner.

### D. The Decision to Purchase the Maryland Warehouse and Convert it into a Massive Immigration Detention Facility Will Harm State Interests

70.     Based on the limited information available about the Williamsport Warehouse, the State has identified a number of its interests that are implicated by the Project. Each of these interests should have been considered by Defendants before taking steps to purchase and convert the Williamsport Warehouse into an immigration detention facility.

71.     *Waterways*. First, the State has an interest in protecting its waterways for recreational and environmental purposes. Construction is likely to disturb the ground of the Williamsport Warehouse site, which can increase sedimentation to local waterways, and to change the site's impervious footprint, which may alter stormwater flow patterns. Further, the current sewer lines are likely insufficient to provide sanitary facilities for a 1,500-bed detention center, and insufficient capacity would result in backups and overflows that would likely impact downstream waters. Together, these actions are likely to impact three surrounding waters:

- Semple Run originates from the northeast of the Williamsport Warehouse, continues along Wright Road downstream, and immediately to the south of the property, and ultimately discharges into Conococheague Creek. It is a water of the State that offers potential trout habitat.

- Conococheague Creek is one of the Potomac River's largest tributaries. It supports an active warmwater fishery for a number of recreational species and hosts a high-density population of macroinvertebrates.

- The Potomac River is a waterway of significant ecological, cultural, and economic importance. The "Upper Potomac" refers to the warmwater, nontidal portion of the river that forms over 200 miles of Maryland's southern boundary from Cumberland to Washington D.C. The Potomac is managed for both warmwater and coolwater gamefish including smallmouth and largemouth bass, walleye, muskellunge, and channel catfish.

72. **Wildlife and Aquatic Species.** The State also has an interest in protecting its wildlife resources, including species designated for protection under Maryland's Nongame and Endangered Species Conservation Act, Md. Code Ann., Nat. Res. §§ 10-2A-01 to 10-2A-09. There are state-protected aquatic species in waters adjacent to and downstream from the Williamsport Warehouse and the federal government's own information indicates the possibility of federally-protected species in the warehouse's vicinity as well:

- Allegheny pearl dace is a fish species that is considered "in need of conservation" by the Maryland Department of Natural Resources. COMAR 08.03.08.09C(4)(b) (Pearl dace). Checkered sculpin is another rare fish that often occurs in the same streams as the Allegheny pearl dace. Both are known to occur in the vicinity of Conococheague Creek and Semple Run.

- Appalachian springsnail, Allegheny cave amphipod, and Franz's cave amphipod are small invertebrates that are considered "in need of conservation" by the State and have been found in the limestone springs that feed Semple Run. COMAR

08.03.08.09C(1)(b) (Appalachian springsnail); COMAR 08.03.08.09C(2)(b) (Allegheny amphipod); COMAR 08.03.08.09C(2)(c) (Franz's cave amphipod).

- The brook floater mussel is considered an endangered species throughout the State of Maryland. COMAR 08.03.08.04C(2)(b). It has been found in the Potomac River downstream of Conococheague Creek.

- The green floater mussel is a state endangered species, COMAR 08.03.08.04C(2)(d), and is also proposed for inclusion on the list of federally threatened species, 88 Fed. Reg. 48,294 (July 26, 2023). Green floater mussels have been observed in the Potomac River downstream of Conococheague Creek and portions of the Potomac River are proposed for designation as critical habitat for the species. 88 Fed. Reg. 48,294. The green floater mussel is sensitive to a narrow range of water quality parameters and needs clean water with low levels of contaminants, adequate dissolved oxygen, and low salinity. 88 Fed. Reg. at 48,298.

- The federal government's own screening tool for locating protected species indicates that several additional species, including the federally endangered Virginia big-eared bat, may be present at the property or surrounding area.

73.    **Ecologically Significant Areas.** The State has an interest in preserving land that is ecologically significant. The Maryland Department of Natural Resources has identified two Ecologically Significant Areas within 0.5 miles of the Project. The Kemps Springs Ecologically Significant Area is approximately 2,000 feet to the southwest and is home to rare limestone springs and associated invertebrates. The Conococheague-Kemps Mill Ecologically Significant Area is approximately 1,400 feet northwest of the Project. The Maryland Department of Natural Resources may identify an area as ecologically significant based on the presence of State protected

rare, threatened, or endangered species, habitat that supports known locations of such species, or the presence of a significant natural community (like an old growth forest).

74.    ***Air quality.***    The State also has a sovereign interest in maintaining air quality. Modifications to the facility and changes to its operations may impact the State's duties and obligations under the Clean Air Act with respect to attainment of National Ambient Air Quality Standards in the region covering the facility.    These impacts must be identified, analyzed, and mitigated through the public NEPA process and consultation with the State. Emissions at the facility itself may increase if the Project involves installing an industrial boiler or other pollution-emitting equipment at the facility.    Similarly, increased traffic to and from the facility could adversely impact air quality.

75.    ***Hazardous materials.***    The State has sovereign interests and responsibilities for ensuring the safe and proper recording, disclosure, and management of hazardous materials present within the State. Upon information and belief, DHS's activities at the Williamsport Warehouse will include the storage and possible use of hazardous materials.

76.    ***Traffic.***    Operating the Williamsport Warehouse as a 1,500-bed detention facility is also likely to have an impact on traffic, including on nearby State highways.    Defendants have not provided sufficient details regarding expected traffic impacts to know whether local roads and state highways can accommodate the significant increase in traffic that would likely be needed to move detainees to and from the facility.    Nor have Defendants provided even an estimate of the number of car trips to and from the facility from friends, family, and legal counsel exercising their rights to visit detainees.    And Defendants have not provided any indication of whether they anticipate having to close roads in the area to accommodate traffic to and from the facility or whether there will be any other acute traffic impacts to the area.

77.    ***Public health and safety.***    The State also expects that the ICE Warehouse Conversion will place additional burdens on essential public services in light of public reporting of conditions in detention facilities around the country revealing evidence of a measles outbreak, sewage problems, and generally unsanitary conditions.  María Luisa Paúl, David Ovalle & David Nakamura, *Measles Cases Identified at ICE's Largest Detention Facility for Children*, Wash. Post (Feb. 3, 2026), https://perma.cc/R68E-UVP8; Rachel Handley, *Louisiana ICE Detainees Report Mice, Sewage, and Delayed Medical Care at Processing Facilities*, WWL Louisiana (Feb. 11, 2026), https://perma.cc/7RDF-YM7N.  Further, the Project is also highly controversial and has already elicited public protests.    Kate Amara, *Washington County Commissioners Adopt Resolution to Support DHS, ICE Amid Protests in Hagerstown*, WBALTV (Feb. 10, 2026), https://perma.cc/4K36-SRNU.  State and local law enforcement presence would likely be required to respond to any future protest.  *See, e.g.*, Laura Bauer & Chris Higgins, *Arson Probe Underway After Fire at KC Warehouse Once Tied to ICE Detention Center*, Kansas City Star (Feb. 13, 2026), https://perma.cc/H4HS-FYMV; Ana Ley, *As American Views of ICE Dim, Warehouses Become a Symbol of Resistance*, N.Y. Times (Feb. 8, 2026), https://www.nytimes.com/2026/02/08/nyregion/ice-warehouse-new-york-opposition.html.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedure Act
### Action that is Contrary to Law (NEPA, 42 U.S.C. § 4321, *et seq.*)

78.    The State realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this complaint.

79.    Under the APA, a Court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short

of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

80.    NEPA claims are subject to judicial review under the APA. *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 189 (4th Cir. 2009).

81.    Defendants' decision to purchase the Williamsport Warehouse for purposes of converting it into an immigration detention facility constitutes final agency action reviewable under the APA.

82.    To the State's knowledge, Defendants have not consulted with any federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved with the decision to purchase the property and convert it into an immigration detention facility.

83.    Defendants did not collaborate with the State prior to purchasing the property or at any point in the process of developing their renovation and operation plans for the facility.

84.    The decision to purchase, construct, and operate an immigration detention center is a "major Federal action[]" with impacts on the human environment that must be evaluated under NEPA. 42 U.S.C. § 4332(C).

85.    This "major federal action" is under Defendant ICE's substantial direction and control. 42 USC § 4336e(10)(A).

86.    To the State's knowledge, Defendants have prepared neither an EIS nor an EA with respect to the Project.

87.    To the State's knowledge, Defendants have not invoked any categorical exclusion that could properly excuse ICE from reviewing the Project under NEPA.

88.    Failure to conduct the required environmental review under NEPA deprives the State, local governments, and the public of the procedure to which they are entitled by law.

89.     The Court should vacate and set aside Defendants' decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility and enjoin any further implementation of the decision to convert the Williamsport Warehouse into an immigration detention facility, including but not limited to any further activity related to construction or retrofitting of the property.

**Count II**
**Violation of the Administrative Procedure Act**
**Agency Action that is Arbitrary and Capricious (5 U.S.C. § 706)**

90.     The State realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this complaint.

91.     The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

92.     In addition to being contrary to law, Defendants' decision to move forward with the Project, including by purchasing the Williamsport Warehouse, is arbitrary and capricious. Defendants have not offered "a satisfactory explanation for [their] action"—nor any explanation— "including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Likewise, Defendants have not given any explanation—let alone a reasoned explanation—for their rejection, or even their consideration, of reasonable alternatives.

93.     Nor have Defendants given any explanation—let alone a reasoned explanation— for their change in previous position that NEPA review is required for projects that involve the purchase, construction, renovation, and operation of immigration detention and processing centers.

94.     Defendants also failed to consider important aspects of the problem, including the immediate impact that this decision will have on public health and safety, and the long-term impact of the agency's decision to purchase and convert the Williamsport Warehouse into an immigration detention facility.

95.     The Court should vacate and set aside Defendants' decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility and enjoin any further implementation of the decision to convert the Williamsport Warehouse into an immigration detention facility, including but not limited to any further activity related to construction or retrofitting of the property.

## **PRAYER FOR RELIEF**

WHEREFORE, the State prays that this Court:

i.     Declare that Defendants' decision to purchase, convert, maintain, and operate an immigration detention facility at the Williamsport Warehouse is contrary to law and violates NEPA and the APA;

ii.     Vacate and set aside Defendants' decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility;

iii.     Temporarily restrain, preliminarily enjoin, and stay Defendants from further implementing their decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility;

iv.     Grant such other relief as this Court may deem proper.

Dated: February 23, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Robert N. Brewer*
Robert N. Brewer (D. Md. Bar No. 31649)
Yasmin Dagne (D. Md. Bar No. 32016)
Steven J. Goldstein*
Adam Kirschner (D. Md. Bar No. 31767)
   *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
rbrewer@oag.maryland.gov
(410) 576-6924

*Counsel for the State of Maryland*

* *Application for admission approved and pending admission ceremony*