# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| STATE OF MARYLAND,<br>200 Saint Paul Place<br>Baltimore, Maryland 21202,<br><br>        Plaintiffs,<br><br>   v.<br><br>KRISTI NOEM, Secretary of Homeland Security,<br>2707 Martin Luther King Jr. Ave. SE<br>Washington, D.C. 20528<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br>2707 Martin Luther King Jr. Ave. SE<br>Washington, D.C. 20528<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br>500 12th St., SW<br>Washington, D.C. 20536<br><br>TODD M. LYONS, Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement,<br>500 12th St., SW<br>Washington, D.C. 20536,<br><br>        Defendants. | Civ. No. 1:26-cv-733-BAH |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S

## MOTION FOR A TEMPORARY RESTRAINING ORDER

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

LEGAL BACKGROUND ....................................................................................... 1

    The National Environmental Policy Act ........................................................... 1

    DHS's NEPA Instruction Manual .................................................................... 5

FACTUAL BACKGROUND .................................................................................. 7

PROCEDURAL BACKGROUND ........................................................................ 12

ARGUMENT ........................................................................................................ 13

  I.     The State's Concrete Interests Will Be Irreparably Harmed Absent Injunctive Relief 13

  II.    The State Is Likely to Succeed on the Merits ............................................... 19

    A.    The Decision to Purchase the Williamsport Warehouse for the Purposes of Converting It into an Immigration Detention Facility Required NEPA Review ............................ 20

        1.    Defendants' Decision is a Major Federal Action ..................................... 21

        2.    Defendants' Decision Will Have Reasonably Foreseeable Significant, or Unknown, Environmental Impacts .................................................................... 21

        3.    No Applicable Exceptions to NEPA Review Are Present ......................... 23

    B.    Defendants Have Failed to Publicly Review the Environmental Impacts of Their Actions ................................................................................................. 24

  III.    The Remaining Factors Weigh in Favor of Injunctive Relief ...................... 26

CONCLUSION ..................................................................................................... 30

## TABLE OF AUTHORITIES

**Case Law**

*Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531 (1987) ................................... 14

*Audubon Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't. of Transp.*, 524 F. Supp. 2d 642 (D. Md. 2007) ............................................................................................................... 2, 26

*Bering Strait Citizens for Resp. Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir. 2008) ......................................................................................................................... 4, 26

*Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009) ........... 28

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003) ...................... 19

*ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425 (D. Md. 2024) ................................ 13

*Defs. of Wildlife v. N.C. Dep't. of Transp.*, 762 F.3d 374 (4th Cir. 2014) ...................... 2

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ................................................ 20

*Fund For Animals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998) ....................................... 28

*Hodges v. Abraham*, 300 F.3d 432 (4th Cir. 2002) ...................................... 2, 14, 24, 26

*Indian River Cnty, v. Rogoff*, 201 F. Supp. 3d 1 (D.D.C. 2016) ...................................... 3

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68 (D. Md. 2025) ........................ 26

*Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986) .............................. 28

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) ................. 13

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596 (4th Cir. 2012) ...................... 4, 20, 29

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................... 13, 26

*North Carolina v. City of Virginia Beach*, 951 F.2d 596 (4th Cir. 1991) ....................................... 1

*Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, 890 F. Supp. 2d 688 (S.D.W. Va. 2012) ........................................................................................................................ 17, 21

*Rio Assocs., L.P. v. Layne*, No. 3:15-CV-00012, 2015 WL 3546647 (W.D. Va. June 8, 2015) .... 17

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)............................ 2, 20, 25, 26

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020)............................................. 13, 27, 29

*S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97 (4th Cir. 1989) .............................. 27

*Stuller Inc. v. Steak N Shake Enters.*, 695 F.3d 676 (7th Cir. 2012) ............................ 14

*United States v. Westvaco Corp.*, No. CV MJG-00-2602, 2015 WL 10323214 (D. Md. Feb. 26, 2015)............................................................................................. 27

*W. N.C All. v. N.C Dep't of Transp.*, 312 F. Supp. 2d 765 (E.D.N.C. 2003) ................................ 14

*Washington County, N.C. v. U.S. Dep't of Navy*, 317 F. Supp. 2d 626 (E.D.N.C. 2004) ........ 18, 27

*Wild Va. v. Council on Env't Quality*, 56 F.4th 281 (4th Cir. 2022) ................................ 5

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)................................................. 13, 19

## Statutes and Regulations

42 U.S.C. § 4321 *et seq*............................................................................ 1

42 U.S.C. § 4331 ...................................................................................... 2

42 U.S.C. § 4332(C) ........................................................................ 2, 3, 20, 25, 26

42 U.S.C. § 4332(C)(i)–(v) ......................................................................... 3

42 U.S.C. § 4332(C)(v) ............................................................................. 3

42 U.S.C. § 4336(b)(2) ................................................................. 4, 21, 22, 25, 26

42 U.S.C. § 4336a(e)(1)(A), (g)(1)............................................... 3, 4, 19, 21, 22, 23, 25

42 U.S.C. § 4336a(e)(2), (g)(1)(B) ............................................................... 4

42 U.S.C. § 4336e(1) .............................................................................. 5

42 U.S.C. § 4336e(10)(A)......................................................................... 3, 21

42 U.S.C. § 4336e(12) ............................................................................. 3

42 U.S.C. § 4336e(6) .............................................................................. 2

Md. Code Ann., Nat. Res. § 8–101(g) ......................................................................... 14

Md. Code Ann., Nat. Res. §§ 10–2A–01 to 10–2A–09 ............................................... 14

36 C.F.R. §§ 800.3(c), 800.4(d), 800.5(c) ..................................................................... 9

**Miscellaneous Authorities**

Contract Summary, Delivery Order from Dep't of Homeland Sec., to KVG LLC,

    https://perma.cc/2H9A-RJDP ................................................................................... 12

Dep't Homeland Sec., Early Notice and Public Review of a Proposed Activity in a 100- to 500-

    Year Floodplain, Hagerstown, Maryland, https://perma.cc/G5KS-6R7R ....10, 11, 15, 17, 21, 25

Dep't of Homeland Sec. (@DHSgov), X (Jan. 30, 2026, 1:14 PM), https://perma.cc/VL4Z-2P4W

    ........................................................................................................................... 9, 21

Dep't of Homeland Sec., *Final Supplemental Environmental Assessment: Addressing the*

    *Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in*

    *Laredo, Webb County, Texas* (April 2024), https://perma.cc/ZHH8-XH97 ........................... 6, 7

Dep't of Homeland Sec., Immigr. & Customs Enf't, *El Paso Service Processing Center: Final*

    *Environmental Assessment* at 2, 6 (Sept. 15, 2021), https://perma.cc/VED3-J4BP. .................. 7

Dep't of Homeland Sec., *Instruction Manual 023-01-001-01, Revision 01, Implementation of the*

    *National Environmental Policy Act (NEPA)* (Nov. 6, 2014),

    https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-

    01.pdf ................................................................................... 5, 6, 21, 22, 24, 25

Jack Armstrong, *DHS Agrees to 'Look Elsewhere' for Proposed Mississippi ICE Facility*,

    Memphis Commercial Appeal (Feb. 6, 2026), https://perma.cc/QUL5-AQRX ...................... 29

Jessica Swann, *Hagerstown Outlines Water Allocation Process for ICE Facility*, LocalNews1.org

    (Feb. 20, 2026), https://perma.cc/4F8V-N343 .................................................... 8, 23

Joe Heim & Jasmine Golden, *Plans for an ICE Detention Center Spark Anger in a Deep-Red Maryland County*, Wash. Post. (March 5, 2026), https://perma.cc/9W53-BM6R. .................. 12

Maggie Cullen, *NH ICE Facility Reversal After Bipartisan Resistance Follows National Trend*, Seacoast Online (Feb. 27, 2026), https://perma.cc/YK2F-TRH7 ............................................ 29

Mike Lewis, *Going Up: Firm Breaks Ground for $35M Warehouse; Wright Road to Reopen This Month*, Herald Mail Media (Sep. 14, 2021), https://perma.cc/KL3M-CMVP ........................... 8

Off. of Gov. Kelly Ayotte, Press Release, *DHS Releases New Documents on Merrimack Facility* (Feb. 12, 2026), https://perma.cc/LRC6-7S9C ....................................................................... 10

Roger Wicker, *Proposed ICE Facility Threatens Byhalia, Mississippi Economy and Infrastructure* (Feb. 4, 2026), https://perma.cc/E2AK-TTHZ .................................................. 29

U.S. Immigr. & Customs Enf't, *ICE Detention Reengineering Initiative* 1, https://www.governor.nh.gov/sites/g/files/ehbemt971/files/inline-documents/merrimack-detention-reengineering-initiative.pdf. ...................................................................................... 10

United States Census Bureau, *Williamsport town, Maryland – Census Bureau Search*, https://perma.cc/U3QU-FB27 (captured Feb. 18, 2026). ........................................................... 7

Washington Cnty. Div. Plan Rev. & Permitting, Permit Issuance Report at 3 (Aug. 1–31, 2021), https://perma.cc/D43B-6749 ....................................................................................... 8

## INTRODUCTION

The Department of Homeland Security (DHS) and the U.S. Immigration Customs and Enforcement (ICE) are moving at an unprecedented pace to construct a massive detention facility in the State of Maryland.  Defendants have proceeded with unrelenting speed from the time they purchased a warehouse near Williamsport in Washington County, Maryland in January to convert the warehouse into such a facility to house as many as 1,500 detainees at any given time.  They did so without any public input and ignored the requirements of the National Environmental Policy Act (NEPA).  Now, this past Friday, March 6, ICE entered into a contract to immediately retrofit the warehouse into this massive immigration detention facility.

The State of Maryland seeks a temporary restraining order to halt any construction or retrofitting of the warehouse while this Court considers a longer preliminary injunction.  The entire purpose of NEPA is to ensure that the federal government, with input from the public, accounts for environmental consequences of large-scale federal projects such as this one.  But for Defendants, nothing is going to get in the way of building the machinery they desire for their immigration detention goals, not even federal law.  Here, once construction begins, there is no way to return to the status quo that exists prior to the beginning of the construction and that, in the process, would threaten the State of Maryland's natural resources and environment.  This Court should enter a time-limited temporary restraining order.

## LEGAL BACKGROUND

### The National Environmental Policy Act

NEPA, 42 U.S.C. § 4321 *et seq*., is "our basic national charter for protection of the environment." *North Carolina v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir. 1991) (quoting 40 C.F.R. 1500.1(a) (1990) (since rescinded)).  The statute "declares a broad national commitment

to protecting and promoting environmental quality," *Audubon Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't. of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)), and acknowledges the necessity of cooperating with state and local governments to advance those ends, *see* 42 U.S.C. § 4331 (declaring "it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures" to accomplish NEPA's goals).

NEPA primarily functions through "a set of 'action-forcing procedures' that require that agencies take a 'hard look' at environmental consequences . . . and that provide for broad dissemination of relevant environmental information." *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (quoting *Robertson*, 490 U.S. at 350). These action-forcing procedures advance the twin goals of "guarantee[ing] that an agency will take a hard look at environmental consequences before making a decision that may affect the environment," and "ensur[ing] that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision." *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002) (citations and quotations omitted).

NEPA's primary action-forcing procedure is the requirement that a federal agency prepare an Environmental Impact Statement (EIS) for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS is a "detailed written statement," *id.* § 4336e(6), that must include a discussion of: "reasonably foreseeable environmental effects of the proposed agency action"; "reasonably foreseeable adverse environmental effects which cannot be avoided";

"a reasonable range of alternatives" including a "no action alternative"; a discussion of "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and an accounting of the "irreversible and irretrievable commitments of Federal resources" from the proposed action, *id.* § 4332(C)(i)–(v). An EIS "shall not exceed 150 pages not including any citations or appendices," except in extraordinarily complex cases, and must be completed within two years of an agency's determination that an EIS is necessary or public notice that an agency intends to prepare one. *Id.* § 4336a(e)(1)(A), (g)(1). "Prior to" completing an EIS, NEPA specifies that the federal agency "shall [make] available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5," the "comments and views of the appropriate Federal, State, and local agencies" on the EIS. *Id.* § 4332(C)(v).

An EIS is required whenever there is a "proposal[]" for: (1) "major federal action" that (2) would "significantly affect[] the quality of the human environment." *Id.* § 4332(C). As NEPA explains, "[t]he term 'proposal' means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." *Id.* § 4336e(12). "Major federal action" is defined as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A). "Although there is no litmus test for whether something qualifies as a major federal action," courts generally focus on the level of federal funding and agency authority over an action to determine if it is a "major federal action." *See Indian River Cnty, v. Rogoff*, 201 F. Supp. 3d 1, 15 (D.D.C. 2016).

If a proposed action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," an agency

"shall prepare" an Environmental Assessment (EA) in lieu of an EIS.  42 U.S.C. § 4336(b)(2).  An EA "shall be a concise *public* document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary."  *Id*. (emphasis added).  Thus, an EA can satisfy an agency's obligation to review environmental impacts under NEPA or it can identify significant impacts that trigger the requirement to prepare an EIS.  An EA "shall not exceed 75 pages, not including any citations or appendices" and must be completed within one year of a determination that NEPA review is required.  *Id.* § 4336a(e)(2), (g)(1)(B).  "An agency, when preparing an EA, must provide the public with sufficient environmental information" to "permit members of the public to weigh in with their views and thus inform the agency decision-making process."  *Bering Strait Citizens for Resp. Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008); *see also N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601–02 (4th Cir. 2012) ("[T]he broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time").

An agency may avoid preparing an EIS or EA for a proposed major federal action only in the limited circumstances where: (1) the proposed action would not constitute "final agency action" under the Administrative Procedure Act (APA); (2) the proposed action is subject to a valid categorical exclusion; (3) preparation of an environmental review document would "clearly and fundamentally conflict with the requirements of another provision of law," or, (4) the proposed action is nondiscretionary such that the agency cannot consider environmental factors when reaching a final decision.  42 U.S.C. § 4336(a)(1)–(4).  A "categorical exclusion" is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of

the human environment within the meaning of [42 U.S.C.] section 4332(2)(C)."  42 U.S.C. § 4336e(1).

## DHS's NEPA Instruction Manual

While NEPA provides general directions for agencies to follow, actual implementation falls on the agencies themselves.[1]  DHS has published its own Instruction Manual on the topic. *See* Dep't of Homeland Sec., *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)* (Nov. 6, 2014), https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf [hereinafter "DHS Instruction Manual"].  The DHS Instruction Manual clarifies that "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, [or] executed by DHS under the direction of Congress," *id.* at III–1, and that environmental effects to be considered include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" effects, *id.* at II–2.

The DHS Instruction Manual further emphasizes the importance of a public, transparent, NEPA process.  "Open communication, consistent with other Federal requirements, is DHS policy," because such collaboration "improve[s] the effectiveness of DHS missions and activities," and "build[s] trust between DHS and the communities it serves."  *Id.* at IV–6.  And the DHS

---

[1] For decades, the White House Council on Environmental Quality (CEQ) published and maintained a centralized set of regulations to standardize and guide federal agencies in their implementation of NEPA at 40 C.F.R. Part 1500.  *See Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 287–92 (4th Cir. 2022) (reviewing procedural history of CEQ regulations through 2022).  CEQ issued an interim final rule rescinding those regulations in February 2025, 90 Fed. Reg. 10,610 (Feb. 25, 2025), and a Final Rule doing the same in January 2026, 91 Fed. Reg. 618 (Jan. 8, 2026).

Instruction Manual also instructs that "collaboration with other Federal, Tribal, State, and local agencies, as well as non-governmental organizations and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making." *Id*. Thus, "[p]ublic involvement starts early and continues throughout the NEPA process," and includes "three key elements: (1) seeking information from outside parties to help identify relevant issues; (2) presenting the results of an environmental impact evaluation for public review or comment, including a description of how the identified relevant issues were considered in the evaluation; and (3) providing a public notice of DHS's final decision, including consideration of relevant public comments." *Id.* at IV–6 to IV–7.

DHS has previously applied NEPA to detention facility construction. In April 2024, DHS issued a 224-page Supplemental Environmental Assessment, addressing the proposed acquisition of land to construct and maintain a "Joint Processing Center" that would be "capable of accommodating 500 undocumented non-citizens," or one-third of the capacity proposed by DHS here. *See, e.g.*, Dep't of Homeland Sec., *Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas* (April 2024), https://perma.cc/ZHH8-XH97. DHS provided extensive opportunity for public input, including a 30-day period of public input for the proposed action, and "a [notice] letter was distributed to 30 potentially interested federal, state, and local agencies; Indian Tribes; and other stakeholder groups or individuals." *Id.* at ES–2. DHS also provided a subsequent 30-day period for public review and comment on the draft Supplemental Environmental Assessment, publicizing the documents online and in local news, and DHS considered all comments received. *Id.* As the agency reiterated in that document, "[i]n addition to public participation, interagency and intergovernmental coordination is a federally

mandated process for informing and coordinating with other governmental agencies regarding federal proposed actions." *Id.* at 1–5. DHS and ICE also followed a similar procedure in 2021, preparing a 98-page Final Environmental Assessment concerning the proposed renovation and expansion of a processing facility already owned by ICE, to accommodate "up to 360 [additional] detainees." Dep't of Homeland Sec., Immigr. & Customs Enf't, *El Paso Service Processing Center: Final Environmental Assessment* at 2, 6 (Sept. 15, 2021), https://perma.cc/VED3-J4BP.

## **FACTUAL BACKGROUND**

On January 16, 2026, DHS and ICE executed a General Warranty Deed purchasing the property located at 16220 Wright Road, Williamsport, Maryland 21795 (hereinafter the "Williamsport Warehouse") for $102.4 million. Deed, Exhibit A. The deed was recorded on January 22, 2026, and the transaction was first publicly reported on January 27, 2026. According to the Maryland Department of Assessments and Taxation, the property is a "MEGA WAREHOUSE" covering 53.74 acres and including an above grade area of 825,620 square feet. SDAT Report, Exhibit B.

The property is located just outside of Williamsport, Maryland, a town with a population of just over 2,000 individuals. United States Census Bureau, *Williamsport town, Maryland – Census Bureau Search*, https://perma.cc/U3QU-FB27 (captured Feb. 18, 2026). Semple Run, a small creek that originates from limestone springs to the property's northeast and which discharges into Conococheague Creek downstream of the property, runs adjacent to the property's south and west. Decl. of Josh E. Kurtz, Sec'y, Md. Dep't of Nat. Res. (Kurtz Decl.) ¶ 9, Exhibit C. Conococheague Creek is a primary tributary of the Potomac River. *Id.* ¶ 12. These waters are regulated by the State for their recreational, aesthetic, and ecological value and as public water supplies. *Id.* ¶¶ 9–22. These waters also provide important habitat for aquatic species protected

7

by Maryland's Nongame and Endangered Species Conservation Act. *Id.* ¶¶ 23, 30–35 (Brook floater mussels), 36–43 (Green floater mussels), 45–48 (Allegheny pearl dace), 49–51 (Appalachian springsnail), 52–55 (Allegheny cave amphipod), 56–58 (Franz's cave amphipod). The property is also within a half mile of two Ecologically Significant Areas—the Kemps Springs Ecologically Significant Area and the Conococheague-Kemps Mill Ecologically Significant Area—which are identified by the state as ecologically significant based on the presence of state-protected, rare, threatened, or endangered species, habitat that supports known locations of such species, or the presence of a significant natural community of ecological value. *Id.* ¶¶ 64–68.

The warehouse itself was constructed between 2021 and 2023 to serve commercial and logistics needs. Mike Lewis, *Going Up: Firm Breaks Ground for $35M Warehouse; Wright Road to Reopen This Month*, Herald Mail Media (Sep. 14, 2021), https://perma.cc/KL3M-CMVP. A permit issued in August 2021 describes the site as an "825,620 sq. ft. one story shell building to be used as a warehouse, fire pump room, and electrical room for future tenant, 84 future docks with overhead doors, 41 fully equipped dock doors, 41 dock doors with future levelers, 4 drive-in doors and mechanical dock levelers, 30 pole lights that are 40 ft. in height." Washington Cnty. Div. Plan Rev. & Permitting, Permit Issuance Report at 3 (Aug. 1–31, 2021), https://perma.cc/D43B-6749. A brochure advertising the warehouse by previous owners describes the facility as having more than 400 parking spaces, 200 trailer spaces, 2,400 square feet of existing office space, four toilets, and two water fountains. Warehouse Brochure, Exhibit D at 2–3. The warehouse receives potable water from the City of Hagerstown via a 2-inch domestic service line and has an approved allocation of 800 gallons per day. Jessica Swann, *Hagerstown Outlines Water Allocation Process for ICE Facility*, LocalNews1.org (Feb. 20, 2026), https://perma.cc/4F8V-N343.

For the State of Mayland, information about Defendants' plans for the property has been limited.  On January 12, 2026, just four days before effectuating the purchase, DHS sent letters initiating consultation under section 106 of the National Historic Preservation Act (NHPA) to the Maryland Historical Trust indicating that ICE was "proposing to purchase, occupy, and rehabilitate a 53.74 acre warehouse property in support of ICE operations."  Letter from Gabrielle M. Fernandez, Dep't of Homeland Sec. to Elizabeth Hughes, Md. Hist. Trust (Jan. 12, 2026), Exhibit E.  The letter did not otherwise specify the purpose for which ICE planned to use the property, besides referring to it in the letter's subject line as a "New ICE Baltimore Processing Facility."  *Id*.

The letter provided a list of "proposed site improvements" that ICE "may" take along the interior and exterior of the property: "installing, upgrading, or rehabilitating existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, recreation areas, and cameras."  *Id*.  The letter concluded that ICE's proposed undertaking – which again was not defined in the letter itself – would "result in a finding of No Historic Properties Affected."  *Id*.  Regulation implementing NHPA allowed the state 30 days to review and potentially object to the letter.  *See* 36 C.F.R. §§ 800.3(c), 800.4(d), 800.5(c).[2]

It was not until January 30, 2026, after public reporting revealed ICE's purchase of the Williamsport Warehouse, that DHS publicly confirmed in a tweet that the properties it was purchasing—including Williamsport Warehouse—would function as detention facilities.  Dep't of Homeland Sec. (@DHSgov), X (Jan. 30, 2026, 1:14 PM), https://perma.cc/VL4Z-2P4W.

---

[2] On January 29, 2026, the Maryland Historical Trust sent an initial letter concurring with DHS's proposed finding but reserving the right to request more information from DHS.  On February 10, 2026, after receiving comments calling into question DHS's portrayal of the project's scope, the Maryland Historical Trust sent a second letter to DHS requesting further information from the agency.  Both letters were sent within the allowed 30-day period. In an email sent to the Maryland Historical Trust on March 2, 2026, DHS indicated that it is preparing a revised consultation package.

On February 12, 2026, following testimony of Acting ICE Director Todd Lyons in the U.S. Senate about a potential ICE warehouse in Merrimack, New Hampshire, New Hampshire Governor Kelly Ayotte released a document that her office had received from ICE titled "ICE Detention Reengineering Initiative."  Off. of Gov. Kelly Ayotte, Press Release, *DHS Releases New Documents on Merrimack Facility* (Feb. 12, 2026), https://perma.cc/LRC6-7S9C.  That document details a plan by ICE to acquire "non-traditional facilities" to renovate and operate as "eight large-scale detention centers and 16 processing sites" as part of an effort to "increase bed capacity to 92,600 beds" by "the end of Fiscal Year 2026."  U.S. Immigr. & Customs Enf't, *ICE Detention Reengineering Initiative* 1, https://www.governor.nh.gov/sites/g/files/ehbemt971/files/inline-documents/merrimack-detention-reengineering-initiative.pdf.  The ICE Detention Reengineering Initiative claims that "ICE is complying with the National Environmental Policy Act" and that "NEPA surveys were also conducted for each site."  *Id*. at 2–3.

On or about February 25, 2026, more than a month after Defendants had purchased the Williamsport Warehouse, DHS posted an "Early Notice and Public Review of a Proposed Activity in a 100- to 500- Year Floodplain" on the "Documents for Public Comment" page of its website. Dep't Homeland Sec., Early Notice and Public Review of a Proposed Activity in a 100- to 500-Year Floodplain, Hagerstown, Maryland, https://perma.cc/G5KS-6R7R [*hereinafter* "Floodplain Notice"], Exhibit F.  For the first time, the Floodplain Notice confirmed in a public forum besides social media that ICE intended to use the Williamsport Warehouse as a "detention processing center."  *Id.*  Similar to the earlier NHPA letters, the Floodplain Notice provided a non-exhaustive list of activities that ICE might take to convert the warehouse into a detention facility including: "replacement of the existing emergency generator," "constructing one modular security checkpoint structure (approximately 150 square feet)," and "sanitary sewer connections or modifications if

10

required by final engineering review." *Id*. The Floodplain Notice also gestures at a review of alternative locations conducted "in accordance with [NEPA]," *id*., but no NEPA review has ever been made public.

By March 5, 2026, several organizations submitted comment letters to DHS in response to the Floodplain Notice, including various departments of the State of Maryland, the Center for Biological Diversity, and the American Civil Liberties Union of Maryland. *See, e.g.*, Md. Dep't of Env't., Md. Dep't of Nat. Res., & Md. Dep't of Transp., Comment Letter on Floodplain Notice (Mar. 5, 2026), Exhibit G (identifying issues with the floodplain notice and highlighting concerns with DHS's decision to purchase the warehouse and convert into an ICE detention facility, including that the conversion threatened sensitive natural resources in the State and raised significant concerns about other environmental impacts, including potentially exceeding existing sewage capacity); Ctr. for Biological Diversity, Comment Letter on Floodplain Notice (Mar. 5, 2026), Exhibit H (explaining that, because of the "sensitive ecological conditions surrounding the property" and "the facility's current inadequate infrastructure," converting the warehouse to a detention facility "could result in substantial adverse impacts on species, water quality, air quality, and public health and safety."); Hagerstown Rapid Response, NAACP of Washington County, ACLU of Maryland, Comment Letter on Floodplain Notice (Mar. 5, 2026), Exhibit I (submitting letter on behalf of local organizations representing community members living in the area of the warehouse and raising concerns that activity in support of a proposed detention facility could strain local resources, including transportation infrastructure, the water supply, and emergency

11

services).[3]  The comment period closed on March 5, 2026, and the Floodplain Notice has already been removed from DHS's website.

The very next day, ICE awarded a contract to "renovat[e]" the Williamsport Warehouse into "a processing and detention facility" and operate it as such.  Contract Summary, Delivery Order from Dep't of Homeland Sec., to KVG LLC, https://perma.cc/2H9A-RJDP [hereinafter "March 6 Contract"].  The contract lists March 6, 2026 as the start date and May 4, 2026 as the current end date.  *Id.*  And according to public reporting, Defendants intend to have the Williamsport Warehouse operational as early as next month.  *See* Joe Heim & Jasmine Golden, *Plans for an ICE Detention Center Spark Anger in a Deep-Red Maryland County*, Wash. Post. (March 5, 2026), https://perma.cc/9W53-BM6R.

## PROCEDURAL BACKGROUND

On February 23, 2026, Plaintiff State of Maryland brought this action to challenge Defendants' purchase of the Williamsport Warehouse for purposes of converting it into a massive detention facility.  *See generally* Compl, ECF 1.  In this action, the State has brought two claims under the Administrative Procedure Act (APA): (1) Defendants' actions are contrary to law, specifically NEPA; and (2) Defendants' actions are arbitrary and capricious.  In their prayer for relief, the State has asked, among other things, for this Court to "[t]emporarily restrain, preliminarily enjoin, and stay Defendants from further implementing their decision to purchase the

---

[3] This comment from local community organizations also raised concerns about "disturbing conditions within detention centers affecting the health and safety of the community at large, like a recent measles outbreak in Texas."  *Id.*  Indeed, in a separate unrelated matter, the State of Maryland has opened a civil rights investigation based on reports of disturbing detention conditions at that local ICE field office in Baltimore.  *See generally State of Maryland v. Lyons*, Civil Action No. 1:26-cv-01024-JRR (D. Md.) (seeking to enforce a subpoena submitted to ICE concerning those conditions).

Williamsport Warehouse for the purpose of converting it into an immigration detention facility." *Id.* at 27.

Upon Defendants entering into a contract this past Friday to further implement their decision to convert the Williamsport Warehouse into an immigration detention facility, the State now brings the instant motion for a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. In this motion, the State asks this Court to enter a time-limited temporary restraining order of 14 days, subject to a further extension consistent with the Federal Rules, that temporarily restrains Defendants from any further construction or retrofitting of the Williamsport Warehouse into an immigration detention facility while the order remains in effect.

## ARGUMENT

"The standards for granting a TRO and granting a preliminary injunction are the same." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024) (citation omitted). Accordingly, to obtain a temporary restraining order, a party "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest. *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The last two factors "'merge' when the government is the opposing party." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## I.    The State's Concrete Interests Will Be Irreparably Harmed Absent Injunctive Relief

The State of Maryland is likely to suffer an irreparable injury without immediate relief. *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (holding that a party seek emergency relief "must make a 'clear showing'" that it is likely to suffer

irreparable harm that is "neither remote nor speculative, but actual or imminent" (citation omitted)).  Here, once construction begins and Maryland's natural resources and environment are threatened, there is no turning back.  Thus, absent a temporary restraining order, Maryland's asserted injury here "cannot be fully rectified by the final judgment after trial." *Id.* (quoting *Stuller Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012).  Indeed, an "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).

The State of Maryland has a sovereign interest in its waterways and its wildlife. *See, e.g.*, Md. Code Ann., Nat. Res. § 8–101(g) (broadly defining "Waters of the State"); Md. Code Ann., Nat. Res. §§ 10–2A–01 to 10–2A–09 (ensuring protections for wildlife and plants).  The planned construction and operation of the detention facility is likely to result in pollution to nearby waters and corresponding harm to the ecosystems therein.  Defendants' failure to comply with NEPA has deprived the State of both the information it needs to understand Defendants' plans for the property and the opportunity to inform the agency's ultimate decision to ensure that these sovereign interests are not harmed. *See Hodges*, 300 F.3d at 438 ("[C]ompliance with NEPA procedures 'ensures that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision.'") (citation omitted); *W. N.C All. v. N.C Dep't of Transp.*, 312 F. Supp. 2d 765, 778 (E.D.N.C. 2003) ("[W]hen a decision to which NEPA obligations attach is made without the informed environmental considerations that NEPA requires, the harm that NEPA intends to prevent has been suffered." (citation omitted)).

14

What limited information Defendants have provided indicates that, in constructing a massive detention facility, the ground at the site will likely be significantly disturbed. Defendants' original NHPA notice to the State indicates that construction activities at the facility "may include, but are not limited to, installing, upgrading, or rehabilitating existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, recreation areas, and camera," and that "tentage and a guard shack may also be installed." Ex. E, Letter from DHS to MHT, at 1. Similarly, Defendants' Floodplain Notice suggests that Defendants "may" install perimeter security fencing, build a security checkpoint structure, install exterior lighting, replace an existing emergency generator, and possibly modify the existing sanitary sewer. Ex. F, Floodplain Notice. At the very least, sediment runoff from such construction is likely to affect Semple Run, a stream which runs adjacent to the property's southern and western boundaries and which receives discharges directly from the property's existing stormwater management system. Kurtz Decl. ¶¶ 9, 11 ("Given its proximity to the property, sedimentation from construction activity is likely to reach Semple Run."). Semple Run is also an important cool-water tributary of Conococheague Creek, one of the Potomac River's primary tributaries. *Id.* ¶ 10. Pollution affecting Semple Run would therefore impact downstream stretches of Conococheague Creek and the Potomac River. *Id.* ¶ 8 ("[T]he health of Semple Run impacts the health of Conococheague Creek, which impacts the health of the Potomac, which ultimately impacts the health of the Chesapeake Bay.").

Moreover, Defendants' proposed detention facility will likely require far more construction activities than they have disclosed, and absent this additional construction, the facility will pose an even greater risk to the environment and health of the local community. The Maryland Department of the Environment has determined that the Williamsport Warehouse is currently served by a 6-inch lateral sewer line which connects to an 8-inch sewer main. Decl. of Walid

Saffouri, Md. Dep't of Env't (Saffouri Decl.) ¶¶ 16–17, Exhibit J. A 6-inch sewer line can have the capacity to handle 63,500 gallons per day, and an 8-inch sewer main should be able to handle 112,800 gallons per day. *Id.* ¶¶ 19–20. Using a range of estimates, a 1,500-person processing center would be expected to generate anywhere from 60,000 to 357,675 gallons per day of wastewater. *Id.* tbl.1. Using the default flow rate for the gallons of wastewater generated per person per day at "institutions other than hospitals," the standard category "most closely analogous" to a detention facility, yields an expected wastewater flow of 187,500 gallons per day. *Id.* ¶¶ 26–27. These estimates likely undervalue the actual flow that will be generated from the facility because they do not include operational personnel. Accordingly, the existing infrastructure is likely insufficient to carry level of waste expected for a 1,500-bed detention facility, and major upgrades to the existing sewer line and sewer main are needed to safely handle the flow. *Id.* ¶ 39 ("Based on the information available, the facility's existing wastewater capacity is likely insufficient to handle the expected increase in flows from a 1500 bed detention facility.").

If upgrades are not made, the facility will likely experience sewage backups and overflows both at its external cleanout valves and inside the building. *Id.* ¶ 36 ("Overloading the 6-inch lateral line that currently serves the warehouse would yield backups at the property."). Overloading the 8-inch sewer main would result in similar impacts for other properties that use that line. *Id.* ¶ 38 ("Overloading the 8-inch sewer main would likely result in sewage overflows, usually from the manholes."). Such occurrences would likely constitute a public health hazard and are also likely to result in wastewater reaching nearby waters. *Id.* ¶ 36 (Overflows at the property "would create public health hazards for the immigrants, ICE agents, and others at the facility and would also have adverse environmental impacts, including to neighboring streams and their aquatic life, if overflows occurred outside of the facility."), ¶ 38 (Overflows from the 8-inch

16

sewer main "would likely impact neighboring streams and their aquatic life and pose a public health hazard.").

In their Floodplain Notice, Defendants indicated that only "limited upgrades . . . may be required to accommodate projected wastewater flows," Ex. F, Floodplain Notice, at 3, thus suggesting that Defendants are not planning on making the necessary, significant upgrades, and creating a situation where sewage overflows are likely. Saffouri Decl. ¶ 39. And even if Defendants upgrade the system irreparable harm is still likely because those upgrades would require "significant excavation along the length of the 6-inch lateral line and likely the 8-inch sewer main as well." *Id.* ¶ 39. That activity "is likely to increase sediment runoff to nearby waters and have significant traffic impacts within the community as well." *Id.*

At bottom, there can be no plausible dispute that the imminent construction of Defendants' proposed detention facility, conducted without any necessary environmental reviews and public engagement, creates an imminent threat of irreparable harm to Plaintiff's water resources. *See Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, 890 F. Supp. 2d 688, 694 (S.D.W. Va. 2012) (holding that "irreparable environmental injury occurs instantaneously with the filling of the stream itself," because "[o]nce the filling has begun, the harmful environmental effects of that filling often cannot be completely reversed"); *Rio Assocs., L.P. v. Layne*, No. 3:15-CV-00012, 2015 WL 3546647, at *5 (W.D. Va. June 8, 2015) (explaining that it is "well settled that this kind of environmental injury," such as harm to "air and water quality," "constitutes irreparable harm").

If more were needed, the waters under imminent threat of pollution are home to a number of species protected by the State as either "endangered" or "in need of conservation," and thus the construction of the facility threatens Maryland wildlife. For instance, the Allegheny pearl dace (a freshwater fish) is known to occur in the vicinity of Semple Run. Kurtz Decl. ¶¶ 47–48. The

Allegheny pearl dace is considered "in need of conservation" throughout Maryland because of its restricted and reduced range, low population sizes, and severe threats. *Id.* ¶¶ 45–46. Likewise, the State endangered brook floater and green floater mussels are known to occur downstream of the facility in the Potomac River. *Id.* ¶¶ 33, 37. Freshwater mussels generally require clean water with low levels of contaminants, adequate dissolved oxygen, and low salinity. *Id.* ¶ 39. Both species are sensitive to disturbances in water quality, like sedimentation, and the green floater is susceptible to being washed downstream during high flow events. *Id.* ¶¶ 34, 38. Populations of green floater mussel are particularly vulnerable to extirpation – localized extinction – because of increased habitat fragmentation and the mussel's relatively short lifespan. *Id.* ¶ 39. Sedimentation, degraded water quality, and stormwater and wastewater effluents pose ongoing threats to the green floater mussel as well. *Id.* ¶ 38. Additional species listed as "in need of conservation" make their homes in the limestone springs that feed into Semple Run including the Appalachian springsnail, Allegheny cave amphipod, and Franz's cave amphipod. *Id.* ¶¶ 49–58.

The State makes extensive efforts to protect these species, including by prohibiting hunting or capturing such creatures, and working to affirmatively support their conservation. *Id.* ¶ 25 (restrictions on "take" of state endangered species), ¶ 28 (describing the states many efforts to support freshwater mussel conservation). These efforts and indeed the affected species would all be irreparably injured if Defendants are allowed to proceed with construction to convert the warehouse into an immigration detention facility. *Id.* ¶ 7 (noting that "several species in this area are particularly vulnerable to changes in water quality, including increases in sedimentation and other pollution that would almost certainly occur if construction proceeds."); *see also Washington County, N.C. v. U.S. Dep't of Navy*, 317 F. Supp. 2d 626, 635 (E.D.N.C. 2004) (holding irreparable harm present where plaintiffs "demonstrated the fragility of the relationship" of certain birds to

the affected site and the "irreparable harm that, though incalculable, would result from the Court's failure to grant an injunction pending a determination on the merits").

These threats are magnified by the very fact that Defendants have entirely ignored them and accordingly failed to plan around or mitigate the likely impacts from the construction of their proposed detention center. *Cf. Winter*, 555 U.S. at 23 ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures."); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003) (finding an "added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment").[4]

In sum, an injunction here is essential to preserving the status quo and allowing the court to render meaningful relief at the merits on the State's NEPA claims. If Defendants are allowed to proceed with construction activities at the facility, the local environment will likely be irreparably damaged, and there would be no prospect of any future environmental review influencing their decision. The key is in the ignition of the bureaucratic steamroller. The State asks that this Court stop Defendants from starting the engine and irreparably harming the State in the meantime.

## II.    The State Is Likely to Succeed on the Merits

Defendants violated NEPA's action-forcing mandate by failing to prepare any environmental document prior to purchasing the property for their intended purposes. 42 U.S.C. §§ 4336(b)(1)–(2) (Federal "agenc[ies] *shall* issue an environmental impact statement with respect

---

[4] To be sure, *Winter* held that the public interest did not support an injunction there; but in this very section of the opinion, the Supreme Court explained it was "pertinent" that the case concerned "training exercises that have been taking place in [Southern California] for the last 40 years," rather than a "new type of activity" for which NEPA analysis is particularly salient. 555 U.S. at 23.

to a *proposed* agency action . . . that has a reasonably foreseeable significant effect on the quality

of the human environment," or otherwise "*shall* prepare an environmental assessment with respect

to a *proposed* agency action that does not have a reasonably foreseeable significant effect on the

quality of the human environment, or if the significance of such effect is unknown[.]" (emphasis

added)); *cf. N.C. Wildlife Fed'n.*, 677 F.3d at 601–02 ("The NEPA process includes a range of

'action-forcing procedures that require . . . agencies [to] take a "hard look" at environmental

consequences [of a proposed action] and [to] provide for broad dissemination of relevant

environmental information.'" (alterations in original)).  Public notice and input to this analysis are

integral to the NEPA process.  42 U.S.C. §§ 4332(C), 4336(b)(2) (instructing that an environmental

impact statement and relevant comments "shall be made available to the . . . public" and that "an

environmental assessment shall be a concise public document"); *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 349 (1989) ("Publication of an EIS, both in draft and final form,

also serves a larger informational role. It gives the public the assurance that the agency 'has indeed

considered environmental concerns in its decisionmaking process,' and, perhaps more

significantly, provides a springboard for public comment." (internal citations omitted)).  Absent

public input the agency will have fallen short of the "hard look" required by NEPA.

**A. The Decision to Purchase the Williamsport Warehouse for the Purposes of Converting It
   into an Immigration Detention Facility Required NEPA Review**

Under NEPA, an agency is required to prepare an environmental impact statement prior to

"major Federal actions" with a "reasonably foreseeable significant effect on the quality of the

human environment."  42 U.S.C. §§ 4332(C), 4336(b)(1); *Dep't of Transp. v. Pub. Citizen*, 541

U.S. 752, 757 (2004).  When the significance of a proposed action's impacts on the environment

is uncertain, NEPA requires the agency to prepare an environmental assessment, "a concise public

document" used to determine the significance of the action's environmental impacts and thus

20

whether further study through an environmental impact statement is necessary. 42 U.S.C. § 4336(b)(2); *Ohio Valley Env't Coal.*, 556 F.3d at 191. There are limited exceptions when environmental analysis is not required which are enumerated under NEPA, 42 U.S.C. § 4336(a), none of which are applicable here. Compl. ¶ 87, ECF 1. Defendants' decision to purchase the Williamsport Warehouse for the purpose of conversion into an immigration detention facility is a "major Federal action" for which NEPA review should have been completed prior to Defendants taking action to implement that decision.

1. *Defendants' Decision is a Major Federal Action*

NEPA defines "major Federal action" as "an action that the agency . . . determines is subject to substantial federal control and responsibility." 42 U.S.C. § 4336e(10)(A). The DHS Instruction Manual emphasizes that "NEPA applies to the majority of DHS actions . . . Examples of situations in which NEPA is not triggered are very few," which largely tracks the statutory language of NEPA discussed below. DHS Instruction Manual at V–1.

It is clear the decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility is a major federal action. Defendants' purchased the Williamsport Warehouse outright for over $100 million and are publicly recorded as the owners of the property, rendering the facility squarely under federal control and responsibility. Ex. A, Deed, at 2–3. DHS has confirmed that the Williamsport Warehouse was acquired with the intention of conversion into a detention facility. Dep't of Homeland Sec. (@DHSgov), X (Jan. 30, 2026, 1:14 PM), https://perma.cc/VL4Z-2P4W; *see also* Ex. F, Floodplain Notice, at 3–4.

2. *Defendants' Decision Will Have Reasonably Foreseeable Significant, or Unknown, Environmental Impacts*

21

If an action has "a reasonably foreseeable significant effect on the quality of the human environment" an agency "shall issue an environmental impact statement." 42 U.S.C. § 4336(b)(1). If an action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," an agency "shall prepare an environmental assessment." *Id.* § 4336(b)(2).[5]

Defendants' decision to convert a commercial warehouse to a detention facility is without precedent. Yet even based upon the limited information that the State has gleaned about the facility and Defendants' plans for it, the State has identified a number of foreseeably significant impacts to the human environment from converting the warehouse into a 1,500 bed detention facility and operating it as such. The Williamsport Warehouse is within a half-mile radius of two Ecologically Significant Areas and is in the watershed of three State waterways which provide habitat for numerous State protected species and contain important, unique, and sensitive natural resources and ecological features. *See generally* Kurtz Decl. This includes two species of freshwater mussel that are considered "endangered" under state law, one of which, the green floater mussel, has also been proposed for protection as a threatened species under the Federal Endangered Species Act. *Id.* ¶¶ 24, 42. These resources will likely be threatened by sedimentation and other forms of pollution that accompany construction activity during the warehouse's renovation. *Id.* ¶¶ 7–8.

The State also has concerns that the existing sewer infrastructure serving the facility will be insufficient to support its new use, presenting significant additional impacts. Backups and

---

[5] The DHS Instruction Manual notes that "[e]xamples of activities for which a Component normally prepares an EA or a Programmatic EA include but are not limited to . . . [p]roposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas" and "[n]ew law enforcement field operations for which the environmental impacts are unknown, . . . or for which the potential for significant environmental controversy is likely." DHS Instruction Manual at V-9.

overflows of sewage from the facility are reasonably foreseeable based on estimates of the capacity of existing sewage infrastructure servicing the Williamsport Warehouse and projections of the capacity needed to serve a 1,500 bed detention facility, threatening both the population of the Williamsport Warehouse and the surrounding community and ecosystems.  Saffouri Decl. ¶¶ 10, 36–39.  There is also a concern that the facility will not be able to provide sufficient potable water for 1,500 individuals.  Ex. I, Local Orgs. Cmt. Ltr., at 4–5.  The warehouse is currently connected to the City of Hagerstown's drinking water system through a 2-inch domestic service line and allocated 800 gallons of drinking water per day. Jessica Swann, *Hagerstown Outlines Water Allocation Process for ICE Facility*, LocalNews1.org (Feb. 20, 2026), https://perma.cc/QQ4B-LDCW.  A 1,500-person facility would be expected to need between 75,000 and 150,000 gallons per day.  *Id.*

In other areas, the secretive nature of Defendants' activities has foreclosed the State's ability to forecast future impacts, but additional significant impacts cannot be ruled out.  *See, e.g.*, Ex. G, Md. Comment Ltr., at 10 (pointing to difficulty in quantifying likely traffic impacts from using the warehouse to hold 1,500 detainees at a given time with the entire population turning over every 3–7 days).

Defendants' decision to convert a commercial warehouse into a massive detention facility will likely have significant environmental impacts, such that an environmental impact statement is required.  In the alternative, even if the environmental impact is merely unknown, Defendants must still prepare an environmental assessment.

### 3.  *No Applicable Exceptions to NEPA Review Are Present*

None of the exceptions to NEPA review found at 42 U.S.C. §§ 4336(a)(1)–(4) apply here. Under subsection (a)(1), the decision to purchase the warehouse for the purpose of converting it

into a detention processing center is clearly final agency action. The agency has already purchased the property and awarded a contract to renovate and operate it as a detention facility. Ex. A, Deed. Under (a)(2), pursuant to DHS's own procedures, it may not invoke any other categorical exclusion of the agency, given the presence of "extraordinary circumstances" here.[6]  Under (a)(3), environmental review is neither excluded by, nor conflicts with, other provisions of law. As DHS itself notes, "[t]here is no national security or homeland security exemption from complying with NEPA." DHS Instruction Manual at IV–9. And finally, under (a)(4) Defendants certainly possess some level of discretion to take environmental factors into consideration in considering whether to construct the proposed facility.

**B.  Defendants Have Failed to Publicly Review the Environmental Impacts of Their Actions**

Defendants have failed to disclose sufficient information about the project to allow the public to weigh in on their proposal and inform the agency's decision making. Defendants' failure to provide public notice of their plans and the likely environmental impacts prior to the irretrievable commitment of federal resources to the decision renders any analysis conducted in secret fatally flawed and insufficient to meet NEPA's requirements. *See Hodges*, 300 F.3d at 438 (describing NEPA's twin goals of "guarantee[ing] that an agency will take a hard look at environmental consequences before making a decision that may affect the environment," and

---

[6] The DHS Instruction Manual explicitly lists "extraordinary circumstances" to include "[a] potentially significant effect on an environmentally sensitive area;" "[a] potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment," including "environmental permits;" "[a]n effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks;" and "[w]hether the action is related to other actions with individually significant, but cumulatively significant impacts." DHS Instruction Manual at V–5 to V–6. At a minimum, Defendants unprecedented activity falls within the category of uncertain environmental effects, and the State has also identified multiple environmentally sensitive areas and species therein, which will be threatened by Defendants' proposed construction. Kurtz Decl. ¶ 7.

"ensur[ing] that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision." (internal citations and quotations omitted)).

Public notice and intergovernmental collaboration, before a federal action occurs, are integral parts of the NEPA process.  NEPA instructs that an "environmental assessment shall be a concise *public* document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary," 42 U.S.C. § 4336(b)(2) (emphasis added), while environmental impact statements and relevant comments similarly "shall be made available . . . to the public," 42 U.S.C. § 4332(C); *see also Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989) ("[T]he broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time."); *Robertson*, 490 U.S. at 349.

The DHS Instruction Manual further emphasizes that "[a]t DHS, public involvement is used in the NEPA process to help define the scope of issues and level of analysis."  DHS Instruction Manual at IV–6.  "Public involvement requirements may be met during scoping at the start of an evaluation and/or by distributing a draft [environmental assessment] and draft [finding of no significant impact] for public review."  *Id.* at V–11.  Such "[i]ntergovernmental collaboration and public involvement improve the effectiveness of DHS missions and activities, as well as build trust between DHS and the communities it serves."  *Id.* at IV–6.

Defendants did not provide a scoping notice for their proposal, did not distribute a draft environmental assessment and finding of no significant impact, and did not provide any other outreach sufficient to allow meaningful public input.  *See* 42 U.S.C. § 4336(b)(2); DHS Instruction Manual at V–8 to V–13.  While DHS's Floodplain Notice baldly asserts that "in accordance with

25

[NEPA] . . . ICE evaluated whether practicable alternatives existed that would meet operational requirements while minimizing environmental and community impacts," Ex. F, Floodplain Notice, at 4, Defendants have not made that analysis public and even if they did, the fact that it was conducted in secret—without public input at any stage—would render it fatally flawed under NEPA's "hard look" standard.  42 U.S.C. § 4332(C) (specifying public notice requirements for an EIS); *Id.* § 4336(b)(2) (stating that an EA "shall be a concise *public* document"); *see also Hodges*, 300 F.3d at 438 ("[C]ompliance with NEPA procedures 'ensures that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision.'"); *Bering Strait Citizens for Resp. Res. Dev.*, 524 F.3d at 953 ("An agency when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.").

In short, Defendants commenced, concluded, and are now implementing the decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility without following NEPA's action-forcing procedures and without the "hard look" at environmental impacts that NEPA requires "*before* taking major federal actions."  *Robertson*, 490 U.S. at 350; *Nat'l Audubon Soc'y*, 422 F.3d at 184 (emphasis added).  Accordingly, Plaintiff is likely to succeed on the merits.

## III.  The Remaining Factors Weigh in Favor of Injunctive Relief

The final two factors "balance of the equities and the public interest—'merge when the Government is the opposing party.'"  *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 122 (D. Md. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Notably, the purpose

of preliminary relief such as a temporary restraining order "is not to conclusively determine the
rights of the parties, but to balance the equities as the litigation moves forward.'" *Roe*, 947 F.3d
at 231 (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).

For multiple reasons the public interest here favors a temporary restraining order to
maintain the status quo.  First, the public interest supports a limited injunction to prevent
Defendants from irreparably harming the environment.  Indeed, "[e]nvironmental injury, by its
nature, can seldom be adequately remedied by money damages . . . [and] [i]f such injury is
sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction
to protect the environment." *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th
Cir. 1989) (citation omitted); *see also United States v. Westvaco Corp.*, No. CV MJG-00-2602,
2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015) ("There is no doubt that . . . reducing the risk of
harm to human health and the environment is in the public interest.").  As explained above,
construction and operation of Defendants' sought detention center will likely result in pollution to
nearby watersheds, threatening both community health and local ecosystems. *See infra* at 13–19.
As best the State can discern, Defendants have not undertaken the necessary processes NEPA
mandates to evaluate and prevent environmental harm, and "[t]he public interest is not served by
compromising environmental due process and proceeding with a project that later may be found
to be in violation of NEPA." *Washington Cnty.*, 317 F. Supp. at 637.

Second, the public interest is served by avoiding harm to the local community while the
case is litigated.  As local advocacy groups have explained, the available information indicates that
the proposed detention facility will process tens of thousands of individuals each year, a population
likely far larger than Hagerstown, the largest city in the area. *See* Ex. I, Local Orgs. Cmt. Ltr., at
3.  It is accordingly likely that if construction proceeds without due consideration for infrastructure

27

requirements, such as water, sewage and transportation, the local community will be irreparably injured. *Id*. at 4 (Noting that the facility "will add tremendous, unprecedented activity and burdens to the local community, our environment, and our infrastructure.").

Third and finally, a temporary restraining order is in the public interest because even a brief pause will allow for better evaluation of, and public input on, Defendants' plans. *See, e.g.*, *id.* at 5 (decrying the "absence of any concrete information or consultation with all relevant state and local officials"). Without an ordered pause, Defendants' rush to construct a massive detention facility will likely preclude their ability to incorporate public feedback, and potentially reevaluate their decision-making. In fact, the decision by Defendant to convert the warehouse into a detention center—and all decisions to implement this plan—"would inevitably be influenced if [Defendants] were allowed to construct major segments of the [project] before" complying with NEPA, and the "completed segments would 'stand like gun barrels pointing into the heartland'" of the local environment. *Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042–43 (4th Cir. 1986) (citation omitted). "It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent." *Id.* In sum, through a temporary restraining order, "the public interest would be served by having the federal defendants address the public's expressed environmental concerns." *Fund For Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998).

On the other side of the ledger, Defendants can point to no public interest in the immediate and unconsidered construction of the proposed detention facility. *Accord Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 27 (D.D.C. 2009) ("Defendants have not set forth any reason as to why the Final Rule must be implemented at this time, as opposed to after a resolution on the merits of Plaintiffs' claims."). Indeed, public reporting indicates that Defendants have repeatedly cancelled recent plans for detention facilities, in the face of political pressure or

community pushback.  For instance, on February 4, 2026, Senator Roger Wicker of Mississippi

sent a public letter to DHS, opposing the agency's imminent acquisition of a "warehouse facility"

in Mississippi for conversion to an ICE detention center, citing "substantial and specialized

infrastructure demands," among other harms.[7]  Shortly thereafter, Senator Wicker announced that

DHS would abandon its planned Mississippi facility and "look elsewhere."[8]  A similar scenario

also played out in New Hampshire last month, where Governor Kelly Ayotte explained that plans

to build an ICE detention facility in the state were abandoned after residents and officials voiced

strong opposition.[9]  Defendants' fluid and changeable proposals for detention centers around the

country accordingly refute any public interest in immediately building a facility in this specific

location.

To be sure, a brief injunction could impose some minor delay in construction, but the

prospect of delay is outweighed by the public's interest in avoiding an uninformed, hasty decision

that results in irreversible action.  *See N. Carolina Wildlife Fed'n*, 677 F.3d at 601–02 ("NEPA

ensures that the agency will not act on incomplete information, only to regret its decision after it

is too late to correct.") (citation omitted).  Indeed, any delay does not infringe on any general

prerogative to enforce immigration laws; Defendants' own policies confirm that NEPA "generally

applies" to DHS construction of such facilities.  *See infra* at 5–7; *cf. Roe*, 947 F.3d at 230 ("[T]he

Government has not shown what institutional harm arises from relief that merely requires it to

comply with its own policies.").

---

[7] *See* Roger Wicker, *Proposed ICE Facility Threatens Byhalia, Mississippi Economy and Infrastructure* (Feb. 4, 2026), https://perma.cc/E2AK-TTHZ.

[8] Jack Armstrong, *DHS Agrees to 'Look Elsewhere' for Proposed Mississippi ICE Facility,* Memphis Commercial Appeal (Feb. 6, 2026), https://perma.cc/QUL5-AQRX.

[9] Maggie Cullen, *NH ICE Facility Reversal After Bipartisan Resistance Follows National Trend*, Seacoast Online (Feb. 27, 2026), https://perma.cc/YK2F-TRH7.

In sum, the public interest favors avoiding irreparable harm to the environment, the State, and the local community, and cannot support Defendants' apparent desire to rapidly construct a mass detention facility in blatant disregard of the process required by federal law.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court enter a temporary restraining order of 14 days restraining Defendants from constructing or retrofitting the Williamsport Warehouse into an immigration detention facility while the order remains in effect.

Dated: March 10, 2026                         Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Steven J. Goldstein*
Steven J. Goldstein (D. Md. Bar No. 32071)
Robert N. Brewer (D. Md. Bar No. 31649)
Yasmin Dagne (D. Md. Bar No. 32016)
Michael Drezner (D. Md. Bar No 31784)
Adam Kirschner (D. Md. Bar No. 31767)
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
sgoldstein@oag.maryland.gov
(410) 576-6414

*Counsel for the State of Maryland*

30