IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND,

    Plaintiff,

v.

KRISTI NOEM ET AL.,

    Defendants.

Civil No. 26-733-BAH

## ORDER

Plaintiff State of Maryland (the "State") filed this action against U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), Kristi Noem, and Todd M. Lyons (collectively "Defendants"), seeking declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., to halt Defendants from moving forward with their plans for turning the property located at 16220 Wright Road, Williamsport, Maryland 21795 (the "Williamsport Warehouse") into an immigration detention facility without first complying with NEPA's requirements for evaluating environmental impact. *See* ECF 1. On March 10, 2026, the State filed a motion for an *ex parte* temporary restraining order ("TRO"). *See* ECF 5.[1] Specifically, the TRO "seeks to restrain and enjoin Defendants from proceeding with construction activities required to build, retrofit, or otherwise convert the Williamsport Warehouse . . . into an

---

[1] The Court has reviewed the State's complaint, ECF 1, and its emergency motion for a TRO, ECF 5, along with the exhibits attached thereto. The Court notes that while the State seeks an *ex parte* TRO, it submits that it nonetheless "notified representatives of the U.S. Attorney's Office for the District of Maryland, that Plaintiff intended to seek a temporary restraining order in this Court to enjoin further construction and retrofitting activity at the facility." ECF 5-3, at 2.

immigration detention facility, during the pendency of" the order. ECF 5, at 1–2. The State also asks the Court to require "Defendants to file a status report within 48 hours describing all steps Defendants have taken to comply with the" TRO. *Id.* at 2.

"Circuit precedent establishes that there is standing to assert procedural allegations under NEPA against [government] defendants in order to preserve the environmental status quo pending federal review." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 330 (4th Cir. 2008) (alteration added). For the reasons stated below, the Court will **GRANT** the State's motion for a TRO. Given the exigent circumstances identified in the motion, including the likelihood of irreparable harm resulting from the environmental concerns identified by the State, the Court has determined that an immediate order granting the TRO is warranted to maintain the status quo until a motion for a preliminary injunction can be filed and a hearing can be set.

To obtain a temporary restraining order, a plaintiff must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When a government entity is a party to the case, as here, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). For the Court to issue such an order *ex parte*, the moving party must have provided the Court with "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and a certification in writing of "any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). The State has met those requirements here.

*See* ECF 5-3, at 1–2 (certification of notice); ECF 5-5 through ECF 5-14 (exhibits, including declarations, supporting finding of irreparable harm).[2]

Upon review of the materials filed, the Court determines that the State has satisfied the four factors governing the issuance of a TRO. First, the State has shown a likelihood of success on the merits. The State brings two claims under the APA: (1) that Defendants' actions are contrary to law, specifically NEPA; and (2) that Defendants' actions are arbitrary and capricious. *See* ECF 1, at 24–27; ECF 5-1, at 18.

The Court briefly pauses to satisfy itself of jurisdiction over this matter. "To establish Article III standing, 'a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (internal quotation marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). However, "[f]or the purposes of meeting the injury-in-fact requirement, states 'are not normal litigants.'" *Maryland v. United States*, 360 F. Supp. 3d 288, 308–09 (D. Md. 2019) (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007)). "They may show harm to three kinds of interests: (1) proprietary or financial interests, (2) quasi-sovereign interest, and (3) sovereign interests." *Id.*

---

[2] *See* 28 U.S.C. § 1746 (providing that "[w]herever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration" if substantially in a certain form).

The Fourth Circuit has before held, in the context of a NEPA case, that a plaintiff alleged facts sufficient to establish standing where the plaintiff asserted that the construction of a defendant's project "would harm its members' ability to use and enjoy the relevant area for a variety of educational, scientific, recreational, and aesthetic purposes, and that one or more of its members currently use the land for such purposes." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 329 (4th Cir. 2008) (citing *Sierra Club v. Morton*, 405 U.S. 727, 738–39 (1972)). The Fourth Circuit also concluded that the plaintiff had traced the injury to the proposed construction and had showed that enjoining the construction, "and requiring the reexamination of the proposal in accordance with NEPA, would redress its procedural and substantive concerns." *Id.* at 329–30. In so holding, the court observed that "[t]he party seeking an injunction need not show that injunction of the [ ] defendant would lead directly to redress of the asserted injury, but only that relief will preserve the federal procedural remedy." *Id.* at 330 (citing *Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323, 1329 (4th Cir. 1972)). The Court views the Fourth Circuit's reasoning in *Limehouse* to apply with equal force here, and thus finds that the State has standing because it has alleged a palpable and imminent injury to its quasi-sovereign interest in its environment due to Defendants' likely failure to comply with NEPA. The State has adequately traced this harm to the construction and renovation plans for the Williamsport Warehouse and has established that this harm is redressable through this action insofar as the relief requested will preserve the federal procedure remedy at issue.[3] *See Savannah Riverkeeper v. United States Army*

---

[3] The Court is aware, however, that the Fourth Circuit more recently held that a state did not have standing to pursue its NEPA claims in *South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019). But in that case, the state plaintiff, South Carolina, asserted that its alleged injury was the potential for the state to be "rendered the permanent repository of weapons-grade plutonium as a result of [the Department of Energy's] decision to terminate" the construction of a facility at the Savannah River Site in South Carolina designed to dispose of nuclear material utilizing "a new mixed oxide fuel fabrication (the MOX facility)." *Id.* at 723, 727. The termination of the

4

*Corps of Eng'rs*, Civ. No. 9:12-610-RMG, 2012 WL 13008326, at *2 (D.S.C. Aug. 14, 2012) ("It is well settled that a state may have sufficient interest in 'preserving its sovereign territory' from environmental injury to support standing." (citing *Massachusetts v. E.P.A.*, 549 U.S. 497, 518–19 (2007))); *cf. Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 355 ("[I]t is recognized that the state, as quasi-sovereign and representative of the interests of the public, has a standing in court to protect the atmosphere, the water, and the forests within its territory, irrespective of the assent or dissent of the private owners of the land most immediately concerned.").

Turning to the merits of the motion, NEPA "is our basic national charter for protection of the environment." *State of N.C. v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir. 1991) (internal quotation marks and citation omitted). "To achieve its purposes, NEPA requires federal agencies to consider the environmental implications of any proposed legislation or 'major federal action[.]'" *State of N.C.*, 951 F.2d at 603 (citing 42 U.S.C. § 4332(2)(C)). "NEPA mandates 'a set of action-forcing procedures that require that agencies take a hard look at environmental

---

construction of the MOX facility, South Carolina claimed, increased the likelihood of the long-term storage of weapons-grade plutonium at the site which, in turn, increased the risk of, among other issues, damage to the environment. *Id.* at 725. South Carolina sued and alleged, in part, that the federal government "violated NEPA by failing to prepare a supplemental Environmental Impact Statement [EIS] covering a period of more than fifty years[.]" *Id.* The Fourth Circuit concluded that South Carolina's theory of standing was too attenuated, in part because "[b]etween [the date of its decision] and 2046—when the analysis in the current [EIS] governing the risks associated with long-term storage of weapons-grade nuclear material at the Savannah River Site expires—the Department of Energy has twenty-eight years to identify an alternative method for disposing of the nuclear material or otherwise removing it from South Carolina." *Id.* at 728. Moreover, "[t]he Secretary of Energy already ha[d] certified that one potential alternative to the MOX program exists, the Dilute and Dispose method." *Id.*

Unlike South Carolina's theory of standing in that case, the State of Maryland's alleged injury is actual or imminent, not conjectural or hypothetical, and is based on Defendant's alleged failure to produce an EA or EIS *at all*, not simply the production of an inadequate one. Further, the State's injury is contemporaneous with Defendants' initiation of construction at the Williamsport Warehouse, which, the State alleges, may have already begun.

consequences, . . . and that provide for broad dissemination of relevant environmental information.'" *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (internal quotation marks omitted) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350.

NEPA requires that "all agencies of the Federal Government shall . . . consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" on the environmental impacts of a proposed action, including but not limited to the "reasonably foreseeable environmental effects of the proposed agency action" and "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C). This detailed written statement is referred to as an "environmental impact statement," or "EIS." *Id.* § 4336e(6).

An EIS is required whenever there is a "proposal[]" for a "major federal action[]" that would "significantly affect[] the quality of the human environment." *Id.* § 4332(C). NEPA defines "proposal" to mean "a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." *Id.* § 4336e(12). NEPA further defines a "major Federal action" as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A). "Although there is no litmus test for whether something qualifies as major federal action, courts have tended to 'consider the following factors: (1) whether the project is federal or non-federal; (2) whether the project receives

6

significant federal funding; and (3) when the project is undertaken by a non-federal actor, whether the federal agency must undertake affirmative conduct before the non-federal actor may act.'" *Indian River Cnty. v. Rogoff*, 201 F. Supp. 3d 1, 15 (D.D.C. 2016) (internal quotation marks omitted) (quoting *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 54–55 (D.D.C. 2003)).

However, "[n]ot every project necessitates an EIS." *Bair v. Calif. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012). In such circumstances, an agency is instead generally required to prepare "an environmental assessment," or "EA."[4]  *Id.*; *see also id.* § 4336e(4) ("The term 'environmental assessment' means an environmental assessment prepared under section 4336(b)(2) of this title."). "Where an EIS is not categorically required, the agency must prepare an EA to determine whether or not the environmental impact is significant enough to warrant an EIS." *Bair*, 867 F. Supp. 2d at 1065.

"In reviewing an agency's efforts to comply with NEPA," the Court must "perform a two-step analysis." *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002). First, the Court examines "whether the agency took a 'hard look' at a proposed project's environmental effects before acting." *Id.* (quoting *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th

---

[4] In limited circumstances, an agency is not required to prepare an EIS or EA at all, but only if (1) "the proposed agency action is not a final agency action," (2) the proposed action is subject to a categorical exclusion, (3) "the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law," or (4) "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." *Id.* § 4336(a). At this stage of the litigation, the Court sees no evidence of any exclusion applying here, especially in light of the State's contention that "DHS has previously applied NEPA to detention facility construction." ECF 5-1, at 12; *see* Dep't of Homeland Sec., Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas (April 2024), https://perma.cc/ZHH8-XH97; *see also Friends of the Everglades, Inc. v. Noem*, 796 F. Supp. 3d 1234, 1276 (S.D. Fla. 2025) (*Friends of the Everglades I*) ("The construction and operation of an immigration detention facility is plainly not an enforcement action.").

Cir. 1996)). "In essence," that inquiry asks "whether 'the adverse environmental effects of the proposed action [were] adequately identified and evaluated' prior to final decisionmaking.'" *Id.* (alteration added) (quoting *Robertson*, 490 U.S. at 350). If the answer is yes, the Court "must then consider whether the agency's conclusions are arbitrary or capricious." *Id.* (citing *Hughes River*, 81 F.3d at 443). "If the agency has followed the proper procedures, and if there is a rational basis for its decision, [the Court] will not disturb its judgment." *Id.* (alteration added).

The Court is satisfied, based on the complaint, motion, and exhibits attached thereto, that prior to engaging in the construction at the Williamsport Warehouse, Defendants are likely required under NEPA to issue an EIS or conduct an EA. *See Friends of the Everglades, Inc. v. Noem*, 796 F. Supp. 3d 1234, 1271 (S.D. Fla. 2025) (*Friends of the Everglades I*).[5] That is because Defendants' plans in Williamsport likely constitute a "major Federal action," or one "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). Based on the information before the Court, the immigration enforcement activities to be carried out at the Williamsport Warehouse will be entirely under federal control and proceed pursuant to federal law. *See Friends of the Everglades I*, 796 F. Supp. 3d at 1273 ("[A]ll immigration enforcement

---

[5] On September 4, 2025, the Eleventh Circuit issued a 2-1 decision staying the district court's order enjoining the further construction and use of the ICE facility at issue in that case. *See Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567 (11th Cir. Sept. 4, 2025) (*Friends of the Everglades II*). There, however, the panel majority noted that "no federal dollars [had yet] been expended on the construction or use of the Facility." *Id.* at *7 (alteration added). The majority went on to note that, "[i]n its operative form, NEPA makes clear that the absence of federal funding renders an action 'non-Federal,' and thus not subject to the EIS requirement." *Id.* (citing 42 U.S.C. § 4336e(10)(B)(i)). To the contrary, Defendants here have already spent federal dollars purchasing the facility and awarding a contract for its "renovation." *See* ECF 5-5, at 2–4 (general warranty deed for the property); *Contract Summary*, Delivery Order from Dep't of Homeland Sec. to KVG LLC, https://perma.cc/2H9A-RJDP (noting that DHS awarded KVG LLC a contract of over $100 million "to procure the renovation" of the Williamsport Warehouse).

activities associated with the camp—key drivers of the project's environmental impact—are entirely under federal control and pursuant to federal law.").[6]

Moreover, the Court finds that there is likely final agency action here. It appears that ICE has awarded a contract to "procure the renovation of [an] existing, ICE-owned permanent structure in Hagerstown, MD to serve as a processing and detention facility and provide all necessary wraparound services for operation of the facility." *Contract Summary*, Delivery Order from Dep't of Homeland Sec. to KVG LLC, https://perma.cc/2H9A-RJDP (capitalization altered and alteration added). The contract lists the start date as March 6, 2026, and the end date as May 4, 2026. *Id.* Presumably, then, the renovation has already begun. Defendants' decision to refrain from issuing an EIS or conducting an EA and proceeding with the "renovation" of the Williamsport Warehouse "represents a determinative position on the matter." *See Friends of the Everglades I*, 796 F. Supp. 3d at 1271 (collecting cases); *Hall v. Norton*, 266 F.3d 969, 975 n.5 (9th Cir. 2001) (noting that agency's "decision not to prepare an EIS is a final agency action"); *San Juan Citizens' All. v. Babbitt*, 228 F. Supp. 2d 1224, 1229 (D. Colo. 2002) ("A failure to prepare an EIS is a final agency action within the meaning of the APA.").

On the record before the Court at this time, the State has shown that Defendants likely failed to comply with their obligations under NEPA. Defendants do not appear to have taken a "hard look" at the potential environmental consequences of their plans for the Williamsport Warehouse. *See Defs. of Wildlife*, 762 F.3d at 393. As far as the Court can tell, no EIS and no EA were initiated or completed. The only indication the Court has seen of any such process is a DHS

---

[6] In staying the district court's decision, the Eleventh Circuit noted that "the Florida-funded and Florida-operated detention activities occurring at the Site do not conceive a 'major federal project' . . . ." *Friends of the Everglades II*, 2025 WL 2598567, at *9. Similar circumstances are not present here, where the State of Maryland brings the suit, and the federal government has purchased the property.

post announcing an "Early Notice and Public Review of a Proposed Activity in a 100- to 500- Year Floodplain" on the "Documents for Public Comment" page of its website, which the State asserts was posted on or about February 25, 2026. *See* ECF 5-1, at 17; U.S. Dep't Homeland Sec., *Early Notice and Public Review of a Proposed Activity in a 100- to 500-Year Floodplain, Hagerstown, Maryland*, https://perma.cc/G5KS-6R7R. The notice states "[i]n accordance with the National Environmental Policy Act (NEPA) and EO 11988, ICE evaluated whether practicable alternatives existed that would meet operational requirements while minimizing environmental and community impacts." *Id.* However, that brief description of the assessment of alternatives comes in the context of a notice centered on the fact that the facility is located in a floodplain. *See id.* Although several organizations submitted comment letters to DHS in response to the notice, *see* ECF 5-1, at 17,[7] the State reports that the comment period closed on March 5, 2026, and there is no indication that DHS considered or responded to any of the comments submitted, *see id.* at 17–18. Regardless, and despite the reference to NEPA in the notice, this opportunity to comment does not appear to take the place of the requirement to complete an EIS or EA. More importantly, given that Defendants apparently awarded a contract authorizing work to begin on the site a day after the comment period closed, the record cannot support a finding that "the agency took a 'hard look' at [the] proposed project's environmental effects before acting." *Hodges*, 300 F.3d at 445 (alteration added).

The Court is also satisfied that the State has shown it is likely to suffer irreparable harm in the absence of a TRO. To establish irreparable harm, the plaintiff "must make a 'clear showing'

---

[7] *See* ECF 5-11 (comment submitted by the respective heads of the Maryland Departments of the Environment, Natural Resources, and Transportation); ECF 5-12 (comment submitted by Center for Biological Diversity); ECF 5-13 (comment submitted by Hagerstown Rapid Response, the Washington County Branch of the NAACP, and the ACLU of Maryland).

that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'"
*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d
197, 216 (4th Cir. 2019) (citation omitted). Additionally, the harm "must be irreparable, meaning
that it cannot be fully rectified by the final judgment after trial." *Id.* (quotations and citations
omitted).

The State offers evidence of significant construction planned to proceed at the
Williamsport Warehouse. For example, Defendants' Floodplain Notice suggested that Defendants
may install perimeter security fencing, build a security checkpoint structure, install exterior
lighting, replace an existing emergency generator, and likely modify the existing sanitary sewer.
*See* ECF 5-10, at 4. Specifically, the notice identifies that "[p]reliminary engineering indicates
that limited upgrades to the existing sanitary lateral or connection point may be required to
accommodate projected wastewater flows." *Id.* The State attached to its motion a declaration
from Walid Saffouri, a program manager with the Maryland Department of the Environment. *See*
ECF 5-14, at 2 ¶ 1. Saffouri states that based on his review of Defendants' plans and his knowledge
of the Williamsport Warehouse, there are "significant concerns that the existing infrastructure is
insufficient to support a population of 1500 detainees." *Id.* at 3 ¶ 8. Saffouri asserts that
"[u]pgrading the system so that it has the capacity to meet expected needs would require significant
excavation along the length of the 6-inch lateral line and likely the 8-inch sewer main," and failure
to upgrade the system "will likely result in sewage backups and overflows creating public health
hazards and environmental harm." *Id.* at 8 ¶ 39.

The State contends that "once construction begins and Maryland's natural resources and
environment are threatened, there is no turning back." ECF 5-1, at 20. Indeed, the State identifies
a number of grave environmental risks from potential renovation and construction at the

11

Williamsport Warehouse, including pollution of three waterways adjacent to or downstream of the property—Semple Run, Conococheague Creek, and the Potomac River—and the corresponding ecosystems that rely on such waterways. *See* ECF 5-1, at 21; ECF 5-7 (declaration of Josh E. Kurtz), at 4–12; *see also* ECF 5-11, at 3–9. In a declaration attached to the motion provided by Josh E. Kurtz, the current Secretary of the Maryland Department of Natural Resources, these environmental risks are discussed at length. *See* ECF 5-7, at 3–12. Secretary Kurtz states that "[c]onstruction at the scale necessary to convert the warehouse into an immigration detention facility without the necessary environmental reviews poses a serious risk to the nearby watersheds and the ecosystems therein." *Id.* at 3 ¶ 7. Secretary Kurtz also identifies several state-listed endangered species, species in need of conservation, and rare species which stand to be harmed by pollution to the waterways resulting from Defendants' plans. *See id.* at 7–15.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987); *see also Rio Assocs., L.P. v. Layne*, No. 3:15-CV-00012, 2015 WL 3546647, at *5 (W.D. Va. June 8, 2015) ("It is well settled that this kind of environmental injury constitutes irreparable harm."). Ill-informed construction activity at the Williamsport Warehouse "is likely to increase sediment runoff to nearby waters and have significant traffic impacts within the community as well." ECF 5-14, at 8 ¶ 39. The Court therefore agrees that continued renovation and construction at and around the Williamsport Warehouse will likely cause the State to suffer irreparable harm through injury to the State's environment.

For similar reasons, the balance of equities and the public interest favor granting a preliminary injunction. As noted, "[w]hen a plaintiff seeks preliminary injunctive relief against

the Government, the balance of the equities and the public interest factors merge." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020)). This is so because "the government's interest *is* the public interest" in such a case. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (emphasis in original) (quoting *Pursuing Am. Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). The Court acknowledges that Defendants' interest in immigration enforcement is significant. Moreover, Defendants have invested considerable resources into the purchase of the Williamsport Warehouse, including the apparent spending of $102.4 million to secure the property. *See* ECF 5-5, at 2–4. The Court does not cast these concerns aside but notes that a pause in the warehouse conversion project will do nothing more than prolong the status quo until more robust briefing and a hearing can occur, which is, of course, the very point of a TRO. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974) ("Ex parte temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."). Opposite the slight inconvenience of a delay in construction stands ongoing and possible future irreparable harms caused by Defendants' likely NEPA violation. "When irreparable environmental harms are sufficiently likely, 'the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Friends of the Everglades I*, 796 F. Supp. 3d at 1284 (quoting *Amoco Prod. Co.*, 480 U.S. at 545); *see also United States v. Westvaco Corp.*, Civ. No. MJG-00-2602, 2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015) ("There is no doubt that . . . reducing the risk of harm to human health and the environment is in the public interest.").

13

Under Federal Rule of Civil Procedure 65(c), a court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "District courts have discretion to set the required security at a nominal amount and this approach has long been followed in public-interest litigation cases." *Maryland v. United States Dep't of Agric.*, 770 F. Supp. 3d 779, 819–20 (D. Md. 2025) (internal citations omitted); *see also Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822 (D. Md. 2025). The Court concludes that a nominal bond of $100 is appropriate here. *Cf. United States Dep't of Agric.*, 770 F. Supp. 3d at 820 (requiring each plaintiff state to pay a nominal bond of $100 and observing that "[a]lthough the risk of harm to the Government is not remote, the potential cost of an improvidently granted TRO on the federal government is too complex to calculate in this expedited proceeding").

Finally, "[e]very temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record." Fed. R. Civ. P. 65(b)(2). Further, at 1:15 p.m. today, counsel entered an appearance on behalf of all Defendants. ECF 7. Though Defendants may be on notice of the filing of the motion for a TRO, *see* ECF 5-3, at 1-2, the Court will comply with these requirements.

Accordingly, on this day of March 11, 2026, at 5:00 p.m., it is **ORDERED** that the Plaintiff's motion for temporary restraining order is **GRANTED**.

Defendants are temporarily restrained, for a period of fourteen (14) days, from proceeding with renovation and/or construction activities required to build, retrofit, or otherwise convert the Williamsport Warehouse, located at 16220 Wright Road, alternatively identified as 10900 Hopewell Road, Williamsport, Maryland 21795, into an immigration detention facility.

14

Defendants are not enjoined from engaging in the preparation of an EIS or EA as required by 42 U.S.C. § 4332(C). Defendants must file a status report within forty-eight (48) hours describing all steps Defendants have taken to comply with this order. The State shall also pay a nominal security bond of $100. The Clerk shall promptly send a copy of this order to the Civil Division of United States Attorney's Office for the District of Maryland.

Dated: March 11, 2026

_____ at 5:00 pm

Brendan A. Hurson
United States District Judge

15