## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND,<br>200 Saint Paul Place<br>Baltimore, Maryland 21202,<br><br>      Plaintiff,<br><br>      v.<br><br>KRISTI NOEM, Secretary of Homeland Security,<br>2707 Martin Luther King Jr. Ave. SE<br>Washington, D.C. 20528<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY,<br>2707 Martin Luther King Jr. Ave. SE<br>Washington, D.C. 20528<br><br>UNITED STATES IMMIGRATION AND<br>CUSTOMS ENFORCEMENT,<br>500 12th St., SW<br>Washington, D.C. 20536<br><br>TODD M. LYONS, Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement,<br>500 12th St., SW<br>Washington, D.C. 20536,<br><br><br>      Defendants. | Civ. No. 1:26-cv-733-BAH |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S

## MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

LEGAL BACKGROUND ...................................................................................................... 2

    The National Environmental Policy Act ............................................................................. 2

    DHS's NEPA Instruction Manual .................................................................................... 5

FACTUAL BACKGROUND .................................................................................................. 7

PROCEDURAL BACKGROUND ........................................................................................ 13

ARGUMENT ......................................................................................................................... 13

I.      The State's Concrete Interests Will Be Irreparably Harmed Absent Injunctive Relief 14

    A.    Construction of the Detention Facility Threatens Imminent Irreparable Harm ........... 15

    B.    Operation of the Detention Facility Threatens Imminent Irreparable Harm ................ 19

II.    The State Is Likely to Succeed on the Merits ................................................................ 23

    A.    The Decision to Purchase the Williamsport Warehouse for the Purposes of Converting It into an Immigration Detention Facility Required NEPA Review ............................ 24

        1.    Defendants' Decision is a Major Federal Action ........................................................ 24

        2.    Defendants' Decision Will Have Reasonably Foreseeable Significant, or Unknown, Environmental Impacts ................................................................................................. 25

        3.    No Applicable Exceptions to NEPA Review Are Present ......................................... 28

    B.    Defendants Have Failed to Publicly Review the Environmental Impacts of Their Actions ........................................................................................................................... 29

III.   The Remaining Factors Weigh in Favor of Injunctive Relief ..................................... 31

CONCLUSION ...................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Nat'l Institutes of Health*, 974 F. Supp. 2d 18 (D. Mass. 2013)........................................ 21

*Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531 (1987) ..................................................... 14

*Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323 (4th Cir. 1972) .......................... 33

*Ass'n of American Publishers, Inc. v. Frosh*, 586 F.Supp.3d 379 (D. Md. 2022)......................... 23

*Audubon Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't. of Transp.*, 524 F. Supp. 2d 642 (D.

    Md. 2007) ............................................................................................................................ 2, 31

*Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009) ............ 33

*Bering Strait Citizens for Resp. Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir.

    2008)................................................................................................................................... 4, 31

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003) ....................... 22

*Cook Cnty., Illinois v. Wolf*, 962 F.3d 208 (7th Cir. 2020) ............................................................ 32

*Defs. of Wildlife v. N.C. Dep't. of Transp.*, 762 F.3d 374 (4th Cir. 2014) ................................. 2, 29

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004)................................................................. 24

*Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL

    2598567 (11th Cir. Sept. 4, 2025) .................................................................................... 25

*Fund For Animals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998) ....................................................... 33

*Hodges v. Abraham*, 300 F.3d 432 (4th Cir. 2002) ........................................................... 2, 29, 30

*Indian River Cnty, v. Rogoff*, 201 F. Supp. 3d 1 (D.D.C. 2016)....................................................... 4

*Indian River Cnty. v. Dep't of Transp.*, 348 F. Supp. 3d 17 (D.D.C. 2018) .................................... 4

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989)............................................................. 29

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68 (D. Md. 2025) ........................... 31

*Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986)................................ 33

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) .................. 14

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596 (4th Cir. 2012) ....................... 4, 23, 34

*Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174 (4th Cir. 2005) ....................................... 4, 31

*New York v. Biden*, 636 F. Supp. 3d (D.D.C. 2022) ........................................................ 20

*New York v. United States Dep't of Homeland Sec.*, 475 F. Supp. 3d 208 (S.D.N.Y. 2020) ......... 20

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................... 13, 31

*North Carolina v. City of Virginia Beach*, 951 F.2d 596 (4th Cir. 1991) ........................................ 2

*Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, 890 F. Supp. 2d 688 (S.D.W. Va.

2012) ............................................................................................................ 18, 24

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ............................................................. 23

*Rio Assocs., L.P. v. Layne*, No. 3:15-CV-00012, 2015 WL 3546647 (W.D. Va. June 8, 2015) .... 18

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ................................... 2, 23, 24

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ............................................................ 13, 31, 34

*S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97 (4th Cir. 1989) .............................. 32

*Stuller Inc. v. Steak N Shake Enters.*, 695 F.3d 676 (7th Cir. 2012) ............................................ 14

*Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113 (9th Cir. 2012) ............................... 4, 21

*Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017) ................................................... 31

*U.S. v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) .................................................... 13

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ....................................................... 13

*Washington County, N.C. v. U.S. Dep't of Navy*, 317 F. Supp. 2d 626 (E.D.N.C. 2004) ........ 19, 32

*Wild Va. v. Council on Env't Quality*, 56 F.4th 281 (4th Cir. 2022) ................................................ 5

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ................................................................. 13, 22

iii

**Other Authorities**

42 U.S.C. § 4331 ................................................................................................................ 2

42 U.S.C. § 4332 ................................................................................................ 3, 23, 24, 30

42 U.S.C. § 4336 ................................................................................. 4, 5, 23, 24, 25, 29, 30

42 U.S.C. § 4336a ...................................................... 3, 4, 5, 23, 24, 25, 28, 29, 30

42 U.S.C. § 4336e ................................................................................. 3, 5, 24, 30

36 C.F.R. §§ 800.3(c), 800.4(d), 800.5(c) ............................................................... 10

Md. Code Ann., Nat. Res. § 8–101(g) ..................................................................... 14

Md. Code Ann., Nat. Res. §§ 10–2A–01 to 10–2A–09 ............................................. 14

**Misscelaneous Authorities:**

Contract Summary, Delivery Order from Dep't of Homeland Sec., to KVG LLC,

   https://perma.cc/2H9A-RJDP .................................................................................... 12

Dep't Homeland Sec., Early Notice and Public Review of a Proposed Activity in a 100- to 500-

   Year Floodplain, Hagerstown, Maryland, https://perma.cc/G5KS-6R7R ................11, 15, 25, 30

Dep't of Homeland Sec. (@DHSgov), X (Jan. 30, 2026, 1:14 PM), https://perma.cc/VL4Z-2P4W

   ..................................................................................................................... 10, 25

Dep't of Homeland Sec., *Final Supplemental Environmental Assessment: Addressing the*

   *Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in*

   *Laredo, Webb County, Texas* (April 2024), https://perma.cc/ZHH8-XH97 ........................... 6, 7

Dep't of Homeland Sec., Immigr. & Customs Enf't, *El Paso Service Processing Center: Final*

   *Environmental Assessment* at 2, 6 (Sept. 15, 2021), https://perma.cc/VED3-J4BP. .................. 7

Dep't of Homeland Sec., *Instruction Manual 023-01-001-01, Revision 01, Implementation of the*

   *National Environmental Policy Act (NEPA)* (Nov. 6, 2014),

https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf.................................................................................. 5, 6, 24, 25, 28, 30

Anita Wadhwani, *Sen. Marsha Blackburn: ICE ends plans for Wilson County immigrant detention 'mega center'*, Tennessee Lookout (February 25, 2026), https://tennesseelookout.com/2026/02/25/sen-marsha-blackburn-ice-ends-plans-for-wilson-county-immigrant-detention-mega-center/.................................................. 34

Colleen Deguzman and Lomi Kriel, *Two Cases of Tuberculosis Detected at El Paso ICE Facility*, The Texas Tribune (February 7, 2026), https://www.texastribune.org/2026/02/07/ice-facility-el-paso-tuberculosis/.................................................................................. 21

Douglas MacMillan & Jonathan O'Connell, *ICE Documents Reveal Plan to Hold 80,000 Immigrants in Warehouses*, Wash. Post (Dec. 24, 2025), https://perma.cc/LSH6-FJKQ ........... 7

Jack Armstrong, *DHS Agrees to 'Look Elsewhere' for Proposed Mississippi ICE Facility*, Memphis Commercial Appeal (Feb. 6, 2026), https://perma.cc/QUL5-AQRX ....................... 34

Jessica Swann, *Hagerstown Outlines Water Allocation Process for ICE Facility*, LocalNews1.org (Feb. 20, 2026), https://perma.cc/4F8V-N343 ......................................................... 9

Joe Heim & Jasmine Golden, *Plans for an ICE Detention Center Spark Anger in a Deep-Red Maryland County*, Wash. Post. (March 5, 2026), https://perma.cc/9W53-BM6R. ................... 12

Katie Thomas, Jessica Silver-Greenberg and Melena Ryzik, *Sick Detainees Describe Poor Care at Facilities Run by ICE Contractor*, NY Times (February 14, 2026) https://www.nytimes.com/2026/02/14/business/ice-health-care-corecivic-immigrants-detention.html.................................................................................. 21

Lauren J. Young, *Measles Outbreak Erupts in One of U.S.'s Largest ICE Detention Centers*, Scientific American (March 5, 2026), https://www.scientificamerican.com/article/measles-outbreak-erupts-in-one-of-u-s-s-largest-ice-detention-centers/.................................................. 21

Maggie Cullen, *NH ICE Facility Reversal After Bipartisan Resistance Follows National Trend*, Seacoast Online (Feb. 27, 2026), https://perma.cc/YK2F-TRH7 ............................................ 34

Maryland Dep't of the Env't Eng'g & Cap. Projects Program, *Design Guidelines for Wastewater Facilities* (2021) ....................................................................................................... 16

Mike Lewis, *Going Up: Firm Breaks Ground for $35M Warehouse; Wright Road to Reopen This Month*, Herald Mail Media (Sep. 14, 2021), https://perma.cc/KL3M-CMVP............................ 8

Off. of Gov. Kelly Ayotte, Press Release, *DHS Releases New Documents on Merrimack Facility* (Feb. 12, 2026), https://perma.cc/LRC6-7S9C ............................................................. 10

Roger Wicker, *Proposed ICE Facility Threatens Byhalia, Mississippi Economy and Infrastructure* (Feb. 4, 2026), https://perma.cc/E2AK-TTHZ .................................................. 34

U.S. Immigr. & Customs Enf't, *ICE Detention Reengineering Initiative* 1, https://www.governor.nh.gov/sites/g/files/ehbemt971/files/inline-documents/merrimack-detention-reengineering-initiative.pdf....................................................................... 10

United States Census Bureau, *Williamsport town, Maryland – Census Bureau Search*, https://perma.cc/U3QU-FB27 (captured Feb. 18, 2026)............................................................ 8

Washington Cnty. Div. Plan Rev. & Permitting, Permit Issuance Report at 3 (Aug. 1–31, 2021), https://perma.cc/D43B-6749 ...................................................................................... 9

**<u>INTRODUCTION</u>**

Last week, this Court entered a temporary restraining order barring the construction of a massive detention facility in Maryland by the Department of Homeland Security (DHS) and U.S. Immigration Customs and Enforcement (ICE).  The Court recognized the immediate threat of irreparable environmental harm if construction were allowed to proceed and found that DHS and ICE likely acted unlawfully in ignoring the clear requirements of the National Environmental Policy Act (NEPA).  For these reasons, and due to the additional harm that would likely result from operating the facility, this Court should enter a preliminary injunction barring the renovation, construction, retrofitting, or operation of the property as an immigration detention facility during the pendency of this litigation.

In the ordinary course, and as required under NEPA, federal agencies must undertake all necessary environmental reviews before beginning a major action, in a manner that permits sufficient public engagement.  But Defendants' actions here are far from ordinary.  They have not complied with NEPA while spending over $100 million dollars of public funds to purchase the property at issue and awarding an additional $113 million contract to renovate and begin operating the facility by May 4, 2026.

Without a preliminary injunction, Defendants will undoubtedly resume their breakneck efforts to renovate, construct, and operate their planned detention facility without due regard for its impact on public health and the environment.  Maryland deserves better, and the law requires it.  This Court should accordingly enter a preliminary injunction.

**LEGAL BACKGROUND**

**The National Environmental Policy Act**

NEPA, 42 U.S.C. § 4321 *et seq.*, is "our basic national charter for protection of the environment." *North Carolina v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir. 1991) (quoting 40 C.F.R. 1500.1(a) (1990) (since rescinded)).  The statute "declares a broad national commitment to protecting and promoting environmental quality," *Audubon Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't. of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)), and acknowledges the necessity of cooperating with state and local governments to advance those ends, *see* 42 U.S.C. § 4331 (declaring "it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures" to accomplish NEPA's goals).

NEPA primarily functions through "a set of 'action-forcing procedures' that require that agencies take a 'hard look' at environmental consequences . . . and that provide for broad dissemination of relevant environmental information." *Defs. of Wildlife v. N.C. Dep't. of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (quoting *Robertson*, 490 U.S. at 350).  These action-forcing procedures advance the twin goals of "guarantee[ing] that an agency will take a hard look at environmental consequences before making a decision that may affect the environment," and "ensur[ing] that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision." *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002) (citations and quotations omitted).

NEPA's primary action-forcing procedure is the requirement that a federal agency prepare an Environmental Impact Statement (EIS) for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS is a "detailed written statement," *id.* § 4336e(6), that must include a discussion of: "reasonably foreseeable environmental effects of the proposed agency action"; "reasonably foreseeable adverse environmental effects which cannot be avoided"; "a reasonable range of alternatives" including a "no action alternative"; a discussion of "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and an accounting of the "irreversible and irretrievable commitments of Federal resources" from the proposed action, *id.* § 4332(C)(i)–(v). An EIS is limited to 150 pages and must be completed within two years. *Id.* § 4336a(e)(1)(A), (g)(1). "Prior to" completing an EIS, NEPA specifies that the federal agency "shall [make] available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5," the "comments and views of the appropriate Federal, State, and local agencies" on the EIS. *Id.* § 4332(C)(v).

An EIS is required whenever there is a "proposal[]" for: (1) "major federal action" that (2) would "significantly affect[] the quality of the human environment." *Id.* § 4332(C). As NEPA explains, "[t]he term 'proposal' means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." *Id.* § 4336e(12). "Major federal action" is defined as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A). "Although there is no litmus test for whether something qualifies as a major federal action," courts generally focus on the level of federal

3

funding and agency authority over an action to determine if it is a "major federal action." *See Indian River Cnty, v. Rogoff*, 201 F. Supp. 3d 1, 15 (D.D.C. 2016).  The scope of environmental effects agencies may be required to analyze under NEPA is broad and includes impacts to protected areas and wildlife, *see Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 186-87 (4th Cir. 2005), and public health and safety, *Indian River Cnty. v. Dep't of Transp.*, 348 F. Supp. 3d 17, 43-44 (D.D.C. 2018); *see also Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124, 1126-27 (9th Cir. 2012).

If a proposed action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," an agency "shall prepare" an Environmental Assessment (EA) in lieu of an EIS.  42 U.S.C. § 4336(b)(2).  An EA "shall be a concise *public* document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary."  *Id*. (emphasis added).  Thus, an EA can satisfy an agency's obligation to review environmental impacts under NEPA or it can identify significant impacts that trigger the requirement to prepare an EIS.  An EA is limited to 75 pages and must be completed within one year.  *Id.* §§ 4336a(e)(2), (g)(1)(B).  "An agency, when preparing an EA, must provide the public with sufficient environmental information" to "permit members of the public to weigh in with their views and thus inform the agency decision-making process."  *Bering Strait Citizens for Resp. Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008); *see also N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601–02 (4th Cir. 2012) ("[T]he broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time").

An agency may avoid preparing an EIS or EA for a proposed major federal action only in the limited circumstances where: (1) the proposed action would not constitute "final agency action" under the Administrative Procedure Act (APA); (2) the proposed action is subject to a valid categorical exclusion; (3) preparation of an environmental review document would "clearly and fundamentally conflict with the requirements of another provision of law," or, (4) the proposed action is nondiscretionary such that the agency cannot consider environmental factors when reaching a final decision.  42 U.S.C. § 4336(a)(1)–(4).  A "categorical exclusion" is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of [42 U.S.C.] section 4332(2)(C)."  42 U.S.C. § 4336e(1).

**DHS's NEPA Instruction Manual**

While NEPA provides general directions for agencies to follow, actual implementation falls on the agencies themselves.[1]  DHS has published its own Instruction Manual on the topic.  *See* Dep't of Homeland Sec., *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)* (Nov. 6, 2014), https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf  ("DHS Instruction Manual"), Exhibit A.  The DHS Instruction Manual clarifies that "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, [or] executed by DHS under

---

[1] For decades, the White House Council on Environmental Quality (CEQ) published and maintained a centralized set of regulations to standardize and guide federal agencies in their implementation of NEPA at 40 C.F.R. Part 1500.  *See Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 287–92 (4th Cir. 2022) (reviewing procedural history of CEQ regulations through 2022).  CEQ issued an interim final rule rescinding those regulations in February 2025, 90 Fed. Reg. 10,610 (Feb. 25, 2025), and a Final Rule doing the same in January 2026, 91 Fed. Reg. 618 (Jan. 8, 2026).

the direction of Congress," *id.* at III–1, and that environmental effects to be considered include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" effects, *id*. at II–2.

The DHS Instruction Manual further emphasizes the importance of a public, transparent, NEPA process. "Public involvement starts early and continues throughout the NEPA process," and includes "three key elements: (1) seeking information from outside parties to help identify relevant issues; (2) presenting the results of an environmental impact evaluation for public review or comment, including a description of how the identified relevant issues were considered in the evaluation; and (3) providing a public notice of DHS's final decision, including consideration of relevant public comments." *Id.* at IV–6 to IV–7.

DHS has previously applied NEPA to detention facility construction.  In April 2024, DHS issued a 224-page Supplemental Environmental Assessment, addressing the proposed acquisition of land to construct and maintain a "Joint Processing Center" that would be "capable of accommodating… 500 undocumented non-citizens," or one-third of the maximum capacity proposed by DHS here.  *See, e.g.*, Dep't of Homeland Sec., *Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas* at 4 (April 2024), https://perma.cc/ZHH8-XH97.  DHS distributed a notice letter concerning the proposed action "to 30 potentially interested federal, state, and local agencies; Indian Tribes; and other stakeholder groups or individuals," offered an initial 30-day period of public input, publicized the documents online and in local news, opened a subsequent 30-day period for public comment on the draft Supplemental Environmental Assessment, and ultimately considered all comments received.  *Id*. at ES–2.  As the agency

reiterated in that document, "[i]n addition to public participation, interagency and intergovernmental coordination is a federally mandated process for informing and coordinating with other governmental agencies regarding federal proposed actions." *Id.* at 1–5. *See also* Dep't of Homeland Sec., Immigr. & Customs Enf't, *El Paso Service Processing Center: Final Environmental Assessment* at 2, 6 (Sept. 15, 2021), https://perma.cc/VED3-J4BP (Following a similar procedure for the proposed renovation and expansion of a processing facility already owned by ICE.).

**FACTUAL BACKGROUND**

On January 16, 2026, DHS and ICE executed a General Warranty Deed purchasing the property located at 16220 Wright Road, Williamsport, Maryland 21795 (hereinafter the "Williamsport Warehouse") for $102.4 million.  Deed, Exhibit B.  The deed was recorded on January 22, 2026, and the transaction was first publicly reported on January 27, 2026.  According to the Maryland Department of Assessments and Taxation, the property is a "MEGA WAREHOUSE" covering 53.74 acres and including an above grade area of 825,620 square feet. SDAT Report, Exhibit C.  According to public reporting based on internal ICE documents, the Williamsport Warehouse is destined to be converted into a "processing" facility with 500 to 1,500 beds, Douglas MacMillan & Jonathan O'Connell, *ICE Documents Reveal Plan to Hold 80,000 Immigrants in Warehouses*, Wash. Post (Dec. 24, 2025), https://perma.cc/LSH6-FJKQ; according to ICE's own public documents, facilities of this scale will be used to "house[] an average daily population of 1,000 to 1,500 detainees for average stays of 3-7 days."  U.S. Immigr. & Customs Enf't, *ICE Detention Reengineering Initiative* 1, https://www.governor.nh.gov/sites/g/files/ehbemt971/files/inline-documents/merrimack-detention-reengineering-initiative.pdf ("ICE DRI"), Exhibit D.

The property is located just outside of Williamsport, Maryland, a town with a population of just over 2,000 individuals. United States Census Bureau, *Williamsport town, Maryland – Census Bureau Search*, https://perma.cc/U3QU-FB27 (captured Feb. 18, 2026). Semple Run, a small creek that originates from limestone springs to the property's northeast and which discharges into Conococheague Creek downstream of the property, runs adjacent to the property's south and west. Second Decl. of Josh E. Kurtz, Secretary of the Maryland Department of Natural Resources (Second Kurtz Decl.) ¶ 12, Exhibit E. Conococheague Creek is a primary tributary of the Potomac River. *Id.* ¶ 15. These waters are regulated by the State for their recreational, aesthetic, and ecological value and as public water supplies, *Id.* ¶¶ 17-21, and also provide important habitat for aquatic species protected by Maryland's Nongame and Endangered Species Conservation Act. *Id.* ¶¶ 27, 33–38 (Brook floater mussels), 39–46 (Green floater mussels), 48–51 (Allegheny pearl dace), 52–54 (Appalachian springsnail), 55–58 (Allegheny cave amphipod), 59–61 (Franz's cave amphipod). The property is also within a half mile of two Ecologically Significant Areas—the Kemps Springs Ecologically Significant Area and the Conococheague-Kemps Mill Ecologically Significant Area—which are identified by the state as ecologically significant based on the presence of state-protected, rare, threatened, or endangered species, habitat that supports known locations of such species, or the presence of a significant natural community of ecological value. *Id.* ¶¶ 67–71.

The warehouse itself was constructed between 2021 and 2023 to serve commercial and logistics needs. Mike Lewis, *Going Up: Firm Breaks Ground for $35M Warehouse; Wright Road to Reopen This Month*, Herald Mail Media (Sep. 14, 2021), https://perma.cc/KL3M-CMVP. A permit issued in August 2021 describes the site as an "825,620 sq. ft. one story shell building to be used as a warehouse." Washington Cnty. Div. Plan Rev. & Permitting, Permit Issuance Report at 3

(Aug. 1–31, 2021), https://perma.cc/D43B-6749.  A brochure advertising the warehouse by previous owners describes the facility as having more than 400 parking spaces, 200 trailer spaces, 2,400 square feet of existing office space, four toilets, and two water fountains.  Warehouse Brochure at 2–3, Exhibit F.  The warehouse receives potable water from the City of Hagerstown via a 2-inch domestic service line and has an approved allocation of 800 gallons per day.  Jessica Swann, *Hagerstown Outlines Water Allocation Process for ICE Facility*, LocalNews1.org (Feb. 20, 2026), https://perma.cc/4F8V-N343.

For the State of Mayland, information about Defendants' plans for the property has been limited.  On January 12, 2026, just four days before effectuating the purchase, DHS sent a letter initiating consultation under section 106 of the National Historic Preservation Act (NHPA) to the Maryland Historical Trust indicating that ICE was "proposing to purchase, occupy, and rehabilitate a 53.74 acre warehouse property in support of ICE operations."  Letter from Gabrielle M. Fernandez, Dep't of Homeland Sec. to Elizabeth Hughes, Md. Hist. Trust at 1 (Jan. 12, 2026), Exhibit G.  The letter did not otherwise specify the purpose for which ICE planned to use the property, besides referring to it in the letter's subject line as a "New ICE Baltimore Processing Facility."  *Id*.

The letter provided a list of "proposed site improvements" that ICE "may" make along the interior and exterior of the property: "installing, upgrading, or rehabilitating existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, recreation areas, and cameras."  *Id*.  The letter concluded that ICE's proposed undertaking – which again was not defined in the letter itself – would "result in a finding of No Historic Properties Affected."  *Id*. at 3.  Regulations

9

implementing NHPA allowed the state 30 days to review and potentially object to the letter.  *See* 36 C.F.R. §§ 800.3(c), 800.4(d), 800.5(c).[2]

It was not until January 30, 2026, after public reporting revealed ICE's purchase of the Williamsport Warehouse, that DHS publicly confirmed in a tweet that the properties it was purchasing—including the Williamsport Warehouse—would function as detention facilities. Dep't of Homeland Sec. (@DHSgov), X (Jan. 30, 2026, 1:14 PM), https://perma.cc/VL4Z-2P4W.

On February 12, 2026, New Hampshire Governor Kelly Ayotte released a document that her office had received from ICE titled "ICE Detention Reengineering Initiative."  Off. of Gov. Kelly Ayotte, Press Release, *DHS Releases New Documents on Merrimack Facility* (Feb. 12, 2026), https://perma.cc/LRC6-7S9C.  That document details a plan by ICE to acquire "non-traditional facilities" to renovate and operate as "eight large-scale detention centers and 16 processing sites" as part of an effort to "increase bed capacity to 92,600 beds" by "the end of Fiscal Year 2026."  Ex. D, ICE DRI at 1.  The ICE Detention Reengineering Initiative claims that "ICE is complying with the National Environmental Policy Act" and that "NEPA surveys were also conducted for each site."  *Id*. at 2–3.

On or about February 25, 2026, more than a month after Defendants had purchased the Williamsport Warehouse, DHS posted an "Early Notice and Public Review of a Proposed Activity in a 100- to 500- Year Floodplain" on the "Documents for Public Comment" page of its website.

---

[2] On January 29, 2026, the Maryland Historical Trust sent an initial letter concurring with DHS's proposed finding but reserving the right to request more information from DHS.  On February 10, 2026, after receiving comments calling into question DHS's portrayal of the project's scope, the Maryland Historical Trust sent a second letter to DHS requesting further information from the agency.  Both letters were sent within the allowed 30-day period. In an email sent to the Maryland Historical Trust on March 2, 2026, DHS indicated that it is preparing a "revised Section 106 consultation package" to be shared with consulting parties "in the near future."

Dep't Homeland Sec., Early Notice and Public Review of a Proposed Activity in a 100- to 500-Year Floodplain, Hagerstown, Maryland, https://perma.cc/G5KS-6R7R ("Floodplain Notice"), Exhibit H. The Floodplain Notice confirmed that ICE intended to use the Williamsport Warehouse as a "detention processing center." *Id.* at 3. Similar to the earlier NHPA letter, the Floodplain Notice provided a non-exhaustive list of activities that ICE might take to convert the warehouse into a detention facility including: "replacement of the existing emergency generator," "constructing one modular security checkpoint structure (approximately 150 square feet)," and "sanitary sewer connections or modifications if required by final engineering review." *Id*. The Floodplain Notice also gestured at a review of alternative locations conducted "in accordance with [NEPA]," *id*. at 4, but no NEPA review has ever been made public.

By March 5, 2026, several organizations had submitted comment letters to DHS in response to the Floodplain Notice, including various departments of the State of Maryland, the Center for Biological Diversity, and multiple coalitions of state and local advocacy organizations. *See, e.g.*, Md. Dep't of Env't., Md. Dep't of Nat. Res., & Md. Dep't of Transp., Comment Letter on Floodplain Notice (Mar. 5, 2026), Exhibit I; Ctr. for Biological Diversity, Comment Letter on Floodplain Notice (Mar. 5, 2026), Exhibit J; Hagerstown Rapid Response, NAACP of Washington County, ACLU of Maryland, Comment Letter on Floodplain Notice (Mar. 5, 2026), Exhibit K;[3] Potomac Riverkeeper Network, Hagerstown Area Religious Council, and Washington County

---

[3] This comment also raised concerns about "disturbing conditions within detention centers affecting the health and safety of the community at large, like a recent measles outbreak in Texas." *Id*. Indeed, in a separate unrelated matter, the State of Maryland has opened a civil rights investigation based on reports of disturbing detention conditions at that local ICE field office in Baltimore. *See generally State of Maryland v. Lyons*, Civil Action No. 1:26-cv-01024-JRR (D. Md.) (seeking to enforce a subpoena submitted to ICE concerning those conditions).

Indivisible, Comment Letter on Floodplain Notice (Mar. 5, 2026), Exhibit L.  The comment period closed on March 5, 2026, and the Floodplain Notice was promptly removed from DHS's website.

The very next day, ICE awarded a contract to "renovat[e]" the Williamsport Warehouse into "a processing and detention facility" and operate it as such.  Contract Summary, Delivery Order from Dep't of Homeland Sec., to KVG LLC, https://perma.cc/2H9A-RJDP ("March 6 Contract").  The contract lists March 6, 2026, as the start date and May 4, 2026, as the current end date.  *Id.*  The contract purports to have already obligated $113.1 million to KVG LLC, with a "potential award amount" of $641.8 million.  *Id.*  This contractor has no known experience leading similar projects and according to public reporting Defendants intend to have the Williamsport Warehouse operational as early as next month.  *See* Joe Heim & Jasmine Golden, *Plans for an ICE Detention Center Spark Anger in a Deep-Red Maryland County*, Wash. Post. (March 5, 2026), https://perma.cc/9W53-BM6R.

In response to the imminent threat of construction activity posed by the March 6 Contract, Plaintiff filed a motion for temporary restraining order on March 10, 2026.  ECF 5-1 at 13.  On March 11, this Court granted Plaintiff's motion, enjoining Defendants "from proceeding with renovation and/or construction activities" at the Williamsport Warehouse in furtherance of its conversion into an immigration detention facility.  ECF 8 at 14-15 (hereinafter "TRO Order").  The Court also ordered Defendants to file a status report within 48 hours, *id.* at 15, which Defendants timely filed on March 13, ECF 9.  In their status report, Defendants indicated that they issued a stop work order to the recipient of the March 6 Contract, KVG, on March 12, who in turn directed "[KVG] personnel and subcontractors to immediately cease all work activities" at the Williamsport Warehouse.  *Id.*

## PROCEDURAL BACKGROUND

On February 23, 2026, Plaintiff State of Maryland brought this action to challenge Defendants' purchase of the Williamsport Warehouse for purposes of converting it into a massive detention facility. *See generally* Compl., ECF 1. As noted, on March 11, 2026, this Court granted the State's motion for a temporary restraining order, enjoining Defendants from undertaking the proscribed activities for 14 days. TRO Order. On March 19, 2026, this Court entered an Order establishing a briefing schedule on the State's motion for a preliminary injunction and extending the TRO "until the Court issues a ruling" on that motion "and no later than Thursday, April 16, 2026." ECF 14 at 2-3. The State now moves for a preliminary injunction pursuant to Fed. R. Civ. P. 65(a), asking this Court to enjoin Defendants from constructing, retrofitting, or operating the Williamsport Warehouse as an immigration detention facility during the pendency of this litigation.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *U.S. v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). To obtain a preliminary injunction, a party "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest. *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The last two factors "'merge' when the government is the opposing party." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

13

**I.    The State's Concrete Interests Will Be Irreparably Harmed Absent Injunctive Relief**

The State of Maryland is likely to suffer an irreparable injury without immediate relief. *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (holding that a party seek emergency relief "must make a 'clear showing'" that it is likely to suffer irreparable harm that is "neither remote nor speculative, but actual or imminent" (citation omitted)). Here, Defendants have awarded a contract to convert the Williamsport Warehouse into a detention facility and begin operating it as such by May 4, 2026, well before this case is likely to reach a conclusion on the merits. *See* March 6 Contract. Once construction begins and Maryland's natural resources and environment are injured, there is no turning back.[4] Similarly, the forthcoming operation of the facility as a massive immigration detention center is likely to cause irreparable harm to public health and the environment. Thus, the harm is imminent and absent a preliminary injunction, Maryland's asserted injury "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline*, 915 F.3d at 216 (quoting *Stuller Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012).

Indeed, in granting a temporary restraining order, this Court found a "likelihood of irreparable harm resulting from the environmental concerns identified by the State[.]" TRO Order at 2; *see also Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.").

---

[4] The State of Maryland has a sovereign interest in its waterways and its wildlife. *See, e.g.*, Md. Code Ann., Nat. Res. § 8–101(g) (broadly defining "Waters of the State"); Md. Code Ann., Nat. Res. §§ 10–2A–01 to 10–2A–09 (ensuring protections for wildlife and plants).

**A. Construction of the Detention Facility Threatens Imminent Irreparable Harm**

What limited information Defendants have provided indicates that construction activity to convert the warehouse into an immigration detention facility will result in irreparable harm to the State's environmental interests. Defendants' original NHPA letter indicates that construction activities at the facility "may include, but are not limited to, installing, upgrading, or rehabilitating existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, recreation areas, and camera," and that "[t]entage and a guard shack may also be installed." Ex. G, Letter from DHS to MHT at 1. Similarly, Defendants' Floodplain Notice suggests that Defendants "may" install a security checkpoint structure and exterior lighting, replace an existing emergency generator, and possibly modify the existing sanitary sewer. Ex. H, Floodplain Notice. The breadth of possible activities contemplated by these notices indicates that construction activity at the facility poses a significant risk to Maryland's environment and natural resources.

Moreover, converting the warehouse into a detention facility will likely require far more construction activity than Defendants have disclosed, and if Defendants fail to undertake that significant construction, the facility will pose an even greater risk to the environment and health of the local community. The Maryland Department of the Environment has determined that the Williamsport Warehouse is currently served by a 6-inch lateral sewer line which connects to an 8-inch sewer main that then feeds into the Wright Road Pumping Station which pumps sewage directly to the Conococheague Wastewater Treatment Plant. Second Decl. of Walid Saffouri, Maryland Department of the Environment (Second Saffouri Decl.) ¶ 18, Exhibit M. A 6-inch sewer line can have the capacity to handle 63,500 gallons per day, and an 8-inch sewer main should be able to handle 112,800 gallons per day. *Id.* ¶¶ 21-22. The Wright Road Pumping Station currently receives an average of 77,498 gallons per day of wastewater and is designed to handle a

maximum capacity of 102,240 gallons per day. *Id.* ¶ 27. That leaves only 24,742 gallons per day of available capacity. *Id.* The limited capacity of this existing infrastructure is likely insufficient to handle the expected increase in wastewater flows that would accompany converting the Williamsport Warehouse into a massive immigration detention facility.

The Maryland Department of the Environment's guidelines for estimating daily wastewater flows illustrate the insufficiency of the current sewer lines. *See generally* Maryland Dep't of the Env't Eng'g & Cap. Projects Program, *Design Guidelines for Wastewater Facilities* (2021), Exhibit N ("Design Guidelines"); Second Saffouri Decl. ¶ 13 (describing the Design Guidelines). Defendants have not provided a public estimate of the amount of wastewater that they expect to be generated at the facility but the Design Guidelines can help provide a range of expected wastewater from a 1,500 bed facility. Second Saffouri Decl. tbl.1. Using the Design Guidelines for "Institutions Other than Hospitals," the category "most closely analogous" to a detention facility, to estimate the facility's expected wastewater yields a daily flow of 187,500 gallons, far exceeding the capacity of the property's existing infrastructure. Second Saffouri Decl. ¶¶ 29-30, 39-41.

Accordingly, major upgrades to the existing sewer line, sewer main, and pumping station are needed for the facility to be safely operated. *Id*. ¶ 45. Those upgrades would require "significant excavation along the length of the 6-inch lateral line and likely the 8-inch sewer main" and "significant upgrades to the Wright Road Pumping Station including excavation to expand the facility's wet well." *Id*. That excavation is "likely to increase sediment runoff to nearby waters and have significant traffic impacts within the community as well." *Id*.

Similar excavation is likely needed to provide sufficient drinking water to the property. The property is connected to the City of Hagerstown's drinking water distribution system by a 2-

inch pipe and is currently allocated 800 gallons per day of drinking water. *Id.* ¶ 49. A 2-inch pipe can deliver from 65,000 to 120,000 gallons per day of drinking water. *Id.* ¶ 50. The Design Guidelines again provide a basis for estimating the drinking water required at a facility because the amount of wastewater generated at a site is usually similar to the amount of drinking water that it receives. *See id.* ¶ 51. Thus, a detention facility providing 24/7 occupancy for up to 1,500 people is likely to need around 187,500 gallons per day of drinking water. *Id.* Real-world numbers from a Maryland run correctional institution indicate the actual demand may be even higher. *See id.* ¶¶ 52-53 (Based on drinking water information from the Eastern Correctional Institution, "a 1,500 person facility would be expected to require 311,347 gallons of drinking water per day."). A major upgrade of the 2-inch distribution line is therefore necessary. *Id.* ¶ 55. Such an upgrade would "require significant excavation and construction activity that is likely to result in sediment pollution to nearby waters." *Id.* ¶ 56.

At a minimum, sediment runoff from such construction is likely to affect Semple Run, a stream which runs adjacent to the property and which receives discharges directly from the property's existing stormwater management system. Second Kurtz Decl. ¶¶ 12, 14 ("Given its proximity to the property, sedimentation from construction activity is likely to reach Semple Run."). Semple Run is an important cool-water tributary of Conococheague Creek, one of the Potomac River's primary tributaries. *Id.* ¶ 13. Pollution affecting Semple Run would therefore impact downstream stretches of Conococheague Creek and the Potomac River. *Id.* ¶ 11.

As the Court noted in its Order, the "significant construction" efforts that are likely needed to build ICE's proposed detention facility pose "grave environmental risks" to nearby watersheds "adjacent to or downstream of the property – Semple Run, Conococheague Creek, and the Potomac River[.]" TRO Order at 11; *see also Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*,

17

890 F. Supp. 2d 688, 694 (S.D.W. Va. 2012) (holding that "irreparable environmental injury occurs instantaneously with the filling of the stream itself," because "[o]nce the filling has begun, the harmful environmental effects of that filling often cannot be completely reversed"); *Rio Assocs., L.P. v. Layne*, No. 3:15-CV-00012, 2015 WL 3546647, at *5 (W.D. Va. June 8, 2015) (explaining that it is "well settled that this kind of environmental injury," such as harm to "air and water quality," "constitutes irreparable harm").

If more were needed, the waters under imminent threat of pollution are home to aquatic species protected by the State as either "endangered" or "in need of conservation". Second Kurtz Decl. ¶ 26. For instance, the Allegheny pearl dace (a freshwater fish) is known to occur in the vicinity of Semple Run. *Id*. ¶¶ 50–51. The Allegheny pearl dace is considered "in Need of Conservation" throughout Maryland because of its "restricted and reduced range, low population sizes, and severe threats." *Id*. ¶¶ 48–49. Likewise, the State endangered brook floater and green floater mussels are known to occur downstream of the facility in the Potomac River. *Id*. ¶¶ 35-36, 39-40. Both species are sensitive to disturbances in water quality, like sedimentation, and the green floater is susceptible to being washed downstream during high flow events. *Id*. ¶¶ 37, 41, 42. Populations of green floater mussel are particularly vulnerable to extirpation – localized extinction – because of increased habitat fragmentation and the mussel's relatively short lifespan. *Id.* ¶ 43. Additional species listed as "in Need of Conservation" make their homes in the limestone springs that feed into Semple Run including the Appalachian springsnail, Allegheny cave amphipod, and Franz's cave amphipod. *Id.* ¶¶ 52–61.

The State makes extensive efforts to protect these species, including by prohibiting hunting or capturing such creatures, and working to affirmatively support their conservation. *Id.* ¶ 28 (restrictions on "take" of state endangered species), ¶ 31 (describing the State's many efforts to

18

support freshwater mussel conservation).  These efforts and indeed the affected species would all be irreparably injured if Defendants are allowed to proceed with construction to convert the warehouse into an immigration detention facility.  *Id*. ¶ 10 (noting that "several species in this area are particularly vulnerable to changes in water quality, including increases in sedimentation and other pollution that would almost certainly occur if construction proceeds."); *see also Washington Cnty, N.C. v. U.S. Dep't of Navy*, 317 F. Supp. 2d 626, 635 (E.D.N.C. 2004) (holding irreparable harm present where plaintiffs "demonstrated the fragility of the relationship" of certain birds to the affected site and the "irreparable harm that, though incalculable, would result from the Court's failure to grant an injunction pending a determination on the merits").  This Court previously found that the above-noted species "stand to be harmed by pollution to the waterways resulting from Defendants' plans."  TRO Order at 12.  This irreparable harm similarly supports entry of a preliminary injunction.

**B.  Operation of the Detention Facility Threatens Imminent Irreparable Harm**

Operating the facility is likely to harm both the environment and public health, further justifying the need for a preliminary injunction.

*Environmental Health Hazards.*  Defendants indicated in their floodplain notice that only "limited upgrades . . .  may be required to accommodate projected wastewater flows," Ex. H, Floodplain Notice at 3, thus suggesting that Defendants are not planning on making the significant upgrades necessary to accommodate increased flows from the facility.  As a consequence, once the facility becomes operational sewage backups are likely both at the facility and throughout the surrounding area.  Second Saffouri Decl. ¶¶ 39 ("Overloading the 6-inch lateral line that currently serves the warehouse would yield backups at the property."), 41 (Overloading the 8-inch sewer main "would likely result in sewage overflows, usually from the manholes."), 44 (Overloading the

19

Wright Road Pumping Station "will likely result in sewage overflows from any part of the pumping station."). Such occurrences would likely constitute a public health hazard and are also likely to result in sewage reaching nearby waters. *See id.* ¶ 39 (Overflows at the property "would create public health hazards for the immigrants, ICE agents, and others at the facility," and cause "adverse environmental impacts, including to neighboring streams and their aquatic life."); Declaration of Dr. David Blythe, State Epidemiologist for the Maryland Department of Health (Blythe Decl.) ¶ 17, Exhibit O ("[E]xposure to sewage containing stool would create a risk for enteric bacterial pathogens, such as E coli, Salmonella, and Campylobacter, or other infections.").

Sewage backups would pose a threat to the surrounding environment similar, or even greater, than that posed by construction activities. Second Saffouri Decl. ¶ 39 (sewage overflows "would likely impact neighboring streams and their aquatic life"); Second Kurtz Decl. ¶¶ 9 ("Sewage overflow events are harmful to sensitive species and can force the closure of commercial and recreational fisheries nearby and for miles downstream."), 42 ("Ongoing threats to green floater mussels include… wastewater effluents.").

*Public Health Threats*. Operation of ICE's planned detention facility will also create a high likelihood of infectious disease outbreaks, harming the health of individuals at the facility and the surrounding community, and undermining the overall state of public health in Maryland. *See, e.g., New York v. Biden*, 636 F. Supp. 3d 1, 15 (D.D.C. 2022) (finding injury where federal action undermined state "efforts to mitigate the spread of COVID-19 [which] are aimed at protecting the public health of their respective jurisdictions as a whole"); *New York v. United States Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 226 (S.D.N.Y. 2020) (finding state injury where federal

action "impedes public efforts in the Governmental Plaintiffs' jurisdictions to stem the spread of [COVID-19].").[5]

Congregate detention facilities, like the one ICE proposes here, pose higher risks of infectious disease outbreaks, including "outbreaks of measles, mumps, tuberculosis, influenza, COVID-19, hepatitis A, hepatitis B, and multidrug-resistant organisms." Blythe Decl. ¶ 8. "ICE detention centers specifically have been documented as 'high-risk environments for infectious diseases' due to generally crowded living conditions, and limited access to preventative care, among other factors." *Id*. ¶ 10 (citation omitted). Tragically, the threat of outbreaks has already been realized at ICE facilities across the country, as public reporting revealed outbreaks of tuberculosis and COVID-19 in an El Paso ICE Facility, and measles outbreaks in ICE facilities in Texas and Arizona.[6]

That threat is increased by ICE's plan to turn over the facility's population every 3-7 days. Such "rapid ingress and egress of detained individuals, some of whom could be infectious with a range of pathogens . . . contributes to the further increased risk of infectious disease outbreaks both at the facility and throughout the local community[.]" Blythe Decl. ¶ 13.

---

[5] Moreover, courts have repeatedly held that NEPA analyses must account for dangers to human health, including the possibility of disease outbreaks and infections resulting from the proposed federal action. *See Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1131 (9th Cir. 2012) (evaluating agency analysis of health risks from new bio-lab); *Allen v. Nat'l Institutes of Health*, 974 F. Supp. 2d 18, 41 (D. Mass. 2013) (same).

[6] *See, e.g.,* Lauren J. Young, *Measles Outbreak Erupts in One of U.S.'s Largest ICE Detention Centers*, Scientific American (March 5, 2026), https://www.scientificamerican.com/article/measles-outbreak-erupts-in-one-of-u-s-s-largest-ice-detention-centers/; Katie Thomas, Jessica Silver-Greenberg and Melena Ryzik, *Sick Detainees Describe Poor Care at Facilities Run by ICE Contractor*, NY Times (February 14, 2026) https://www.nytimes.com/2026/02/14/business/ice-health-care-corecivic-immigrants-detention.html; Colleen Deguzman and Lomi Kriel, *Two Cases of Tuberculosis Detected at El Paso ICE Facility*, The Texas Tribune (February 7, 2026), https://www.texastribune.org/2026/02/07/ice-facility-el-paso-tuberculosis/.

Preventing outbreaks in facilities like the one proposed here takes "sustained and comprehensive planning, emphasizing the importance of detection, treatment, infection prevention and control practices, and continued access to high-quality medical care." *Id.* ¶ 18.  However, ICE has not publicly disclosed any consideration of public health risks, whether in their NEPA analyses or otherwise, let alone the necessary plans to prevent, mitigate, and treat outbreaks as necessary. In sum, "the planned ICE facility poses a heightened risk of infectious disease outbreaks, especially without sufficient infection control plans and facility improvements, threatening the health and well-being of individuals in the facility and the surrounding community." *Id.* ¶ 20.

All of these environmental and health threats, from both the construction and operation of the facility, are magnified by Defendants' failure to conduct a transparent review.  *Cf. Winter*, 555 U.S. at 23 ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures."); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003) (finding an "added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment") (citations omitted).[7]

In sum, an injunction here is essential to preserving the status quo and allowing the court to render meaningful relief at the merits on the State's NEPA claims.  If Defendants are allowed to proceed with construction activities at the facility, which they plan to complete by May 4, 2026, and eventually with operation of the facility as a massive immigration detention facility, irreparable

---

[7] To be sure, *Winter* held that the public interest did not support an injunction there; but in this very section of the opinion, the Supreme Court explained it was "pertinent" that the case concerned "training exercises that have been taking place in [Southern California] for the last 40 years," rather than a "new type of activity" for which NEPA analysis is particularly salient.  555 U.S. at 23.

harm to Plaintiff would be likely, and there would be little prospect of any future environmental review influencing Defendants' decision.

The key is in the ignition of the bureaucratic steamroller. The State asks that this Court stop Defendants from starting the engine and irreparably harming the State in the meantime.

## II.     The State Is Likely to Succeed on the Merits

"To secure a preliminary injunction, a plaintiff must 'make a clear showing that [it is] likely to succeed at trial, [but it] need not show a certainty of success." *Ass'n of American Publishers, Inc. v. Frosh*, 586 F.Supp.3d 379, 388 (D. Md. 2022) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)). Here, Defendants violated NEPA's action-forcing mandate by failing to prepare any environmental document prior to purchasing the property for their intended purposes. 42 U.S.C. §§ 4336(b)(1)–(2); *cf. N.C. Wildlife Fed'n.*, 677 F.3d at 601–02 ("The NEPA process includes a range of 'action-forcing procedures that require . . . agencies [to] take a "hard look" at environmental consequences [of a proposed action] and [to] provide for broad dissemination of relevant environmental information.'" (alterations in original)).

Moreover, meaningful public engagement is integral to the NEPA process, yet no such engagement happened here. 42 U.S.C. §§ 4332(C), 4336(b)(2) (instructing that an environmental impact statement and relevant comments "shall be made available to the . . . public" and that "an environmental assessment shall be a concise public document"); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency 'has indeed considered environmental concerns in its decision-making process,' and, perhaps more significantly, provides a springboard for public comment." (internal citations omitted)). And absent meaningful public engagement the agency will have fallen short of the "hard look" required

23

by NEPA. *Robertson*, 490 U.S. at 351 (NEPA does not prohibit "unwise" agency action but it does prohibit "uninformed" agency action).

**A. The Decision to Purchase the Williamsport Warehouse for the Purposes of Converting It into an Immigration Detention Facility Required NEPA Review**

Under NEPA, an agency is required to prepare an environmental impact statement whenever there is a "proposal[]" for a "major Federal action[]" with a "reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. §§ 4332(C), 4336(b)(1); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). When the significance of a proposed action's impacts on the environment is uncertain, NEPA requires the agency to prepare an environmental assessment, "a concise public document" used to determine the significance of the action's environmental impacts and thus whether further study through an environmental impact statement is necessary. 42 U.S.C. § 4336(b)(2); *Ohio Valley Env't Coal.*, 556 F.3d at 191. There are limited exceptions when environmental analysis is not required, 42 U.S.C. § 4336(a), none of which are applicable here. TRO Order at 7 n.4.

Defendants' decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility is a "major Federal action" for which NEPA review should have been completed prior to Defendants taking action to implement that decision. As the Court held in granting a Temporary Restraining Order, "prior to engaging in the construction at the Williamsport Warehouse, Defendants are likely required under NEPA to issue an EIS or conduct an EA." TRO Order at 8.

1. *Defendants' Decision is a Major Federal Action.*

NEPA defines "major Federal action" as "an action that the agency . . . determines is subject to substantial federal control and responsibility." 42 U.S.C. § 4336e(10)(A). The DHS Instruction Manual emphasizes that "NEPA applies to the majority of DHS actions . . . Examples

24

of situations in which NEPA is not triggered are very few," which largely tracks the statutory language of NEPA discussed below.  DHS Instruction Manual at V–1.

The decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility is clearly a major federal action.  Defendants purchased the Williamsport Warehouse outright for over $100 million and are publicly recorded as the owners of the property, rendering the facility squarely under federal control and responsibility.  Ex. B, Deed, at 2–3.  DHS has confirmed that the Williamsport Warehouse was acquired with the intention of conversion into a detention facility.  Dep't of Homeland Sec. (@DHSgov), X (Jan. 30, 2026, 1:14 PM), https://perma.cc/VL4Z-2P4W; *see also* Ex. H, Floodplain Notice, at 3–4.  As the Court concluded, the activities at the Williamsport Warehouse "will be entirely under federal control and proceed pursuant to federal law," TRO Order at 8.[8]

    2.   *Defendants' Decision Will Have Reasonably Foreseeable Significant, or Unknown, Environmental Impacts*

If a major federal action has "a reasonably foreseeable significant effect on the quality of the human environment" an agency "shall issue an environmental impact statement."  42 U.S.C. § 4336(b)(1). If such action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," an agency "shall prepare an environmental assessment."  *Id.* § 4336(b)(2).[9]

---

[8] This Court properly distinguished the instant situation from the one at issue in *Friends of the Everglades II* where "no federal dollars [had yet] been expended on the construction or use of the Facility." TRO Order at 8 n.5 (quoting *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567 (11th Cir. Sept. 4, 2025).

[9] The DHS Instruction Manual notes that "[e]xamples of activities for which a Component normally prepares an EA or a Programmatic EA include but are not limited to . . . [p]roposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas" and

Defendants' decision to convert a commercial warehouse into a detention facility is without precedent. Yet based upon the limited information that the State has gathered about the facility and Defendants' plans for it, the State has identified a number of foreseeably significant impacts to the human environment Defendants' decision. *See, supra* at 14-22 (outlining the foreseeable significant impacts from Defendants' intended construction, retrofitting, and operation of the Williamsport Warehouse into a massive immigration detention facility).

For example, in its current condition the facility will not be able to provide sufficient potable water for 1,500 individuals. Second Saffouri Decl. ¶¶ 49-56. The warehouse is currently connected to the City of Hagerstown's drinking water system through a 2-inch domestic service line and allocated 800 gallons of drinking water per day. *Id*. ¶ 49. The Department of the Environment's best estimate is that the facility, when holding 1,500 individuals, will require approximately 187,500 gallons per day of drinking water. *Id*. ¶ 51. Upgrading the existing water line so that it can provide sufficient potable water to the facility will require significant excavation. *Id*. ¶ 55.

The State also has concerns that the existing wastewater infrastructure will be insufficient to support the property's new use, presenting significant environmental impacts. Backups and overflows of sewage from the facility are reasonably foreseeable based on estimates of the capacity of existing wastewater infrastructure servicing the Williamsport Warehouse and projections of the capacity needed to serve a 1,500-person detention facility, threatening both the population of the Williamsport Warehouse and the surrounding community and ecosystems. Second Saffouri Decl. ¶¶ 10, 36–39; Second Kurtz Decl. ¶¶ 9-10, 42; Blythe Decl. ¶¶ 17, 20.

---

"[n]ew law enforcement field operations for which the environmental impacts are unknown, . . . or for which the potential for significant environmental controversy is likely." DHS Instruction Manual at V-9.

The State has identified a number of resources that would be foreseeably impacted by the construction activity needed to renovate the building so that it has sufficient drinking and wastewater capacity and from operating the facility. The Williamsport Warehouse is within a half-mile radius of two Ecologically Significant Areas and is in the watershed of three State waterways which provide habitat for numerous State protected species and contain important, unique, and sensitive natural resources and ecological features. *See generally* Second Kurtz Decl. This includes two species of freshwater mussel that are considered "endangered" under state law, one of which, the green floater mussel, has also been proposed for protection as a threatened species under the Federal Endangered Species Act. *Id.* ¶¶ 36, 45. These resources will likely be threatened by sedimentation and other forms of pollution that accompany construction activity during the warehouse's renovation and its subsequent operation. *Id.* ¶¶ 7–8.

Likewise, the operation of the facility as a massive immigration detention facility would foreseeably create environmental and public health hazards. For example, operating the facility without major upgrades to the wastewater system will likely threaten surrounding watersheds with pollution, and endanger vulnerable species in those ecosystems. *Id*. ¶¶ 9-10. Moreover, Defendants' facility will pose a heightened risk of infectious disease outbreaks, threatening the health of individuals at the facility and in the surrounding community.

In other areas, the secretive nature of Defendants' activities has foreclosed the State's ability to forecast future impacts, but additional significant impacts cannot be ruled out. *See, e.g.*, Ex. I, Md. Cmt. Ltr. at 9 (noting uncertainty around floodplain and air pollution impacts), 10 (pointing to difficulty in quantifying likely traffic impacts from using the warehouse to potentially hold 1,500 detainees at a given time with the entire population turning over every 3–7 days).

27

Defendants' decision to convert a commercial warehouse into a massive detention facility will likely have a significant impact on the human environment, such that an environmental impact statement is required. At the very least, even if the environmental impact is merely unknown, Defendants must still prepare an environmental assessment.

### 3. *No Applicable Exceptions to NEPA Review Are Present*

As the Court previously noted, none of the exceptions to NEPA review found at 42 U.S.C. §§ 4336(a)(1)–(4) likely apply here. TRO Order at 7 n.4. Under subsection (a)(1), the decision to purchase the warehouse for the purpose of converting it into a detention processing center is clearly final agency action.[10] Under (a)(2), pursuant to DHS's own procedures, it may not invoke any other categorical exclusion of the agency, given the presence of "extraordinary circumstances" here.[11] Under (a)(3), environmental review is neither excluded by, nor conflicts with, other provisions of law. DHS Instruction Manual at IV–9 ("There is no national security or homeland security exemption from complying with NEPA."). And finally, under (a)(4) Defendants certainly possess some level of discretion to take environmental factors into consideration in considering whether to construct the proposed facility.

---

[10] The Court correctly held that there was "likely" final agency action in the TRO Order. TRO Order at 9.

[11] The DHS Instruction Manual explicitly lists "extraordinary circumstances" to include "[a] potentially significant effect on an environmentally sensitive area;" "[a] potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment," including "environmental permits;" "[a]n effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks;" and "[w]hether the action is related to other actions with individually significant, but cumulatively significant impacts." DHS Instruction Manual at V–5 to V–6. At a minimum, Defendants' unprecedented activity falls within the category of uncertain environmental effects, and the State has also identified multiple environmentally sensitive areas and species therein, which will be threatened by Defendants' proposed construction. Second Kurtz Decl. ¶ 7.

28

**B.  Defendants Have Failed to Publicly Review the Environmental Impacts of Their Actions.**

NEPA requires that federal agencies take a "hard look" at the environmental impacts of their proposed actions prior to acting and prescribes specific requirements for ensuring that hard look review occurs. *Defs. of Wildlife*, 762 F.3d at 393.  As the Court noted, "Defendants do not appear to have taken a 'hard look' at the potential environmental consequences" of their action and, "as far as the Court can tell, no EIS and no EA were initiated or completed." TRO Order at 9.

Moreover, Defendants have failed to disclose sufficient information about the project to allow the public to weigh in on their proposal and inform the agency's decision making.  As the Court observed, Defendants' Floodplain Notice "does not appear to take the place of the requirement to complete an EIS or EA" and because Defendants "awarded a contract authorizing work to begin on the site a day after the comment period closed, the record cannot support a finding that "the agency took a 'hard look' at [the] project's environmental effects before acting," TRO Order at 10 (quoting *Hodges*, 300 F.3d at 445).

Timely public notice and intergovernmental collaboration are integral parts of the NEPA process.  *See Hodges*, 300 F.3d at 438 (describing NEPA's twin goals of "guarantee[ing] that an agency will take a hard look at environmental consequences before making a decision that may affect the environment," and "ensur[ing] that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decision-making process and the implementation of the decision") (internal citations and quotations omitted). *See also Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989) ("[T]he broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time.").  NEPA instructs that an "environmental assessment shall be a concise *public* document," 42 U.S.C. § 4336(b)(2)

(emphasis added), while environmental impact statements and relevant comments similarly "shall be made available . . . to the public," 42 U.S.C. § 4332(C).  The statute also makes clear that these public documents must be produced at the "proposal" stage when public input can play a role in the agency's ultimate decision.  *See* 42 U.S.C. 4336(b)(1) ("An agency shall issue an [EIS] with respect to a *proposed* agency action") (emphasis added); 4336(b)(2) ("an agency shall prepare an [EA] with respect to a *proposed* agency action") (emphasis added); 4336e(12) ("The term 'proposal' means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects.").

The DHS Instruction Manual further emphasizes that "[a]t DHS, public involvement is used in the NEPA process to help define the scope of issues and level of analysis." DHS Instruction Manual at IV–6.  Such "[i]ntergovernmental collaboration and public involvement improve the effectiveness of DHS missions and activities, as well as build trust between DHS and the communities it serves." *Id.* at IV–6.

Defendants did not provide a scoping notice for their proposal, did not distribute a draft environmental assessment and finding of no significant impact, and did not provide any other outreach sufficient to allow meaningful public input.  *See* 42 U.S.C. § 4336(b)(2); DHS Instruction Manual at V–6 to V–13.  While DHS's Floodplain Notice baldly asserts that "in accordance with [NEPA] . . . ICE evaluated whether practicable alternatives existed that would meet operational requirements while minimizing environmental and community impacts," Ex. H, Floodplain Notice, at 4, Defendants have not made that analysis public and even if they did, the fact that it was conducted in secret—without public input at any stage—would render it fatally flawed under NEPA's "hard look" standard.  42 U.S.C. §§ 4332(C), 4336(b)(2); *see also Hodges*, 300 F.3d at

438 ("[C]ompliance with NEPA procedures 'ensures that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision.'"); *Bering Strait Citizens for Resp. Res. Dev.*, 524 F.3d at 953 ("An agency when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.").

In short, Defendants commenced, concluded, and are now implementing the decision to purchase the Williamsport Warehouse for the purpose of converting it into an immigration detention facility without following NEPA's action-forcing procedures and without the "hard look" at environmental impacts that NEPA requires "*before* taking major federal actions." *Nat'l Audubon Soc'y*, 422 F.3d at 184 (emphasis added).  Accordingly, Plaintiff is likely to succeed on the merits.

## III.    The Remaining Factors Weigh in Favor of Injunctive Relief

The final two factors "balance of the equities and the public interest 'merge when the Government is the opposing party.'" *Maryland v. Corp. for Nat'l & Cmty. Serv*., 785 F. Supp. 3d 68, 122 (D. Md. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Notably, the purpose of preliminary relief such as a preliminary injunction "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward.'" *Roe*, 947 F.3d at 231 (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).

For multiple reasons the public interest here favors a preliminary injunction to maintain the status quo.  First, the public interest supports a preliminary injunction to prevent Defendants from irreparably harming the environment.  Indeed, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages . . . [and] [i]f such injury is sufficiently likely,

therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) (citation omitted). Similarly, the public interest weighs against allowing federal action that poses "potentially dire public health consequences." *See Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 234 (7th Cir. 2020). As explained above, construction and operation of the detention center will likely result in pollution and health hazards, threatening both public health and local ecosystems. *See supra* at 14-22. Defendants have not followed the processes NEPA mandates to evaluate environmental impacts, and "[t]he public interest is not served by compromising environmental due process and proceeding with a project that later may be found to be in violation of NEPA." *Washington Cnty.*, 317 F. Supp. 2d at 637.

Second, the public interest is served by avoiding harm to the local community while the case is litigated. As several local advocacy groups have explained, the available information indicates that the proposed detention facility will process tens of thousands of individuals each year, a population likely far larger than Hagerstown, the largest city in the area. *See* Ex. K, HRR, NAACP & ACLU Cmt. Ltr., at 3. It is accordingly likely that if construction proceeds without due consideration for infrastructure requirements, such as water, sewage and transportation, the local community will be injured. *Id.* at 4 (noting that the facility "will add tremendous, unprecedented activity and burdens to the local community, our environment, and our infrastructure.").

Third and finally, a preliminary injunction is in the public interest because a pause will allow for better evaluation of, and public input on, Defendants' plans. *See, e.g.*, *id.* at 5 (decrying the "absence of any concrete information or consultation with all relevant state and local officials"); Ex. L, PRN, HARC & WCI Cmt. Ltr at 2-4 (similar). Without an ordered pause, Defendants' rush to construct a massive detention facility will likely preclude their ability to

32

incorporate public feedback and potentially reevaluate their decision-making.  In fact, the decision by Defendant to convert the warehouse into a detention center—and all decisions to implement this plan—"would inevitably be influenced if [Defendants] were allowed to construct major segments of the [project] before" complying with NEPA, and the "completed segments would 'stand like gun barrels pointing into the heartland'" of the local environment.  *Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986) (citation omitted).  "It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent."  *Id.*  And allowing Defendants to move forward with construction, which they intend to complete by May 4, 2026, during the pendency of this litigation risks diminishing the options open to Defendants to the point that NEPA review "would become a meaningless formality."  *Nat'l Audubon Soc'y*, 422 F.3d at 201 (quoting *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1333 (4th Cir. 1972)).

In sum, through a preliminary injunction, "the public interest would be served by having the federal defendants address the public's expressed environmental concerns." *Fund For Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998).

On the other side of the ledger, while Defendants may claim an interest in immigration enforcement, that general interest does not explain why they must convert this specific warehouse into a detention facility, and why they must do so "at this time," without meaningful public engagement and a hard look at environmental impacts.  *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 27 (D.D.C. 2009).

Indeed, public reporting indicates that Defendants have repeatedly cancelled recent plans for similar detention facilities, in the face of political pressure or community pushback.  In at least three separate instances just this year, in Mississippi, New Hampshire, and Tennessee, DHS has

33

reversed course on their plans to build detention facilities.[12]  Defendants' fluid and changeable proposals for detention centers around the country accordingly refute any contention that the public interest supports immediately building a facility in this specific location.

To be sure, an injunction might delay construction, but the prospect of delay is outweighed by the public's interest in avoiding an uninformed, hasty decision that results in irreversible action. *See N.C. Wildlife Fed'n*, 677 F.3d at 601–02 ("NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.") (citation omitted). Indeed, any delay does not infringe on any general prerogative to enforce immigration laws; Defendants' own policies confirm that NEPA "generally applies" to DHS construction of such facilities.  *See supra* at 5–7; *cf. Roe*, 947 F.3d at 230 ("[T]he Government has not shown what institutional harm arises from relief that merely requires it to comply with its own policies.").

While Defendants have already "invested considerable resources" in building a detention center at this warehouse, TRO Order at 13, continuing a rushed and uninformed federal action is not in the public interest.  Indeed, to the extent Defendants must first evaluate the environemntal impacts of their project, that process effectuates the will of Congress as expressed in NEPA.  As this Court put it in the context of whether a temporary restraining order would cause any delay in construction, "[o]pposite the slight inconvenience of a delay in construction stands ongoing and possible future irreparable harms caused by Defendants' likely NEPA violation."  *Id.*

---

[12] *See* Roger Wicker, *Proposed ICE Facility Threatens Byhalia, Mississippi Economy and Infrastructure* (Feb. 4, 2026), https://perma.cc/E2AK-TTHZ; Jack Armstrong, *DHS Agrees to 'Look Elsewhere' for Proposed Mississippi ICE Facility,* Memphis Commercial Appeal (Feb. 6, 2026), https://perma.cc/QUL5-AQRX; Maggie Cullen, *NH ICE Facility Reversal After Bipartisan Resistance Follows National Trend*, Seacoast Online (Feb. 27, 2026), https://perma.cc/YK2F-TRH7; Anita Wadhwani, *Sen. Marsha Blackburn: ICE ends plans for Wilson County immigrant detention 'mega center'*, Tennessee Lookout (February 25, 2026), https://tennesseelookout.com/2026/02/25/sen-marsha-blackburn-ice-ends-plans-for-wilson-county-immigrant-detention-mega-center/.

In sum, the public interest favors avoiding irreparable harm to the environment and public health, and cannot support Defendants' apparent desire to rapidly construct a mass detention facility in blatant disregard of the process required by federal law.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter a preliminary injunction barring Defendants from renovating, constructing, retrofitting, or operating the Williamsport Warehouse as an immigration detention facility while this litigation remains ongoing.

Dated: March 19, 2026                           Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Steven J. Goldstein*
Steven J. Goldstein (D. Md. Bar No. 32071)
Robert N. Brewer (D. Md. Bar No. 31649)
Yasmin Dagne (D. Md. Bar No. 32016)
Michael Drezner (D. Md. Bar No 31784)
Adam Kirschner (D. Md. Bar No. 31767)
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
sgoldstein@oag.maryland.gov
(410) 576-6414

*Counsel for the State of Maryland*

35