**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| STATE OF MARYLAND,<br>    Plaintiff,<br><br>    v.<br><br>KRISTI NOEM, Secretary of Homeland<br>Security et al.,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:26-cv-733-BAH |

**BRIEF OF AMICI CURIAE POTOMAC RIVERKEEPER NETWORK, WASHINGTON
COUNTY INDIVISIBLE, AND CENTER FOR BIOLOGICAL DIVERSITY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

As part of its rapid and reckless expansion of immigration detention nationally, Defendants U.S. Immigration and Customs Enforcement ("ICE") and the U.S. Department of Homeland Security ("DHS") purchased a mega warehouse in Williamsport, Maryland to convert into an immigration facility for 1,500 detainees. Defendants did so without conducting the necessary environmental review or providing notice to the public, violating the National Environmental Policy Act ("NEPA") and prompting the State of Maryland to file the instant lawsuit. Amici are local and national environmental and community groups concerned about Defendants' flagrant disregard for the law and the harm that their plans will cause to local air quality, waterways, sewage and stormwater systems, vulnerable species, and public health and welfare. Given Defendants' intent to proceed rapidly with the construction and operation of the warehouse once the Court's temporary restraining order expires, the State's requested preliminary injunction is critical. Without it, the State will suffer irreparable harm to its interests in the environment and the health and welfare of its residents, including amici and many of their members.

## ARGUMENT

To obtain a preliminary injunction, a party "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The last two factors "'merge' when the government is the party opposing." *Id.* at 230 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Applying these factors, Maryland is entitled to a preliminary injunction to

1

halt the construction of the detention facility and all related activity unless and until the Defendants comply with NEPA.

**I.      The State of Maryland Is Likely to Succeed on the Merits of This Case.**

NEPA requires an agency to prepare an environmental impact statement ("EIS") for "major Federal actions" with a "reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. §§ 4332(2)(C), 4336(b)(1). The EIS must address, among other things, "the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 172 (2025); *see* 42 U.S.C. § 4332(2)(C)(i)-(v) (listing topics an EIS must address). It must take a "hard look" at the proposed action's impacts, and that hard look "should include neither researching in a cursory manner nor sweeping negative evidence under the rug." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 194 (4th Cir. 2005). Defendant DHS's NEPA policy manual explains that the EIS must address impacts that are "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." Dkt. 15-4 at II-2, II-4. "[W]hen a major federal action is undertaken, no part may be constructed without an EIS." *Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986); *see* 42 U.S.C. § 4332(2)(C).

Defendants were required to issue an EIS before purchasing the Hagerstown property. Their plan to construct and operate a mass detention facility is a "major Federal action[]" because it is "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). Constructing and operating a mass detention facility will have a "reasonably foreseeable significant effect on the quality of the human environment" by harming the local

2

waterways, sewage and stormwater systems, species, air quality, and public health and welfare. *Id.* § 4336(b)(1). As of now, the warehouse is unfit for human habitation, and the retrofitting process will require substantial work, carrying with it significant risk to the environment. The planned addition of up to 1,500 people will nearly double the area's current population, taxing existing infrastructure for drinking water, sewer, solid waste, stormwater, roadways, and more. The warehouse is also located near multiple waterways that are home to endangered species. *See* Dkt. 15-8 at 6–14. These waterways are also used for recreation, including fishing, and used as a source for drinking water processed downstream of the site.[1]

Defendants conducted no such review of the environmental impacts of its plan. They did not engage in any meaningful analysis or public discussion of the significant environmental impacts that will inevitably result from the retrofitting of a warehouse into a mass detention facility. Nor did they share information that would enable the State of Maryland or the broader public to analyze and comment on the environmental impacts of their warehouse detention plan.[2]

Additionally, this location's existing vulnerabilities will exacerbate the adverse environmental and human health harms of this project. DHS's policy manual defines the effects of a proposed action for purposes of environmental review to include those that are "direct, indirect, or cumulative." Dkt. 15-4 at II-2. It defines a cumulative impact as "the impact on the environment which results from the incremental impact of an action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but

---

[1] *See* Dkt. 15-8 at 21; City of Hagerstown, *Water Quality Report 2024* (2025), https://www.hagerstownmd.org/ccr; *Production*, City of Hagerstown, https://www.hagerstownmd.org/201/Production [https://perma.cc/QR24-ZHLQ] (last accessed Mar. 25. 2026).

[2] A few days after Maryland filed this suit, DHS issued a "Notice and Public Review of a Proposed Activity in a 100- to 500-Year Floodplain." Dkt. 15-11. This notice was procedurally and substantively inadequate. It was provided *after* DHS acquired the property, offered the public a scant six days to review and respond, and was devoid of environmental analysis that would satisfy the requirements of NEPA. *See* Dkt. 15-15.

collectively significant actions taking place over a period of time." *Id.* Indeed, while the manual relies on federal regulatory requirements for guidance on the specific elements of an EIS, even the lower threshold environmental assessment must include "conclusions regarding the significance of environmental impacts for the proposed action and alternatives and a consideration of cumulative impacts." *Id.* at V-12. Using their own definitions, Defendants have failed to consider the cumulative effects of the proposed project.

The census tract including the warehouse site is already overburdened by pollution. *See MDEnviroScreen Report, Census Tract ID 24043010803* (July 23, 2025) (Ex. A). In Maryland, an "overburdened community" means any census tract for which three or more of the designated environmental health indicators are above the 75th percentile statewide. Md. Code Ann., Env't § 1-701(a)(7). The census tract meets this definition, with six indicators over the 75th percentile:

- **97th percentile for particulate matter (PM) 2.5**, a mixture of particles 2.5 micrometers or smaller that can include chemicals, dust, soot, and metals. Because these particles are so small, they can travel into the lungs and bloodstream.[3] There is significant evidence that increased $PM_{2.5}$ concentrations are harmful to human health, increasing rates of respiratory disease, ischemic heart disease, cerebrovascular disease, lung cancer, and death.[4] Exposure to $PM_{2.5}$ is unsafe for human health at any level.[5]

- **87th percentile for diesel particulate matter**, a highly toxic subset of particulate matter containing mostly soot and toxic compounds found in exhaust from trucks, buses, trains, ships, and other equipment with diesel engines. These particles "can reach deep into the

---

[3] *Particulate Matter (PM) Basics*, EPA, https://www.epa.gov/pm-pollution/particulate-matter-pm-basics [https://perma.cc/96ME-H67H] (last updated May 30, 2025).
[4] Am. Lung Ass'n, *State of the Air 2025 Report*, 26–27 (2025), https://www.lung.org/getmedia/5d8035e5-4e86-4205-b408-865550860783/State-of-the-Air-2025.pdf [https://perma.cc/B5LS-JZVL].
[5] *Id.*

lungs, where they can contribute to health problems such as eye, throat, and nose irritation, heart and lung disease, and lung cancer."[6]

▪ **94th percentile for proximity to facilities releasing toxic chemicals** into the air, water, or soil. People living near these facilities may be exposed to pollution during a facility's regular operations or accidental releases. Thirteen such facilities are located in Washington County. In 2024, they released about 235,000 pounds of toxic chemicals and over 118,000 pounds of styrene, a carcinogenic chemical.[7]

▪ **92nd percentile for proximity to risk management facilities**, which are active facilities with a required chemical accident management plan due to having highly hazardous substances onsite. The warehouse is under one half of a mile from one such facility, about one mile from two such facilities, and under 2.5 miles from another.[8]

▪ **94th percentile for proximity to mining operations**, which can contribute to "erosion, sinkholes, loss of biodiversity, or the contamination of soil, groundwater, and surface water by chemicals emitted from mining processes" and can "endanger the health and safety of the public."[9]

▪ **Above the 90th percentile for myocardial infarctions**, also known as heart attacks. "Exposure to outdoor air pollution following a heart attack has been shown to increase the risk of death. The effects of air pollution may also be greater for the elderly and people with other preexisting health conditions."[10]

---

[6] *MDEnviroScreen EJ Score Indicator Maps*, https://experience.arcgis.com/experience/324aa8ed73df41cc8b6333cbb12e0ab4 [https://perma.cc/BC3U-SNPU] (last visited Mar. 25, 2026) (select "Diesel PM" under "EJ Score Indicators").

[7] EPA, *2024 Toxics Release Inventory Factsheet for Washington Cnty., MD* (Nov. 2025) (Ex. G) (generated from *TRI Explorer*, https://enviro.epa.gov/triexplorer/tri_release.chemical).

[8] *RMP Viewer*, Data Liberation Project, https://rmpmap.org/#@39.6099,-77.8024,12z (last accessed Mar. 25, 2026).

[9] *MDEnviroScreen EJ Score Indicator Maps*, *supra* note 6 (select "Proximity to Mining Operations").

[10] *Id.* (select "Myocardial Infraction [sic]" under "EJ Score Indicators").

The area also ranks in the 58th percentile for wastewater, an indicator that measures "the relative risk of being exposed to pollutants from wastewater that flows into rivers or other bodies of water downstream."[11] This number may well increase with the near doubling of area residents, apparently without a meaningful plan to address the associated increased sewage demands.

Of course, environmental harms and risks do not remain within a single census tract. Every one of the contiguous census tracts bordering the warehouse site have similar, or higher, pollution burdens, and each of them is also defined as "underserved" under Maryland law because the poverty rate is over 25 percent. Md. Code Ann., Env't § 1-701(8); *MDEnviroScreen Report, Census Tract ID 24043011700* (July 23, 2025) (Ex. B) (burdened with six environmental health indicators); *Census Tract ID 24043010402* (July 23, 2025) (Ex. C) (burdened with seven environmental health indicators); *Census Tract ID 24043001002* (July 23, 2025) (Ex. D) (burdened with six environmental health indicators, including diesel PM at the 100th percentile); *Census Tract ID 24043010802* (July 23, 2025) (Ex. E) (burdened with eight environmental health indicators, including low birth weight).

## II.     Absent Injunctive Relief, the State's Interests in Its Natural Resources and the Health and Welfare of Its Residents Will Likely Suffer Irreparable Harm.

The irreparable harm at stake here is the harm to the environment and "the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." *Sierra Club v. Marsh*, 872 F.2d 497, 500–01 (1st Cir. 1989). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987). And "[o]nce large bureaucracies are committed to a

---

[11] *Id.* (select "Wastewater Discharge" under "EJ Score Indicators").

course of action, it is difficult to change that course," even with the benefit of an EIS. *Sierra Club*, 872 F.2d at 500; *see Md. Conservation Council, Inc.*, 808 F.2d at 1042 ("It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent.").

Absent a preliminary injunction ordering the required assessment of the full range of impacts, the State's interests in its natural resources and the health and welfare of its residents, including amici, will suffer irreparable harm. Among other possible harms, Defendants' plans will irreparably harm local air quality, waterways, sewage and stormwater systems, species, and public health and welfare.

### a.  *Harm to Air Quality*

Defendants' plan will likely harm local air quality. The construction and operation of a mass detention facility will generate an increase in vehicle traffic from heavy construction vehicles and government transport vehicles of detainees and equipment, increasing the area's already high levels of $PM_{2.5}$ and diesel PM.[12] A traffic study is necessary to evaluate the extent to which the roads in the vicinity could accommodate such traffic. Additionally, the detention facility will likely require a massive amount of power to operate. Similar facilities have used diesel-powered generators to meet energy needs.[13] Diesel exhaust from these diesel-powered trucks or generators is carcinogenic to humans, and its components, including $PM_{2.5}$ and nitrogen oxides, are harmful to human health even from low concentrations and short-term exposure.[14]

---

[12] *See MDEnviroScreen EJ Score Indicator Maps*, *supra* note 6 ("Particulate Matter (PM 2.5)" & "Diesel PM").

[13] *See* Compl. at 17, *Friends of the Everglades, Inc. v. Noem*, No. 1:25-cv-22896, (S.D Fla., June 27, 2025).

[14] *See* Int'l Agency Rsch. Cancer, *IARC: Diesel Engine Exhaust Carcinogenic* (June 12, 2012), https://www.iarc.who.int/wp-content/uploads/2018/07/pr213_E.pdf [https://perma.cc/RKT5-NMGX]; Union of Concerned Scientists, *Diesel Engines and Public Health* (updated Sept. 26, 2024), https://www.ucs.org/resources/diesel-engines-public-health#2 [https://perma.cc/MFM7-S683] (listing peer-reviewed scientific studies); Ghassan B. Hamra et al., *Lung Cancer and Exposure to Nitrogen Dioxide and Traffic: A Systematic Review and Meta-Analysis*, 123 Env't Health Perspectives 1107 (2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4629738/.

### b. *Harm to Waterways and the Sewage and Stormwater Systems*

The construction and operation of the detention facility is highly likely to harm already impaired water quality in nearby water bodies for reasons including runoff from construction, runoff from stormwater, and sewage discharge. The proposed detention facility lies near significant water resources including Semple Run, Conococheague Creek, and the Upper Potomac River. These waterways support local drinking water supplies, recreational uses, aquatic species, and migratory birds. Conococheague Creek—which Semple Run, the stream next to the proposed detention facility, immediately feeds into—and the Upper Potomac River are already on the Clean Water Act's impaired water body list and subject to pollution limits (called total maximum daily loads ("TMDLs")).[15] Regular monitoring assessments show that both waterways are unable to meet their designated uses, "Aquatic Life and Wildlife" and "Water Contact Sports," and impairments include high pH and an excess of phosphorus, sulfate, chloride, and *E. coli*.[16] Defendants' activities will likely cause an increase in these pollutants that could cause these water bodies to exceed their TMDLs.

The construction activities associated with the proposed detention facility will damage these vulnerable water bodies. Land clearing, vegetation removal, soil compaction—carried out by trucks and other heavy-duty materials—all increase erosion, which in turn will increase sediment runoff into Semple Run, then Conococheague Creek, and then the Upper Potomac River. Indeed, DHS has acknowledged that runoff will directly "discharge to Semple Run Creek." Dkt. 15-11. Sediment and other pollutant runoff from construction activities and

---

[15] *See Waterbody Report, Conococheague Creek*, EPA, https://mywaterway.epa.gov/waterbody-report/MDE_EASP/MD-02140504/2024 [https://perma.cc/468G-YTC3] (2024) ("Conococheague Report"); *Waterbody Report, Potomac River Washington Cnty.*, EPA, https://mywaterway.epa.gov/waterbody-report/MDE_EASP/MD-02140501/2024 [https://perma.cc/9AMB-CZHJ] (2024) ("Potomac Report").
[16] *See* Conococheague Report, *supra* note 15; Potomac Report, *supra* note 15.

stormwater events "can cause an array of physical, chemical, and biological impacts on receiving waters," contributing to "aquatic ecosystem degradation, increased drinking water treatment costs, and impairment of the recreational use and aesthetic value of impacted waters."[17]

Operating the detention facility will also further impair the surrounding waterbodies by increasing sewage overflows and wastewater runoff. Defendants' intent to incarcerate 1,500 people in a converted warehouse—nearly equal to the entire population of the town of Williamsport—will significantly increase the amount of wastewater sent to the facility's and the public's sewer collection systems, leading to increased risk of overwhelming its hydraulic capacity, and resulting in sewer overflows, excursions of effluent limitations, and other operational failures at the corresponding wastewater treatment plant. DHS's Floodplain Notice acknowledges increased "projected wastewater flows" but does not offer any explanation on how it will upgrade sewer infrastructure or wastewater treatment systems. Dkt. 5-11. Without those needed upgrades, the proposed project will very likely cause sewage overflow into Semple Run, Conococheague Creek, and the Potomac River.[18]

One need only look back a few months to see how sewage can wreak havoc on the Potomac River. Untreated sewage flowing into the river in January and February led the District of Columbia to declare a local public emergency based on the presence of *E. coli*, MRSA, and other bacteria.[19] Here, the likely sewage overflows and greatly increased quantities of treated wastewater would discharge dangerous pathogens like *E. coli*, chemicals used in cleaning and sanitation, and nutrients like phosphorous and nitrogen (as ammonia). Increased nutrient loads

---

[17] *Construction General Permit (CGP) Frequent Questions*, EPA, https://www.epa.gov/npdes/construction-general-permit-cgp-frequent-questions [https://perma.cc/8JN9-PXAV] (last updated Mar. 9, 2026).

[18] The warehouse's existing sewer lines do not have anywhere close to enough capacity to handle the wastewater flow coming from 1,500 people. *See* Decl. of Walid Saffouri ¶¶ 13–38 (Dkt. 15-16).

[19] D.C. Mayor's Order 2026-028, *Declaration of Public Emergency - Potomac Interceptor Collapse and Impacts* (Feb. 18, 2026), https://perma.cc/N4JA-38ST.

create conditions for eutrophication and harmful algal blooms, threatening other plant and animal life in the ecosystem. *See, e.g.*, *Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 11–12 (1st Cir. 2012).

### c.  *Harm to Endangered Species*

The increased sedimentation, nutrient loading, and pollutant discharges from Defendants' construction and operation of the detention facility are highly likely to harm aquatic ecosystems and wildlife, including two kinds of state-protected downstream freshwater mussels—the green floater (*Lasmigona subviridis*) and the brook floater (*Alasmidonta varicosa*). Freshwater mussels provide critical ecosystem services, including biofiltration, nutrient cycling and storage, and environmental monitoring; they also hold cultural significance as a food source and for spiritual practices.[20]

Harm to these mussels will have knock-on ecological effects. Mussels improve water ecosystems by filtering significant quantities of organic matter, bacteria, and other pollutants, such as *E. coli,* that are not fully removed by wastewater treatment plants.[21] Incredibly, a single adult mussel can filter 10 to 15 gallons of water a day, and dense mussel beds can remove dozens of tons of particulates annually.[22] These filtration services reduce drinking water treatment costs by lowering pathogen and other contaminant levels, and although difficult to quantify, the economic value of a mussel community in a single waterbody likely exceeds millions of dollars.[23] Mussels store nutrients in their tissues which are released upon death; large-scale die-

---

[20] Caryn C. Vaughn, *Ecosystem services provided by freshwater mussels*, 810(1) Hydrobiologia, 1 (2017), https://www.researchgate.net/publication/314125476_Ecosystem_services_provided_by_freshwater_mussels.
[21] *Id.* at 3.
[22] Md. Dep't Nat. Res., *Supporting Stream Communities from Bottom to Banks: Mussel and Tree Plantings Bring Healthy Waters to Town Creek* (May 1, 2022), https://news.maryland.gov/dnr/2022/05/01/supporting-stream-communities-from-bottom-to-banks-mussel-and-tree-plantings-bring-healthy-waters-to-town-creek/ [https://perma.cc/28DJ-VN8E].
[23] David L. Stayer, *What are freshwater mussels worth?*, 20 Freshwater Mollusk Biology & Conservation 103–13, 106, 109 (2017) (Ex. H).

offs can therefore trigger an influx of nutrients into the ecosystem that further exacerbate water quality degradation in Conococheague Creek and the Upper Potomac River.[24]

The green floater and the brook floater occur in receiving waters around and downstream of the proposed detention facility.[25] Both species are classified by the Maryland Department of Natural Resources as "S1" (critically imperiled) and are listed as state-endangered.[26] The U.S. Fish and Wildlife Service ("FWS") proposed to list the green floater as "threatened" under the Endangered Species Act and identified excessive sedimentation as a primary threat to its survival.[27] FWS also proposed to designate critical habitat for the green floater for a segment of the Upper Potomac River near its confluence with Conococheague Creek.[28] FWS is reconsidering federal protection for the brook floater mussel with a deadline in 2029.[29]

The likely stormwater discharges or sewer overflows from the project site could further imperil the vulnerable green floater and brook floater populations. Freshwater mussels are highly sensitive to water quality degradation. Elevated ammonia concentrations (often resulting from wastewater, sewer overflows, and organic matter decomposition) can be lethal even at levels below national water quality criteria.[30] Even minor increases of ammonia could impair the downstream green and brook floater populations.[31] Pollution sources that elevate ammonia concentrations are the same ones that reduce dissolved oxygen levels.[32] Increased nutrient and

---

[24] Vaughn, *supra* note 20, at 5.

[25] *See* Decl. of Josh Kurtz ¶ 27 (Dkt. 15-8).

[26] Md. Dep't Nat. Res., *List of Rare, Threatened, and Endangered Animals of Maryland* (Nov. 2023), https://dnr.maryland.gov/wildlife/Documents/rte_Animal_List.pdf [https://perma.cc/7WDQ-L3XC].

[27] 88 Fed. Reg. 48294, 48301–02 (July 26, 2023).

[28] *Id*. The proposed green floater listing and critical habitat imposes additional procedural requirements on Defendants, including to "confer" with FWS. 16 U.S.C. § 1536(a)(4). To amici's knowledge, Defendants have not conferred with FWS about the green floater.

[29] Stipulated Settlement Agreement at 2, *Center for Biological Diversity v. Burgum*, No. 1:25-cv-1168-DLF (D.D.C. Feb. 13, 2026).

[30] Teresa Newton, *Effects of Ammonia on Freshwater Mussels in the St. Croix River*, U.S. Geological Survey (Dec. 2022), https://www.umesc.usgs.gov/documents/fact_sheets/ammonia_mussel.pdf [https://perma.cc/5CLM-5JYK].

[31] 88 Fed. Reg. at 48302.

[32] *Id.*

organic matter loading and resulting depleted dissolved oxygen can cause behavioral changes in juvenile mussels that reduce survival.[33] Sedimentation is an additional threat; fine sediments can contain toxic contaminants and alter streambed habitat—impairing feeding, reproduction, and overall survival.[34] Upstream disturbances have been documented to impact aquatic ecosystems for miles downstream.[35]

### d. Harm to Public Health and Welfare

The mass detention of 1,500 people in one facility with inadequate infrastructure threatens public health and safety. There is abundant evidence that ICE has systematically failed to provide adequate medical care to those they have detained. *See* Decl. of Kate Sugarman, MD ¶¶ 17–28 (Mar. 25, 2026) (Ex. F). As a result, detainees suffer devastating health impacts, up to and including premature death. *Id.* ¶¶ 8–10, 19–22. The lack of medical care also results in the spread of infectious disease both in and outside of detention facilities. *Id.* ¶¶ 13–16, 27. Current detainees at ICE detention facilities across the nation face measles, tuberculosis, and other infectious disease outbreaks from living in unsanitary, overcrowded conditions and without access to necessary medical care.[36] ICE is facing calls to close one of its recently opened detention facilities in Texas due to a measles outbreak and inadequate medical care.[37] Infectious diseases do not remain confined to ICE facilities. Instead, they spread readily from detention

---

[33] *Id.*

[34] *Id.* at 48303.

[35] 83 Fed. Reg. 51570, 51575 (Oct. 11, 2018) (proposed rule acknowledging that sediment discharge could have effects on mussels, including habitat degradation "miles downstream").

[36] *See e.g.*, Nicole Acevedo, *ICE confirms a measles outbreak in the nation's largest detention facility in Texas*, NBC News (Mar. 4, 2026), https://www.nbcnews.com/news/us-news/ice-confirms-measles-outbreak-nations-largest-detention-facility-texas-rcna261659 [https://perma.cc/T23V-C5WL]; Jeff Ferrell & Kory Cook, *Nearly 4,000 health professionals urge release of children held in ICE detention*, Red River Radio (Mar. 2, 2026), https://www.redriverradio.org/news/2026-03-02/nearly-4-000-health-professionals-urge-release-of-children-held-in-ice-detention [https://perma.cc/833Y-92P9].

[37] *See* Ayden Runnels, *ICE replacing operator of El Paso detention camp, report says*, The Texas Tribune (Mar. 4, 2026), https://www.texastribune.org/2026/03/04/texas-camp-east-montana-ice-detention-possible-closure/ [https://perma.cc/UPC5-J9Z7].

facility guards and staff to their families and neighbors, to children, to schoolmates, and beyond. *Id.* ¶ 13. This can overwhelm local health systems, resulting in worse care for both detainees and the local community. *Id.* ¶ 11. All of this is particularly concerning in a community that already has elevated risk factors, including high rates of poverty, myocardial infarction, and frequency of infants with low birth weights. *MDEnviroScreen Report, Census Tract ID 24043010803* (Ex. A); *Census Tract ID 24043010802* (Ex. E).

Additionally, sewer backups and overflows from the site will result in additional releases of contaminants from human waste into downstream waters, spreading waterborne disease, potentially fatal pathogens and endangering downstream communities that depend on these waters. Increased traffic will cause higher levels of dangerous air pollutants, like diesel PM.

**III.    The Public Interest and Balance of the Equities Favor a Preliminary Injunction.**

When the government is opposing a preliminary injunction, the balance of equities and public interest factors merge. *See Nken*, 556 U.S. at 435. The Supreme Court has recognized that "[i]f [environmental] injury is sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co*, 480 U.S. at 545.

The balance of harms weighs heavily in Maryland's favor here. The harms to interests of the State and amici are significant. *See supra* § II. The area and its residents are already overburdened by pollution, and the proposed detention facility is likely to compound many of those harms and create new ones. Local waterways and the species that inhabit them are already vulnerable, and changes in stormwater runoff and increases in wastewater pollution only heighten risk to sensitive populations. *See id.*

In contrast to the harms that Maryland will suffer if Defendants proceed, any harm Defendants may shoulder if enjoined would be minimal and self-inflicted. Defendants no doubt will invoke their interest in enforcement of immigration laws to oppose injunctive relief. But

13

such an interest does not explain why they must construct and operate this specific warehouse at this time. Furthermore, "even a 'legitimate' governmental interest can be outweighed by the harm . . . impose[d] on . . . the public." *Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F.Supp.3d 1311, 1342 (S.D. Fla. 2024), *supplemented*, No. 23-CV-22655, 2024 WL 5459522 (S.D. Fla. May 23, 2024), and *modified sub nom. Farmworker Ass'n of Fla., Inc. v. Uthmeier*, 792 F.Supp.3d 1306 (S.D. Fla. 2025). Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citations omitted). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citations omitted). There can be no protectable government interest in bypassing environmental review that is plainly required by the law.

Federal immigration laws enjoy no privilege over NEPA. And even if they did, Defendants' actions are not a demand of immigration law but a choice of immigration policy. Committed though Defendants may be to developing mass detention warehouses that operate "like [Amazon] Prime, but with human beings," [38] they are most certainly not required to detain most immigrants they charge with removability. Defendants' interest in the immediate retrofitting of the warehouse to create more detention space is rooted in a reversible—and in many cases, illegal—policy choice.[39] Any harm caused by an injunction is self-inflicted.

---

[38] Marina Dunbar, *Ice director wants to run deportations like 'Amazon Prime for human beings'*, The Guardian (Apr. 9, 2025), https://www.theguardian.com/us-news/2025/apr/09/ice-todd-lyons-deporation-amazon [https://perma.cc/XK24-BXGS].

[39] In July 2025, DHS and the U.S. Department of Justice adopted an internal policy requiring ICE employees to subject large categories of immigrants in the U.S. interior to mandatory detention without bond. The U.S. District Court for the Central District of California declared the policy unlawful, certified a nationwide class of bond-eligible detained immigrants, and extended declaratory relief to the entire class, a ruling that has since been adopted as applicable to immigrants petitioning for relief in the Maryland District Court. *See Bautista v. Santacruz*, No. 5:25-CV-01873, 2025 WL 3713987, at *1 (C.D. Cal. Dec. 18, 2025), *judgment entered sub nom. Maldonado Bautista v. Noem*, No. 5:25-CV-01873, 2025 WL 3678485 (C.D. Cal. Dec. 18, 2025); *Bautista* Court *See Torres v. Bacon*, No. CV MJM-25-3961, 2026 WL 532308, at *3 (D. Md. Feb. 26, 2026).

It is not too much to ask that the federal government comply with the law—*all* laws—while fulfilling its duties. As the Supreme Court has said, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 766 (2021). The harms to Maryland, the public, and the environment that NEPA is designed to protect far outweigh Defendants' interests in constructing a mass detention facility without the required environmental reviews. The public interest factors weigh in favor of injunctive relief.

**CONCLUSION**

For the foregoing reasons, amici Potomac Riverkeeper Network, Washington County Indivisible, and the Center for Biological Diversity respectfully request that the Court grant Plaintiff's motion for a preliminary injunction.

Deena Tumeh
(pro hac vice admission pending)
Rachel Rintelmann
(pro hac vice admission pending)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
Tel: (202) 793-6482
Fax: (202) 667-2356
dtumeh@earthjustice.org
rrintelmann@earthjustice.org

*/s/ Daniel H. Waltz*
Daniel H. Waltz (Md. Bar 31307)
Laurel M. Jobe
(pro hac vice admission pending)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (303) 880-9136
Fax: (520) 623-9797
dwaltz@biologicaldiversity.org
ljobe@biologicaldiversity.org

*Co-Counsel for Amici Potomac Riverkeeper Network, Center for Biological Diversity, and Washington County Indivisible*