# Exhibit F

**<u>Declaration of Kate Sugarman, MD</u>**

I, Kate Sugarman, declare under penalty of perjury of the laws of the United States as follows:

1. Except where otherwise noted, I make this declaration based on my personal knowledge and medical records that I have reviewed.

2. I am a medical doctor and have been practicing family medicine since 1991 in community clinics serving low-income patients, many of whom are immigrants.

3. I am on the steering committee of the Medical Providers Network of New York Lawyers for the Public Interest. I am on faculty of Georgetown Law School and George Washington School of Medicine, where I teach medical students and medical residents on topics of human rights and immigrant health care.

4. Since 2004, on a volunteer basis, I have been performing forensic medical evaluations, documenting scars and signs of torture as evidence for people seeking asylum. I have also done these evaluations from inside ICE detention centers.

5. I am a national and Maryland leader in the advocacy group Doctors for Camp Closure, D4CC, a group of doctors and health care workers working in opposition to ICE jails. D4CC advocates against ICE detention centers and advocates in favor of humane treatment for all immigrants.

6. As a medical doctor, I have grave concerns regarding the proposed ICE detention center in Washington County, Maryland. I can speak from personal experience that this proposed center will be not only damaging to the health of the people that it detains but also will put the surrounding community at risk.

7. In my role as a leader of D4CC, I have worked with medical providers across the country to submit letters in opposition to the proposed Hagerstown detention center. Some of

those letters are attached to my Declaration. Based upon my own knowledge and expertise, I share in the concerns highlighted in these letters.

8. I have worked with multiple medical legal partnerships since before the COVID-19 pandemic, when I was asked to intervene on behalf of detained immigrants who are not receiving proper medical care when in ICE custody. I have reviewed hundreds of medical charts of detained immigrants in ICE custody. I have written letters of medical urgency on behalf of these detained immigrants. The lack of care was so severe that many of these people were released from ICE custody to get access to life-saving care.

9. Since January of 2025, my letters of medical urgency documenting detained people with critical medical conditions who were not being treated have resulted in four people being ordered released. One person released was suffering from progressively worsening heart failure, a treatable condition, yet ICE was denying her the cardiology treatment that she needed in order to live. The second person released was suffering from recurring internal bleeding that was so severe she required multiple blood transfusions. ICE refused to treat the underlying cause of these recurring bleeds. The third was a young man who was forced to be detained in such unhygienic conditions that he was even denied soap and water to wash and bathe. He had a potentially cancerous mass in his testicles and even then was denied medical care. The fourth person suffered from a potentially surgically correctable but untreated intestinal defect. ICE records said he needed to see a surgeon but was never brought to a surgeon. He had made several visits while in custody to local emergency rooms, where they also suggested he see a surgeon yet was never brought to a surgeon.

10. Unfortunately, many of my letters of medical urgency have been ignored. I have advocated for many more people to be released due to their precarious and potentially dangerous medical conditions which are going untreated without any luck. One elderly woman suffers from continuous chest pain due to blockages in her coronary arteries. She has had multiple visits to ERs in different cities every time ICE moves her to a different city. Every ER and every ICE clinic says that she needs to see a cardiologist. She has yet to see a cardiologist.

11. This example also highlights the extraordinary burden detention centers place on local emergency rooms. A group of doctors located in Washington County published an open letter detailing how overburdened their healthcare system already is, with only eight volunteer paramedics and an emergency department that already struggles to see patients in a timely manner.[1] The sudden influx of patients who have experienced medical neglect in detention can overwhelm the system, resulting in worse care for detainees and local community members alike.

12. ICE frequently transfers detainees from one facility to the next, meaning that the patients lose their continuity of care, and their health as a result continues to worsen. ICE's intent to transfer detainees through the Washington County facility every 3 to 7 days only compounds that risk.

13. The risk of infectious disease in detention centers, particularly those with high turnover, is significant. We have already seen outbreaks of influenza, COVID, mumps, measles, and hepatitis A in detention facilities. There has even been an increase in reported cases of tuberculosis in these facilities.

---

[1] https://blog.hagerstownrapidresponse.com/p/doctors-warn-ice-facility-could-endanger.

14. These health risks will not stay confined to the warehouse site. Guards and other personnel are equally exposed to infectious diseases, and they in turn pass those diseases to their families and communities. Their children may bring them to school. Whatever circulates in a detention center will also have a community impact outside of that facility.

15. Children, people with disabilities, and the elderly are also at higher risk from serious and potentially life-threatening illnesses, both in and outside of detention facilities.

16. Given that the population immediately surrounding the proposed Hagerstown detention center already has some of the highest rates of myocardial infarctions of any census tract in Maryland, the risk to the local community is significant.

17. I have closely reviewed the U.S. ICE Performance Based National Detention Standards (PBNDS), including Standard 4.3: Medical Care.[2] These standards require: medical, mental health, and dental screening; medically necessary and appropriate medical, dental, and mental health care and pharmaceutical services at no cost to the detainee; comprehensive, routine, and preventive health care, as medically indicated; emergency care; specialty health care; timely responses to medical complaints; hospitalization as needed within the local community; and staff or professional language services necessary to allow for access for detainees with limited English proficiency, and effective communication for detainees with disabilities, during any medical or mental health appointment, sick call, treatment, or consultation. *Id.* at II(A)(1)-(8). Section II(J) requires a plan for 24-hour access to medical and mental health care. *Id.*

18. In my medical and personal opinion, ICE routinely fails to meet these standards. At times, I have observed ICE lying or falsifying records to hide medical neglect.

---

[2] https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

4

19. Based upon the notes included in detainee medical files, it may sometimes appear that a detainee is healthy. But then, when I have interviewed the actual detainee, it was a completely different situation. I recall a specific case in which a man had an infection so deep it had gone into his bones, called osteomyelitis. His elbow was exuding pus. People were using towels and napkins because the discharge was so severe. The ICE record said: "Slight wound. Topical antibiotics applied. Gauze dressing placed." When we finally got him released, he was immediately admitted to the intensive care unit.

20. I have personally observed many examples of patients not getting access to the timely care that they need. I have reviewed numerous charts where the patient's request for urgent medical treatment was ignored, and medical records that include notes stating that the detained patient needs specialty care that the patient never received. There are so many examples where detainees are denied access to timely medical care. There was a man detained in Arizona who complained for a long time of a toothache. He did not get care and died from a dental infection.[3]

21. I know from direct experience that many detained immigrants have chronic conditions that are not being properly treated.

22. I have seen many cases where necessary medications are not administered to detainees in a timely fashion. I have reviewed charts of HIV-positive patients who have been denied appropriate HIV medication.

23. I am aware of ICE facilities where the detainees are not even given access to soap and clean water to meet their most basic hygienic needs.

---

[3] https://www.cbsnews.com/boston/news/emmanuel-damas-ice-death-toothache-boston-arizona/.

24. I repeatedly have heard from detainees that the health professional speaks to them only in English, without access to interpretation. I am advocating for someone currently detained who keeps telling the ICE medical staff about his very severe symptoms. Their medical notes indicate that he feels well. This detainee does not speak English, and the staff only speak to him in English despite their treatment standards saying that they provide language access for non-English speakers.

25. New York Lawyers for the Public Interest has clearly documented the medical neglect and hazardous conditions faced by people in ICE custody.[4]

26. ICE has reportedly stopped paying for medical care for detainees in their custody, which is fully consistent with the medical reports that I am seeing.[5]

27. Some detainees are ultimately returned to our communities, where they will carry with them the residual health effects of their time in detention. There are community costs to this beyond infectious disease, including but not limited to advanced illnesses due to lack of treatment (including untreated hepatitis B, which is extremely contagious and advances to liver failure), permanent psychological damage from the cruel conditions, permanent kidney damage, and the ultimate harm of someone dying from a treatable condition. These impacts tax our healthcare systems, but they also tax our community resources; the loss of neighbors, colleagues, family, and friends to these preventable health outcomes is a tragedy.

---

[4] https://www.nylpi.org/wp-content/uploads/2025/09/English-OCJ-Health-in-Detention-Report_FINAL.pdf.

[5] https://www.cbsnews.com/atlanta/news/ice-stopped-paying-for-detainee-medical-care-as-population-surged/.

28. Based upon my review of ICE's National Detention Standards and my extensive experience reviewing medical records for ICE detainees, it is abundantly clear that ICE does not even follow its own medical guidelines.

The foregoing is true and correct to the best of my knowledge and belief. Executed on March 25, 2026 in Montgomery County, Maryland.

Respectfully submitted,

Kate Sugarman

Kate Sugarman, MD

7

Docusign Envelope ID: 7C2ECE94-C6D1-435E-B208-CB5AEC38F6A0

# Attachments

March 19, 2026

**Subject: Opposition to Proposed ICE Detention Facility in Hagerstown, MD**

To Whom It May Concern,

We all care about the safety, health, and dignity of our families and communities. For several years I have volunteered with the Medical Providers Network, a network of physicians that evaluate people in immigration detention with serious medical conditions, documenting unmet medical needs. I have spent countless hours interviewing people about their experiences inside detention, reviewed thousands of pages of medical records and death reports, and I am haunted by the callous disregard for human life I have witnessed. I am writing to strongly oppose the proposed conversion of a warehouse in Hagerstown into an immigration prison. A warehouse without adequate water supply, sewage infrastructure, or ventilation was built to store objects, not human beings. Calling it a processing center does not change what it is.

The people who would be held in this de facto prison are our neighbors. They are parents, workers, and community members seeking safety and stability. Many have been living in the United States for years, contributing to local economies, caring for children and elderly relatives, and building lives here. I swore an oath to heal, and I cannot stay silent while our government expands a system that makes even healthy people sick.

My colleagues and I have documented how in immigration prisons dozens of people are crammed into large spaces with inadequate ventilation, subjected to extreme temperatures and the rapid spread of infectious disease. People are served small portions of often rotted food and forced to purchase basic supplies like soap. They rarely see sunlight or the outdoors, while lights remain on 24 hours a day making rest impossible. They are separated from their children and loved ones, held in a state of limbo with no clear end date. The medical consequences are severe and well-documented. Delays in diagnoses, substandard medical care, and interruptions to life-sustaining medications are routine. Pregnant people miscarry due to lack of prenatal care. Solitary confinement is used in response to mental health emergencies, despite being recognized internationally as a form of torture. Children and adults develop anxiety, depression, and trauma-related illness.

What many people don't realize is that civil immigration detention is extraordinarily costly and has become increasingly deadly. As of this writing, 13 people have died in ICE custody in 2026. In recent weeks, there has been nearly one death every four days. A warehouse that cannot meet basic standards of health and safety will inevitably add to the death toll. We can all agree that an immigration hearing should never result in a death sentence.

There are better ways to use these resources that reflect our shared values and don't come at the cost of human lives. Community-based programs that help people access services, stay connected with family, and appear for their hearings cost far less than detention and are more effective. Investing in housing, healthcare, and legal support in lieu of detention strengthens entire communities.

I urge you to reject this proposal. I have seen what these environments do to human beings. No community should balance its budget on the suffering of its neighbors.

Sincerely,
Chanelle M. Diaz, MD, MPH

Ellen M. Shank, MD
2315 Stockton Blvd
Sacramento, CA 95817
ellen.marie.shank@gmail.com

March 10, 2026

To Whom It May Concern:

I am writing today as an emergency medicine physician and concerned citizen about the proposed ICE detention center in Washington County. I have been involved with Doctors 4 Camp Closure on the West Coast, as well as a provider of forensic medical evaluations for asylum seekers since 2021, healthcare provider at the Southern Border through Refugee Health Alliance, and author of letters of support for medical asylum with Al Otro Lado.

We are seeing on the West Coast how emergency medicine physicians are increasingly required to navigate political landscapes. There is an ICE office in downtown Sacramento, CA, where detainees are currently held in the basement office of a federal building without adequate clothing, without natural light, adequate bedding, or sufficient medical supplies. Detained immigrant patients with acute medical concerns and traumatic injuries are presenting to EDs across the state in the accompaniment of ICE/CBP officers for treatment well past the ideal time of presentation. There have already been 32 deaths in ICE detention facilities so far this year as I write this letter, and we are dreading the day when we hear of a death from the slipshod operation in Sacramento. The vast majority of the deaths thusfar would have been preventable with provision of basic medical care and longitudinal medications for chronic diseases.

As a practitioner of forensic medicine familiar with child abuse and sexual assault, I am particularly concerned to see how federal detention centers run by private contractors have historically put vulnerable women and children at risk of invasive screening procedures, including body cavity searches for adolescents and children. Let me emphasize this point- there have been instances of contracted detention center guards without medical training performing regular anus and vaginal cavity checks of girls as young as three years old. Even in the emergency department setting, we do not perform pelvic examinations on prepubertal girls unless they are under anesthesia due to the trauma it incurs. This should never happen again, and the current cultural and political milieu is ripe for replication of such horrors.

My medical experience with asylum-seekers and now ICE detainees argues against expanding new holding areas, and instead, eliminating ICE detention centers from our communities. As a board-certified emergency physician, I am well aware of how delays in treatment can lead to exacerbations of chronic medical conditions to the point of acute medical crises. I urge your community to abandon the building of an additional ICE detention center in Washington County to mitigate further horrors, prevent further child abuse and neglect, and avoid further preventable deaths of immigrant community members. Thank you for your attention.

Sincerely,
Ellen M. Shank MD
MD License A185421
NPI # 1619536703

**Linda D. Green MD**

**3113 Varnum Street**

**Mount Rainier, Maryland 20712**

*lindadgreen@gmail.com*

February 23, 2026

To Whom It May Concern:

I am writing today as both a Maryland physician and concerned citizen about the proposed ICE detention center in Washington County. The development of a detention center anywhere in Maryland is an attack on working people of the state and as you know, the state removed a detention center from the Jessup prison complex in recent years. I have supported Doctors 4 Camp Closure for years including efforts to provide care at the Southern border and defend public health. I cheered their efforts to vaccinate immigrants for COVID-19 during the pandemic's high points. D4CC has seen firsthand how detention facilities have failed to keep people healthy and safe and certainly opposes this development in the Hagerstown area during this period when ICE stops nearly all Black and Brown working people simply for existing.

Recently I have been involved in reviewing the record of an immigrant from the Philippines who was detained for months during which he developed severe gastrointestinal bleeding from a new diagnosis of ulcerative colitis. He received no care or even wrong care that made the problem worse while in detention and when he was finally admitted to a hospital he also required amputation for an infected toe. Even that relatively simple treatment was badly managed requiring intravenous antibiotics so it could heal. Despite the letters and testimony of many of us in the medical field ICE persisted in efforts to return him to the Philippines where he could not get the specialized care he needed. Only when protestors reached the tarmac and convinced the airplane staff that a long transport would be unsafe was he taken off the plane and returned to detention. Continued awareness of his medical condition led to his finally being released from detention. But many others have not been so fortunate and had such support. Deaths of children and adults in detention centers, most recently in Texas, have been widely reported for a long time, not just this year. And the overcrowding and lack of attention is much worse now.

The need is great to minimize the impact of ICE in our communities, not give ICE license to racially profile, harm residents and their neighbors, and even kill people. In my neighborhood we watched an ICE agent throw a much smaller man to the ground and when the agent's gun came out of his holster he scambled to grab it and pointed it

at a group of bystanders several yards away. We were lucky to not be victims of his lack of control. The attitude of these masked agents of the government is to view hardworking immigrants and their families like scum. Inhuman treatment is standard and lack of medical care is the norm. In addition the conditions in the centers contribute to worsening health through poor nutrition, lack of water, poorly controlled temperature, inadequate sleep, and infection risk.

My medical experience with prison populations and now detainees argues against expanding new holding areas and instead eliminating ICE from our neighborhoods. As a board certified internist and oncologist I am well aware of how delays in treatment can lead to deterioration of chronic conditions as well as to precipitate acute crises. I urge you to abandon this detention center project. Thank you for your attention.

Linda D. Green MD

MD License D21428

NPI # 1114005087

Docusign Envelope ID: 7C2ECE94-C6D1-435E-B208-CB5AEC38F6A0

# YALE UNIVERSITY

*School of Medicine*
*Department of Psychiatry*
*Connecticut Mental Health Center*
*34 Park St., 4th Floor*
*New Haven, CT 06519*

 

*Robert D. Beech, MD, Ph.D.*
 *Medical Director,*
*Acute Inpatient Unit and*
*Transitional Living Program*
*Tel: (203) 974-7757*
*Fax: (203)974-7615*
*Email: robert.beech@yale.edu*

February 26, 2026

To Whom It May Concern:

I write as a physician and a licensed, board-certified psychiatrist to express deep concern about the proposed ICE detention center in Washington County, Maryland.

The opinions expressed here are my own and do not represent those of Yale University, the Department of Psychiatry, the Connecticut Mental Health Center, Connecticut Department of Mental Health and Addiction Services or any other organization with which I am affiliated.

As physicians, we begin our training with the basic ethical principle, *primum non nocere* ("first, do no harm"). This principle underlies all of our training and all of our subsequent practice.

In medicine, this means that we should not perform any intervention where the harm, or the risk of harm, from the intervention itself outweighs the possible benefit. I believe that this principle can, and should, also be applied in other areas of life.

Mass detention for the sake of mass detention is an intervention where the harm is entirely predictable and the possibility for benefit is negligeable or non-existent.

The proposed ICE detention center in Washington County, Maryland, is part of an ongoing, nation-wide expansion of the number of people being held in ICE detention. According to NBC news[1] there are currently more than 70,000 people being held by ICE in 224 facilities nationwide. This is compared to approximately 40,000 people being held by ICE at the end of the Biden Administration.[2] With funding provided by the "Big Beautiful Bill, " ICE is planning to expand this to upwards of 135,000 people at a cost to U.S. taxpayers of over 45 billion dollars[3].

Conditions in facilities currently run by ICE are appalling and constitute an ongoing violation of the U.S. Constitution's prohibition against cruel and unusual punishment as well as international standards regarding the treatment of prisoners and in some cases may rise to the level of torture under international law[4]. Documented abuses occurring in ICE detention centers include inadequate medical and mental health care, overcrowding and unsanitary conditions, arbitrary and punitive detention, abusive practices including physical and sexual abuse by staff, detention of vulnerable populations including pregnant women, children and families, and obstruction of legal access[5]. This abuse is not accidental or a result of lack of funding. Rather, it appears to be part of a deliberate strategy to dehumanize non-citizens and normalize the mistreatment and abuse of immigrants. While ICE is spending 45 billion dollars on the construction of new, for-profit, detention centers, ICE decided to stop paying third-party providers for medical care for detainees and terminated an agreement with the VA to provide medical care for detainees, despite the fact that some detention centers have no doctor or dentist on staff [5].

Docusign Envelope ID: 7C2ECE94-C6D1-435E-B208-CB5AEC38F6A0

# YALE UNIVERSITY

*School of Medicine*
*Department of Psychiatry*
*Connecticut Mental Health Center*
*34 Park St., 4th Floor*
*New Haven, CT 06519*



*Robert D. Beech, MD, Ph.D.*
 *Medical Director,*
*Acute Inpatient Unit and*
*Transitional Living Program*
*Tel: (203) 974-7757*
*Fax: (203)974-7615*
*Email: robert.beech@yale.edu*

I have had clients tell me that while the experiences that led them to come to the U.S. as asylum seekers were intolerable, the most traumatic moment they experienced in their lives was being in an ICE detention center.

We should not believe that these new detention centers are being built in order to relieve overcrowding or improve conditions for people already in ICE custody. If the goal were to reduce overcrowding in ICE detention centers, the straightforward way to do this would be to release all non-violent offenders on bond. This was standard practice until the current administration instituted a new rule denying detained immigrants the right to release on bond. The new policy has been rejected by over 360 judges in over 3,000 cases[6]; however, a recent 2-1 split decision by the 5th Circuit Court of Appeals upheld the policy, allowing the Trump administration to continue its policy of routinely denying bond to detained immigrants including potentially millions of people who have been in this country for decades, have never committed a crime, and pose no risk to public safety.

Nor should we believe that the policy of mass detention of immigrants is somehow increasing public safety. Studies have consistently shown that immigrants commit fewer crimes than native born Americans[7] and the vast majority of those detained in ICE facilities have no history of violent crime[8]. Rather the continued focus on mass detention and deportation by this administration increases the risk of violent crime by (1) diverting resources away from crime prevention and investigation by local authorities and (2) eroding trust and decreasing the likelihood that people will report or cooperate with the investigation of crimes if such cooperation brings the risk of deportation for them or their family.

Finally, it is important to recognize the larger context of the current push for mass detention and deportation. Stephen Miller and other advocates of mass deportation within the administration have repeatedly invoked white nationalist and neo-Nazi slogans and ideology and see the reversal of demographic trends in the U.S. as an explicit goal of immigration policy [9]. While the advocates of mass detention have, for the most part, not called for a "final solution" to the "immigration problem," DHS itself has called for "remigration," a term with historical links to Nazi Germany and used currently by far-right European groups as part of their campaign to create ethnically homogeneous states[10].

Stephen Miller and his allies are proposing to deport over 11 million people from this country. As an integral step in that process, they are building a network of detention centers where people that the administration deems a threat can be held indefinitely without access to medical care or legal recourse. This raises a couple of obvious questions: (1) if the plan is to deport people, why do we need to incarcerate so many of them here? And (2) how do you deport 11 million people to nowhere?

The link between the mass detention centers now being built in this country and the mass murders carried out by Nazi Germany was discussed recently by historian Heather Cox Richardson [11]. She notes that, "…we don't know exactly how ICE will use this warehouse. But we know enough."

As I said at the beginning of this letter: Mass detention for the sake of mass detention is an intervention where the harm is entirely predictable and the possibility for benefit is negligeable or non-existent.

If we believe in the principle that we should, "first, do no harm," then let us stop doing things that are expressly designed to hurt people.

Robert D. Beech, MD, Ph.D.

# YALE UNIVERSITY

*School of Medicine*
*Department of Psychiatry*
*Connecticut Mental Health Center*
*34 Park St., 4th Floor*
*New Haven, CT 06519*

 

*Robert D. Beech, MD, Ph.D.*
*Medical Director,*
*Acute Inpatient Unit and*
*Transitional Living Program*
*Tel: (203) 974-7757*
*Fax: (203)974-7615*
*Email: robert.beech@yale.edu*

Sources:

1. https://www.nbcnews.com/politics/immigration/concerns-grow-ice-plans-build-mega-warehouses-immigration-detention-rcna257454

2. https://www.americanimmigrationcouncil.org/report/immigration-detention/

3. https://www.americanimmigrationcouncil.org/blog/ice-expanding-detention-system/

4. https://phr.org/our-work/resources/endless-nightmare-solitary-confinement-in-us-immigration-detention/

5. https://www.hrw.org/report/2025/07/21/you-feel-like-your-life-is-over/abusive-practices-at-three-florida-immigration

6. https://popular.info/p/ice-has-stopped-paying-for-detainee

7. https://www.americanimmigrationcouncil.org/fact-sheet/debunking-myth-immigrants-and-crime/

8. https://www.cbsnews.com/news/ice-arrests-violent-criminal-records-trump-first-year/

9. https://www.splcenter.org/resources/extremist-files/stephen-miller/#miller-s-emails-to-breitbart-news

10. https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained

11. https://heathercoxrichardson.substack.com/p/february-7-2026

Docusign Envelope ID: 7C2ECE94-C6D1-435E-B208-CB5AEC38F6A0

February 25, 2026

To whom It may concern,

My name is Dr. Paula Latortue-Albino. I am an obstetrician and gynecologist and a concerned citizen living and practicing in Washington, DC. I take care of patients coming to my clinic from the entire DMV area, looking for routine and specialized services that are at times urgent and hard to access.  Some of my patients travel close to an hour by car or bus to see me.

I am writing with grave concern regarding the proposed ICE detention center in Washington County. This detention center will put at risk the health and life of many members of the surrounding communities.

There have been multiple reliable and confirmed reports of people who are detained, most often without a signed judicial order, not having access to care for chronic and acute conditions. New York Lawyers for the Public Interest has clearly documented the medical neglect and hazardous conditions faced by people in ICE detention centers.

custody.https://www.nylpi.org/resource/denied-care-denied-dignity-systemic-medical-failures-in-immigration-detention-at-orange-county-jail/

https://newrepublic.com/post/205458/ice-detainees-pay-for-medical-care

Adults, children, the elderly and pregnant and nursing women have all been affected by the inappropriate conditions in detention centers. As an obstetrician and gynecologist, I worry about pregnant women being dehydrated, having miscarriages and stillbirths, going into preterm labor, having a placental abruption (early detachment of the placenta in late pregnancies) or having undiagnosed preeclampsia. All of these conditions can be life-threatening for pregnant women and for their babies.  As a gynecologist, I worry about women with heavy menstrual periods and anemia (low blood counts) not having access to private bathrooms and feminine hygiene products and potentially having complications like fainting or heart attacks due to their blood loss, and women with infections in their urine or their uteruses at risk of sepsis, death and infertility. I worry about women who breastfeed being separated from their babies, and worry about babies and kids experiencing malnutrition, and being traumatized.

The Center for Reproductive Rights has reported multiple cases of miscarriages happening in detention centers. For example, a woman named Lucia was bleeding heavily and not provided with medical treatment, until her life was on the line, needing emergency care and blood transfusions. There have also been reports of other obstetric emergencies being dismissed, with patients being told to "drink water" while bleeding instead of being provided healthcare that could save their pregnancies and their lives.

https://reproductiverights.org/news/pregnant-postpartum-nursing-women-ice-custody/

The need is great to minimize the impact of ICE in our communities, not give ICE license to racially profile, harm residents and their neighbors.  There is a lot of evidence that inhuman treatment is standard, and lack of medical care is the norm in detention centers. In addition, the conditions in the centers contribute to worsening health through poor nutrition, lack of water, poorly controlled temperature, inadequate sleep, and infection risk. I urge you to abandon this detention center project in Washington County MD for the well-being of communities in the greater DMV area.

Thank you for your attention.

**Paula Latortue Albino, MD FACOG**

Obstetrician and Gynecologist

Washington, DC

NPI # 1962866822

pmlatortue@gmail.com

Docusign Envelope ID: 7C2ECE94-C6D1-435E-B208-CB5AEC38F6A0

# Jyothi Marbin MD | jyothi.marbin@gmail.com

March 4, 2026

To Whom It May Concern,

I am writing as a pediatrician who cares for children and families every day, many of whom are part of immigrant communities. I am deeply concerned about the proposal to establish an ICE detention facility in Maryland.

From a medical and public health perspective, immigration detention is harmful to children and families. Even when children are not directly detained, the presence and expansion of detention infrastructure in a community creates fear that has measurable health consequences. Families delay seeking medical care. Children with asthma, diabetes, and other chronic illnesses miss appointments. Parents avoid emergency rooms out of fear that interaction with institutions may expose them to immigration enforcement. This leads to preventable worsening of disease and avoidable suffering.

The scientific literature is clear: exposure to detention, family separation, or even the threat of detention produces toxic stress in children. Toxic stress is not a metaphor; it alters neurodevelopment, increases risk of anxiety and depression, and is associated with long-term cardiovascular, metabolic, and immune dysfunction. The conditions commonly documented in detention facilities - overcrowding, inadequate medical staffing, poor access to specialty care, inconsistent medications, insufficient mental health services, disrupted sleep, and infectious disease risk - are incompatible with the standards of care we are trained to uphold.

As a pediatrician, I am also concerned about the broader community impact. When immigration enforcement expands, trust in healthcare systems erodes. Public health depends on trust. If families fear that seeking care could place them or their loved ones at risk, outbreaks go untreated, vaccinations are delayed, prenatal care is missed, and children suffer.

We do not improve community safety or wellbeing by expanding detention capacity. We increase fear, destabilize families, and worsen health inequities. Our obligation as healthcare professionals is to prevent harm, especially to children. The establishment of a new ICE detention facility moves us in the opposite direction.

I urge you to oppose this project and to pursue policies that protect the health, dignity, and safety of children and families in our state.

Sincerely,

Jyothi Nagraj Marbin MD

Docusign Envelope ID: 7C2ECE94-C6D1-435E-B208-CB5AEC38F6A0

Emily Georges, MD
Seattle, WA 98105
Egeorges2911@gmail.com

March 18, 2026

To Whom It May Concern:

I am writing today as a pediatrician and prior high school teacher to express my concern about the detention of children by ICE. All children, no matter their immigration status, should be treated with dignity and respect and protected from harm and trauma.

The ICE facilities do not meet the basic standards children need to grow and develop. This is among the reasons the AAP has expressed that there is no amount of time in detention that is safe for children and detention itself poses a threat to children's health. Children held in detention receive inadequate and inappropriate immunizations, delays in medical care, inadequate education services, and limited access to mental health services. Childhood is a critical time in growth and development. Studies have shown that holding a child in detention for any amount of time may result in developmental delays, which can be lifelong, and may impact long-term learning potential. Children are also at higher risk from serious and potentially life-threatening illnesses, dehydration, and malnutrition when they are denied adequate access to medical care by a pediatrician and are held in confined spaces with mixed vaccination status individuals. Therefore, while tragic, it is not surprising that children have died because they were held in ICE detention centers that lack the infostructure children need to survive.

Finally, there is ample research that highlights the negative mental health consequences of family separation and/or detention. Children who have immigrated to our country frequently have experienced immense trauma in their country of origin and/or as part of their journey to the United States. Not only are ICE jails unable to give them the mental health support they need, but they also deny children the support of their parents. It is no wonder that child detention has been associated with higher rates of depression, anxiety, sleep disturbances, developmental regressions, and posttraumatic stress disorder. In fact, only torture shares the same immense negative impact on child psychological wellbeing as does family separation and detention.

Children are our future and deserve certain safeguards so they can develop into healthy adults. We must prioritize the health and safety of all children, regardless of where they or their parents were born, their documentation status, or nationality. It is for these reasons that as a pediatrician and concerned citizen, I urge you to end the detention of children in ICE jails.

Emily Georges, MD
MD61283335