**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF MARYLAND,

      Plaintiff,

      v.

MARKWAYNE MULLIN,[1] *et al*.,

      Defendants.

Case No. 1:26-cv-733

**Defendants' Response in Opposition to**
**Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 15)**

---

[1] Markwayne Mullin is automatically substituted for Kristi Noem under Federal Rule of Civil Procedure 25(d).

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     LEGAL BACKGROUND .................................................................................2

III.    STANDARD OF REVIEW ...............................................................................4

IV.     FACTUAL BACKGROUND .............................................................................5

V.      ARGUMENT ....................................................................................................8

      A.      Plaintiff is not likely to succeed on the merits of its claims. .................................8

            1.      Plaintiff lacks standing to bring its claims because it cannot show an injury in fact. ..................................................................................8

            2.      Plaintiff's NEPA claims fail. ...................................................10

                  a.      A categorical exclusion is a form of NEPA review. ......................11

                  b.      The agency properly applied three CEs to the project. .................12

                  c.      The agency properly applied the CEs because the project is not part of a larger action, no extraordinary circumstances exist, and no public notice requirements apply. ...........................17

      B.      Plaintiff has not established irreparable harm. ....................................................21

      C.      The balance of equities and public interest favor allowing ICE's retrofitting of the warehouse to proceed. ...........................................................................27

      D.      If the Court enjoins the activities, Plaintiff is required to post a bond. ................28

VI.     CONCLUSION .................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
  189 F.3d 851 (9th Cir. 1999) .......................................................................................17

*Back Country Horseman of Am. v. Johanns*,
  424 F. Supp. 2d 89 (D.D.C. 2006) ...........................................................................11, 20

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ......................................................................................................4

*Cal. Ass'n of Private Postsecondary Schls. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) ...........................................................................21

*California v. Norton*,
  311 F.3d 1162 (9th Cir. 2002) .....................................................................................11

*City of Alexandria v. Fed. Highway Admin.*,
  756 F.2d 1014 (4th Cir. 1985) .....................................................................................12

*Ctr. for Biological Diversity v. Salazar*,
  706 F.3d 1085 (9th Cir. 2013) ..................................................................................3, 11

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
  144 F.4th 296 (D.C. Cir. 2025)....................................................................................10

*Defs. of Wildlife v. N.C. Dep't of Transp.*,
  762 F.3d 374 (4th Cir. 2014) .......................................................................................17

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1991) .....................................................................................4, 21

*Earth Island Inst. v. Muldoon*,
  82 F.4th 624 (9th Cir. 2023) ....................................................................................11, 20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)......................................................................................................9

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
  174 F.3d 411 (4th Cir. 1999) .......................................................................................29

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) .......................................................................................4

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)......................................................................................................18

*Maryland v. United States*,
  360 F. Supp. 3d 288 (D. Md. 2019) .............................................................................9

*Massachusetts v. E.P.A.*,
  549 U.S. 497 (2007).......................................................................................................9

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ....................................................................................................10

*Mayor & City Council of Balt. v. Trump*,
   429 F. Supp. 3d 128 (D. Md. 2019) ..............................................................................4

*Metro. Edison Co. v. People Against Nuclear Energy*,
   460 U.S. 766 (1983) ....................................................................................................14

*Miranda v. Garland*,
   34 F. 4th 338 (4th Cir. 2022) ......................................................................................28

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
   915 F.3d 197 (4th Cir. 2019) ......................................................................................21

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................................5, 27

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009) ........................................................................................4

*Reed v. Salazar*,
   744 F. Supp. 2d 98 (D.D.C. 2010) ..............................................................................19

*S.C. Wildlife Fed'n v. Limehouse*,
   549 F.3d 324 (4th Cir. 2008) ......................................................................................10

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ........................................................................................3

*Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) ......................................................................................27

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025) ...................................................................................... 2, 3, 19, 20

*South Carolina v. United States*,
   912 F.3d 720 (4th Cir. 2019) .............................................................................8, 9, 22

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
   933 F.3d 728 (D.C. Cir. 2019) ......................................................................................3

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) .........................................................................................11

*Wild v. S.C. Dep't of Transp.*,
   9 F. App'x 114 (4th Cir. 2001) ....................................................................................17

*Wild Va. v. Council on Env't Quality*,
   56 F.4th 281 (4th Cir. 2022) .......................................................................................22

*Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*,
   375 F.3d 1085 (11th Cir. 2004) ..................................................................................11

*Winter v. Natural Resources Defense Council,*
    555 U.S. 7 (2008) ...................................................................................................1, 4

**Statutes**

42 U.S.C. § 4332(C)(2) .........................................................................................................2

42 U.S.C. § 4336(a)(2) ...................................................................................................11, 20

42 U.S.C. § 4336(e)(1) .........................................................................................................2

42 U.S.C. § 4336e(1) ............................................................................................................3

42 U.S.C. §§ 4336(b)(1)-(2) .................................................................................................2

5 U.S.C. § 706 .......................................................................................................................3

5 U.S.C. § 706(2)(A) .............................................................................................................4

**Rules**

Fed. R. Civ. P. 65(c) ...........................................................................................................29

**Other Authorities**

90 Fed. Reg. 8443 (Jan. 20, 2025) ......................................................................................28

## I.    INTRODUCTION

Plaintiff asks this Court to halt Defendant U.S. Immigration and Customs Enforcement's ("ICE") retrofitting and operation of a processing and detention center in a commercial area between Hagerstown, Maryland and Williamsport, Maryland. The subject property is in an area replete with large warehouses and itself contains a large warehouse that ICE intends to retrofit into the processing and detention center at the center of this case. Almost all retrofitting work will take place within the footprint of the preexisting warehouse. Plaintiff claims that ICE failed to analyze the environmental impacts of the facility under the National Environmental Policy Act ("NEPA"), but Plaintiff is mistaken—the agency has determined that the warehouse will not have significant environmental impacts consistent with NEPA. From this determination and the location and state of the property—in an area between multiple major highways and large warehouses, close to the city of Hagerstown, and improved with an extremely large warehouse and parking lot with 400 parking spaces—it is clear that any added environmental impacts of the facility will be minor and consistent with the impacts of what would reasonably be expected in the area. NEPA, then, cannot be used to block this project merely because of policy disagreements, or because Plaintiff does not want the facility to be located in the State of Maryland.

Specifically, the Court should deny Plaintiff's motion because Plaintiff cannot meet any of the four required factors under *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) for a preliminary injunction to issue. First, Plaintiff cannot show a likelihood of success on the merits of its claims because Plaintiff lacks standing and Defendants analyzed the environmental impacts of the facility consistent with NEPA. Second, Plaintiff has not established imminent, irreparable harm. Under *Winter*, NEPA violations do not create presumptive

irreparable injury. All of Plaintiff's asserted harms stem from work to retrofit the warehouse and operate it as a detention center. As explained below, however, ICE is reconsidering the plans and scope of the warehouse and will not engage in construction to retrofit the warehouse or operation of it for housing detainees without further NEPA analysis. Plaintiff thus cannot show an imminent irreparable injury, and that failure is fatal to its motion. Further, Plaintiff offers only speculation about potential impacts from retrofitting an existing massive warehouse in an already heavily developed area. Third and fourth, the public interest and balance of the equities weigh in favor of the facility because of the compelling and critical national security interest in enforcement of immigration law, and in a manner that complies with ICE's detention standards. Each factor independently requires denial of emergency relief. Therefore, the Court should deny Plaintiff's Motion.

## II.    LEGAL BACKGROUND

NEPA "is a purely procedural statute" that "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.* (*Seven County*), 605 U.S. 168, 173 (2025). It "is a procedural cross-check, not a substantive roadblock." *Id.* "Otherwise stated, NEPA does not mandate particular results, but simply prescribes the necessary process for an agency's environmental review of a project." *Id.* at 177 (citation modified).

Under NEPA, federal agencies fulfill their obligation to analyze the environmental impacts of major federal actions through preparation of an environmental impact statement ("EIS") if the agency determines the action will have significant environmental impacts, preparation of an environmental assessment ("EA") to assess whether the action will have significant environmental impacts, or invocation of a categorical exclusion ("CE"). *See* 42

DEFS.' RESP. TO PL.'S
MOT. FOR A PRELIM. INJ.                           2

U.S.C. §§ 4336(b)(1)-(2), 4332(C)(2) (defining EIS), 4336(e)(1) (CE). CEs are categories of actions that normally do not have significant effects on the environment, individually or in the aggregate, and therefore do not require an EA or EIS unless extraordinary circumstances exist that make application of a CE inappropriate. 42 U.S.C. § 4336e(1). CEs are a form of NEPA compliance that streamline agency NEPA review while providing several procedural safeguards. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) ("Application of a [CE] is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an [EIS] or an [EA] is necessary." (citation omitted)); *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 735 (D.C. Cir. 2019) ("[CEs] are not exemptions or waivers of NEPA review; they are simply one type of NEPA review." (citation omitted)).

In assessing environmental effects under NEPA, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail" of its written analysis. *Seven Cnty.*, 605 U.S. at 182-83. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183. As the Supreme Court recently "doubly underscore[d]," "inherent in NEPA . . . is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process. A reviewing court may not substitute its judgment for that of the agency as to the environmental consequences of its actions." *Id.* (citations omitted).

### III.    STANDARD OF REVIEW

Judicial review of administrative actions is governed by the Administrative Procedure Act ("APA"). 5 U.S.C. § 706; *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA standard of review, an agency's final decision must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citations omitted). And "[e]specially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" *Id.* (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). Ultimately, the Court's task "is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas*, 462 U.S. at 105 (citation omitted). Judicial review under the APA is limited to the agency's administrative record. *Mayor & City Council of Balt. v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019) (Review under the APA ordinarily "is limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." (citations omitted)).[2]

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991); *see also Lopez v. Brewer*, 680 F.3d

---

[2] The agency here has not yet lodged the administrative record, but, under the record review rule set forth above, the Court's consideration of the merits still must be limited to information that was before the agency at the time it made its decision.

1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The balance of equities and public interest "factors merge when the Government" is the party opposing the preliminary injunction request. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV.    FACTUAL BACKGROUND

ICE acquired an existing warehouse between Williamsport and Hagerstown, Maryland to retrofit it into a facility to temporarily house and process immigration detainees. *See* Dep't of Homeland Security Record of Env't Consideration for CE Actions under NEPA ("REC"), attached hereto as Exhibit 1 at 20-21. The subject property consists of nearly 54 acres, on which there is a preexisting 825,620-square-foot warehouse. *See* Maryland Dep't of Assessments & Tax'n Data Search, Dkt. No. 15-6 at 2. This "mega warehouse" was built in 2022, *id.*, and, as Plaintiff states, has more than 400 parking spaces, 200 trailer spaces, 2,400 square feet of existing office space, four toilets, and two water fountains. Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Br.") 9 (citation omitted), Dkt. No. 15-1. As shown below, the property is situated between multiple highways and major thoroughfares (Maryland Veterans Memorial Highway (I-81), Greencastle Pike (Highway 63), Eisenhower Memorial Highway (I-70), and Virginia Avenue (Highway 11)) and in an area with multiple other large warehouses within a one-mile radius:[3]

---

[3] While the address of the subject property on the deed is different from the property address in the agency's documents, this difference is due to a fairly recent change in the designated address of the property. Now, the correct address of the property is the address that appears on the deed: 16220 Wright Road, Williamsport, MD 21795. Deed, Dkt. No. 15-5 at 8.



Ex. 1 at 51.

In January 2026, ICE completed an environmental and historical preservation review of the acquisition and retrofitting of the property known as a Record of Environmental Consideration ("REC"). Ex. 1. The REC explained that the facility, as initially retrofitted, will accommodate up to 542 detainees and include 448 typical dormitory pods, 32 disability-accessible dormitory pods, and 62 pods designated for behavioral and special housing needs. *Id.*

at 1. The facility will also include four separate, secure recreation yards, a visitor waiting area, two cafeterias, one kitchen and food preparation area, three multi-purpose rooms, a health services room, laundry facilities, and staff areas. *Id*. Proposed improvements to the property and warehouse are as follows:

> installation of perimeter security fencing; installation of a modular security checkpoint structure (approx. 150 sq ft) located entirely within an existing paved area; construction of 6 exterior recreation courts on existing asphalt surfaces; installation of exterior lighting and security cameras; replacement of the existing emergency generator with a larger capacity unit (approx. 1,000 kw) to meet current life safety and operational requirements; installation of new telecom cabling, routed through existing utility corridors or previously disturbed areas; and sanitary sewer connection improvements, if required by final engineering review.

*Id*. No off-site sewer upgrades or new sewer connections are anticipated for the facility, and no new building additions, footprint expansions, off-site construction, or capacity-related improvements are planned. *Id*. The REC also notes that the acquisition and retrofitting of the property falls within three NEPA CEs: C1, D1, and E2. *Id*. at 2-3, 20-25. The agency also found that no extraordinary circumstances exist that could make the environmental impacts of the facility nonetheless significant. *Id*. at 20-22.

After ICE's environmental review and application of the CEs, ICE bought the subject property from FRIND-Hopewell, LLC in January 2026. Deed, Dkt. No. 15-5 at 3. Plaintiff waited until over a month later to file its Complaint, asserting two claims. Dkt. No. 1. Count I alleges Defendants violated NEPA and the APA because they allegedly failed to conduct environmental review under NEPA. *Id*. ¶¶ 78-89. Count II alleges Defendants violated the APA by acting arbitrarily and capriciously and contrary to law when acquiring the subject property for purposes of creating a processing and detention center. *Id*. ¶¶ 90-95. On March 6, ICE awarded a contract to KVG, LLC to retrofit the warehouse. Pls.'s Br. 12 (citation omitted). Plaintiff then moved for a temporary restraining order on March 10, 2026, Dkt. No. 5-1, which the Court

DEFS.' RESP. TO PL.'S
MOT. FOR A PRELIM. INJ.                          7

granted on March 11, Dkt. No. 8. Plaintiff then moved for a preliminary injunction on March 19, and the Court extended the temporary restraining order until it rules on the preliminary injunction, or April 16, whichever is sooner. Dkt. No. 15; Dkt. No. 14.

## V.   ARGUMENT

### A.   Plaintiff is not likely to succeed on the merits of its claims.

Plaintiff cannot show a likelihood of success on the merits because, first it lacks standing, and second, both of its claims are premised on the false assumption that Defendants failed to conduct NEPA review on the Maryland processing and detention center. Compl. ¶ 87 (Count I: "To the State's knowledge, Defendants have not invoked any categorical exclusion that could properly excuse ICE from reviewing the Project under NEPA."); *id*. ¶ 93 (Count II: "Nor have Defendants given any explanation—let alone a reasoned explanation—for their change in previous position that NEPA review is required for projects that involve the purchase, construction, renovation, and operation of immigration detention and processing centers."). Plaintiff's claims fail because Defendants completed NEPA review. Applying a CE is a wholly appropriate means to comply with NEPA, and the agency did so here by applying three CEs to the acquisition and retrofitting of the property for its initial capacity of approximately 540 individuals. Ex. 1 at 2-3, 20-25.

### 1.   Plaintiff lacks standing to bring its claims because it cannot show an injury in fact.

"To establish Article III standing, 'a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *South Carolina v. United States,* 912 F.3d 720, 726 (4th Cir. 2019) (internal quotation

marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000)). But, as the Court noted in its prior Order, "[f]or the purposes of meeting the injury-in-fact requirement, states 'are not normal litigants.'" *Maryland v. United States,* 360 F. Supp. 3d 288, 308-09 (D. Md. 2019) (quoting *Massachusetts v. E.P.A.,* 549 U.S. 497, 518 (2007)). "They may show harm to three kinds of interests: (1) proprietary or financial-interests, (2) quasi-sovereign interest, and (3) sovereign interests." *Id.*

The Court determined that "[t]he State has standing because it has alleged a palpable and imminent injury to its quasi-sovereign interest in its environment due to Defendants' likely failure to comply with NEPA." Dkt. No. 8 at 4. But Defendants demonstrate below in the irreparable harm section that Plaintiff's claims about the facility's damage to the environment are far too speculative to meet Plaintiff's burden to demonstrate standing. On this issue, *South Carolina*, 912 F.3d at 728-29 is instructive. There, the Fourth Circuit held that the plaintiff, which was a State, lacked standing for its NEPA claims due to its alleged injury in fact being too speculative; the Court so held because the alleged injury "lie[d] at the end of a highly attenuated chain of possibilities." *Id.* Likewise, Plaintiff's allegations of harm here are based on multiple steps of speculative contingencies like: (1) the wastewater from the facility overloading the current infrastructure; (2) ICE either ignores the overload and does not expand the infrastructure, or expands the infrastructure in a way that causes environmental harm; (3) the infrastructure fails; (4) ICE does not quickly or appropriately repair the infrastructure; and (5) wastewater then flows into nearby creeks, causing environmental harm. *See infra* Section V.B. As in *South Carolina*, here, the "theory of injury that [plaintiff] relies on to support both of its claims is too speculative at this juncture to support Article III standing." 912 F.3d at 730.

Additionally, a "quasi-sovereign interest" generally refers to *parens patriae* interests,

which a state cannot usually assert against the United States. *Massachusetts v. Mellon*, 262 U.S. 447, 485–486 (1923) ("But the citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof."). Nor is Plaintiff's claimed procedural harm from Defendants' alleged violation of NEPA enough on its own to support standing. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) ("However, even a plaintiff claiming procedural injury must show how the agency's error could affect her 'concrete interests.'" (citation omitted)). Having no concrete interest that imminently stands to be harmed, Plaintiff fails to demonstrate an injury in fact sufficient for standing.

The Court found that a Fourth Circuit case was analogous to the claims at issue and thus indicated that Plaintiff has standing here, but the case is distinguishable, and its application should lead to a different result now. Dkt. No. 8 at 4 (citing *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 329 (4th Cir. 2008)). There, the Court found the plaintiff's allegation of injury in fact sufficient when it alleged that the defendant's project "would harm its members' ability to use and enjoy the relevant area for a variety of education, scientific, recreational, and aesthetic purposes, and that one or more of its members currently use the land for such purposes." *Id*. (citation omitted). By contrast, here, citizens of Maryland cannot use or enjoy the subject property for any of the above purposes because there is a preexisting large warehouse on the property that already prevented such uses even before ICE acquired the property. Thus, *Limehouse* only highlights the deficiencies of Plaintiff's alleged injuries here. Plaintiff has failed to demonstrate an injury in fact sufficient to show standing.

### 2.    Plaintiff's NEPA claims fail.

a.    **A categorical exclusion is a form of NEPA review.**

As noted above, an agency may satisfy its procedural obligations under NEPA through

a CE. *See* 42 U.S.C. § 4336(a)(2). CEs are not loopholes. *Ctr. for Biological Diversity*, 706 F.3d

at 1096 ("Application of a categorical exclusion is not an exemption from NEPA; rather it is a

form of NEPA compliance."). Instead, they are streamlined environmental reviews that contain

several procedural safeguards to categories of actions that normally do not have significant

environmental effects. "[T]he entire point of categorical exclusions is to reduce the

administrative burden of approving certain projects." *Earth Island Inst. v. Muldoon*, 82 F.4th

624, 636 (9th Cir. 2023) (citation omitted). Thus, "[i]n many instances, a brief statement that a

categorical exclusion is being invoked will suffice." *California v. Norton*, 311 F.3d 1162, 1176

(9th Cir. 2002); *see also Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d

1085, 1095 (11th Cir. 2004) ("Documentation of reliance on a categorical exclusion need not be

detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency

indeed considered whether or not a categorical exclusion applied and concluded that it did.").

"[A]n agency's decision to classify a proposed action as falling within a particular categorical

exclusion will be set aside only if a court determines that the decision was arbitrary and

capricious." *Back Country Horseman of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006)

(internal quotation marks and citation omitted).

DHS's application of a CE is a multi-step process. Dkt. No. 15-4 at 34-37.[4] First, before

---

[4] Defendants look to a DHS NEPA instruction manual for guidance on how to apply CEs and how to comply otherwise with NEPA. *See* Dkt. No. 15-4. The manual is not binding, but it serves as a practical aid for DHS personnel to implement NEPA. *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1009 (9th Cir. 2021) ("NEPA, not the [DHS instruction] Manual, is the source of any binding legal obligations to which DHS is subject."). Even though the manual's provisions regarding CEs are not binding, the agency nevertheless complied with them, as explained below.

DHS applies a CE, it determines that the proposed action falls within the terms of the category for any given CE. *Id*. at 35. DHS's CEs are listed in Appendix A of its NEPA instruction manual. *Id*. at 59-87. Second, even when a CE covers a proposed action, DHS nevertheless will not apply the CE if the proposed action is a piece of a larger connected action. *Id*. Third, under the DHS NEPA instruction manual, the agency examines a variety of resource conditions to determine whether extraordinary circumstances exist and warrant further analysis and documentation. *Id*. at 35-36 (setting forth potential extraordinary circumstances for the agency to consider in connection with a proposed project). Finally, and relevant here, if certain specified CEs apply and are invoked for a proposed action, DHS prepares a REC to document the NEPA analysis. *Id*. at 34-35, 37.

As explained below, Defendants have taken the above steps to apply three CEs to the acquisition and retrofitting of the subject property. Thus, Defendants have properly completed NEPA review, and Plaintiff's claims, which rely on an alleged failure to complete any NEPA review, have no likelihood of success on the merits. *See City of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1018-21 (4th Cir. 1985) (upholding the defendant agency's application of a CE to a highway project because the agency's application of its CE was not arbitrary or capricious).

> **b.      The agency properly applied three CEs to the project.**

Before acquiring the subject property, the agency determined that the acquisition and retrofitting of the property to house approximately 540 detainees fell within three DHS CEs: C1, D1, and E2. Ex. 1 at 2-3. The text of the CEs is below:

> C1 - Acquisition of an interest in real property that is not within or adjacent to environmentally sensitive areas, including interests less than a fee simple, by purchase, lease, assignment, easement, condemnation, or donation, which does not result in a change in the functional use of the property.

D1 - Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property (e.g. realigning interior spaces of an existing building, adding a small storage shed to an existing building, retrofitting for energy conservation, or installing a small antenna on an already existing antenna tower that does not cause the total height to exceed 200 feet and where the FCC would not require an EA or EIS for the installation).

E2* - New construction upon or improvement of land where all of the following conditions are met:
> (a) The structure and proposed use are compatible with applicable Federal, tribal, state, and local planning and zoning standards and consistent with federally-approved state coastal management programs,
> (b) The site is in a developed area and/or a previously-disturbed site,
> (c) The proposed use will not substantially increase the number of motor vehicles at the facility or in the area,
> (d) The site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings, and,
> (e) The construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.).

*Id*. at 3.

The REC explained that acquisition of the subject property meets the two requirements of CE C1 (i.e., that the property is not within or adjacent to environmentally sensitive areas and that the acquisition will not result in a change in the functional use of the property). First, the property is not within or adjacent to an environmentally sensitive area. The agency provides examples of environmentally sensitive areas as areas having special designation such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, and National Monuments. *Id*. at 12. The agency found that: no State or National Forests are within or adjacent to the property; no archaeological resources or historic architectural resources are present; no historic properties will be affected; no wetlands are present on the property, and no wetlands are anticipated to be impacted by the retrofitting

work; no work on the property will be located in a floodzone, and facility modifications will cause no functional changes to existing floodplain conditions; there is no designated critical habitat, or even suitable habitat, on the property for species listed under the Endangered Species Act; and no changes to groundwater resources or wellhead protection areas are anticipated on the subject property. *Id*. at 12-13. Therefore, the agency concluded that the subject property is not within or adjacent to an environmentally sensitive area. *Id*.

Second, the REC explained that acquisition of the property does not result in a change in the functional use of the property. The pre-existing building on the subject property spans 825,620 square feet and has more than 400 parking spaces, 200 trailer spaces, and 2,400 square feet of existing office space. Pl.'s Br. 9 (citation omitted). In other words, the property and its preexisting "mega warehouse" were built to be used for an endeavor requiring a massive space and many people and vehicles coming in and out. As CEs are a type of NEPA review, the proper focus for this inquiry on functional use is environmental impact. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) ("The theme of [NEPA's statutory text] is sounded by the adjective 'environmental': NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment." (emphasis in original)). The environmental impacts associated with the property and the preexisting warehouse are functionally the same both before and after Defendants' acquisition and retrofitting: the existing facility is currently served by a 6-inch sanitary sewer lateral that the agency's engineering reviews indicate will be sufficient for the facility with the capacity of 540 people, Ex. 1 at 8; the facility's operations are not expected to result in significant changes to traffic patterns or modes of transportation, *id*. at 9; traffic and noise levels are not expected to rise above those of usual residential traffic levels, *id*. at 8; air quality impacts

are expected to be minor and localized, *id.*; and proposed modifications to the facility will occur primarily within previously disturbed areas and will not result in impacts to wildlife or habitats, *id.* at 10. Thus, in terms of environmental impacts, the functional use of the subject property is the same both before and after acquisition of the property, and application of C1 is therefore appropriate.

As for CE D1, the retrofitting of the facility for a capacity of up to approximately 540 people will not result in a change in functional use, as described above. Further, the retrofitting of the facility almost exclusively falls within one of the examples in the text of the CE: "realigning interior spaces of an existing building." *Id.* at 3. The only planned initial retrofitting work that does not fall within this example is: installation of perimeter security fencing; installation of a modular security checkpoint structure (approx. 150 sq ft) located entirely within an existing paved area; construction of 6 exterior recreation courts on existing asphalt surfaces; installation of exterior lighting and security cameras; replacement of the existing emergency generator with a larger capacity unit (approx. 1,000 kw) to meet current life safety and operational requirements; installation of new telecom cabling, routed through existing utility corridors or previously disturbed areas; and sanitary sewer connection improvements, if required by final engineering review. *Id.* at 1. These are all minor improvements, fitting within D1, because they are either within existing paved surfaces or minimal in scope and environmental impact.

Finally, the REC establishes that the retrofitting work satisfies CE E2's five requirements, (a)-(e). *Id.* at 3. Requirement (a) provides that "the structure and proposed use are compatible with applicable Federal, tribal, state, and local planning and zoning standards and consistent with federally-approved state coastal management programs." *Id.* The property is not

within a Coastal Zone Management Area or within tribal jurisdiction, so those requirements do not apply. *Id*. at 5, 14. Further, penal and correctional institutions are an allowed use under the County zoning designation, so the subject property likely will not require rezoning. *Id*. at 45.

Requirement (b) provides that "the site is in a developed area and/or a previously-disturbed site." *Id*. at 3. The project fits this requirement because "[a]ll construction is temporary, localized, and confined to previously disturbed areas." *Id*. at 1. Additionally, as discussed and shown above in the graphic of the subject property and surrounding area, the property and warehouse are in a commercial area with multiple other large warehouses and thus is already "developed."

Requirement (c) provides that "[t]he proposed use will not substantially increase the number of motor vehicles at the facility or in the area." *Id*. at 3. This requirement is satisfied because the facility's operations are not expected to result in significant changes to traffic patterns or modes of transportation. *Id*. at 9. Further, "traffic and noise levels are not expected to rise above those of usual residential traffic levels." *Id*. at 8. Also, the existing warehouse already has 400 parking spots, Pl.'s Br. 9 (citation omitted), establishing that it already accommodates many vehicles.

Requirement (d) provides that "[t]he site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings." Ex. 1 at 3. This requirement is met because, as explained above, all work at the site will be completed in previously disturbed areas, and those disturbed areas are of a similar size and type to other large warehouses in the immediate surrounds. *See id*. at 51 (aerial photo of the subject property and surrounds).

Last, requirement (e) provides that "the construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.)."

*Id.* at 3. The project meets this requirement because, as explained above, the agency has found that existing traffic, water, and sewer infrastructure likely will not need to be changed or upgraded for purposes of the retrofit. As explained above, for all three CEs, the agency's application of the CEs to the proposed action satisfies the generous berth the agency has when determining if an action fits into a CE. *See Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999) (holding that an agency's interpretation of the scope of its own CE is "given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation" establishing the CE).

> **c.     The agency properly applied the CEs because the project is not part of a larger action, no extraordinary circumstances exist, and no public notice requirements apply.**

Even when an action fits into a CE's category, per the DHS NEPA instruction manual, the agency will not apply a CE if the action is part of a larger, connected action. Dkt. No. 15-4 at 34-35. This issue is often referred to by courts as NEPA "segmentation," where an agency is prohibited from analyzing connected actions piecemeal under NEPA to avoid higher levels of review. *See Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014). Here, the agency reasonably concluded that its acquisition, retrofitting, and operation of the warehouse to accommodate approximately 540 people is not part of a larger action or connected to another action. Ex. 1 at 8. The only other action remotely related to the action at issue is ICE's purchase and retrofit of other warehouses, and these other purchases are not connected actions to the project at issue. An action is connected only if there would be no utility to the authorized action independent of the utility of the alleged connected action. *Wild v. S.C. Dep't of Transp.*, 9 F. App'x 114, 120-21 (4th Cir. 2001)  (per curiam) (courts likely will not find that there has been segmentation if the subject action has "independent utility," i.e, whether it has an "independent reason to exist." (citation omitted)). Here, the Maryland facility is a standalone facility that will

have utility by providing a secure detention facility independent of whether any other warehouses are purchased and retrofitted to be detention centers. Relatedly, any attempt to challenge all DHS purchases of warehouses would be an improper programmatic challenge under NEPA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891-94 (1990).

Under the DHS NEPA instruction manual, when applying a CE, the agency also considers whether any extraordinary circumstances exist that render environmental impacts significant. Dkt. No. 15-4 at 35-36. The instruction manual lists ten potential extraordinary circumstances for the agency to consider when applying a CE. *Id*. at 36. Here, the REC explained that none of these extraordinary circumstances is present. Ex. 1 at 21-22. Plaintiff argues that an extraordinary circumstance exists because the proposed action will allegedly have a potentially significant effect on an environmentally sensitive area. Pl.'s Br. 28, n.11. As discussed above regarding CE C1, the environmental analysis shows that the subject property is not located on or adjacent to an environmentally sensitive area, and because almost all retrofitting work will be within the footprint of the warehouse, impacts to any environmentally sensitive areas will be minimal and not significant. Ex. 1 at 12-13. Plaintiff also argues that the agency's work on the facility poses an extraordinary circumstance because of impacts to sensitive species. Pl.'s Br. 28, n.11. But impacts to "sensitive species" does not appear on the extraordinary circumstances list in the agency's NEPA instruction manual. Dkt. No. 15-4 at 36. Instead, the instruction manual sets out an extraordinary circumstance for "[a] potentially significant effect on species or habitats protected by the ESA, Marine Mammal Protection Act, Migratory Bird Treaty Act, Magnuson-Stevens Fishery Conservation and Management Act, or other law protecting a species or habitat." *Id*. As explained in the irreparable harm section below, work on the facility will not significantly impact species protected by federal law as referenced in the above extraordinary

circumstance. And even if potential effects to sensitive species were relevant to the extraordinary circumstances inquiry, the facility will not significantly affect any of those species either.

Plaintiff also claims that an extraordinary circumstance exists because there are "uncertain environmental effects" associated with the facility. Pl.'s Br. 28, n.11. But Plaintiff does not identify what environmental effects are uncertain, nor could Plaintiff credibly do so. The irreparable harm section below explains that the environmental impacts from the agency's work on the facility will not be significant. The agency has thoroughly supported this conclusion in its REC. Ex. 1. In sum, the project does not have any extraordinary circumstances. *See Reed v. Salazar*, 744 F. Supp. 2d 98, 116 (D.D.C. 2010) ("Because extraordinary circumstances are, by definition, extraordinary, it would be inappropriate to require an agency, as a general rule, to [even] document its consideration of them.").

The Supreme Court's *Seven County* decision recently reaffirmed the substantial deference that is owed to the agency's NEPA analysis under arbitrary and capricious review. *Seven Cnty.*, 605 U.S. at 183. As here, in determining whether the project fell into CE categories, whether the project was part of a larger action, and whether extraordinary circumstances exist, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail" of its written analysis. *Id.* Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* Here, the agency made such factual determinations about the scope and intensity of impacts, and after analysis applying agency expertise and data collection, concluded that the project falls within three CEs and involves no extraordinary circumstances. Decl. of Andrew DeGregorio

("DeGregorio Decl.") ¶ 8, attached as Ex. 2; Ex. 1. These factual determinations and conclusions are entitled to substantial deference. *Seven Cnty.*, 605 U.S. at 183.

Plaintiff criticizes the agency's lack of public disclosure about the facility under NEPA. Pl.'s Br. 29-31. But NEPA contains no disclosure requirement for the application of CEs, much less any *public* disclosure requirements. 42 U.S.C. § 4336(a)(2) (NEPA stating that an environmental document is not required if the proposed agency action is categorically excluded, with no mention of any public documentation or notice requirement); *Back Country Horseman of Am.*, 424 F. Supp. 2d at 99 (holding that an "agency had no obligation to formally document its decision" to apply a CE); *Earth Island Inst.*, 82 F. 4th at 636 ("Where agency action falls under a categorical exclusion, it need not comply with the requirements of an environmental impact statement or environmental assessment." (citation omitted)). Further, the agency did disclose important facts about its plans for the facility in consultation and historic preservation letters sent to Native tribes, various local historical trust organizations, and the County Planning and Zoning Board. *See* Ex. 1 at 46-167. The DHS NEPA instruction manual recommends preparing a REC for the application of CE E2, which the agency prepared, Ex. 1, but the instruction manual contains no requirement that the REC be made public.

Further, the Court and Plaintiffs have expressed doubt about the agency's decision not to prepare an EA or EIS for this project, given that the agency has prepared an EA for some other detention and processing centers. Dkt. No. 8 at 7, n.4; Pl.'s Br. 6-7. However, at least one of these facilities is a new build, situated on an undeveloped cattle ranch, and is designed to house 700 individuals (500 detainees and 200 staff). Dep't of Homeland Sec., Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance

of a New Joint Processing Center in Laredo, Webb County, Texas (April 2024), at Cover Sheet, https://perma.cc/ZHH8-XH97. The project at issue will have different and less environmental impacts, and the agency's decision to prepare an EA for other facilities does not in itself create a policy or requirement for the agency to do so for all other detention centers in all places. Environmental impacts are necessarily site-specific, and so is the agency's analysis of extraordinary circumstances. Here, the agency properly applied CEs and concluded that no extraordinary circumstances existed. That is all NEPA requires.

### B.    Plaintiff has not established irreparable harm.

To establish irreparable harm, Plaintiff must make a "clear showing" that it will suffer harm that is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd.*, 952 F.2d at 812 (citation omitted). Plaintiff must also show that the harm is irreparable, *i.e.*, that it "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). As noted above, Plaintiff has not established the injury necessary to establish article III standing. But, even if the Court disagrees, Plaintiff must satisfy a much higher standard for showing imminent, irreparable harm to carry its burden for issuance of a preliminary injunction. *Cal. Ass'n of Private Postsecondary Schls. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury."). Plaintiff has not met that burden because it has alleged remote and speculative harm that falls far short of establishing the required imminent irreparable injury.

As an initial matter, all of Plaintiff's alleged harms stem from construction to retrofit the facility and operation of the facility. As explained in the Declaration of Andrew DeGregorio, however, the agency is reconsidering the precise scope of and plans for the facility and will not

DEFS.' RESP. TO PL.'S
MOT. FOR A PRELIM. INJ.                        21

engage in any construction activities to retrofit the facility or any operations at the facility until it engages in further NEPA analysis and makes a final decision on its plans for the facility. DeGregorio Decl. ¶¶ 8-11. The agency will not be imminently pursuing any retrofitting work for detention purposes. *Id.* ¶¶ 9-11 (the agency only plans on the following work at the site before more NEPA analysis is completed: installing a perimeter security fence, cameras, and fiberoptic cable for the cameras, repairing roof and walls leaks and the HVAC system, and minor construction within the warehouse to create ICE administrative space). Plaintiff does not allege in its brief that any of this limited work—that is necessary to protect the federal investment in the property—would cause irreparable harm. Pl.'s Br. 14-23; Decl. of Shawn Byers ("Byers Decl.") ¶ 14 (explaining that security measures are needed for the site because of vandalism at other ICE sites and at the subject property itself), attached as Ex. 3. For this reason alone, Plaintiff cannot meet its burden of showing imminent irreparable harm.[5]

Aside from the agency's commitment to halt retrofitting work, and starting with construction, Plaintiff contends that once construction of the processing facility near Hagerstown starts, and once it is operational, Maryland's natural resources and the environment will likely be injured. Pl.'s Br. 14. In support of these claims, the State points to documents that anticipate that Defendants may install, upgrade, or rehabilitate: existing parking areas, fencing, lighting, landscaping, drainage/stormwater, recreation areas, cameras, and installation of "[t]entage and a guard shack." *Id.* at 15. Plaintiff alleges that these activities pose a "significant risk" to

---

[5] Indeed, ripeness concerns support the Court deferring consideration of Plaintiff's claims while the agency undertakes additional administrative process and analysis regarding the retrofit and operation of the facility and will not engage in any of the alleged harm-causing activities during that process. DeGregorio Decl. ¶¶ 9-11; *Cf. Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 294 (4th Cir. 2022) ("'A plaintiff's claim is not ripe for judicial review if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *South Carolina*, 912 F.3d at 730)).

DEFS.' RESP. TO PL.'S
MOT. FOR A PRELIM. INJ.                    22

Maryland's environment and natural resources, *id.*, but Plaintiff fails to plausibly explain how these routine and limited activities on an existing warehouse site are likely to cause environmental harm beyond the baseline condition. Instead, they claim that converting the warehouse to a processing facility is "likely to require far more construction activity" than Defendants have disclosed, and if Defendants do not "undertake that significant construction, the facility will pose an even greater risk to the environment and health to the local community." *Id.* The State thus makes contradictory assertions, suggesting that construction activities are likely to cause environmental harm and *not* undertaking construction activities will pose even greater environmental risks.

First, the State points to environmental harms associated with wastewater treatment. It offers the declaration of Walid Saffouri, a Program Manager with the Maryland Department of the Environment, who states that the warehouse is presently served by a 6-inch lateral sewer line that ties into an 8-inch sewer main shortly after leaving the warehouse's footprint, which pumps wastewater through a force main into the Conococheague Wastewater Treatment Plant via the Wright Road Pumping Station. 2d Decl. of Walid Saffouri ¶ 18, Dkt. No. 15-16 ("2d Saffouri Decl."). The declarant notes that the Wright Road Pumping Station is designed to handle a maximum of 102,240 gallons of wastewater, that it currently receives 77,498 gallons of wastewater, and thus has only an additional capacity of 24,742 gallons of wastewater each day. *Id.* ¶ 27. Mr. Saffouri asserts that, based on a maximum capacity of 1,500 beds, and design guidelines which project 125 gallons per bed per day, the Wright Road Pumping Station will presumably be unable to handle the projected 187,500 gallons of additional wastewater from the processing facility. *Id.* ¶¶ 28-30. Mr. Saffouri states that "the facility's existing wastewater capacity is likely insufficient to handle the expected increase in flows from a 1,500 bed detention

facility," and opines that such a facility "will likely result in sewage backups and overflows creating public health hazards and environmental harm." *Id.* ¶ 45. Specifically, the State claims that once the facility becomes operational, "sewage backups are likely both at the facility and throughout the surrounding area," resulting in public health hazards for aliens, ICE agents, and others at the facility, and causing adverse environmental impacts to neighboring streams and aquatic life. Pl.'s Br. 19-20; 2d Saffouri Decl. ¶¶ 39, 41; Decl. of David Blythe, Dkt. No. 15-18 ("Blythe Decl.") ¶ 17; 2d Decl. of Josh E. Kurtz, Dkt. No. 15-8 ("2d Kurtz Decl.") ¶¶ 9, 42. To avoid this dire outcome, Mr. Saffouri states that upgrading the system would require significant excavation along the 6-inch lateral line, and likely the 8-inch sewer main, and to the Wright Road Pumping Station, including excavation to expand the facility's wet well. *Id.* He opines that this anticipated activity "is likely to increase sediment runoff to nearby waters and have significant traffic impacts." *Id.*

Not only are these speculative harms not imminent due to ICE's commitment not to engage in retrofitting construction or operations pending additional administrative processes (including NEPA analysis), they are also premised on the incorrect assumption that 1,500 beds will be occupied.[6] The REC, however, authorizes use of the facility to accommodate a maximum of 542 detainees. Ex. 1 at 1. The State's assumptions, to the extent they are based on nearly triple the number of detainees, are thus inaccurate. Second, even assuming that wastewater treatment for the facility will require additional capacity, the State offers no basis for concluding that

---

[6] Upon discussions with its contractor and emerging need, ICE is considering expanding capacity at the facility to up to 1,500 detainees eventually, but the agency does not yet have detailed plans from its contractor regarding what those capacity improvements would entail, and the agency has not made a final decision as to whether to pursue the capacity increase. DeGregorio Decl. ¶ 11. As the Declaration of Andrew DeGregorio notes, any decision to increase the capacity of the facility will occur only after additional NEPA analyses. *Id.*

DEFS.' RESP. TO PL.'S
MOT. FOR A PRELIM. INJ.                    24

Defendants will not engage with the State to ensure that sufficient capacity is made available when the facility becomes operational. The State assumes a worst-case scenario in which the parties responsible for operating the facility and ensuring environmental protection do so in a manner that is inconsistent with meeting wastewater standards. Third, even assuming the State's assumptions about the need to account for 1,500 detainees, and the associated needs for upgrades to existing capacity, its conclusions about harm from runoff associated with upgrades are wholly speculative and conclusory. For example, the State argues that upgrades will likely require excavation, that excavation is likely to increase sediment runoff, that the sediment runoff is likely to be significant, and that runoff will have significant traffic impacts. Pl.'s Br. 15-16. But they offer no details to support these claims. Even assuming that increased capacity will result in a need to excavate existing pipelines, the State offers nothing to support the claim that excavation would cause significant environmental harm due to runoff or that such harm could not be avoided, or that attendant traffic impacts (if any) could not be avoided.

The State also claims that the processing facility will need, based on 24/7 occupancy for 1,500 people, around 187,500 gallons of drinking water per day, and potentially as much as 311,347 gallons per day based on use at the Eastern Correctional Institution in January 2026. Pl.'s Br. 16-17. The State's declarant states that an upgrade of the current 2-inch pipe that delivers drinking water—currently 65,000 to 120,00 gallons per day—will be necessary, and opines that such an upgrade will "require significant excavation and construction" and further "is likely to result in sediment pollution to nearby waters." 2d Saffouri Decl. ¶ 56. Plaintiff contends that sediment runoff from the construction they anticipate is likely to reach a nearby stream, Semple Run, and then Conococheague Creek, a tributary of the Potomac River. Pl.'s Br. 17; 2d Kurtz Decl. ¶¶ 11-14. Based on the anticipated sedimentation effects, the State contends that one

fish species in need of conservation known to occur in the vicinity of Semple Run—the Allegheny pearl dace—and two freshwater state endangered mussel species known to occur downstream in the Potomac River—the brook floater and green floater—could be adversely affected. Pl.'s Br. 18; 2d Kurtz Decl. ¶¶ 48-51.[7]

Once again, the State's alleged harms are based on assumptions that are not correlated to the actions that Defendants have approved. Most prominently, the State assumes that drinking water needs will be based on 24/7 occupancy for 1,500 people, but that capacity is almost three times what the REC authorized. Even using the State's estimated per capita water usage assumption of 125 gallons per person per day, a total occupancy of 542 people would require 67,750 gallons per day, which falls near to—and likely within—the amount of water that the State estimates the current infrastructure can provide (65,000 to 120,000 gallons per day). *See* Pl.'s Br. 17. Even assuming that conversion of the facility will require additional drinking water capacity, the State offers only speculative assertions for presuming that increasing the capacity of drinking water delivery will result in sedimentation that will impact aquatic species that are endangered or in need of conservation. And certainly none of these speculative harms is imminent.

Finally, the State warns that once operational, the planned ICE processing facility will pose an increased risk of infectious disease outbreaks of measles, mumps, tuberculosis, influenza, COVID-19, and hepatitis to individuals within the facility and to members of the surrounding community. Pl.'s Br. 20-21; Blythe Decl. ¶ 8. Plaintiff claims that the proposed

---

[7] Plaintiff also cites the presence of three additional species designated by the State as being in need of conservation—the Appalachian springsnail, the Allegheny cave amphipod, and the Franz's cave amphipod. Pl.'s Br. 18. Plaintiff asserts that these species are "threatened by reductions in water quality from excess runoff and sedimentation from adjacent development." 2d Kurtz Decl. ¶ 58.

DEFS.' RESP. TO PL.'S
MOT. FOR A PRELIM. INJ.                    26

facility poses a "heightened risk of infectious disease outbreaks . . . threatening the health and well-being of individuals in the facility and the surrounding community." Pl.'s Br. 22; Blythe Decl. ¶ 20. Again, Plaintiff's concerns are speculative in nature. Notably, Plaintiff does not compare the risks associated with the anticipated processing facility to any of the current extant detention facilities in Maryland or elsewhere. Nor does Plaintiff explain how such alleged harms are imminent or why the ICE detention standards would not adequately prevent irreparable harm from disease outbreaks.

Taken together, Plaintiff's claims of irreparable harm are much too speculative and remote to carry the heavy burden required for a preliminary injunction. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) ("The plaintiff must make a clear showing of irreparable harm . . . , and the required irreparable harm must be neither remote nor speculative, but actual and imminent." (citation omitted)).

**C.    The balance of equities and public interest favor allowing ICE's retrofitting of the warehouse to proceed.**

When the government is opposing a motion for temporary restraining order, the balance of the equities and public interest factors merge. *Nken*, 556 U.S. at 435. Here, the significant national interest in combatting unlawful immigration favors allowing ICE to continue the development and use of its facility. *See* Byers Decl. ¶¶ 10, 12 (explaining that the temporary detention center's use in detaining aliens operationally benefits ICE and furthers its immigration enforcement mission). There are currently deportation orders for approximately 42,442 people in the State of Maryland, and 5,614 of those orders are for individuals with criminal records. *Id*. ¶ 12. If ICE is not able to get the facility at issue operational, it may have to forego arrest of some of these individuals for lack of detention space. *Id*. As the President explained:

> Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a

Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

Protecting the American People Against Invasion, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). If the facility is preliminarily enjoined, this critical national interest will be hindered. *See* Byers Decl. ¶ 12 (explaining that the operation of the detention center will further ICE's immigration enforcement mission by providing detention space and protecting public safety); *see Miranda v. Garland*, 34 F. 4th 338, 365-66 (4th Cir. 2022) (overturning the district court's grant of a preliminary injunction in part because the balance of the equities and public interest factors weighed against an injunction because "[t]he enforcement of our immigration laws is the government's sovereign prerogative, and detention is necessarily a part of [the removal] procedure." (citations and quotation marks omitted)). ICE has an urgent need for detention space in Maryland, as there are currently no ICE-owned detention facilities in the state, and Maryland law hinders ICE from contracting with State or local law enforcement agencies for detention space. Byers Decl. ¶ 12. This lack of detention space means that when individuals are detained by ICE in Maryland, they must be moved to facilities in other states, likely further away from where the individual was apprehended, and therefore likely further away from family and legal counsel. *Id*. In comparison to the speculative, conclusory harms claimed by Plaintiff, *see supra* Sect. V.B, the public interest and balance of the equities favor denial of Plaintiff's Motion.

## D. If the Court enjoins the activities, Plaintiff is required to post a bond.

Although Plaintiff has not met its burden to show entitlement to emergency injunctive relief, if construction on the facility is restrained, the Court should require Plaintiff to post a meaningful bond.

Federal Rule of Civil Procedure 65(c) preconditions the issuance of a preliminary injunction on "the movant giv[ing] security in an amount that the court considers proper to pay

the costs and damages sustained by any party to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "This rule is mandatory and unambiguous," and a court "is not free to disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). In determining the bond amount, a "court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Id.* at 421 n.3. This amount should cover the potential "losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities." *Id.* (quotation omitted).

The Court should require Plaintiff to post a meaningful bond if it grants Plaintiff's Motion.

## VI.   CONCLUSION

The Court should deny Plaintiff's Motion for a Preliminary Injunction because Plaintiff has not met its burden to show a likelihood of success on the merits of its NEPA claim or its burden to demonstrate that the facility will result in irreparable harm to its interests. Nor has Plaintiff demonstrated that a balance of the equities supports preliminarily enjoining the ICE processing and detention center, or that a preliminary injunction would be in the public interest. For each of these reasons, the Court should deny Plaintiff's Motion.

Dated: April 2, 2026                                  ADAM R.F. GUSTAFSON
                                                      Principal Deputy Assistant Attorney General
                                                      U.S. Department of Justice
                                                      Environment & Natural Resources Division


                                                      */s/    Hayley A. Carpenter*
                                                      HAYLEY A. CARPENTER

DEFS.' RESP. TO PL.'S
MOT. FOR A PRELIM. INJ.                      29

SEAN C. DUFFY
Trial Attorneys (Carpenter: CA Bar No. 312611)
(Duffy: NY Bar No. 4103131)
Natural Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
(202) 598-3362 (Carpenter)
(202) 598-7291 (Duffy)
hayley.carpenter@usdoj.gov
sean.c.duffy@usdoj.gov

*Attorneys for Defendants*