# Exhibit 3
# Byers Declaration

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

**STATE OF MARYLAND**,

     Plaintiff,

v.

      Case No. 1:26-cv-733-BAH

**KRISTI NOEM**, et al.,

     Respondents and Defendants.

## DECLARATION OF SHAWN L. BYERS

I, Shawn L. Byers, hereby make the following declaration with respect to the above-captioned matter:

1.     I am employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), as the Deputy Field Office Director (DFOD) of the ERO Chicago Field Office. I have held this position since August 2022. Since January 2, 2026, I have also been serving as the National Project Manager for the ICE detention capacity acquisition program.

2.     I have been employed by ICE since November 2, 2003. Since that time I have served in positions of ever-increasing responsibility. After numerous positions in local and regional ERO offices, on December 18, 2011, I was promoted to Unit Chief at ERO Headquarters. On June 17, 2012, I was promoted to an Assistant Field Office Director position in the ERO Chicago Field Office. On April 29, 2018, I was promoted to a Deputy Field Office Director position in ICE's ERO St. Paul Field Office. On June 20, 2021, I transferred to ERO Washington Field Office in Fairfax, Virginia. On August 14, 2022, I transferred to ERO Chicago Field Office in Chicago, Illinois.

1

3.      In my current position as a DFOD, I supervise subordinate managers and mid-level supervisors of ICE law enforcement officers and support staff charged with identifying, locating, and arresting aliens who are present in the United States in violation of law. I also supervise eight subordinate managers (Assistant Field Office Directors) and 32 supervisors (Supervisory Detention and Deportation Officers) who are charged with handling the facility-related issues of 13 offices located in the six states that comprise the ERO Chicago office area of operations: Illinois, Indiana, Wisconsin, Missouri, Kansas, and Kentucky. My additional duties include the supervision of the Contracting Officer Representative (COR) for the 13 facilities-related and 45 detention-related contracts, with a combined annual value exceeding $72,000,000 in FY 2025. The COR is responsible for the technical monitoring and administration of the contract. As the first line supervisor for the COR, I am the deciding official for all contracting matters related to facilities projects including design approvals, and when needed, any contract violation notices.

4.      During my tenure as a DFOD, I have managed over 30 facilities-related construction projects to include the relocation of entire multiple offices into both commercially leased and General Services Administration managed spaces.

5.      Prior to my promotion as a DFOD, as a first line manager, supervisor, and headquarters Detention and Deportation Officer, I led ground level construction efforts for multiple facilities construction and relocation projects. I am familiar with the ICE detention standards applicable to facilities that hold aliens present in the United States in violation of law prior to their removal from the United States.

6.      Prior to my government service, I worked in skilled trades and as a business owner installing underground gas lines for residential customers for over 14 years. In my experiences in the skilled trades and as a business owner, I regularly had to inspect and assess real property,

2

including utility infrastructure, for construction purposes.

7.    As the National Program Manager for the ICE detention capacity acquisition program, my responsibilities include vetting potential properties for operational feasibility, performing or coordinating Certificates of Inspection and Possession inspections (CIPs), and overseeing designs by vendors to ensure they meet operational requirements.

8.    ICE maintains detention capacity within each field office's area of jurisdiction to facilitate compliance with the *ICE National Detention Standards (Revised 2025)*. As described in the *ICE National Detention Standards*, ICE uses its immigration detention authority to effectuate its mission of enforcing the nation's immigration laws by securing individuals in custody while they await the resolution of their immigration proceedings and/or removal from the United States. The ICE detention standards ensure detainees are treated humanely, protected from harm, provided appropriate medical and mental health care, and are afforded the rights and protections to which they are entitled.

9.    In the past, ICE has relied on state, local, and contractor facilities to house its detainees. Consistent with Section 90003 of Public Law 119-21 ("One Big Beautiful Bill"), signed July 4, 2025, which appropriated $45,000,000,000 for ICE's detention capacity, ICE has developed a reimagined detention structure and acquisition strategy to address the rising operational tempo and increasing number of arrests of illegal aliens. This strategy focuses on acquiring existing facilities and retrofitting them to meet ICE detention needs and standards. Additionally, the strategy seeks to implement a new detention model comprised of ICE-owned facilities that would reduce the need to rely on state, local, or contractor owned facilities.

10.    Operating an ICE-owned detention facility protects public safety and national security by equipping the agency with the capacity to detain aliens present in the United States in

violation of law, including known or suspected terrorists, foreign fugitives, and those aliens that have failed to appear for their immigration proceedings, and those pending removal who failed to surrender after being ordered removed by an immigration judge.

11.    I am familiar with the recently acquired ICE property located, according to Washington County, Maryland, land records, at 16220 Wright Road, Williamsport, Maryland, 21795-0000—also known as 10990 Hopewell Road, Hagerstown, Maryland, 21740. The property consists of almost 54 acres, upon which a large, vacant warehouse sits. The warehouse has a floor area of approximately 825,620 square feet. A CIP inspection was completed in accordance with the *Regulations of the Attorney General Governing the Review and Approval of Title for Federal Land Acquisitions (2016)*, section 4.2, by Dr. Elena Gold on January 6, 2026, prior to ICE's purchase of the property.

12.    ICE intends to ultimately use this facility to serve the Baltimore ERO field office's needs for detention space within the state of Maryland and the surrounding areas, as necessary. There is no existing ICE-owned detention facility in the area, and Maryland state laws do now allow ICE to contract with state or local law enforcement agencies for detention space. Thus, when aliens are arrested and detained by ICE in Maryland, they must be moved to other facilities in other states. As of March 31, 2026, data maintained by the ERO Law Enforcement Systems and Analysis (LESA) Division shows there are 42,442 individuals in Maryland that have final orders of removal 5,614 of whom have criminal records. Without sufficient detention capacity in Maryland, ICE may have to forego arrest of some of these individuals. Additionally, there are 134,751 people in varying stages of immigration proceedings in Maryland, 7,239 of whom have criminal records. Without sufficient detention capacity in Maryland, ICE's ability to enforce the nation's immigration laws and protect public safety would be degraded.

4

13.     Prior to the purchase of the facility, the Department conducted a National Environmental Policy Act (NEPA) analysis based on an initial engineering solution that would utilize existing infrastructure, including water, sanitary sewer, stormwater management, and transportation access to accommodate up to 542 detainees, as well as administrative facilities. Since the completion of the initial NEPA analysis in January 2026, ICE has continued to work on—and consider modifying—its construction plans for the facility, including the possibility of housing up to 1,500 detainees.  ICE is currently working with a contractor to develop a construction plan for the interior of the facility for the purpose of holding detainees according to the *ICE National Detention Standards*.  ICE intends to conduct further NEPA analysis based on these plans, once sufficiently developed. ICE will conduct additional NEPA analysis before it makes a final decision on its plan for retrofitting the warehouse for housing detainees.

14.     . But for this Court's temporary restraining order, however, ICE would have proceeded with basic work consistent with the prior use of the warehouse.  For example, ICE has been unable to install perimeter fencing around the property. Multiple other locations acquired for detention purposes have been the targets for vandalism; arson has been attempted at three such sites. The Hagerstown facility itself has been the subject of graffiti and damage to landscaping after ICE purchased it, which likely could have been prevented if ICE had installed a security fence before the Court's Temporary Restraining Order. ICE also would have installed security cameras and alarm systems to deter such vandalism. Additionally, the building is in need of repairs to the roof and HVAC system—repairs that would be needed for any new tenant of the building regardless of its intended use. These routine repairs are also prevented by the Court's order.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: April 2, 2026

SHAWN L BYERS

Digitally signed by
SHAWN L BYERS
Date: 2026.04.02
16:51:44 -05'00'

Shawn L. Byers
Deputy Field Office Director
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security