**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND,<br><br>              Plaintiff,<br><br>       v.<br><br>MARKWAYNE MULLIN, *et al.*,<br><br>              Defendants. | Civ. No. 1:26-cv-733-BAH |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.     The State Has Standing. ..................................................................................... 2

    II.    The State Is Likely to Succeed on the Merits. ................................................... 3

        A.    Defendants' Record of Environmental Consideration Is Riddled with Inconsistencies and Its Ultimate Conclusion Is Therefore Unreasonable. .............................................. 4

        B.    Defendants Cannot "Stack" Categorical Exclusions to Cover the Entire Project. ......... 6

        C.    Defendants' Categorical Exclusions Are Inapplicable by Their Own Terms and Are Otherwise Precluded by Extraordinary Circumstances. ................................................. 7

           1.    Defendants' Cited Categorical Exclusions Do Not Apply. .......................................... 7

           2.    Extraordinary Circumstances Preclude the Use of Categorical Exclusions. .............. 10

    III.   Irreparable Harm is Actual and Imminent. ...................................................... 13

    IV.   The Remaining Factors Favor a Preliminary Injunction. ............................................. 18

    V.    This Court Should Waive the Bond Requirement ....................................................... 20

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822 (D. Md. 2025) ........... 20

*American Wild Horse Campaign v. Burgum*, 768 F.Supp.3d 1291 (D. Colo. 2025)....................... 5

*Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ....................................................... 4

*City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025)................................................ 17

*Clinch Coal. v. United States Forest Serv.*, No. 21-CV-00003, 2025 WL 3473302 (W.D. Va. Dec. 3, 2025)...................................................................................................................................... 7

*Defs. of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374 (4th Cir. 2014) ...................... 7

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .................................... 17

*Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543 (9th Cir. 2024)......................................... 6

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ....................................................................... 18

*Hodges v. Abraham*, 300 F.3d 432 (4th Cir. 2002) ......................................................................... 3

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ............................................................................................. 16

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)................................................................. 6

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704 (D. Md. 2018) ................................ 17

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .................................................................................... 3

*Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462 (4th Cir. 1992) ........................ 20

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022)........................................................................ 18

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013).............................................................................. 20

*Porter v. Clarke*, 852 F.3d 358 (4th Cir. 2017) ............................................................................ 16

*Public Emps. for Env.'t Resp. v. National Park Serv.*, 605 F. Supp. 3d 28 (D.D.C. 2022).............. 4

*Seven Cnty. Infrastructure Coal. v. Eagle County, Colo.*, 605 U.S. 168 (2025) ............................. 4

*Sierra Club v. United States*, 255 F. Supp. 2d 1177 (D. Colo. 2002)............................................. 10

*Solar Energy Indus. Ass'n v. FERC*, 80 F. 4th 956 (9th Cir. 2023)................................................... 5

*South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019)........................................................ 3

*Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113 (9th Cir. 2012) ................................... 16

*Washington Cnty., North Carolina v. U.S. Dep't of Navy*, 317 F. Supp. 2d 626 (E.D.N.C. 2004) 19

*Wilds v. South Carolina Dept. of Transp.*, 9 F. App'x 114 (4th Cir. 2001) ..................................... 7

**Other Authorities**

42 U.S.C. § 4332(C)(iii) .................................................................................................................. 15

42 U.S.C. § 4336(a)(2)....................................................................................................................... 6

42 U.S.C. § 4336e(1) .................................................................................................................... 6, 10

**Miscellaneous Authorities**

Jerod Macdonald-Evoy*, ICE Director Envisions Amazon-Like Mass Deportation System: 'Prime, but with Human Beings'*, Ariz. Mirror (Apr. 8, 2025)*,* https://azmirror.com/2025/04/08/ice-director-envisions-amazon-like-massdeportation-system-prime-but-with-human-beings/ ...... 10

**INTRODUCTION**

The State has clearly shown that a preliminary injunction is warranted to stop Defendants from moving forward with their decision to convert the Williamsport Warehouse into a major detention facility. In their response, Defendants put forth a moving target, claiming both that they already complied with NEPA for an "initial capacity" of 542 detainees and that they will engage in unspecified "future NEPA analysis" before proceeding with certain aspects of construction. Defendants' piecemeal planning gives the State no comfort and should give this court no pause in granting the requested preliminary injunction.

First, Defendants' argument that the State has missed the mark because the facility will hold only 542 detainees rather than 1,500 is contradicted by statements found throughout their own documents. Those documents indicate that the facility "could ultimately house" far more than 542 people and that Defendants are considering modifying their plans "including the possibility of housing up to 1,500 detainees." Regardless, the State has shown that local infrastructure is insufficient to support a population of even 542 detainees and, thus, Defendants' attempts to minimize their plans are meaningless for purposes of this motion.

Second, Defendants argue that their nonbinding commitments to forego unspecified construction activity until completing "additional NEPA analysis" renders the State's irreparable injury remote or speculative. Not so. Defendants have already awarded a contract to retrofit and operate the facility and have clearly stated their intent to imminently begin certain construction. Even taking Defendants at their word, any self-imposed pause could lift at any moment, in secret and without warning, and very likely before this Court is able to reach a decision on the merits. Indeed, Defendants' previous foray into NEPA analysis for this project was completed in a single day, and without any public notice. It is particularly important to avoid such a situation here where

additional construction activity would further bias the fair accounting of project alternatives that Defendants must engage in under NEPA. Accordingly, the Court should enter the requested preliminary injunction.

## ARGUMENT

### I.    The State Has Standing.

At the TRO stage, this Court properly concluded that the State has standing to sue, TRO Order at 4-5, ECF 8.[1] The Court held that the State (1) "alleged a palpable and imminent injury to its quasi-sovereign interest in the environment" due to Defendants' NEPA violations, (2) "adequately traced this harm to the construction and renovation plans for the Williamsport Warehouse," and (3) established that this harm "is redressable through this action." *Id*. at 4. Defendants briefly assert that the State's injuries are too speculative or sound in *parens patriae*, Defs.' Resp. at 9-10, ECF 34, but neither argument holds water.

The State has set forth in detail the injuries that will likely result without an injunction. Defendants' construction and operation of a massive detention facility is likely to cause pollution to the State's waterways and harm to protected species and otherwise constitutes a public health risk. Mem. Supp. Pl.'s Prelim. Inj. ("Mem.") at 15-22, ECF 15–1. In response, Defendants argue that these injuries rest on "multiple steps of speculative contingencies." Defs.' Resp. at 9. But operating the warehouse as an immigration detention facility without infrastructure upgrades *will* overwhelm the existing wastewater infrastructure, posing *immediate* harm to public health and the environment. *See* Pl.'s Ex. M, Second Saffouri Decl. ¶¶ 39, 41, 44, ECF 15–16 (describing the impacts of overloading sewer infrastructure); Pl.'s Ex. O, Blythe Decl. ¶ 17, ECF 15–18

---

[1] Plaintiff's citations to the record are to the original page numbers of the original document.

(explaining health risks resulting from "sewage backups").  And as detailed *infra* Part II.c.i., the existing wastewater infrastructure is likely insufficient to support an immigration detention facility regardless of whether capacity is capped at 542 or 1,500 detainees.[2]

And if Defendants perform the significant construction needed to upgrade that infrastructure, that too would injure the State.  *See, e.g.*, Pl.'s Ex. E, Second Kurtz Decl. ¶¶ 7-8, ECF 15–8 (threats to water quality and aquatic species from construction); Second Saffouri Decl. ¶¶ 43, 45, 56 (similar for wastewater and drinking water systems).  Whether Defendants proceed with these infrastructure upgrades or not, the project will injure the State's interests.

Defendants' attempt to label the State's asserted harms as "*parens patriae* interests" Defs.' Resp. at 9-10, similarly misses the mark. The state has alleged injuries to its interests in its waterways, natural resources, and public health, distinct from those of its citizens and sufficient to support its standing here.  *See e.g., Hodges v. Abraham*, 300 F.3d 432, 444-45 (4th Cir. 2002) (explaining that a state's interests "over vast swaths of land and natural resources" provided basis for standing to assert a NEPA claim against the federal government.); *Massachusetts v. EPA*, 549 U.S. 497, 518-19 (2007) (observing that states have quasi-sovereign interests "independent of and behind the titles of its citizens in all the earth and air within its domain" (citation omitted)). The State thus has standing to sue.

## II.    The State Is Likely to Succeed on the Merits.

The State is likely to succeed on the merits because Defendants failed to take a "hard look" at the environmental consequences of their actions as required under NEPA.  *See* Mem. at 23-31.

---

[2] As this Court properly recognized, this situation is unlike *South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019).  There, the potential injury might have materialized in 28 years, while here "the State's injury is contemporaneous with Defendants' initiation of construction[.]"  TRO Order at 4-5 n.3.

In their response, Defendants revealed for the first time that they prepared a Record of Environmental Consideration (REC) to justify their invocation of three categorical exclusions, which they contend means "Defendants completed NEPA review."  Defs.' Resp. at 8, 10-21.  But "NEPA is not just a box that must be checked at some point in an agency process," *Public Emps. for Env.'t Resp. v. National Park Serv.*, 605 F. Supp. 3d 28, 59 (D.D.C. 2022), and Defendants' analysis fails to pass muster under NEPA's "hard look" standard.

First, the REC is internally inconsistent and contradictory, rendering Defendants' decisionmaking unreasonable and fundamentally flawed.  Second, Defendants cannot "stack" categorical exclusions to cover one major federal action, where no single exclusion could cover it alone.  Third, none of the three exclusions invoked by Defendants could properly apply to this project because they are facially inapplicable and otherwise precluded by extraordinary circumstances.  Accordingly, the State is likely to succeed on the merits.

**A. Defendants' Record of Environmental Consideration Is Riddled with Inconsistencies and Its Ultimate Conclusion Is Therefore Unreasonable.**

An agency's decisions under NEPA must be "reasonable and reasonably explained."  *Seven Cnty. Infrastructure Coal. v. Eagle County, Colo.*, 605 U.S. 168, 180 (2025).  That standard implies some level of deference to the agency, *id.*, but internal contradictions and "half-baked" reasoning violate the rule, *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 963 (D. Md. 2020) (rejecting "half-baked and internally contradictory explanation" for agency action).  Here, the record is marred by inconsistent statements about the scope of Defendants' undertaking, rendering its ultimate decision unreasonable.

Defendants claim that the project will not have significant environmental impacts in large part because the facility will only hold 542 detainees and not 1,500, Defs.' Resp. at 6, 24, 26,

despite previous indications, Mem. at 7.  But nowhere do Defendants disclaim an intent to use the facility for more than 542 individuals in the future.  To the contrary, Defendants' declarants have confirmed that the facility "could ultimately house 1,500 detainees," Defs.' Ex. 2, DeGregorio Decl. ¶ 11, ECF 34–2, and that ICE is considering "modifying [] its construction plans for the facility, including the possibility of housing up to 1,500 detainees."  Defs.' Ex. 3, Byers Decl. ¶ 13, ECF 34–3.  And the REC itself confirms that the "facility will be designed to accommodate 500 to 1,000 detainees, with scalability to accommodate up to 2,000 individuals."  Defs.' Ex. 1, REC at 5, ECF 34–1.[3]

Defendants cannot reasonably conduct an environmental analysis for a 542-person facility when, by their own admission, it is likely to end up housing three times that number.  To the contrary, "when engineering sewer and drinking water systems a property needs to account for the maximum potential demand on the system, anything less would result in an undersized and insufficient system."  Second Saffouri Decl. ¶ 28.

When an agency faces such internal uncertainty, "the proper course is to prepare an EA to the best of the agency's ability, not to avoid environmental analysis altogether."  *Solar Energy Indus. Ass'n v. FERC*, 80 F. 4th 956, 995 (9th Cir. 2023); *see also American Wild Horse Campaign v. Burgum*, 768 F.Supp.3d 1291, 1320-22 (D. Colo. 2025) (holding that uncertainty over presence of extraordinary circumstances required EA or EIS instead of categorical exclusion).

---

[3] This comment in the REC is time-stamped on February 6, 2026, after the project was approved on January 15, 2026, raising questions of whether it was part of the REC.  *See* REC at 5 (timestamped "02/06/2026 11:31:07").

**B. Defendants Cannot "Stack" Categorical Exclusions to Cover the Entire Project.**

Defendants now claim that, because aspects of the project fit within three separate categorical exclusions an EA or EIS is not required.  But this approach of "stacking" narrow categorical exclusions to forgo the review of a much broader action is irreconcilable with the statute.  *See Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024) (rejecting similar approach by an agency because it would do "violence to NEPA's procedural safeguards.").

In relevant part, NEPA requires an agency to prepare an EA or EIS unless "the proposed agency action is excluded pursuant to *one of* the agency's categorical exclusions."  42 U.S.C. § 4336(a)(2) (emphasis added), (b)(2) (same).  By using the singular "one of," the statute establishes the determination should be based on the applicability of an individual categorical exclusion to the entire agency action.[4]

That makes perfect sense given the role categorical exclusions play in NEPA.  A categorical exclusion reflects an agency's prior determination that a defined class of actions "normally does not significantly affect the quality of the human environment."  42 U.S.C. § 4336e(1).  If an action fits into that category, an agency may conclude that it is unlikely to result in significant impacts and thus avoid the need for an EA or EIS.  But if an entire action does not fit within a given category, then by definition, the prior determination cannot apply.  As the Ninth Circuit explained, NEPA supports the principle that categorical exclusions "may not be combined, where no one [categorical exclusion] could cover a proposed action alone."  *Friends of the Inyo*, 103 F.4th at 556-57.  After all, "[a]ny project can be broken down into seemingly innocuous independent acts,"

---

[4] To be sure, the DHS Instruction Manual explains that categorical exclusion may apply if "the entire action clearly fits within one or more of the [categorical exclusions] in Appendix A, Table 1."  Pl.'s Ex. A, DHS Instruction Manual at V-5, ECF 15–4.  To the extent that this language conflicts with the statute, it is the statute that controls. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

and allowing agencies to "combin[e] carefully defined exclusions" to exclude virtually any project from substantive review would "swallow the protections of NEPA. *Id*.[5]

Here, Defendants took this unlawful approach to evade the environmental review that NEPA requires. Defendants stacked DHS categorical exclusions C1 (acquisition of an interest in real property), D1 (minor renovations and additions to buildings), and E2 (new construction), to conclude that the project "is not expected to result in any significant adverse environmental impacts" and avoid "further environmental documentation." REC at 22. But Defendants are not engaging in a real estate transaction, minor renovations, and new construction as separate and discrete projects. Rather, they are proposing a single federal action involving the construction and operation of a massive detention center. Viewed as a whole, the project far exceeds the "small and routine actions that do not have significant environmental impacts" for which categorical exclusions are generally appropriate. *See Clinch Coal. v. United States Forest Serv.*, No. 21-CV-00003, 2025 WL 3473302, at *1 (W.D. Va. Dec. 3, 2025).

### C. Defendants' Categorical Exclusions Are Inapplicable by Their Own Terms and Are Otherwise Precluded by Extraordinary Circumstances.

####    1. *Defendants' Cited Categorical Exclusions Do Not Apply.*

As discussed above, Defendants improperly stacked a combination of three separate categorical exclusions to cover the entire project. In any event, none of the three specific

---

[5] Such an approach is also inconsistent with the prohibition on breaking a single action into smaller component pieces to avoid a finding of significant impact, commonly known as "segmentation." *See Wilds v. South Carolina Dept. of Transp.*, 9 F. App'x 114, 120 (4th Cir. 2001) ("[A]n agency may not avoid significant environmental impact by improperly 'segmenting' a project." (citation omitted)); DHS Instruction Manual at V-5 ("It is not appropriate to segment a proposed action . . . by division into smaller parts in order to avoid a more extensive evaluation . . . under NEPA."); *see also* Defs.' Resp. at 17 (acknowledging that "an agency is prohibited from analyzing connected actions piecemeal under NEPA to avoid higher levels of [environmental] review" (citing *Defs. of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374, 394 (4th Cir. 2014)).

categorical exclusions invoked by Defendants could reasonably be applied to cover the entire project, whether in isolation or in combination.

Start with exclusion E2, which applies to "[n]ew construction upon or improvement of land" where "[t]he construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.)." DHS Instruction Manual at A-8. As to this requirement, Defendants argue that "existing traffic, water, and sewer infrastructure likely will not need to be changed or upgraded for purposes of the retrofit," Defs.' Resp. at 17, and the REC likewise concluded that "no off-site sewer upgrades or new connections are anticipated," REC at 20. Yet Defendants fail to provide a single piece of data to support these conclusions, nor could they, because they are simply not true.

To take just one example of the necessary infrastructure upgrades ignored by Defendants, the State has shown that the Wright Road Pumping Station, which controls wastewater flow in the surrounding community, is operating with only 24,742 gallons per day of available capacity. *See* Second Saffouri Decl. ¶ 27. Even if Defendants' detention facility was capped at 542 detainees, which is unlikely for the reasons explained above, it would still generate approximately 67,750 gallons per day, or more than twice the remaining capacity of the pumping station. *See id.*.[6]

Additional information about the pumping station revealed by Washington County confirms that the situation is dire. In an apparent email sent from the Washington County Administrator to DHS on February 11, 2026, the County indicated that the pumping station has capacity for only two equivalent dwelling units (a standardized unit of measure used by utilities to

---

[6] The 67,750 figure was determined using the same basis as Mr. Saffouri's earlier estimates: with an estimated flow of 125 gallons per person per day from an "institution other than a hospital," 542 detainees will generate 67,750 gallons per day.

quantify water or sewer demand), which is the equivalent of 400 gallons.  E-mail from Michelle Gordon, Cnty. Adm'r, to Kristi Noem, Sec'y. Homeland Sec. et al., (Feb. 11, 2026, at 1:49 PM), Exhibit A.[7]  The existing infrastructure is unquestionably insufficient to support Defendants' planned detention facility whether it houses 542 or 1,500 detainees.  Exclusion E2 clearly does not apply here.

Without exclusion E2 to cover the major construction that must occur prior to the facility's use as a processing center, DHS is left with only exclusions C1 and D1, which focus on property acquisition and minor renovations.  The activities addressed by these exclusions plainly do not encompass Defendants' "entire action"—meaning all the work necessary to convert the warehouse into a detention center and operate it as such—and an EA or EIS is therefore necessary for this reason alone.  *See* DHS Instruction Manual at V-5 (noting categorical exclusions are only appropriate if "[t]he entire action" "[c]learly fits the category described in the [categorical exclusion]").

Moreover, neither exclusion C1 or D1 applies to the proposed action.  Both exclusions apply only where federal action does not "not result in a change in the functional use of the property."  DHS Instruction Manual A-6, A-7.  Defendants' assertion that detaining hundreds of individuals will not change the "functional use" of a shipping warehouse borders on the absurd.  *See* Defs.' Resp. at 14.  Defendants argue that, because the warehouse was "built to be used for an endeavor requiring a massive space and many people and vehicles coming in and out," there will be no change in environmental impact when Defendants convert it into a detention center and use

---

[7] The email also notes that the County previously adopted a resolution in support of DHS and ICE.  There has, however, been significant local opposition to the project.  Indeed, a majority of the Hagerstown City Council joined an amicus brief in support of the State's motion for a preliminary injunction.  *See* Br. *Amici Curiae* Local Officials, ECF 20-1.

it to house hundreds of detainees 24 hours a day with the entire population expected to turn over every 3-7 days.  Defs.' Resp. at 14.

Regardless of what DHS officials might think, a logistics warehouse does not have the same "functional use" as a detention facility for human beings.[8]  Rather, the project presents major changes to the property's "functional use," which will have significant impacts on public health, local infrastructure, and the environment.  *See* Blythe Decl. ¶¶ 8-13 (describing public health issues unique to ICE detention centers); Second Saffouri Decl. ¶¶ 17, 30 (describing significantly increased wastewater needs of the detention facility); Second Kurtz Decl. ¶¶ 7-9 (discussing harm to species from construction activity to modify facility and, alternatively, from failing to do so); *see also* Br. *Amici Curiae* Hagerstown City Council Members et al. [hereinafter "Local Officials"] at 10, ECF 20–1 (noting concerns that the facility would further strain local emergency response capacity).  Defendants simply cannot claim that there will be no change to the functional use where "neither the use of the property nor the type and magnitude of impacts is unchanged."  *See Sierra Club v. United States*, 255 F. Supp. 2d 1177, 1183 (D. Colo. 2002) (rejecting application of similar categorical exclusion).

Accordingly, because none of Defendants' categorical exclusions apply to the proposed project, DHS must prepare either an EA or an EIS.

2.  *Extraordinary Circumstances Preclude the Use of Categorical Exclusions.*

Even if the cited categorical exclusions could apply, extraordinary circumstances are present that bar their use here.  42 U.S.C. § 4336e(1).  The REC concluded that Defendants' project

---

[8] *See* Jerod Macdonald-Evoy, *ICE Director Envisions Amazon-Like Mass Deportation System: 'Prime, but with Human Beings'*, Ariz. Mirror (Apr. 8, 2025), https://azmirror.com/2025/04/08/ice-director-envisions-amazon-like-massdeportation-system-prime-but-with-human-beings/ (ICE leadership describing goal of deportation activities operating "like (Amazon) Prime but with human beings.").

"does not involve any extraordinary circumstances . . . that would create the potential for a normally excluded action to have a significant environmental effect." REC at 22. But again, the State has clearly shown that the project implicates extraordinary circumstances and that its impacts are potentially significant. *See* DHS Instruction Manual at V-5.

First, the project presents "potentially significant effect[s] on public health or safety." DHS Instruction Manual at V-6. Specifically, Dr. David Blythe, Maryland's State Epidemiologist, described in his declaration the risks to public health created by Defendants' proposed detention facility. Dr. Blythe explained in detail that "congregate detention facilities" create a "higher risk for infectious disease outbreaks" and that "ICE detention centers specifically have been documented as 'high-risk environments for infectious diseases.'" Blythe Decl. ¶¶ 8, 10. Moreover, Defendants' proposed operation of the facility as a "processing center" will involve the rapid movement of numerous individuals in and out of the facility on a near-daily basis. *Id.* ¶ 13. Such an operation only heightens the risk of infectious disease outbreaks, and taken in combination with Defendants' apparent failure to develop any infection control plans, the facility poses a clear public health risk "to individuals in the facility and the surrounding community." *Id.* ¶¶ 13, 20; *see also* Br. *Amici Curiae* Local Officials at 11 (describing observed impact from other similar ICE facilities on emergency health services and the struggles of the local emergency department).

The burdens on local public safety resources from a detention center are also likely to be significant. Even assuming a population of only 542 detainees, the facility represents a significant increase in the region's population. Indeed, Williamsport itself is home to only around 2,000 residents. As the mayor of Hagerstown recently noted, "[a]ny significant increase in regional population density, regardless of its source, has a direct impact on response times, resource allocation and the safety of every resident." Br. *Amici Curiae* Local Officials at 10. And those

concerns are exacerbated by the fact that "nearly all of the county's fire and rescue and emergency medical services teams are volunteers." *Id*. At bottom, there can be no plausible dispute that Defendants' proposed detention facility involves "potentially significant effect[s] on public health or safety," an extraordinary circumstance that precludes the application of categorical exclusions. DHS Instruction Manual at V-6.

Second, the project also presents "potentially significant effect[s] on species or habitats protected by . . . law." *Id*. The State has identified a number of species protected by state law that are likely to be affected by construction and operation of the project. These include the Allegheny pearl dace, protected as "in need of conservation" under state law, which has been observed in the vicinity of Semple Run. Second Kurtz Decl. ¶¶ 48-51. Similarly, the brook floater and green floater mussels, protected as endangered species under state law, are known to occur in the Potomac River shortly downstream of its confluence with Conococheague Creek. *Id.* ¶¶ 35-36; 39-40. These and several other species described by the State are likely to be impacted by the sedimentation that will accompany construction activity to upgrade infrastructure to accommodate the facility. *Id.* ¶¶ 10, 37, 42, 65-66. And if Defendants continue with the project without upgrading those systems, as the REC indicates they will, these species are likely to be impacted by the sewage overflows that will inevitably follow. Second Kurtz Decl. ¶¶ 9, 42; *see also* Brief of *Amici* Environmental Groups at 11-12.

Defendants cannot rebut these threats to the local environment. Their conclusory assertion that environmental impacts "will be minimal," Defs.' Resp. at 18, is predicated on the erroneous assumptions that no infrastructure upgrades are necessary and that operation of a detention facility is functionally the same as running a logistics warehouse. Accordingly, Defendants' project

12

presents the extraordinary circumstance of "potentially significant effects" on public health and safety and protected species and habitats. DHS Instruction Manual at V-6.

Finally, and at a minimum, the project's environmental impacts are "likely to be highly uncertain, or likely to involve unique or unknown environmental risks." *Id*. Defendants' own declarant states that the project is part of a "new detention model" focusing on "acquiring existing facilities and retrofitting them" as detention centers. Byers Decl. ¶ 9. Not only is the project part of ICE's newly "reimagined detention structure," *id*., but since January Defendants have "consider[ed] modifying" their plans for the facility in order to house "up to 1,500 detainees." *Id.* ¶ 13. Thus, Defendants concede that this project has little precedent, and that even the specific plans at issue are being actively revised in order to increase detention capacity by nearly 300%. At the very least, building and operating such a detention center has a "highly uncertain" impact on the environment and public health and involves "unique or unknown environmental risks" such that categorical exclusions should not apply. DHS Instruction Manual at V-6.

## III.    Irreparable Harm is Actual and Imminent.

The State previously set forth the myriad irreparable injuries to the environment and public health likely to result from the construction and operation of a detention facility at the Williamsport Warehouse. Mem. at 14-19. Defendants' arguments do not rebut the State's clear showing of irreparable harm, which is both actual and imminent.

The State has demonstrated in detail that "major upgrades" to the existing sewer and drinking water systems are needed to convert the vacant Williamsport Warehouse into a massive detention center. *See* Second Saffouri Decl. ¶¶ 43, 45, 56. Defendants offer no analysis of their own to rebut these conclusions. Rather, they primarily argue that the State's allegations of harm are "inaccurate" because they are "premised on the incorrect assumption" that the facility will

13

house 1,500 individuals, instead of the 542-person capacity that Defendants relied upon in their REC. Defs.' Resp. at 24-26. But as recounted above, Defendants' own documents indicate that the project is likely to house 1,500 individuals and both common sense and basic engineering principles require infrastructure to be sized for the maximum possible population. *See supra* at 5.

Even accepting Defendants' more conservative estimate, however, the existing sewer infrastructure is still inadequate. *See supra* at 8-10. Indeed, the REC acknowledges that "upsizing or modification" to sewer infrastructure may be required to "handle projected wastewater flows[.]" REC at 1, 8. Defendants thus cannot rebut the State's evidence that significant upgrades to facility infrastructure will be required, whether for 542 people or 1,500 people.

Defendants also claim that the State's injuries are contradictory. Defs. Resp. at 23. Not true. By barreling forward with this project, Defendants have placed the State in a no-win situation: the State's interests in its wildlife, waterways, and public health will be harmed whether Defendants continue to ignore local infrastructure issues or if they address them. If Defendants proceed without the requisite upgrades to the wastewater infrastructure, as the REC supports, operation of the detention center will cause sewage overflows, harming public health and the environment. *See supra* at 12. On the other hand, if Defendants undertake the significant construction to upgrade these systems, the necessary excavation will result in sediment runoff and other pollution harming local waterways and protected species. *See id*. The fact that there will be significant environmental impacts regardless of how Defendants proceed does not undermine the State's position. It only illustrates why the preparation of an EA or EIS—both of which require an analysis of alternatives including a no-action alternative—is essential.

Defendants' remaining arguments are meritless. On wastewater, the State is not assuming that "Defendants will not engage with the State to ensure that sufficient [wastewater] capacity is

14

made available." Defs.' Resp. 25.  Rather, that has already transpired; Defendants explicitly proceeded with purchasing the Williamsport Warehouse and greenlighting construction of a detention center without such engagement.  And it is self-evident that significant construction and excavation, "is likely to increase sediment runoff," Second Saffouri Decl. ¶¶ 45, 56, causing pollution and other environmental harms, Second Kurtz Decl. ¶¶ 8, 10, 14.  Further, the State does not argue that "runoff will have significant traffic impacts," Defs.' Resp. at 25, but rather that the significant construction activity to accommodate the facility will, Second Saffori Decl. ¶¶ 45, 56. Defendants simply offer no contrary analysis.

As to the public health risks posed by Defendants' proposed detention center, Defendants simply declare that such harms are "speculative," without rebutting the declaration of Dr. Blythe, who described in detail how ICE detention centers are documented "high-risk environments for infectious diseases." Blythe Decl. ¶¶ 8-10. And, as Dr. Blythe notes, the risk of disease-spread is amplified by Defendants' plans to rapidly "process" individuals at the Williamsport Warehouse, moving them in and out of the facility in a matter of days. *See id.* ¶ 13.  Indeed, Defendants now suggest that the facility will accommodate numerous staff, *see* REC at 1 (describing various rooms at facility), and indicate that nearly 180,000 individuals in Maryland are potentially subject to immigration detention, *see* Byers Decl. ¶ 12.

Defendants also argue that the State did "not compare the risks" of infectious disease outbreaks at the facility "to any of the current extant detention facilities in Maryland or elsewhere," Defs. Resp. at 27, but this is exactly the type of analysis that *Defendants* should have conducted as part of an EA or EIS's analysis of alternatives.  *See* 42 U.S.C. § 4332(C)(iii) (requiring alternatives analysis in EIS); DHS Instruction Manual at V-12 (including "description of the proposed action and alternatives" as part of the "minimum required content for an EA").  As a

factual matter, there are no immigration detention facilities in Maryland for such comparison, as Defendants well know. *See* Byers Decl. ¶ 12. As for facilities in other states, the State documented recent outbreaks of tuberculosis, COVID-19, and measles in multiple ICE facilities elsewhere in the country, *see* Mem. at 21, which Defendants do not meaningfully contest. Further, Defendants' passing reference to "ICE detention standards," in a legal brief, Defs.' Resp. at 27, does not satisfy the requirement under NEPA for DHS to consider risks to human health at this specific facility. *See Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124-25 (9th Cir. 2012) (evaluating agency analysis of health risks from new bio-lab). In sum, Defendants come nowhere close to rebutting the State's clear showing of irreparable harm.

Defendant also argues that any harm to the State is not imminent because ICE "will not engage in any construction activities to retrofit the facility or any operations at the facility until it engages in further NEPA analysis[.]" Defs.' Resp. at 21-22. At the outset, this Court should not defer to this "convenient litigation position" raised for the first time in briefing to "defend past agency action against attack." *See Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (citation omitted). Nor does Defendants' commitment to undertake additional review affect the timeliness of the State's claim, as "a party should not be able to evade judicial review . . . by temporarily altering questionable behavior." *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (citation omitted).

In any event, Defendants' argument on imminence is unavailing. Defendants cannot rebut the State's showing of irreparable harm by arguing that some of their construction will occur now and the rest will follow later. As Defendants' own evidence shows, the construction that Defendants wish to immediately pursue, such as "installing a perimeter security fence" and security cameras, "repairing roof and wall leaks," and creating an "ICE administrative space," Defs.' Resp. at 22, is part and parcel with retrofitting the warehouse for detention purposes, *see*

16

REC at 1, 46 (listing "[p]roposed improvements" as including "installation of perimeter security fencing," "installation of exterior lighting and security cameras," creation of "office space to support operational and administrative functions," and "repairing or replacing the existing roof"). The construction of these improvements cannot be separated from the whole project; they are simply "the first domino in the 'predictable chain of events leading from the government action to the asserted injury[.]'" *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 173 (D. Md. 2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024)).

The pertinent question though is not whether the State will be irreparably harmed tomorrow, but whether the State will be irreparably harmed during the pendency of this litigation absent the requested relief. *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 726 (D. Md. 2018) (the purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm *during the pendency of a lawsuit* ultimately to preserve the court's ability to render a meaningful judgment on the merits") (citation omitted) (emphasis added). And given Defendants' contractual plan to have the detention center operational by May 4, *see* Mem. at 12, the harm to the State is imminent.

Further, Defendants' assurances to not engage in construction without further NEPA analysis ring hollow. Defendants fail to explain what that future NEPA analysis will entail, and the materials disclosed by Defendants here show the extreme speed with which they are likely to conduct that environmental "review." Specifically, the REC demonstrates that, during one week in January, the agency initiated National Historic Preservation Act consultation on Monday, conducted its entire environmental review on Thursday, and completed the $102 million purchase of the warehouse on Friday. *See, e.g.*, REC at 1, 24, 46 (showing that DHS mailed NHPA consultation letters on January 12 and conducted entire environmental review on January 15); Pl.'s

17

Ex. B, Deed, ECF 15–5 (showing that purchase was executed January 16). Moreover, Defendants explicitly claim that they need never publish or otherwise provide public notice if that further review is conducted pursuant to a categorical exclusion. *See* Defs.' Resp. at 20 (claiming "no requirement that the REC be made public"). And, as explained above, Defendants' own documents demonstrate that their further NEPA review will be used to support expanding the capacity of the proposed detention center. *See supra* at 5.

Absent a preliminary injunction, significant construction and retrofitting efforts at the Williamsport Warehouse could begin at any moment, without any warning to the State or this Court. And such construction and subsequent operation implicates all of the irreparable harms previously demonstrated by the State.

## IV.    The Remaining Factors Favor a Preliminary Injunction.

As set forth in the Motion for Preliminary Injunction, the public interest and the balance of the equities overwhelmingly favor the State. Mem. at 31-35. Defendants make no substantive attempt to rebut the State's arguments on this score.

For their part, Defendants vaguely claim a public interest in "combatting unlawful immigration." Defs.' Resp. at 27. But unlike the only case that Defendants cite on this factor, the requested injunction would simply preserve the status quo and would not compel any change to Defendants' law enforcement operations. *Cf. Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (explaining that the injunction there "mandated a broad change in the government's policy of detaining aliens pending removal proceedings"); *see HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (holding public interest was "served by maintaining the status quo" where, under preliminary injunction, the government only had to continue implementing refugee program pursuant to "well-established" statutory processes). Indeed, Mr. Byers, the National Project

18

Manager for the ICE detention capacity acquisition program, concedes that ICE will conduct some modicum of "further NEPA analysis" before all construction can be completed, Byers Decl. ¶ 13, refuting any purported need to immediately build and operate this facility.

As to whether the public interest favors building this specific detention facility, Defendants offer little. While Defendants claim an "urgent need for detention space in Maryland," Defs.' Resp. at 28, their sole declaration cited in support says no such thing. Rather, Mr. Byers hedges that, "[w]ithout sufficient detention capacity in Maryland, ICE *may* have to forego arrest of some" individuals with a final order of removal. Byers Decl. ¶ 12 (emphasis added). Mr. Byers does not claim that an ICE detention facility is needed in Maryland, urgently or otherwise, whether to effectuate arrests or to enable any other law enforcement activity. Defendants accordingly have no factual support for their claim of an "urgent need" for detention space. Nor do Defendants dispute that they have repeatedly abandoned plans for detention facilities across the country in the face of community pushback, Mem. at 33-34, further undermining their argument.

The public interest is also not served by allowing Defendants to install fencing and conducting other repair work now, in response to Defendants' vague security concerns, and proceeding with further construction thereafter. It is notable that Defendants have not moved to modify the Temporary Restraining Order, to explain "precisely" what that their immediate construction would entail, and why alternatives would not suffice in the interim, as this Court instructed. Order at 3, ECF 14. To the contrary, allowing that construction to proceed would harm the public interest because "[o]nce the [agency] moves forward, any consideration of the environmental impact will be less objective given the commitments made on the project and may become a mere formality." *Washington Cnty., North Carolina v. U.S. Dep't of Navy*, 317 F. Supp. 2d 626, 634 (E.D.N.C. 2004).

19

In sum, and just as this Court found at the TRO stage, the "slight inconvenience" imposed by a delay in construction is outweighed by the irreparable harms that would result if construction is allowed to immediately proceed. TRO Order at 13. The public interest and balance of the equities accordingly support a preliminary injunction.

## V.      This Court Should Waive the Bond Requirement

The Court should exercise its discretion to waive the bond required under Rule 65(c). A district court has "the discretion to . . . waive the security requirement," *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (abrogated on other grounds), or "set a bond amount of zero . . . to ensure judicial review of administrative action." *Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992). As this Court already recognized, the approach of setting the required security at a nominal amount "has long been followed in public-interest litigation cases." TRO Order at 14 (citation omitted). While Defendants ask for a "meaningful bond," Defs.' Resp. at 28-29, they "do not request a specific amount in bond," and "such unsupported speculations" warrant at most a nominal bond, *see Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 861 (D. Md. 2025). This Court properly concluded that a nominal bond was appropriate when issuing the TRO, and the Court should reach the same conclusion here.

## CONCLUSION

For the foregoing reasons, and those set forth in the State's Opening Brief, the State respectfully requests that this Court enter a preliminary injunction barring Defendants from renovating, constructing, retrofitting, or operating the Williamsport Warehouse as an immigration detention facility while this litigation remains ongoing.

Dated: April 9, 2026                              Respectfully submitted,


                                                  **ANTHONY G. BROWN**
                                                  ATTORNEY GENERAL OF MARYLAND


                                                  By: */s/ Steven J. Goldstein*
                                                  Steven J. Goldstein (D. Md. Bar No. 32071)
                                                  Robert N. Brewer (D. Md. Bar No. 31649)
                                                  Yasmin Dagne (D. Md. Bar No. 32016)
                                                  Michael Drezner (D. Md. Bar No 31784)
                                                  Adam Kirschner (D. Md. Bar No. 31767)
                                                  Lauren Gorodetsky*
                                                    *Assistant Attorneys General*
                                                  Office of the Attorney General
                                                  200 Saint Paul Place
                                                  Baltimore, Maryland 21202
                                                  sgoldstein@oag.maryland.gov
                                                  (410) 576-6414

                                                  *Counsel for the State of Maryland*

                                                  *\* Application for admission approved and
                                                  pending admission ceremony*


                                  21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of April, 2026, the foregoing Reply in Support of

Plaintiff's Motion for a Preliminary Injunction was electronically filed using the Court's

CM/ECF system, which will effect service on counsel of record who are registered CM/ECF

users.

Dated: April 9, 2026

/s/ *Steven J. Goldstein*

Steven J. Goldstein, Bar No. 32071