IN THE MATTER OF:                              *       BEFORE THE WATER AND
                                               *       SCIENCE ADMINISTRATION OF
BOARD OF COUNTY COMMISSIONERS OF               *       THE MARYLAND DEPARTMENT
WASHINGTON COUNTY, MARYLAND                    *       OF THE ENVIRONMENT
100 West Washington Street, Suite 1101         *
Hagerstown, Maryland 21740                     *
                                               *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ADMINISTRATIVE ORDER

The State of Maryland, Department of the Environment ("Department" or "MDE") pursuant to the powers, duties, and responsibilities vested in the Secretary of the Environment ("Secretary") by the provisions of Title 9, Subtitles 2, 3, and 5, of the Environment Article of the Annotated Code of Maryland ("Environment Article"), and the Code of Maryland Regulations ("COMAR"), as delegated to the Director of the Department's Water and Science Administration, has made the following findings and issues this Administrative Order to the Board of County Commissioners of Washington County, Maryland ("County"). This Order addresses deficiencies in the County's water and sewerage plan and the capacity of certain sewerage infrastructure in the County to protect the environment, public health, and comfort.

## STATUTORY AND REGULATORY AUTHORITY

1.      The State of Maryland has a comprehensive statutory and regulatory program to govern the discharge of pollutants to waters of the State, the treatment and disposal of sewage, and the abatement of nuisances generated by activities throughout the State. Title 1, Subtitle 3, of the Environment Article authorizes the Secretary to carry out and enforce all the provisions of the Environment Article and the regulations promulgated thereunder.

2.      The term "discharge" is defined in § 9-101(b) of the Environment Article as "(1) The addition, introduction, leaking, spilling, or emitting of a pollutant into waters of this State; or (2) The placing of a pollutant in a location where the pollutant is likely to pollute."

3.    The term "disposal system" is defined in § 9-101(c) of the Environment Article as a "system for disposing of wastes by surface, above surface, or underground methods." The term disposal system "includes a treatment works and a disposal well."

4.    The term "person" is defined in § 9-301(h) of the Environment Article to include: (1) the State; (2) a county, municipal corporation, or other political subdivision of the State; and (3) the federal government or any of its units.

5.    The term "pollutant" is defined in § 9-101(g) of the Environment Article as "(1) Any waste or wastewater that is discharged from: (i) A publicly owned treatment works; (ii) An industrial source; or (2) Any other liquid, gaseous, solid, or other substance that will pollute any waters of this State."

6.    The term "sewage" is defined by § 9-201(k) of the Environment Article to include: "(1) any human or animal excretion or water-carried domestic waste; or (2) a mixture of industrial waste and any human or animal excretion or water-carried domestic waste."

7.    The term "sewerage system" is defined by § 9-201(p) of the Environment Article to include: "(1) the channels used or intended to be used to collect and dispose of sewage; and (2) any structure of appurtenance used or intended to be used to collect or prepare sewage discharge into waters of this State." *See also* Section 9-501(m) of the Environment Article.

8.    The term "community sewerage system" is defined by Section 9-501(b) of the Environment Article as "a publicly or privately owned sewerage system that serves at least 2 lots."

9.    The term "waters of this State" is defined by § 9-101(l) of the Environment Article as: "(1) Both surface and underground waters within the boundaries of this State subject to its jurisdiction, including that part of the Atlantic Ocean within the boundaries of this State,

2

the Chesapeake Bay and its tributaries, and all ponds, lakes, rivers, streams, public ditches, tax ditches, and public drainage systems within this State, other than those designed and used to collect, convey, or dispose of sanitary sewage; and (2) The flood plain of free-flowing waters determined by the Department of Natural Resources on the basis of the 100-year flood frequency."

10.    Section 9-322 of the Environment Article prohibits the discharge of any pollutant into the waters of the State, except as permitted by designated subtitles of the Environment Article and the rules and regulations adopted under those subtitles.

11.    Section 9-323 of the Environment Article requires a person to hold a discharge permit issued by MDE "before the person may, *inter alia*, operate any disposal system, other outlet, or establishment if its operations could cause or increase the discharge of pollutants into waters of the State.

12.    Section 9-252(a) of the Environment Article empowers MDE to (1) issue, promulgate, and enforce regulations to prevent and/or correct pollution of waters of the State; (2) "[r]equire any public water supply system, public sewerage system, or refuse disposal system to be operated in a manner that will protect public health and comfort"; and (3) "[o]rder the alteration, extension, or replacement of any public water supply system, public sewerage system, or refuse disposal system."

13.    Section 9-204 of the Environment Article and COMAR 26.03.12 establish comprehensive permit requirements for the installation, material alteration, or material extension of water supply systems, sewerage systems, and refuse disposal systems. The statute requires applicants to submit detailed plans and specifications to the Secretary and pay applicable permit fees as part of the application process.

3

14.    The Department is the executive agency charged with supervising the planning and implementation of water supply and sewerage systems under Title 9, Subtitle 5 of the Environment Article.

15.    Section 9-503 of the Environment Article requires the governing body of each county to have a comprehensive water and sewerage plan that is approved by the Department.

16.    Pursuant to § 9-503(b) of the Environment Article, each county's water and sewerage plan must cover at least the 10-year period next following adoption by the county governing body.

17.    Section 9-510(b) of the Environment Article empowers MDE to issue, promulgate, and enforce regulations to prevent and/or correct pollution of waters of the State.

18.    COMAR 26.03.01.04 mandates that each county's water and sewerage plan be continuously updated to provide a current water and sewerage plan, which includes all planned or programmed development within the county.

19.    Under § 9-503(c)(2) of the Environment Article, each county governing body is required to adopt and submit to the Department a revision or amendment to its county water and sewerage plan if the Department requires a revision or amendment.

20.    Pursuant to § 9-505(a) of the Environment Article, each water and sewerage plan must, *inter alia*, (1) "provide for the orderly expansion and extension" of "community sewerage systems"; (2) "Provide for the sizing and staging of facilities construction that is consistent with the county plan"; (3) demonstrate compliance with the same "by using graphic and tabular information"; (4) "Provide: (i) For sewage treatment facilities that are adequate to prevent the discharge of any inadequately treated sewage or other liquid waste into any waters; or (ii) Otherwise for safe and sanitary treatment of sewage and other liquid waste;" (5) "Contain

4

adequate information about: (i) The existing sewage treatment capacity in each drainage basin or sewage treatment plant service area in the county; (ii) The present level of use of sewage treatment plants in each drainage basin; and (iii) Projections for use of sewage treatment plant capacity based on: 1. Outstanding building permits and subdivision plats if the county has subdivision authority; or 2. Zoning commitments if the county does not have subdivision authority;" (6) establish procedures to identify and acquire any necessary easements or rights-of-way that are necessary to construct or expand community sewerage systems in time to serve planned development; (7) "Set a time schedule and a proposed method for financing the construction and operation of each planned … (iii) community sewerage system"; and (8) "Set forth the estimated cost of constructing and operating each planned … (iii) community sewerage system…."

21.     Under § 9-511 of the Environment Article, a sewerage system may not be installed or extended unless it conforms to the applicable county plan or an approved revision or amendment to that plan.

## FINDINGS

### The Property and the Sewerage System

22.     On or between 2021 and 2023, a warehouse (the "Warehouse") was constructed at 16220 Wright Road, Williamsport, Maryland 21795, Map 48, Grid 21, Parcel 57 in Washington County (the "Property"). According to the Maryland Department of Assessments and Taxation, the Property is classified as a "Mega Warehouse" covering 53.4 acres and including an above grade area of 825,620 square feet.  A permit issued by the Washington County Division of Permits and Inspections describes the Property as an "825,620 sq. ft. one-story shell building to be used as a warehouse, fire pump room, and electrical room for future tenant, 84 future docks

5

with overhead doors, 41 fully equipped dock doors, 41 dock doors with future levelers, 4 drive-in doors and mechanical dock levelers, 30 pole lights that are 40 ft. in height." Washington Cnty. Div. Plan Rev. & Permitting, Permit Issuance Report at 3 (Aug. 1-31, 2021), https://perma.cc/D43B-6749.

23.    The Warehouse is connected to the County's sewerage system through an 8-inch sewer lateral pipe that connects directly to a 6-inch sewer lateral pipe. The County has allocated 2 EDUs of sewage discharge per day to the Property. Each EDU of sewage is equivalent to 200 gallons per day, so the Warehouse may discharge up to 400 gallons per day of sewage to the County's sewerage system. Notwithstanding these limitations, a 6-inch sewer line may handle up to 63,500 gallons per day of wastewater, and an 8-inch sewer line may handle up to 112,800 gallons per day of wastewater.[1] As such, the Property has the physical capability to discharge tens of thousands of gallons of additional sewage to the County's sewerage system than the County has authorized the Property to discharge. However, the County's sewerage system has physical capacity limitations to receive this level of discharge in both the receiving sewer main pipe and the downstream pumping station.

24.    The County's sewer main pipe that receives all sewage from the Property is 8 inches in diameter. However, this 8-inch sewer main pipe also carries the sewage from other properties (homes, businesses, etc.) in the surrounding area. As such, the capacity of the County's sewer main pipe to carry wastewater from the Property is lower than its design capacity. The County's 8-inch sewer main pipe, in turn, flows to the Wright Road Pumping Station (the "Pumping Station"), which pumps sewage under pressure to the Conococheague Wastewater Treatment Plant for treatment and discharge to waters of the State in accordance with

---

[1] These numbers represent best estimates of pipe capacity. A pipe's actual capacity is influenced by a number of external factors including, but not limited to: Inflow and Infiltration, slope of the pipe, pipe material, and pipe age.

6

an NPDES Discharge Permit issued by the Department under Title 9, Subtitle 3 of the Environment Article.

25.    The Pumping Station is designed to handle a maximum flow of 102,240 gallons of wastewater per day.

26.    To ensure that the Pumping Station does not exceed its capacity, the County assigns sewage flow limits to the properties served—or approved to be served—by the Pumping Station through an allocation system. As noted above, the County has allocated 2 EDUs (400 gallons per day) of sewage per day to the Property.

27.    On January 12, 2026, the Department of Homeland Security, U.S. Immigration and Customs Enforcement Agency (collectively, "DHS") sent letters to the Maryland Historical Trust indicating that DHS was proposing to purchase, occupy, and rehabilitate a 53.74-acre warehouse in support of DHS operations. The subject line of the letter was "New ICE Baltimore Processing Facility."

28.    On January 16, 2026, DHS purchased the Property for $102.4 million.

29.    On February 11, 2026, the County's Administrator, Ms. Michelle Gordon, wrote to then-Secretary of DHS, Kristi Noem. In that apparent correspondence, Ms. Gordon outlined the "Washington County infrastructure needs that have been identified so far." Ms. Gordon informed DHS that "[p]ublic Sewer service for this building [the Warehouse] is provided by Washington County Government; and Public Water service is provided by the City of Hagerstown." Ms. Gordon further noted that "[w]hen the warehouse was constructed, the developer purchased 2 EDU's of sewer allocations from the County" and stated that "[t]he Wright Road Pump Station which will serve this new ICE Processing facility has just two (2) EDUs remaining of processing capacity." Finally, Ms. Gordon stated that "[d]ue to the lack of

7

capacity, this pump station will require the developer (who is now DHS) to provide infrastructure improvements to accommodate the increased need and capacity."

30.    On February 15, 2026, DHS posted an "Early Notice and Public Review of a Proposed Activity in a 100-to 500- Year Floodplain" on the "Documents for Public Comment" page of its website (the "Floodplain Notice"). The Floodplain Notice stated that DHS intends to use the Warehouse as a detention processing center. It also provided a list of activities that DHS might take to convert the Warehouse into a detention facility, which included sanitary sewer connections or modifications if required by a final engineering review.

31.    DHS officials have made various public statements regarding the number of individuals that will be housed at the Warehouse. In an April 2, 2026 filing with the United States District Court for the District of Maryland, DHS stated that the Warehouse, as initially retrofitted, will accommodate up to 542 detainees, but that DHS is considering expanding capacity at the Warehouse for up to 1,500 detainees.[2] While the exact number of individuals at the Warehouse may vary on a day-to-day basis, the water and sewerage systems that serve the Property must be sufficient to meet the maximum potential demand from all individuals at the Property (e.g., the maximum volume of water these individuals may consume and the maximum volume of sewage that these individuals may discharge) at any given time.

32.    As stated in the County's letter to DHS—and confirmed by the Department's independent review of documentation provided by the County—the County allocates a certain number of EDUs for each property that is connected—or is approved to connect—to the Pumping Station. These allocations ensure that the Pumping Station conveys sewage safely without experiencing overflows or backups. However, the Pumping Station's capacity is over

---

[2] This number does not include the *additional* DHS employees or contractors who would be required to staff, operate, and oversee the detention of the detainees at the Warehouse.

8

99% allocated. Specifically, 101,800 gallons of the 102,240 gallons of the Pumping Station's capacity is already allocated, leaving only 509 gallons (approximately 2 EDUs) for new and existing properties to discharge additional sewage to the Pumping Station.

Wastewater Projections for the Warehouse and Impacts of Overloading Infrastructure

33.     Pursuant to the Department's design guidelines[3], the Property, operating solely as a warehouse for physical products and not as a detention center, would be expected to produce an approximate daily average flow of 24,768.6 gallons of sewage per day (825,620 square feet x 0.03), which, if the Property actually discharged that amount, would require an allocation of 124 EDUs from the County.

34.     Despite this, the County has allocated only 2 EDUs (i.e., 400 gallons per day) for sewage flows from the Property to the Pumping Station.

35.     The Department's design guidelines for wastewater facilities include standardized figures for estimating the projected future flow from new developments. For facilities that house people, these guidelines typically use the number of people or the number of beds as a factor. The Department's guidelines do not have a dedicated category for "detention processing centers" but such a facility is most closely analogous to the category "Institutions Other than Hospitals," which the guidelines project to generate 125 gallons per bed per day.

36.     Using these numbers to estimate the daily sewage flow from a 1,500-bed detention facility yields an estimated flow of 187,500 gallons of sewage per day. If DHS were to limit the number of detainees at the Warehouse to 542, then the estimated flow would be 67,750 gallons of sewage per day.[4]

---

[3] The Department's guidelines are available here:
https://mde.maryland.gov/programs/water/wwp/Documents/Wastewater%20Design%20Guidelines%20-%202021.pdf

9

37.    Furthermore, reviewing the wastewater data from a similar type of facility, the State's Eastern Correctional Institution, reveals that the average flow rate per inmate per day is 238.45 gallons in January 2026. Using that figure to estimate the daily wastewater flow from a detention processing facility yields an estimated flow of 357,675 gallons of wastewater per day for a 1,500-bed facility and 129,239 gallons of wastewater per day for a 542-bed facility.

38.    As discussed above, the Property is served by a 6-inch sewer lateral line that connects to an 8-inch sewer main. A 6-inch lateral line can typically handle up to 63,500 gallons per day of flow, and an 8-inch sewer main can typically handle up to 112,800 gallons per day of flow. However, the *actual* capacity of the existing 8-inch sewer main is less than its *design* capacity because the 8-inch sewer main already conveys additional wastewater flows from other properties in the surrounding area.

39.    Under any scenario—an estimated flow of 187,500 to 357,675 gallons per day for 1,500 beds or an estimated flow of 67,750 to 129,239 gallons per day for 542 beds—the 6-inch sewer lateral line (up to 63,500 gallons per day) is inadequate to convey wastewater flows from the Property.[5] This discrepancy creates a hazard to the environment and to public health: if a sewer pipe's design capacity is exceeded, the sewer pipe will overflow and/or backup. Sewer overflows from pipes typically occur from manholes and related outlets, discharging raw, untreated sewage and its associated pollutants to the ground surface and to waters of the State. These overflows harm the environment and waters of the State, degrading the quality of neighboring streams, and endangering aquatic life and the public, releasing harmful bacteria,

---

[4] As noted above, this volume does not include additional sewage flows from employees, visitors, or other individuals at the Warehouse.

[5] Considering that a) there will be employees and/or contractors at the Warehouse in addition to the detainees and b) other properties are also served by the 8-inch sewer main, the 8-inch sewer main (up to 112,800 gallons per day) is also likely inadequate to convey the wastewater flows from Property.

nutrients, other pathogens, and related pollutants. Sewer backups typically occur inside buildings, discharging pollutants into homes, businesses, and related establishments. These pollutants create an immediate health hazard and damage real and personal property. Accordingly, the 6-inch sewer lateral is inadequate to convey sewage flows from the Warehouse, and the addition of new flows from the Warehouse without first upgrading the capacity of these sewer pipes to accommodate the new flows would cause or contribute to sewer overflows and backups.

40.     The Wright Road Pumping Station is also undersized: the Pumping Station's *total* design capacity is 102,240 gallons per day, but the anticipated volume of sewage flow for a facility serving 1500 detainees is between 187,500 and 357,675 gallons per day, an additional flow that (by itself without accounting for any existing sewage flows) exceeds the Pumping Station's capacity by 150% or more. The most conservative estimate for a facility serving 542 detainees, and not accounting for employees, would still account for 66.2% of the Pumping Station's capacity; but, as highlighted in the County's statement to DHS, the Pumping Station's capacity is already over 99% allocated, leaving only 509 gallons per day (approximately 2 EDUs) of un-allocated capacity at the Pumping Station.  If the Pumping Station's capacity is exceeded, the County's community sewerage system will overflow and/or backup. These sewer overflows may occur at the Pumping Station, upstream manholes, or related outlets, resulting in the discharge of raw, untreated sewage and pollutants to the ground surface and to waters of the State—including Semple Run and Conococheague Creek, a primary tributary of the Potomac River. Such discharges impair the recreational, aesthetic, and ecological value of these waters and threaten aquatic species and the public by releasing harmful bacteria, nutrients, other pathogens, and related pollutants. Sewer backups from the Pumping Station may occur inside

11

buildings, thereby endangering public health by exposing individuals to the pathogens and related pollutants in raw sewage and damaging real and personal property. Accordingly, the Pumping Station is inadequate to convey sewage flows from the Warehouse, and the addition of new flows from the Warehouse without first upgrading the capacity of the Pumping Station to accommodate these flows would cause or contribute to sewer overflows and sewage backups.

Washington County Water and Sewerage Plan

41.    The County's Water and Sewerage Plan was last comprehensively updated in 2009. While the County has submitted periodic amendments, it has not submitted a comprehensive revision to the Department since the 10-year planning horizon ended in 2019, some 7 years ago. Accordingly, the County's Water and Sewerage Plan is outdated and insufficient to evaluate new, large-scale developments.

42.    Furthermore, the County's Water and Sewerage does not meet the requirements of § 9-505(a) of the Environment Article because the County's Water and Sewerage Plan does not contemplate the increased hydraulic load from the proposed Warehouse. This volume exceeds the existing capacity of the County's community sewerage system for this area.

43.    Accordingly, the proposed detention processing facility at the Property does not conform to the County's Water and Sewerage Plan.

44.    Under § 9-503(c)(2) of the Environment Article, the Department may require a county to revise or amend its water and sewerage plan.

45.    Under § 9-511 of the Environment Article, water supply systems and sewerage systems "may not be installed or extended" unless the proposed installation or extension conforms to the county's water and sewerage plan. Therefore, an updated Water and Sewerage

12

Plan must be finalized before the County proceeds to design or construct its community sewerage system to accommodate increased sewage flows from the Property.

## ORDER

46.    Therefore, pursuant to § 9-503(c)(2) of the Environment Article, it is this 13th day of April 2026, hereby ORDERED by the Director of the Water and Science Administration that the County shall submit a comprehensive revision of the County's Water and Sewerage Plan to the Department in accordance with Title 9, Subtitle 5 of the Environment Article and COMAR 26.03.01. This revision shall include a 10-year planning horizon, provide an updated, data-driven capacity analysis for the infrastructure that will be impacted by the proposed Warehouse and other proposed development in the County, and identify the infrastructure improvements that are necessary to serve this development.

47.    Therefore, pursuant to § 9-252 of the Environment Article, it is this 13th day of April 2026, hereby further ORDERED by the Director of the Water and Science Administration that the County:

    a. Shall not allocate, authorize, or facilitate any increase in sewage flow to the Pumping Station beyond two EDUs (400 gallons), unless authorized by MDE to address a discrete public health emergency, until:

        i. An updated Water and Sewerage Plan for the County is approved in accordance with § 9-507 of the Environment Article;

        ii.    All necessary improvements to the sewerage system that serves the Property are designed, approved, and constructed; and

13

      iii.     The improvements to the sewerage system conform to the approved Water and Sewerage Plan.

b. Shall not install, modify, or extend any portion of the sewerage system that flows to the Pumping Station or the Pumping Station itself until:

     i. An updated Water and Sewerage Plan is approved in accordance with this Order;

     ii.     The installation, modification, or extension conforms to the approved Water and Sewerage Plan; and

     iii.     All necessary permits and approvals are approved and issued, including any construction permit in accordance with § 9-204 of the Environment Article.

c. Shall obtain a construction permit from the Department before making any material alteration or upgrade to the Pumping Station.

## PROCEDURE FOR REQUESTING REVIEW OF THIS ORDER

48.     The County may commence an action in the Circuit Court for Washington County within ten (10) days after service of this Order to vacate and set aside the Order issued pursuant to § 9-252 on the ground that this Order is unlawful or unreasonable or that this Order is not necessary for the protection of public health or comfort in accordance with Section 9-263 of the Environment Article and the Maryland Rules.

49.     If the County fails to commence an action in a timely manner as required by Section 9-263 of the Environment Article and the Maryland Rules, then without further notice this Order will become final and may not be appealed by the County, and the County is legally required to comply with the terms and conditions established in this Order.

50.    Any attorney who represents the County must be admitted to practice law in the State of Maryland or must be specially admitted to practice law in the State of Maryland pursuant to Maryland Rule 19-215 *et seq.*

51.    Nothing in this Order shall be construed to limit any authority of the Department to issue any other Orders or to take any action the Department deems necessary to protect the public health or comfort, or to limit any authority the Department has or may hereafter be delegated.

52.    Any submittals to the Department pursuant to this Order or questions concerning this matter shall be directed to Judd Crane, Assistant Attorney General, 1800 Washington Boulevard, Suite 6048, Baltimore, Maryland 21230, telephone (410) 537-3040, or email – judd.crane@maryland.gov.

**IT IS SO ORDERED:**

**Secretary of the Environment**

April 13, 2026
Date

D. Lee Currey, Director
Water and Science Administration

Approved as to form and legal sufficiency this 13th day of April 2026

/s/ Judd Crane
Judd Crane, Assistant Attorney General