**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | *       Civil No. 26-733-BAH |
| MARKWAYNE MULLIN ET AL., | * |
| Defendants. | * |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**<u>MEMORANDUM OPINION</u>**

This case provides a crystal-clear example of a federal agency failing to comply with the basic requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.  In purchasing a large warehouse in Williamsport, Maryland built to hold cargo, and seeking to quickly convert it into a detention facility designed to house human beings, the Department of Homeland Security ("DHS") and its subsidiary, U.S. Immigration and Customs Enforcement ("ICE"), ignored NEPA's mandate to take "a 'hard look' at [the] environmental consequences" of its proposed action.  *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).  Had DHS done so, it likely would have found that the rapid transformation of a cargo-processing facility with four toilets and two water fountains into a temporary residence and workplace for hundreds, if not thousands, would jeopardize the health and safety of the surrounding ecosystem in myriad ways, most notably through the likely over-taxing of the sewer system.

Even under the highly deferential "arbitrary and capricious" standard that the Court must employ as it reviews DHS's argument that this massive warehouse conversion can be shoehorned

into three categorical exclusions reserved for projects that do "not significantly affect the quality of the human environment," 42 U.S.C. § 4336e(1), the Court is left with no doubt that DHS has failed to comply with NEPA. To find proof of this clear failure, one needs to do little more than review a transcript of the Court's hearing earlier this week at which counsel for Defendants could not answer basic questions about how and why their clients came to the conclusion that a warehouse-to-jail conversion that, even under the most conservative of estimates, is likely to increase Williamsport's daily population by nearly 50% does not require a more thorough environmental review. Indeed, what review was done appears to have proceeded at a rocket's pace, and only after Defendants erroneously concluded that the categorical exclusions applied. What's more, counsel for Defendants effectively conceded that additional review of the project's significant environmental impact *is* needed to ensure compliance with NEPA, a candid admission that dooms any contention that DHS's actions prior to plowing forward with the warehouse purchase and conversion pass legal muster. The Court, having been convinced that DHS failed to clear the low bar of basic NEPA compliance, and noting that all four relevant factors weigh in the State of Maryland's favor, is thus compelled to grant the motion for a preliminary injunction.

## I.    **PROCEDURAL BACKGROUND**

On December 24, 2025, the Washington Post reported that the federal government was seeking contractors to renovate industrial warehouses into immigrant detention centers. Douglas MacMillan & Johnathan O'Connell, *ICE documents reveal plan to hold 80,000 immigrants in warehouses*, Wash. Post (Dec. 24, 2025), https://www.washingtonpost.com/business/2025/12/24/ice-immigrants-detention-warehouses-deportation-trump/ [https://perma.cc/GQR9-XM2D]. On January 16, 2026, in apparent furtherance of that plan, DHS and ICE purchased a vacant commercial warehouse just outside of

Williamsport, Maryland (the "Williamsport Warehouse").[1]   ECF 1, at 2 ¶ 2; *DHS, ICE buy warehouse in MD for potential detention site*, The Daily Record (Jan. 28, 2026) https://thedailyrecord.com/2026/01/28/ice-dhs-williamsport-warehouse-immigrant-detention/ [https://perma.cc/ND7K-BLUG].

A little over one month later, the State of Maryland (the "State") filed this action against ICE, DHS, Markwayne Mullin,[2] and Todd M. Lyons (collectively "Defendants"), seeking declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and NEPA to halt Defendants from moving forward with their plans to convert the Williamsport Warehouse into an immigration detention facility before statutorily required procedures have been completed.  ECF 1.  On March 10, 2026, the State filed a motion for an ex parte temporary restraining order ("TRO").  ECF 5.  The next day, the Court granted the TRO ex parte, ordering Defendants to cease any renovation or construction activities required to build, retrofit, or otherwise convert the Williamsport Warehouse into an immigration detention facility and requiring Defendants to file a status report within forty-eight hours describing all steps taken to comply with the TRO.  ECF 8.  Defendants timely complied, informing the Court that they had halted work at the Williamsport Warehouse.  ECF 9.

On March 17, the parties filed a joint motion to establish a briefing schedule, among other relief.  ECF 11.  The Court granted the motion in part, setting a briefing schedule for the State's

---

[1] Other warehouses have been purchased across the country for this purpose, and other states have sued.  *See* Heather Hollingsworth, *How US communities have responded to plans to convert warehouses into immigration detention centers*, AP News (updated 10:29 AM, Apr. 9, 2026), https://apnews.com/article/immigration-detention-warehouses-backlash-states-d2f4cfd885f013d51477b5926d4d2c3c.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Kristi Noem (the secretary originally named in the action) was automatically substituted for the new United States Secretary of Homeland Security and former Oklahoma senator, Markwayne Mullin.

motion for a preliminary injunction ("PI") and extending the TRO until a hearing could be held on that motion. ECF 14. The State filed its motion seeking a PI pursuant to Fed. R. Civ. P. 65(a) on March 19, ECF 15, and Defendants filed a response in opposition on April 2, ECF 34. Two motions for leave to file amicus briefs were also filed.[3] *See* ECF 16; ECF 20. The State filed a reply, ECF 37, and a hearing on the pending PI motion was held on April 15 at 10:00 a.m., ECF 22. At the conclusion of the hearing, the Court granted the State's motion in large part and issued an order that day reflecting the same. ECF 42. This opinion follows to further explain the Court's decision to order the PI.

## II.      STATUTORY BACKGROUND

### A.      NEPA

NEPA "is 'our basic national charter for protection of the environment.'" *State of N.C. v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir. 1991) (quoting 40 C.F.R. § 1500.1(a) (1990) (since rescinded)). The statute "declares a broad national commitment to protecting and promoting environmental quality." *Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (quoting *Robertson*, 490 U.S. at 348). It "was the first of 'several landmark environmental laws enacted by Congress in the 1970s,' including the Clean Air Amendment, the Clean Water Act, and the Endangered Species Act." *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *4

---

[3] The first was filed on March 26 by the Center for Biological Diversity, the Potomac Riverkeeper Network, and Washington County Indivisible. ECF 16. The second was filed by Hagerstown City Council Members Caroline Anderson, Erika Bell, and Tiara Burnett, Maryland State Delegate Matthew J. Schindler, Hagerstown Rapid Response, the Washington County Branch of the NAACP, the Hagerstown Area Religious Council, the ACLU of Maryland, and the Amica Center for Immigrant Rights. ECF 20. At the hearing on April 15, 2026, the Court orally granted both motions for leave to file, which is also reflected in the order at ECF 42.

(11th Cir. Sept. 4, 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 172 (2025)).

"Compliance with NEPA ensures that federal agencies will consider significant environmental impacts of federal action, make available the relevant information, and open to public scrutiny their decision making process." *Id.* at 660–61 (citing *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)). NEPA acknowledges the necessity of cooperating with state and local governments to advance those ends. *See* 42 U.S.C. § 4331 ("The Congress . . . declares that it is the continuing policy of the Federal Government, *in cooperation with State and local governments*, . . . to use all practicable means and measures, . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." (emphasis added)).

"The purpose of NEPA is two-fold. First, it ensures that an 'agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" *Hodges*, 300 F.3d at 438 (first quoting *Robertson*, 490 U.S. at 350). "Second, compliance with NEPA procedures 'ensures that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision.'" *Id.* (quoting *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996)). "To achieve its purposes, NEPA requires federal agencies to consider the environmental implications of any proposed legislation or 'major federal action[.]'" *State of N.C.*, 951 F.2d at 603 (citing 42 U.S.C. § 4332(2)(C)). Accordingly, NEPA mandates "a set of action-forcing procedures that require" agencies (1) to "take a hard look at environmental consequences" and (2) to broadly disseminate the relevant environmental information to members of the public. *Defs. of Wildlife v. N.C. Dep't*

*of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (internal quotation marks omitted) (quoting *Robertson*, 490 U.S. at 350). However, "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350; *see also Audubon Naturalist Soc'y*, 524 F. Supp. 2d at 661 ("NEPA does not mandate a particular outcome for a proposed project; rather, it is a procedural statute which prescribes the process by which the agency is to reach an informed decision."). "Simply stated, NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 173.

That being said, an agency's desire to move quickly does not mean it can steamroll NEPA's procedural safeguards. *See Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783, 808–09 (S.D. W. Va. 2009) ("[T]he procedural safeguards created by NEPA must be carefully adhered to."). Congress mandated that "all agencies of the Federal Government shall . . . consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" on:

> (i) reasonably foreseeable environmental effects of the proposed agency action;
>
> (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(C).

Compliance with NEPA can take several forms. The first mandates the drafting of an "environmental impact statement," or "EIS," which is a "detailed written statement that is required by section 4332(2)(C) of [] title [42]." *Id.* § 4336e(6). An EIS is limited to 150 pages and must be completed within two years after the sooner of the date the agency determines an EIS is required, issues a notice of intent to prepare an EIS, or notifies an applicant that an application to establish a right-of-way for such an action is complete. *Id.* § 4336a(e)(1)(A), (g)(1)(A)(i)–(iii).

An EIS is required whenever there is a "proposal[]" for a "major federal action[]" that would "significantly affect[] the quality of the human environment." *Id.* § 4332(C). NEPA defines "proposal" to mean "a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." *Id.* § 4336e(12). NEPA further defines a "major Federal action" as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A). "Although there is no litmus test for whether something qualifies as major federal action, courts have tended to 'consider the following factors: (1) whether the project is federal or non-federal; (2) whether the project receives significant federal funding; and (3) when the project is undertaken by a non-federal actor, whether the federal agency must undertake affirmative conduct before the non-federal actor may act.'" *Indian River Cnty. v. Rogoff*, 201 F. Supp. 3d 1, 15 (D.D.C. 2016) (internal quotation marks omitted) (quoting *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 54–55 (D.D.C. 2003)).

An agency need not prepare an EIS if the proposed action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of

such effect is unknown." 42 U.S.C. § 4336(b)(2). In such circumstances, an agency can choose to prepare an "environmental assessment," or "EA." *Id.*; *see also id.* § 4336e(4) ("The term 'environmental assessment' means an environmental assessment prepared under section 4336(b)(2) of this title."); *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 995 (9th Cir. 2023) ("[W]hen an agency is uncertain about the possible environmental effects of a proposed action, the proper course is to prepare an EA to the best of the agency's ability[.]"). An EA is "a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." *Id.* § 4336(b)(2). Thus, an EA can satisfy an agency's obligation to review environmental impacts under NEPA or it can identify significant impacts that trigger the requirement to prepare an EIS. *See* ECF 15-1, at 11. An EA is limited to 75 pages and must be completed within one year of the sooner of the date the agency determines the EA is required, a notice of intent to prepare an EA is issued, or a right-of-way applicant is notified. 42 U.S.C. § 4336a(e)(2), (g)(1)(B)(i)–(iii).

There are some circumstances in which an agency is not required to prepare an EA or EIS at all with respect to a proposed action. Such circumstances include when (1) "the proposed agency action is not a final agency action," (2) the proposed action is subject to a categorical exclusion, (3) "the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law," or (4) "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." *Id.* § 4336(a)(1)–(4). "The term 'categorical exclusion' means a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of section 4332(2)(C) of this title." *Id.* § 4336e(1). "Application of a

categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013); *see also United Keetoowah Band of Cherokee Indians in Oklahoma v. Fed. Commc'ns Comm'n*, 933 F.3d 728, 735 (D.C. Cir. 2019) ("Categorical exclusions are not exemptions or waivers of NEPA review; they are simply one type of NEPA review." (citation omitted)).

### B.    DHS's Security Directive and NEPA Instruction Manual

Historically, the White House Council on Environmental Quality ("CEQ") published and maintained at 40 C.F.R. Part 1500 a centralized set of regulations to standardize and guide federal agencies in their implementation of NEPA. *See Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 288 (4th Cir. 2022). "CEQ has the authority to promulgate regulations implementing NEPA. Other agencies—those that will actually be undertaking NEPA reviews related to proposed federal actions—then promulgate their own regulations, consistent with CEQ's." *Id.* (internal citations omitted). However, CEQ issued an interim final rule rescinding its centralized regulations in February 2025, 90 Fed. Reg. 10,610 (Feb. 25, 2025), and a final rule doing the same in January 2026, 91 Fed. Reg. 618 (Jan. 8, 2026). *See* ECF 15-1, at 12 n.1.

Accordingly, DHS's own directive and manual addressing NEPA compliance occupy a position of central importance in this case.[4]   DHS's NEPA procedures are contained within Department of Homeland Security Directive 023-01 Rev. 01 and the Instruction Manual 023-01-001-01 Rev. 01, *Implementing the National Environmental Policy Act* ("DHS NEPA Instruction

---

[4] DHS's internal guidance references the now-rescinded CEQ regulations and states that it was designed "to be used in conjunction with those regulations."  Department of Homeland Security Directive No. 023-01 Rev. 01, https://perma.cc/T6A3-3LD3.  In the absence of CEQ regulations, however, the guidance remains comprehensible.  The parties do not discuss the impact of the rescinded CEQ regulations on the DHS directive and manual.

Manual"). *See* Department of Homeland Security Directive No. 023-01 Rev. 01, https://www.dhs.gov/sites/default/files/publications/mgmt/environmental-management/mgmt-dir_023-01-implementation-national-environmental-policy-act_revision-01.pdf [https://perma.cc/T6A3-3LD3]; Department of Homeland Security Instruction Manual 023-01-001-01 Rev. 01, *Implementing the National Environmental Policy Act* ("DHS NEPA Instruction Manual"), at ECF 15-4.   In Section IV-1, the DHS NEPA Instruction Manual provides that components of DHS will "ensure that the appropriate NEPA analysis and documentation is completed before a decision is made that irretrievably commits resources or limits the choice of reasonable alternatives to satisfy an objective, fix a problem, address a weakness, or develop a program."   DHS NEPA Instruction Manual, at IV-1.   "Because of the diversity of DHS," however, the Instruction Manual states that "it is not feasible to describe . . . the decision-making process for every DHS program."   *Id.*

However, the DHS NEPA Instruction Manual assures that "NEPA applies to the majority of DHS actions," *id.* at V-1, and the record reflects that Defendants understood the undertaking of their plans at the Williamsport Warehouse to be subject to NEPA, *see* ECF 34-1.   When NEPA applies to a proposed action, DHS engages in several steps illustrated by a flow chart included in the manual:

**Figure 1 - NEPA Flow Chart**



DHS NEPA Instruction Manual, at V-3.  Here, apparently just hours before Defendants purchased

the Williamsport Warehouse, they completed a Record of Environmental Consideration ("REC"),

which the manual defines as an "internal DHS administrative document that records the application

of" a categorical exclusion to a specific proposal.  *Id.* at II-6; ECF 34, at 11–12; ECF 34-1 (REC

for the Williamsport Warehouse).  The DHS NEPA Instruction Manual requires a REC be prepared

whenever certain categorical exclusions are invoked, specifically whenever an exclusion "denoted

by an asterisk is applied in order to document that potential impacts to the human environment

have been appropriately considered and the determination that the proposed action is either

11

appropriately categorically excluded or must be analyzed further through an EA or EIS process."[5]

DHS NEPA Instruction Manual, at V-7.

Defendants here determined that NEPA applied to their proposed action and proceeded down the "CATEX" branch of the decision tree, or the one applicable to proposals determined to fall under a categorical exclusion. *See id.* at II-6; ECF 34-1. The REC identified that DHS and ICE "propose[d] to acquire and retrofit an existing facility located within an established industrial area in Washington County, MD . . . designed to accommodate up to 542 detainees." ECF 34-1, at 21. The REC identified "[p]roposed improvements" as including:

> installation of perimeter security fencing; installation of a modular security checkpoint structure (approx 150 sq ft) located entirely within an existing paved area; construction of 6 exterior recreation courts on existing asphalt surfaces; installation of exterior lighting and security cameras; replacement of the existing emergency generator with a larger capacity unit (approx. 1,000 kw) to meet current life safety and operational requirements; installation of new telecom cabling, routed through existing utility corridors or previously disturbed areas; and sanitary sewer connection improvements, if required by final engineering review.

*Id.* The REC noted that "[n]o off site sewer upgrades or new connections are anticipated" and it stated that "[a]ll construction activity is temporary, localized, and confined to previously disturbed areas." *Id.* The REC further stated that "[n]o new building additions, footprint expansions, off site construction, or capacity related improvements are included in the Project." *Id.* As Andrew J. DeGregorio, the Energy and Environmental Programs Manager employed by ICE's Office of Asset and Facilities Management ("OAFM"), states in a declaration provided to the Court as part of Defendants' opposition, the REC was thus prepared only with respect to "acquisition of the property, reasonable repairs to the property, including to the roof and HVAC system on site, as well as measures for the security of the property." ECF 34-2, at 4 ¶ 8.

---

[5] "In addition, there may be instances where a Component chooses to prepare a REC when it is not otherwise required." DHS NEPA Instruction Manual, at 35, V-7.

Defendants' REC identified the proposal for the Williamsport Warehouse as falling into three separate categorical exclusions: C1, D1, and E2*:

- C1 - Acquisition of an interest in real property that is not within or adjacent to environmentally sensitive areas, including interests less than a fee simple, by purchase, lease, assignment, easement, condemnation, or donation, which does not result in a change in the functional use of the property.

- D1 - Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property (e.g. realigning interior spaces of an existing building, adding a small storage shed to an existing building, retrofitting for energy conservation, or installing a small antenna on an already existing antenna tower that does not cause the total height to exceed 200 feet and where the FCC would not require an EA or EIS for the installation).

- E2* - New construction upon or improvement of land where all of the following conditions are met:
    - (a) The structure and proposed use are compatible with applicable Federal, tribal, state, and local planning and zoning standards and consistent with federally-approved state coastal management programs,
    - (b) The site is in a developed area and/or a previously-disturbed site,
    - (c) The proposed use will not substantially increase the number of motor vehicles at the facility or in the area,
    - (d) The site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings, and,
    - (e) The construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.).

ECF 34-1, at 3–4; DHS NEPA Instruction Manual, app. A, table 1 (list of categorical exclusions), at A-1 through A-27.

It bears noting that DHS previously prepared an EA when applying NEPA to detention facility construction. In September 2021, DHS and ICE prepared an EA for the El Paso Service Processing Center ("SPC"). *See* Dep't of Homeland Sec., Immigr. & Customs Enf't, El Paso Service Processing Center: Final Environmental Assessment at 1–2 (Sept. 15, 2021), https://perma.cc/VED3-J4BP (preparing an EA for the proposed renovation and expansion of a processing facility already owned by ICE). There, the agencies proposed "the demolition of four

existing dormitory buildings and the construction of one new dormitory building" at the El Paso SPC. *Id.* at 1. The agencies published the draft EA in advance of releasing the final version and accepted public comments. *See id.* at 6.

## III.   FACTUAL BACKGROUND

### A.   The Williamsport Warehouse

On January 16, 2026, DHS and ICE purchased the Williamsport Warehouse, located at 16220 Wright Road, Williamsport, Maryland 21795, for $102.4 million.[6] ECF 15-5, at 3. The State represents that the "deed was recorded on January 22, 2026, and the transaction was first publicly reported on January 27, 2026." ECF 15-1, at 14. According to the Maryland Department of Assessments and Taxation, the property is a "mega warehouse" covering 53.74 acres and including an above-grade area of 825,620 square feet. ECF 15-6, at 2 (capitalization altered). Public statements made by ICE suggest that facilities of this scale will be used to "house[] an average daily population of 1,000 to 1,500 detainees for average stays of 3-7 days." ECF 15-7 (ICE Detention Reengineering Initiative), at 2–5.

The Williamsport Warehouse is located just outside of Williamsport, a town that the U.S. Census Bureau recorded as having a population of just over 2,000 individuals in 2020. U.S. Census Bureau, *Williamsport town, Maryland – Census Bureau Search*, https://perma.cc/U3QU-FB27 (captured Feb. 18, 2026). The warehouse is situated between multiple highways and major thoroughfares, "including state highway MD-63, Interstate-81, and I-70." ECF 34-1, at 10. Other relatively large commercial buildings appear to be close by the Williamsport Warehouse. *See,*

---

[6] The address of the Williamsport Warehouse is "alternatively identified as 10900 Hopewell Road, Williamsport, Maryland 21795." ECF 15, at 2.

*e.g.*, ECF 34-1, at 30 (aerial photo of the warehouse); *see also* ECF 34, at 10–11.  A number of apartment homes are also nearby.  ECF 34-1, at 30.

Additionally, "[t]hree state waterways are either adjacent to or downstream of the property: Semple Run, Conococheague Creek, and the Potomac River."  ECF 15-8 (declaration of Josh E. Kurtz), at 4 ¶ 11.  Semple Run is a small creek that "feeds into the Conococheague Creek," which itself "feeds into the Potomac River and the Chesapeake Bay."  *Id.*  These waters are regulated by the State for their recreational, aesthetic, and ecological value and as public water supplies.  *See id.* ¶¶ 17–21.  These waters also provide important habitat for aquatic species protected by Maryland's Nongame and Endangered Species Conservation Act.  *See id.* ¶¶ 27, 33–38 (brook floater mussels), 39–46 (green floater mussels), 48–51 (Allegheny pearl dace, a species of fish), 52–54 (Appalachian springsnail), 55–58 (Allegheny cave amphipod), 59–61 (Franz's cave amphipod); *see also, e.g.*, COMAR 08.03.08.04.C(2)(d) (listing the green floater mollusk as an endangered species in Maryland).

The property is also within a half mile of two Ecologically Significant Areas—the Kemps Springs Ecologically Significant Area and the Conococheague-Kemps Mill Ecologically Significant Area—which are identified by the State as ecologically significant based on the presence of rare, threatened, or endangered species, habitat that supports known locations of such species, or the presence of a significant natural community of ecological value.  *See* ECF 15-8, at 15–16 ¶¶ 67–71; *see also* ECF 15-12 (Maryland Department of Natural Resources, Maryland

15

Department of the Environment, and Maryland Department of Transportation's comment on early notice of proposed activity in floodplain), at 9–10.

Construction on the Williamsport Warehouse began in 2021, and it was originally intended to serve commercial and logistics needs.[7] *See* Mike Lewis, *Going Up: Firm Breaks Ground for $35M Warehouse; Wright Road to Reopen This Month*, Herald Mail Media (5:00 AM, Sep. 14, 2021), https://www.heraldmailmedia.com/story/news/2021/09/14/penzance-breaks-ground-new-warehouse-off-wright-road-washington-county/8317965002/ [https://perma.cc/KL3M-CMVP]. "According to permit information from the county, the building is to be used as a warehouse, fire pump room and electrical room for a future tenant and includes 84 future docks with overhead doors, 41 fully equipped dock doors, 41 dock doors with future levelers, four drive-in doors and mechanical dock levelers as well as 30 pole lights that are 40 feet tall." *Id.*; *see also* Washington Cnty. Div. Plan Rev. & Permitting, Permit Issuance Report at 3 (Aug. 1–31, 2021), https://perma.cc/D43B-6749. A brochure advertising the warehouse by previous owners describes the facility as having more than 400 parking spaces, 200 trailer spaces, 2,400 square feet of existing office space, four toilets, and two water fountains. *See* ECF 34, at 10; ECF 15-1, at 16; ECF 15-9, at 3 (brochure). The warehouse receives potable water from the City of Hagerstown via a 2-inch domestic service line and has an approved allocation of 800 gallons per day. *See* Jessica Swann, *Hagerstown Outlines Water Allocation Process for ICE Facility*, LocalNews1.org (Feb. 20, 2026), https://perma.cc/4F8V-N343.

B.    **Record of Environmental Consideration**

As part of a "detention reengineering initiative," ICE seeks to "fully implement a new detention model by the end of Fiscal Year 2026" that involves "design[ing] and renovat[ing]

---

[7] Private entities are not subject to NEPA requirements, as the statute regulates only "agencies of the Federal Government." 42 U.S.C. § 4332.

16

existing structures to meet ICE's detention and design standards." ECF 15-7, at 2. In apparent pursuit of that initiative, ICE has purchased or attempted to purchase warehouses in several states for the purposes of converting them into immigration detention and processing centers. *See* Heather Hollingsworth, *How US communities have responded to plans to convert warehouses into immigration detention centers*, AP News (updated 10:29 AM, Apr. 9, 2026), https://apnews.com/article/immigration-detention-warehouses-backlash-states-d2f4cfd885f013d51477b5926d4d2c3c [https://perma.cc/SJM8-947S]. In January of 2026, ICE completed an environmental and historical preservation review of the acquisition and retrofitting of the Williamsport Warehouse known as a REC, as explained above. *See, e.g.*, DHS NEPA Instruction Manual, at II-1.

Defendants identify the entirety of "Exhibit 1" attached to its opposition to the PI as the REC. *See* ECF 34-1. It is 26 pages of materials with four appendices and several attachments— in total, 168 pages. *See id.* However, at the hearing Defendants explained that only five pages of the exhibit constitute the actual REC. *See* ECF 34-1, at 21–25. The rest, Defendants clarified, is supporting documentation. Additionally, the Court observes that pages 47 to 168 of the exhibit reflect a letter sent to various interested parties pursuant to the National Historic Preservation Act with several photo exhibits attached. *See, e.g.*, ECF 34-1, at 47–62 (letter and attachments from DHS to Michael Gehr, chairperson of Hagerstown Planning Department Historic District Commission). The letters, sent on January 12, 2026, largely repeat in form and substance throughout the remainder of the exhibit. *See id.* at 47–168.

The first document in support of the REC is titled "Environmental Planning and Historic Preservation Decision Support System" concerning the "Hagerstown, MD Property Acquisition." *Id.* at 2. The relevant project in that document is titled "Hagerstown, MD Property Acquisition."

17

ECF 34-1, at 2.  The REC itself lists the "Estimated Start Date" as "01/19/2026."  *Id.* at 21.  The REC that DHS and ICE "propose[] to acquire and retrofit an existing facility located within an established industrial area in Washington County, MD on approx. 53.74 acres of land, surrounded by wooded areas, and commercial and residential development."  *Id.*  The REC states that the Williamsport Warehouse "will utilize existing infrastructure, including water, sanitary sewer, stormwater management, and transportation access and is designed to accommodate up to 542 detainees and spans a total area of 830,397 sq ft."  *Id.*

It goes on to state that "[h]ousing configurations include 448 typical dormitory pods, 32 ADA-compliant dormitory pods, and 62 pods designated for behavioral and special housing needs" and that "[t]he facility will include 4 separate secure recreation yards, a visitor waiting area, 2 cafeterias, one kitchen and food preparation area, 3 multi-purpose rooms, a health services room, and laundry facilities."  *Id.*  As discussed, the REC lays out what improvements the agencies intend to make to the Williamsport Warehouse.  *Id.*  The REC specifically notes that "[n]o off site sewer upgrades or new connections are anticipated," and characterizes "[a]ll construction activity" as "temporary, localized, and confined to previously disturbed areas."  *Id.*  "No new building additions, footprint expansions, off site construction, or capacity related improvements are included in the Project," it states.  *Id.*

Under the heading "Project Types," the Decision Support Document identifies the three categorical exclusions that DHS contends apply to the conversion of the Williamsport Warehouse: "Real Estate Activities" (C1), "Repair & Maintenance Activities" (D1), and "Construction, Installation, and Demolition Activities" (E2*):

- Real Estate Activities - Acquisition of an interest in real property that is not within or adjacent to environmentally sensitive areas, including interests less than a fee simple, by purchase, lease, assignment, easement, condemnation, or donation, which does not result in a change in the functional use of the property. (CATEX C1)

18

- Repair & Maintenance Activities - Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property. (CATEX D1)

- Construction, Installation, and Demolition Activities - New construction upon or improvement of land where all of the following conditions are met. (CATEX *E2)

*Id.* at 3; *see also id.* at 4 (again listing the relevant categorical exclusions). Under a section titled "Required Conditions," the document indicates that "[t]his review addresses NEPA and other EP&HP[8] requirements as described in DHS Directive 023-01." *Id.* at 5.

Although the project description at the beginning of the REC states that the facility would be "designed to accommodate up to 542 detainees," *id.* at 1, under the "Comments" section of the Decision Support Document, a comment from Gabrielle Fernandez made on "02/06/2026 11:31:07" states that the "facility will be designed to accommodate 500 to 1,000 detainees, with scalability to accommodate up to 2,000 individuals." *Id.* at 5–6. Another commenter, Sarah Larkin, identified as an "Environmental Reviewer," *id.* at 3, comments that the "proposed action is not expected to result in impacts to mapped wetland features," and it "is located within a previously developed area, and minimal disturbance for construction is planned outside of the existing facility footprint and paved areas," *id.* at 6. Her comment goes on to "summarize[]" the findings of an "Environmental Report" conducted with respect to the project, including that "[n]o state or national forest lands are located within or adjacent to the Project site," that "[t]he majority

---

[8] "EP&HP" appears to refer to the first document included in the REC, DHS's "Environmental Planning and Historic Preservation Decision Support System." *See* ECF 34-1, at 2.

19

of the parcel is located outside the 100-year floodplain," and that "the Project site does not overlap with any designated critical habitat for federally listed species." *Id.* at 6–7.

Moreover, Larkin summarizes that a "proposed fence line would be installed in the unpaved ground immediately adjacent to the existing asphalt parking lot, and neither the parking lot nor the adjacent disturbed ground provides suitable habitat for the listed species." *Id.* at 7. Larkin's comment also identifies that "[s]urrounding properties to the east, south, and west include moderately sized stands of forest cover," and "the Project site contains no wetlands or streams that would provide suitable habitat for the green floater." *Id.* "Based on this information, ICE has determined that the Project will have no effect on federally listed endangered or threatened species or their critical habitats." *Id.* The remaining comments reiterate that "proposed modifications to the facility, including perimeter fencing, recreation yards, lighting, and generator replacement, will occur primarily within previously disturbed areas and will not result in significant impacts to wildlife or habitats." *Id.* at 8.

The next section of the Decision Support Document (in support of the REC), titled "EPHP Review," contains an "Environmental Resources" section that identifies the agencies' determination that the proposed action "will not have a potentially significant effect on public health or safety." *Id.* at 9. In relevant part, that section includes purported analysis related to wastewater systems. *See id.* at 9–10. It states that "[w]astewater and potable water systems are already in place and designed to accommodate industrial-scale use." *Id.* at 9. "The existing facility is currently served by a 6-inch sanitary sewer lateral discharging from the building to the municipal sewer system." *Id.* According to this document,

> Preliminary engineering reviews indicate that the existing sanitary sewer lateral is sufficient to handle projected wastewater flows associated with the Project, however the Project may require upsizing or modification of the existing sanitary sewer lateral and/or point of connection to accommodate projected facility

wastewater flows. All required utility approvals, permits, and connection authorizations would be obtained to confirm the system's ability to accommodate anticipated flows. Final confirmation of capacity and compliance would be completed through coordination with the local municipal sewer authority and would be subject to detailed engineering design and permitting.

*Id.* at 9–10. The next paragraph repeats similar information, although instead of touting the sufficiency of the existing sanitary sewer infrastructure, it identifies sewer capacity improvements as "unlikely":

> Prior to construction, available conveyance and treatment capacity would be formally verified with the municipality; however, based on preliminary engineering review and existing service conditions, the need for additional off-site capacity improvements or municipal system upgrades is considered unlikely. No immediate need for off-site sewer upgrades has been identified at this time. Any sewer improvements would be designed and implemented in coordination with the local municipal sewer authority and would occur within existing utility easements, right-of-way, or previously disturbed areas. Ground disturbance associated with sewer improvements would be temporary, localized, and linear in nature, consisting primarily of trenching for pipe replacement or connection upgrades. Installation activities are not expected to result in changes to land use, long-term drainage patterns, or water quality. Upon completion of construction, all disturbed areas would be backfilled and restored to pre-construction conditions. Accordingly, potential impacts to soils, utilities, and water resources would be short term and minor (see Section 2.5.6 Utilities).

*Id.* at 10. This supporting document further states that "[b]ased on the updated Phase 1 ESA and Existing Conditions Report, there are no known hazardous waste and contamination risks associated with the proposed project." *Id.*

With respect to "[t]ransportation safety," it opines that it will "not be significantly affected, as the facility is located near major transportation corridors, including state highway MD-63, Interstate-81, and I-70." *Id.* "The facility's operations," the document further concludes, "are not expected to result in significant changes to traffic patterns or modes of transportation." *Id.* The supporting document also contains a discussion about historic preservation, cultural resources, and tribal input. *See id.* at 16–20. ICE states that it "invited the following tribes to participate in

21

consultation for this undertaking: the Delaware Nation, Oklahoma; and the Seneca-Cayuga Nation." *Id.* at 20. "Consultation letters were sent out on 1/12/25," but ICE had "not received any responses as of 1/15/25," just two days later. *Id.*

The REC itself repeats much of the information in the Decision Support Document. *Id.* at 21–25. In item 7 of the form, a box is checked reflecting that the "[p]roposed [a]ction is not a piece of a larger action." *Id.* at 22. The REC affirms that the proposed action has been determined by ICE to fall under "current DHS CATEX C1, E2*, D1," that it "[i]s not a piece of a larger action which has been segmented into smaller parts in order to avoid a more extensive evaluation of the potential for significant environmental impacts," and that it "[d]oes not involve any extraordinary circumstances, as defined in DHS Instruction 023-01-001-01, Section V(B)(2), that would create the potential for a normally excluded action to have a significant environmental effect." *Id.* at 23. The REC is digitally signed by three individuals—the "Preparer of this REC," the "Environmental Approver of this REC," and the "Action Proponent." *Id.* at 25.

The four appendices to the REC include "figures," *id.* at 27 (Appendix A), "site engineering drawings," *id.* at 33 (Appendix B), "USFWS coordination," *id.* at 36 (Appendix C), and "permitting and approvals matrix," *id.* at 44 (Appendix D). Appendix A contains a variety of images of the Williamsport Warehouse in maps and photographs, along with modified images identifying environmental features and other project-related areas. *See id.* at 28–32. Appendix B contains what purport to be site engineering drawings, but which are almost entirely cut off or cropped out of the document. *See id.* at 33–35. Appendix C, referring to the agencies' efforts to coordinate their review with the United States Fish and Wildlife Service, contains correspondence from that agency of the United States Department of the Interior detailing the "[l]ist of threatened and endangered species that may occur in your proposed project location or may be affected by

22

your proposed project." *Id.* at 37–43.  Appendix D contains a permitting and approval matrix related to United States Fish and Wildlife Service Endangered Species Act compliance; several Maryland Department of the Environment and Department of Health COMAR provisions; and Washington County Director of Plan Review and Permitting usage requirements.  *See id*. at 45–46.  The remaining attachments consist of several pictures of the Williamsport Warehouse and surrounding areas, along with correspondence related to the National Historic Preservation Act ("NHPA") and attachments to those letters.  *See, e.g.*, *id.* at 63–78; *see also* ECF 15-10, at 2–17.

### C.      Purchase and Contract

On January 16, 2026, a day after the REC was completed, DHS and ICE purchased the Williamsport Warehouse for $102.4 million.  ECF 15-5, at 3.  On or about February 25, 2026, more than a month after Defendants had purchased the Williamsport Warehouse, DHS posted an "Early Notice and Public Review of a Proposed Activity in a 100- to 500- Year Floodplain" on the "Documents for Public Comment" page of its website.  Dep't Homeland Sec., Early Notice and Public Review of a Proposed Activity in a 100- to 500- Year Floodplain, Hagerstown, Maryland, https://perma.cc/G5KS-6R7R [hereinafter "Floodplain Notice"], *also available at* ECF 15-11. The Floodplain Notice provided a non-exhaustive list of activities that ICE might take to convert the warehouse into a detention facility including: "replacement of the existing emergency generator," "constructing one modular security checkpoint structure (approximately 150 square feet)," and "sanitary sewer connections or modifications if required by final engineering review." *Id.*  The Floodplain Notice also gestured at a review of alternative locations conducted "in accordance with [NEPA]," *id.*, but no NEPA review had been made public at that point.

By March 5, 2026, several organizations submitted comment letters to DHS in response to the Floodplain Notice, including various departments of the State of Maryland, the Center for Biological Diversity, and the ACLU of Maryland.  *See* ECF 15-12 through ECF 15-15.  The

comment period closed on March 5, 2026, and the Floodplain Notice has been removed from DHS's website. *See* ECF 15-1, at 19. The next day, ICE awarded a contract to "renovat[e]" the Williamsport Warehouse into "a processing and detention facility" and to operate it as such. March 6 Contract, https://perma.cc/2H9A-RJDP. The contract lists March 6, 2026 as the start date and May 4, 2026 as the end date. *Id.* The contract purports to have already obligated $113.1 million to KVG LLC, with a "potential award amount" of $641.8 million. *Id.*

However, according to DeGregorio, OAFM's Energy and Environmental Programs Manager, DHS is "reconsidering the precise scope of and plans for the facility and will not engage in any construction activities to retrofit the facility or any operations at the facility until it engages in further NEPA analysis and makes a final decision on its plans for the facility." ECF 34, at 26-27 (citing Declaration of Andrew J. DeGregorio). Accordingly, DHS claims it will no longer "be imminently pursuing any retrofitting work for detention purposes" and will instead only plan on the following work at the site before more NEPA analysis is completed: "installing a perimeter security fence, cameras, and fiberoptic cable for the cameras, repairing roof and walls leaks and the HVAC system, and minor construction within the warehouse to create ICE administrative space." *Id.* at 27.

## IV.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citations omitted). To obtain a preliminary injunction, the Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20). When a government entity is a

24

party to the case, as here, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435

(2009); *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

The movant "must establish all four elements in order to prevail." *Profiles, Inc. v. Bank of Am.*

*Corp.*, 453 F. Supp. 3d 742, 746 (D. Md. 2020) (citing *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th

Cir. 2013), *abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022)).

V.    **ANALYSIS**

The Court begins by addressing the question of the State's standing to sue, then turns to

the issues raised by Defendants' claims of voluntary cessation, and then focuses on the ordinary

factors to be addressed when resolving a motion for a preliminary injunction.

A.    **Standing**

Defendants argue that the State does not have standing to bring this suit because its "claims

about the facility's damage to the environment are far too speculative."    ECF 34, at 14.

Accordingly, Defendants claim, the State has "no concrete interest that imminently stands to be

harmed" and thus has failed to "demonstrate an injury in fact." *Id.* at 15.   The State responds by

directing Defendants to the Court's prior ruling on standing in the TRO, and reiterates the

reasoning employed by the Court there. *See* ECF 37, at 6–7 (citing ECF 8, at 3–5).  However, the

Court appreciates that the TRO was issued ex parte and thus reconsiders its prior holding here, this

time with the benefit of both parties' briefing on the issue.[9]

"To establish Article III standing, 'a plaintiff must show (1) it has suffered an injury in fact

that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

---

[9] The Court engaged in the standing analysis at the TRO stage sua sponte because of the Court's
obligation to assure itself of its ability to hear the case. *See Buscemi v. Bell*, 964 F.3d 252, 258
(4th Cir. 2020) (discussing a court's obligation to assure itself of subject matter jurisdiction and
address standing sua sponte).

opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (internal quotation marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). However, "[f]or the purposes of meeting the injury-in-fact requirement, states 'are not normal litigants.'" *Maryland v. United States*, 360 F. Supp. 3d 288, 308–09 (D. Md. 2019) (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007)). "They may show harm to three kinds of interests: (1) proprietary or financial interests, (2) quasi-sovereign interest, and (3) sovereign interests." *Id.*

The Fourth Circuit has before held, in the similar context of a NEPA case, that a non-profit conservation organization plaintiff alleged facts sufficient to establish standing where that plaintiff asserted that the construction of a defendant's project "would harm [plaintiff's] members' ability to use and enjoy the relevant area for a variety of educational, scientific, recreational, and aesthetic purposes, and that one or more of its members currently use the land for such purposes." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 329 (4th Cir. 2008) (citing *Sierra Club v. Morton*, 405 U.S. 727, 738–39 (1972)). The Fourth Circuit also concluded that the plaintiff had traced the injury to the proposed construction and had showed that enjoining the construction, "and requiring the reexamination of the proposal in accordance with NEPA, would redress its procedural and substantive concerns." *Id.* at 329–30. In so holding, the court observed that "[t]he party seeking an injunction need not show that injunction of the [ ] defendant would lead directly to redress of the asserted injury, but only that relief will preserve the federal procedural remedy." *Id.* at 330 (citing *Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323, 1329 (4th Cir. 1972)).

Applying the Fourth Circuit's reasoning in *Limehouse* to this case, the Court previously held "that the State has standing because it has alleged a palpable and imminent injury to its quasi-

sovereign interest in its environment due to Defendants' likely failure to comply with NEPA." ECF 8, at 4.  Defendants attempt to argue that *Limehouse* is distinguishable because "[t]here, the Court found the plaintiff's allegation of injury in fact sufficient when it alleged that the defendant's project 'would harm its members' ability to use and enjoy the relevant area for a variety of educational, scientific, recreational, and aesthetic purposes, and that one or more of its members currently use the land for such purposes.'"  ECF 34, at 15 (quoting *Limehouse*, 549 F.3d at 329). "By contrast, here," Defendants argue, "citizens of Maryland cannot use or enjoy the subject property for any of the above purposes because there is a preexisting large warehouse on the property that already prevented such uses even before ICE acquired the property."  *Id.*  While true that the property at the heart of this case is, of course, home to a large warehouse, that distinction is not meaningful for purposes of standing.  The imminent injury the State alleges here is analogous with respect to the area *surrounding* the property, including nearby waterways, which citizens of Maryland do enjoy "for a variety of educational, scientific, recreational, and aesthetic purposes." *See Limehouse*, 549 F.3d at 329; *see, e.g.*, ECF 15-8, at 5 ¶ 17 (noting that Conococheague Creek and its tributaries are designated as recreational trout waters and public water supply).

Defendants also take issue with the Court's prior conclusion that the State asserts a quasi-sovereign interest, arguing that "a 'quasi-sovereign interest' generally refers to *parens patriae* interests, which a state cannot usually assert against the United States."  ECF 35, at 14–15.  In support of that proposition, Defendants invoke a single quote from *Commonwealth of Massachusetts v. Mellon*: "But the citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof."  *See* ECF 34, at 14–15 (citing *Mellon*, 262 U.S. 447, 485 (1923)).  While this 1923 quote is correct and "[a] State does

27

not have standing as parens patriae to bring an action against the Federal Government[,]" *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 (1982),[10] additional relevant and binding precedent establishes that Maryland is not merely asserting a *parens patrie* interest in its NEPA challenge to the Williamsport Warehouse conversion.

In *Hodges v. Abraham*, the Fourth Circuit considered whether Jim Hodges, then the governor of South Carolina, had standing in his official capacity to bring a NEPA challenge against the Department of Energy ("DOE") for changes to plans related to plutonium storage in South Carolina.  300 F.3d at 443–44.  Answering in the affirmative, the Fourth Circuit noted that "whether Governor Hodges possesse[d] standing to sue the DOE turn[ed] on whether his asserted proprietary interests in the land, streams, and drinking water of South Carolina [were] sufficiently concrete to qualify as the bases for a recognized procedural right."  *Id.* at 444.  Finding it "uncontroverted that at least one state highway [ran] through [the site at issue], and that several streams and wildlife habitats [were] located near [the site]," the Fourth Circuit concluded that "the Governor, in his official capacity, [wa]s essentially a neighboring landowner, whose property [wa]s at risk of environmental damage from the DOE's activities at" the site.  *Id.* at 445.  The Court found that "Governor Hodges therefore ha[d] a concrete interest that NEPA was designed to protect," and, "as such, he [was] not merely pursuing a *parens patriae* action, and he possesse[d] the requisite standing to enforce his procedural rights under NEPA."  *Id.*

The same is true here.  State waterways flow adjacent to the Williamsport Warehouse's boundaries and are home to several protected species.  *See generally* ECF 15-8; ECF 15-16; *see*

---

[10] *See also Hodges*, 300 F.3d at 444 ("The Supreme Court has clearly established that a *parens patriae* action cannot be maintained against the Federal Government. . . . As such, if Governor Hodges seeks only to protect the health and well-being of the residents of South Carolina, his action is of the *parens patriae* variety, and it may not be pursued.").

*also* ECF 15-1, at 34 (explaining that "[t]he Williamsport Warehouse is within a half-mile radius of two Ecologically Significant Areas and is in the watershed of three State waterways which provide habitat for numerous State protected species and contain important, unique, and sensitive natural resources and ecological features").  The State is thus not merely pursuing a *parens patriae* action, but instead is "essentially a neighboring landowner, whose property is at risk of environmental damage" from Defendants' proposed actions at the Williamsport Warehouse. *Hodges*, 300 F.3d at 445.[11]

Finally, Defendants attempt to analogize this case to *South Carolina v. United States*, 912 F.3d at 720, a more recent Fourth Circuit decision holding that a state did not have standing to pursue its NEPA claims because its alleged injury was too attenuated.  However, the Court stands by its prior analysis distinguishing that case.  *See* ECF 8, at 4 n.3.  In *South Carolina v. United States*, the state plaintiff, South Carolina, asserted that its alleged injury was the potential for the state to be "rendered the permanent repository of weapons-grade plutonium as a result of [the Department of Energy's] decision to terminate" the construction of a facility at the Savannah River Site in South Carolina designed to dispose of nuclear material utilizing "a new mixed oxide fuel fabrication facility (the 'MOX facility')." *Id.* at 723, 727.  The termination of the construction of the MOX facility, South Carolina claimed, increased the likelihood of the long-term storage of weapons-grade plutonium at the site which, in turn, increased the risk of, among other issues, damage to the environment. *Id.* at 725.  South Carolina sued and alleged, in part, that the federal

---

[11] At the April 15, 2026 hearing on the motion, Defendants appeared to argue that *Hodges* should be limited to cases involving plutonium or other scenarios involving similar allegations of potentially catastrophic environmental impacts.  However, the Court disagrees that the Fourth Circuit premised its finding of standing in *Hodges* on the magnitude of the potential environmental damage as it merely noted that Hodges stood in the shoes of a property owner whose land was "at risk of environmental damage[.]" *Hodges*, 300 F.3d at 445.

government "violated NEPA by failing to prepare a supplemental Environmental Impact Statement [EIS] covering a period of more than fifty years[.]" *Id.*

The Fourth Circuit concluded that South Carolina's theory of standing was too attenuated, in part because "[b]etween [the date of its decision] and 2046—when the analysis in the current [EIS] governing the risks associated with long-term storage of weapons-grade nuclear material at the Savannah River Site expires—the Department of Energy has twenty-eight years to identify an alternative method for disposing of the nuclear material or otherwise removing it from South Carolina." *Id.* at 728.  Moreover, "[t]he Secretary of Energy already ha[d] certified that one potential alternative to the MOX program exist[ed], the Dilute and Dispose method." *Id.*  Unlike South Carolina's theory of standing in that case, Maryland's alleged injury here is imminent, not conjectural or hypothetical, and the environmental harms it alleges will flow from Defendants' failure to prepare an EIS or EA stand to occur within the next few months,[12] on the date the Williamsport Warehouse's contract regarding renovation of the facility for use as a detention and processing center was originally set to be completed.  Accordingly, the Court does not find persuasive Defendants' challenge to the State of Maryland's standing to bring this action and reaffirms the decision on standing made in the prior ruling on the TRO.  *See* ECF 8, at 3–5.

---

[12] Defendants now represent that they will not proceed with further retrofitting efforts at the warehouse until additional NEPA analysis is completed.  *See* ECF 34-2, at 5 ¶ 11 ("Part of this assessment is the planned population for the facility—initial plans are for approximately 540 but the facility could ultimately house 1,500 detainees. Once those plans are nearer finalization, ICE will conduct additional NEPA analysis based on those plans before it makes a final decision on its plan for retrofitting the warehouse for housing detainees.").  But without any indication of how long such analysis will take, and given the evidence that the agency's prior "analysis" may have begun and been completed within a single day, *see* ECF 34-1, at 2, the Court does not view these new representations to affect the State's standing.

**B.      Mootness and Ripeness**

Next, the Court addresses Defendants' suggestion that voluntary cessation impacts the justiciability of this lawsuit. Defendants now suggest that the action is not actually ripe (and also that the State cannot establish irreparable harm) because "ICE will conduct additional NEPA analysis before it makes a final decision on its plan for retrofitting the warehouse for housing detainees." ECF 34-2, at 4 ¶ 8. Specifically, DeGregorio suggests that the plan to retrofit the warehouse for detainees is not yet finalized—"initial plans are for approximately 540 but the facility could ultimately house 1,500 detainees." *Id.* at 5 ¶ 11. According to DeGregorio, "[o]nce those plans are nearer finalization, ICE will conduct additional NEPA analysis based on those plans before it makes a final decision on its plan for retrofitting the warehouse for housing detainees." *Id.*; *see also* ECF 34-3, at 6 ¶ 13 ("ICE will conduct additional NEPA analysis before it makes a final decision on its plan for retrofitting the warehouse for housing detainees.").

The Court must consider the effect of the Defendants' claims of temporary voluntary cessation of the work the State primarily opposes—i.e., the retrofitting of the warehouse for approximately 1,500 detainees—on the pending request for preliminary injunctive relief. Mootness, ripeness, and irreparable injury are all issues to be explored. The Court first addresses mootness and ripeness and later turns to the question of irreparable harm.

1.      Mootness

"It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). If it did, courts would be compelled to leave a defendant "free to return to his old ways." *Id.* (quoting the same). "In accordance with this principle, the standard [the Supreme Court has] announced for determining whether a case has

been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)). The Supreme Court has described the standard as a "heavy burden." *Id.* (quoting the same).

That high bar is not cleared here.[13] Far from suggesting that there is no reasonable expectation that the allegedly wrongful behavior might reoccur, Defendants' declarations, at best, merely identify that they have yet to decide on the precise scope of their efforts to convert the Williamsport Warehouse into a detention center. *See, e.g.*, ECF 34-2, at 5 ("Part of this assessment is the planned population for the facility—initial plans are for approximately 540 but the facility could ultimately house 1,500 detainees."). And although Defendants state that "additional NEPA analysis" will occur prior to making a final decision on plans to expand the capacity of the proposed detention and processing facility beyond 542 people, Defendants do not specify what additional NEPA analysis they will undertake or when it will be undertaken. *See* ECF 34-2; ECF 34-3. Moreover, Defendants maintain that they have fully complied with NEPA as it relates to the creation of a detention and processing facility that will hold roughly 542 people and thus, without further action, could seek to renovate the facility to meet that goal at any time. ECF 34, at 17 ("Before acquiring the subject property, the agency determined that the acquisition and retrofitting of the property to house approximately 540 detainees fell within three DHS CEs: C1, D1, and

---

[13] Perhaps in recognition of this conclusion, Defendants do not argue that this case is moot. Nevertheless, because the Defendants' representations after the State's filing of the motion for a PI raise the potential for mootness, and "mootness implicates [the Court's] Article III jurisdiction," the Court has "an obligation to address it sua sponte." *Wild Virginia*, 56 F.4th at 292 (citing *Castendet-Lewis v. Sessions*, 855 F.3d 253, 260 (4th Cir. 2017)).

E2.").[14]  Indeed, Defendants have already purchased the Williamsport Warehouse for over $100 million, ECF 15-1, at 15, and signed a contract obligating $113.1 million to their efforts with the potential to obligate up to $641.8 million, *id.* at 19.  Accordingly, the lawsuit is not moot.

        2.      Ripeness

Unlike mootness, Defendants *do* argue (albeit in a footnote) that the case carries ripeness concerns.  *See* ECF 34, at 27 n.5.  "The doctrine of ripeness arises from the case or controversy requirement of Article III."  *Wild Virginia*, 56 F.4th at 293 (quoting *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022)).  "For that reason, it 'presents the threshold question whether a claim is justiciable.'"  *Id.* (quoting the same).  While the Court has "a burden to *address* Article III jurisdiction sua sponte, the burden remains on Plaintiffs to *demonstrate* that the claim is ripe."  *Id.* (emphasis in original).  "While standing involves 'the question[ ] of *who* may sue,' ripeness involves '*when* they [may] sue.'"  *Id.* (alterations in *Wild Virginia*) (quoting *South Carolina*, 912 F.3d at 730).  "[B]ecause ripeness is peculiarly a question of timing," the Court "may look to factual developments that occurred after the complaint was filed to determine

---

[14] The Court appreciates Defendants' pledge—offered for the first time at the hearing—to provide the State with fourteen (14) days' notice of any efforts to commence significant efforts to renovate the Williamsport Warehouse.  However, it appears from the record that Defendants previously failed to coordinate with State officials on the decision to purchase and retrofit the warehouse and DHS's precise description of the scope of project has not always been consistent.  It is also clear to the Court, as described *infra* note 28, that this promise to give notice could be rescinded or modified if there is a change in DHS leadership or relevant personnel.  As such, the Court cannot conclude that this pledge to cooperate changes the analysis.  To the extent Defendants may contend in the future that they have complied with the dictates of NEPA and wish to commence construction on the detention facility, nothing prevents them from notifying the Court and seeking a modification of the preliminary injunction.

whether [the plaintiff]'s claims were ripe for review at the time of the district court's judgment." *Id.* at 293–94 (internal quotation marks omitted) (quoting *Whitaker*, 42 F.4th at 208).

"A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Id.* at 294 (internal quotation marks omitted) (quoting *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013)). "In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)); *see also Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018) ("In reviewing a ripeness claim, we consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." (cleaned up)). In making such a determination, the Supreme Court has instructed lower courts to consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733.

With respect to a NEPA challenge, the Supreme Court has stated that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* at 737. The Fourth Circuit has provided additional guidance as to the meaning of this sentence: "in citing 'NEPA procedure,' the Supreme Court was specifically referring to 'an environmental impact statement prepared pursuant to NEPA' and stating that *a challenge to an improperly prepared environmental*

34

*impact statement* would be ripe." *Wild Virginia*, 56 F.4th at 297 (emphasis in original) (citation omitted). Relatedly, the D.C. Circuit has observed that the Supreme Court's statement in *Ohio Forestry Association* "was not resolving the point at which such a violation would occur," only that a NEPA challenge would be ripe when the violation in fact occurred. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 481 (D.C. Cir. 2009). In assessing when that violation occurred in this case, the Court keeps in mind that "a plaintiff's claim is not ripe for judicial review 'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *South Carolina*, 912 F.3d at 730 (quoting *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013)). "To be sure, ripeness can rest on anticipated future injury." *Wild Virginia*, 56 F.4th at 295. But "[a]t bottom, 'the purpose of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.*

The State frames its case in its principal memorandum in support of the motion for a preliminary injunction as a challenge to the "decision to purchase the Williamsport Warehouse for the purposes of converting it into an immigration detention facility." ECF 15-1, at 31. However, in its reply memorandum, the State appears to re-frame the challenge as one related to Defendants' awarding "a contract to retrofit and operate the facility." ECF 37, at 5. For purposes of ripeness, however, the Court may consider *all* the events that have transpired since the filing of the lawsuit, including the fact that Defendants have now awarded a contract "to procure the renovation of existing, ICE-owned permanent structure in Hagerstown, MD to serve as a processing and detention facility and to provide all necessary wraparound services for operation of the facility."

35

March 6 Contract, https://perma.cc/2H9A-RJDP (capitalization altered); *see Wild Virginia*, 56 F.4th at 293–94.

With respect to the first prong of the ripeness analysis, the Court concludes that the events that have transpired so far make this case fit for judicial decision—specifically, the purchase of the Williamsport Warehouse together with the award of the contract to renovate it "to serve as a processing and detention facility." *See Deal*, 911 F.3d at 191 ("In reviewing a ripeness claim, we consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." (cleaned up)). Here, the agency has already identified the categorical exclusions it deems applicable to the proposed action, and the REC identifies the proposed action as a single action, rather than a part of a larger one. *See* ECF 34-1, at 22. But regardless of what type of NEPA analysis was employed to commence the purchase and renovation of the Williamsport Warehouse, the Court has no trouble concluding that the purchase of the building together with the award of the contract to transform it into a detention and processing facility has not created some "abstract disagreements over administrative policies" between the parties. *Wild Virginia*, 56 F.4th at 295. Rather, that commitment of agency resources here reflects "an administrative decision [that] has been formalized," for which the State will feel "its effects . . . in a concrete way" in the immediate future. *Id.*

Nevertheless, "[t]o be fit for judicial review, a controversy should be presented in a 'clean-cut and concrete form.'" *South Carolina*, 912 F.3d at 730 (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)). "This occurs when the action is 'final and not dependent on future uncertainties or intervening agency rulings.'" *Id.* (quoting *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002)). Defendants' footnote on ripeness suggests that "numerous 'contingent future events[]'" must occur before" the Williamsport Warehouse can be transformed into a detention and

36

processing center. *Id.* at 731 (citation omitted); *see* ECF 34, at 27 n.5. In truth, however, every action Defendants needed to take to execute their proposal—with the possible exception of some additional analysis under NEPA, which is the very question before the Court—is complete. Defendants determined certain categorical exclusions applied to their proposed course of action, completed a REC, purchased the warehouse, and awarded a potentially multi-hundred-million-dollar contract to execute their plan. Simply stated, there is no better time for Plaintiffs to raise NEPA compliance than now as Defendants are ready and able to commence the transformation of the Williamsport Warehouse into a detention center at any moment.

Defendants identify no law or regulation that would constrain their continued undertaking to transform the Williamsport Warehouse into a detention center capable of holding 542 people. *See* Department of Homeland Security Directive No. 023-01 Rev. 01; DHS NEPA Instruction Manual, at ECF 15-4. Neither does the applicable manual identify some additional condition precedent needed to proceed with work at the project site. *Cf.* DHS NEPA Instruction Manual, at 13 ("Because of the diversity of DHS," the DHS NEPA Instruction Manual states that "it is not feasible to describe . . . the decision-making process for every DHS program."). Defendants have submitted declarations stating that they "will conduct additional NEPA analysis before [they] make[] a final decision on [their] plan for retrofitting the warehouse for housing detainees." ECF 34-2, at 4 ¶ 8; *see also* ECF 34-2, at 5 ¶ 11. Those declarations, however, do not suggest that Defendants are obligated to do so. *Cf. South Carolina*, 912 F.3d at 731 (holding NEPA challenge was not ripe for judicial review where the "Department of Energy must fail to identify an alternative method of disposal and breach its commitment to dispose of" nuclear waste and "Congress or the courts must set aside or refuse to enforce the statutory mechanisms currently in place to ensure timely removal of the nuclear material" before the injury alleged would occur);

37

*Ohio Forestry Ass'n, Inc.*, 523 U.S. at 734 (finding that challenge to the provisions of a plan was not ripe under NEPA where "before the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court"). Indeed, the passing reference to additional NEPA analysis could mean that Defendants will simply invoke another categorical exclusion and proceed with the construction and operation of a detention facility without any further notice. *See supra* note 14.

Second, the Court finds that withholding judicial review of the action now would cause the State significant hardship. As the State points out, Defendants take the position that "they need never publish or otherwise provide public notice if that further review is conducted pursuant to a categorical exclusion." ECF 37, at 21–22 (citing ECF 34, at 25). "Absent a preliminary injunction, significant construction and retrofitting efforts at the Williamsport Warehouse could begin at any moment, without any warning to the State or this Court." *Id.* at 22. Since significant construction and even the subsequent operation of the facility can occur without any future notice to the State, the Court is left to conclude that the State does not "have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 734; *see also Airport Neighbors All., Inc. v. United States*, 90 F.3d 426, 428 (10th Cir. 1996) ("Ordinarily, a NEPA claim no longer presents a live controversy when the proposed action has been completed and when no effective relief is available."). And noting that the harm alleged by the State flows from continued construction on the project and its eventual operation, the State is likely to incur hardship by waiting for further developments. *See* ECF 15-1, at 21 ("Once

construction begins and Maryland's natural resources and environment are injured, there is no turning back."). Accordingly, the Court concludes that the action is ripe.

### C. Likelihood of Success on the Merits

"A plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed at trial." *Di Biase*, 872 F.3d at 230 (4th Cir. 2017) (citing *Pashby*, 709 F.3d at 321). Therefore, the State bears the burden of clearly showing that Defendants violated NEPA in pursuing their undertaking at the Williamsport Warehouse.[15]

The State argues that "Defendants violated NEPA's action-forcing mandate by failing to prepare any environmental document prior to purchasing the property for their intended purposes." ECF 15-1, at 30. The State contends that absent the "meaningful public engagement [that] is integral to the NEPA process," Defendants "have fallen short of the 'hard look' required by NEPA." *Id.* at 30–31 (citing *Robertson*, 490 U.S. at 351). Defendants respond that the State's claims "are premised on the false assumption that Defendants failed to conduct NEPA review on the Maryland processing and detention center." ECF 34, at 13. Defendants specifically contend that they did follow the law because "[a]pplying a [categorical exclusion] is a wholly appropriate means to comply with NEPA," and Defendants argue they "did so here by applying three [categorical exclusions] to the acquisition and retrofitting of the property for its initial capacity of approximately 540 individuals." *Id.*

#### 1. The Supreme Court's Recent NEPA Guidance

The United States Supreme Court recently heard a challenge to an EIS under NEPA in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025). Although

---

[15] Courts may begin their analysis of a motion for a preliminary injunction with any of the *Winter* factors. *Washington Post v. McManus*, 355 F. Supp. 3d 272, 305 (D. Md. 2019), *aff'd*, 944 F.3d 506 (4th Cir. 2019).

the case before this Court differs from that one in many respects, the Supreme Court in *Seven County* speaks broadly about NEPA in a way that informs the analysis of the instant dispute. *See generally id.* There, "the Seven County Infrastructure Coalition—a group of seven Utah counties—applied to" the U.S. Surface Transportation Board (the "Board") "for approval of an 88-mile railroad line in northeastern Utah." *Id.* at 174. "After receiving an application for a new railroad line, the Board issues a public notice and initiates an agency proceeding to review the proposal; alternatively, the Board may streamline approval through a statutory exemption process." *Id.* (quoting 49 U.S.C. §§ 10101, 10502, 10901). "In addition, for covered projects, NEPA compels the Board to prepare an environmental impact statement, or EIS." *Id.* Seven County Infrastructure Coalition's application prompted the Board to prepare an EIS, which "clocked in at more than 3,600 pages." *Id.* at 175. "In the wake of the Board's final approval, a Colorado county and several environmental organizations sued by filing petitions for review in the U.S. Court of Appeals for the D.C. Circuit." *Id.* at 176. "The D.C. Circuit found 'numerous NEPA violations arising from the EIS.'" *Id.* "Specifically, the Court of Appeals held that the Board impermissibly limited its analysis of upstream and downstream projects." *Id.* at 177. The Supreme Court granted certiorari on the petition filed by the Coalition and railway and reversed. *See id.* at 177–79.

In so holding, the Supreme Court explained that it "disagree[d] with the D.C. Circuit's decision on two grounds." *Id.* at 179. First, and most relevant to courts considering NEPA challenges of any kind, the Supreme Court concluded that the D.C. Circuit "did not afford the Board the substantial judicial deference required in NEPA cases." *Id.* The Supreme Court explained, "[a]s a general matter, when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." *Id.* (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S.

40

369, 391–92 (2024)). "But when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Id.* at 179–80. "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id.* at 180 (citing *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

"In practice," the Supreme Court explained that "judicial deference in NEPA cases can take several forms." *Id.* "For example, NEPA says that the EIS should be 'detailed.'" *Id.* (quoting 42 U.S.C. § 4332(2)(C)). "Of course, the meaning of 'detailed' is a question of law to be decided by a court." *Id.* (citing *Loper Bright*, 603 U.S. at 391–92). But when it comes to answering the question of "what details need to be included in any given EIS," the Supreme Court noted that "[f]or the most part, that question does not turn on the meaning of 'detailed'—instead, it 'involves primarily issues of fact.'" *Id.* at 180–81. (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989)). "The agency is better equipped to assess what facts are relevant to the agency's own decision than a court is." *Id.* at 181. "As a result, 'agencies determine whether *and to what extent* to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process.'" *Id.* (emphasis in original) (quoting *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004)). The Supreme Court warned that "[b]revity should not be mistaken for lack of detail." *Id.* "To tie all of this together: When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry[.]" *Id.* at 182–83. "Courts should afford substantial deference and should not micromanage those

41

agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183. "As the Court has emphasized on several occasions, . . . 'inherent in NEPA . . . is a rule of reason, which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process.'" *Id.* (internal quotation marks omitted) (quoting *Public Citizen*, 541 U.S. at 767).

Moreover, "courts not only must defer to the agency's reasonable choices regarding the scope and contents of the EIS, but also must keep in mind that review of an agency's EIS is not the same thing as review of the agency's final decision concerning the project." *Id.* at 184. "The ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Id.* at 184–85. "Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Id.* at 185.

The Supreme Court observed that "[s]ome courts have strayed and not applied NEPA with the level of deference demanded by the statutory text and this Court's cases." *Id.* at 183. The Court noted that the "upshot" of straying from that deference has "transformed" NEPA "from a modest procedural requirement into a blunt and haphazard tool employed by project opponents (who may not always be entirely motivated by concern for the environment) to try to stop or at least slow down new infrastructure and construction projects." *Id.* For example, "[s]ome project opponents have invoked NEPA and sought to enlist the courts in blocking or delaying even those projects that otherwise comply with all relevant substantive environmental laws." *Id.* The increased time and cost means "[f]ewer projects make it to the finish line. Indeed, fewer projects make it to the starting line." *Id.* at 183–84. That is why reviewing courts must remember their

42

limited role in NEPA challenges. *See id.* at 185. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.*

### 2. Framework for Analyzing Application of Categorical Exclusions

With those general principles in mind, the Court turns to the specific features of the case before it. Often, NEPA lawsuits come in the form of a challenge to the sufficiency of an EA or EIS. *See, e.g.*, *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 173–74; *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 181 (4th Cir. 2005) ("We agree with the district court that the Navy's EIS was deficient and thus hold that the Navy must complete a Supplemental EIS (SEIS) to address its shortcomings."). Not so here. This case presents a challenge to the application of an agency's categorical exclusions, and there appears to be a dearth of Fourth Circuit caselaw concerning challenges of this kind. Nevertheless, the Fourth Circuit has before entertained a challenge to an agency's application of categorical exclusions under NEPA. *See City of Alexandria, Va. v. Fed. Highway Admin.*, 756 F.2d 1014 (4th Cir. 1985). From that case, and additional persuasive case law in other circuits that accord with the reasoning articulated in this Circuit, the Court gleans a framework for how to assess the merits of this lawsuit.

The State brings two claims under the APA: (1) that Defendants' actions are contrary to law, specifically NEPA; and (2) that Defendants' actions are arbitrary and capricious. *See* ECF 1, at 24 (Count I), at 36 (Count II). "A federal agency's compliance with NEPA . . . is subject to review under the Administrative Procedures Act[.]" *Sierra Club v. United States*, 255 F. Supp. 2d 1177, 1181 (D. Colo. 2002). As a general matter, "[i]n reviewing an agency's efforts to comply with NEPA," the Court must "perform a two-step analysis." *Hodges*, 300 F.3d at 445. First, the Court examines "whether the agency took a 'hard look' at a proposed project's environmental effects before acting." *Id.* (quoting *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996)). "In essence," that inquiry asks "whether 'the adverse environmental

43

effects of the proposed action [were] adequately identified and evaluated' prior to final decisionmaking.'" *Id.* (alteration modified) (quoting *Robertson*, 490 U.S. at 350). If the answer is yes, the Court "must then consider whether the agency's conclusions are arbitrary or capricious." *Id.* (citing *Hughes River*, 81 F.3d at 443). "If the agency has followed the proper procedures, and if there is a rational basis for its decision, [the Court] will not disturb its judgment." *Id.* (alteration added).

Categorical exclusions fit into that framework a bit differently than an EA or EIS. An established categorical exclusion reflects that an agency has already taken a "hard look" at a certain *type* of agency action. *See* 42 U.S.C. § 4336e(1). That is why an agency "is not required to prepare an environmental document with respect to a proposed agency action if . . . the proposed agency action is excluded pursuant to one of the agency's categorical exclusions." *Id.* § 4336(a)(2); *see also Salazar*, 706 F.3d at 1096 ("Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary."). Accordingly, the "hard look" the agency must take at a proposed action to conclude it falls within the scope of a categorical exclusion need not be detailed or lengthy. *See, e.g.*, *Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) ("Documentation of reliance on a categorical exclusion need not be detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did."); *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) ("In many instances, a brief statement that a categorical exclusion is being invoked will suffice. Here, concern for adequate justification of the categorical exclusion is heightened because there is substantial evidence in the record that exceptions to the categorical exclusion are applicable.").

44

To conclude otherwise would defeat the very purpose of categorical exclusions. *See Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th Cir. 2023) ("[T]he entire point of categorical exclusions is to reduce the administrative burden of approving certain projects.").

Consequently, in NEPA cases involving the application of categorical exclusions, the role of the Court is not to question the categorical exclusion itself or the extensiveness of review in which the agency reached its conclusion to apply it, but rather to consider whether the ultimate conclusion reached to apply the categorical exclusion was arbitrary or capricious. *See City of Alexandria*, 756 F.2d at 1017 (concluding that the provision of the APA "relevant to a nonadversarial decision not to prepare an environmental impact statement (EIS), and therefore the standard that we apply, permits us to set aside agency conclusions only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'" (quoting 5 U.S.C. § 706(2)(A)). "Agency action is arbitrary and capricious if the agency relies on factors that Congress did not intend for it to consider, entirely ignores important aspects of the problem, explains its decision in a manner contrary to the evidence before it, or reaches a decision that is so implausible that it cannot be ascribed to a difference in view." *Ergon-W. Virginia, Inc. v. United States Env't Prot. Agency*, 980 F.3d 403, 410 (4th Cir. 2020) (quoting *United States v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993)).

Moreover, "[i]t is well-established that 'an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations.'"[16] *Red Wolf Coal. v. United*

---

[16] *See also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required."); *Healey v. McDonough*, 33 Vet. App. 312, 321 (2021) ("This squares with a longstanding practice of requiring an agency to follow its own internal guidance and policies even when they impose obligations beyond those imposed by binding legal authorities.").

*States Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 811 (E.D.N.C. 2018) (quoting *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. Envtl. Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014)).  In assessing an agency's adherence to its own categorical exclusions, the Fourth Circuit has stated "[s]o long as no project required to be included under the statute is excluded under the regulations, we should defer to the agency's interpretation of its own regulations." *City of Alexandria*, 756 F.2d at 1020.[17] But considering whether an agency has complied with the text of "more specific examples of categorical exclusions listed in the regulations" is not contrary to that principle of deference— indeed, in *City of Alexandria*, the Fourth Circuit considered the meaning of the phrase "access control" in a particular categorical exclusion applied by the agency to justify a highway ramp metering project and it concluded that neither that phrase, nor anything else "in the listed categorical exclusions themselves . . . preclude[d] their application" to the project at issue. *Id.* at 1019; *see also Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999) ("We agree that an agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight *unless plainly erroneous or inconsistent with the terms used in the regulation*." (emphasis added) (citing *City of Alexandria*, 756 F.2d at 1020)).

It also bears noting that federal courts have generally rejected an agency's invocation of a categorical exclusion as arbitrary and capricious when the agency has "provided no evidence whatsoever of such a determination being made before" a decision was finalized.  *See Edmonds*

---

[17] The Fourth Circuit has noted that "[t]he Supreme Court's recent ruling in *Loper Bright Enterprises v. Raimondo* calls into question the viability of *Auer* deference," or the general rule that courts should defer to an agency's interpretation of its own regulations when such regulations are ambiguous, because in *Loper Bright* the Supreme Court "rejected the long-standing notion that 'ambiguities' in statutory language act as 'implicit delegations to agencies.'" *United States v. Boler*, 115 F.4th 316, 322 n.4 (4th Cir. 2024) (citation omitted); *see also Auer v. Robbins*, 519 U.S. 452 (1997).  However, "[s]ince *Loper Bright* dealt specifically with ambiguities in statutory directives to agencies and did not address the issue of agency interpretations of their own regulations," the Fourth Circuit has continued to apply *Auer* deference.  *See id.*

*Inst. v. Babbitt*, 42 F. Supp. 2d 1, 18 (D.D.C. 1999) (citing *Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 481 (D.D.C.1994); *Fund for Animals v. Espy*, 814 F. Supp. 142, 149–51 (D.D.C. 1993)); *Mainella*, 375 F.3d at 1095 ("After reviewing the record, we cannot find any indication that the Park Service considered the application of the categorical exclusion prior to its decision, nor does the agency direct our attention to any such evidence."); *California*, 311 F.3d at 1175 ("The Environmental Groups argue that the United States cannot rely on the categorical exclusion because the United States did not make a categorical exclusion determination at the time it granted the lease suspensions."); *Oak Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 845–46 (E.D. Tenn. 2019) ("Indeed, in the cases courts have found the invocation of a categorical exclusion to be arbitrary and capricious, it is usually because the agency produced *no* NEPA documentation whatsoever, or only provided its justification for the categorical exclusion after making its determination.").

3.   Analysis of the Categorical Exclusions Applied Here

Defendants argue that the action at issue here fell into three DHS categorical exclusions. *See* ECF 34, at 17–18. As discussed earlier, those categorical exclusions are as follows:

- C1 - Acquisition of an interest in real property that is not within or adjacent to environmentally sensitive areas, including interests less than a fee simple, by purchase, lease, assignment, easement, condemnation, or donation, which does not result in a change in the functional use of the property.

- D1 - Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property (e.g. realigning interior spaces of an existing building, adding a small storage shed to an existing building, retrofitting for energy conservation, or installing a small antenna on an already existing antenna tower that does not cause the total height to exceed 200 feet and where the FCC would not require an EA or EIS for the installation).

- E2* - New construction upon or improvement of land where all of the following conditions are met:

47

- o (a) The structure and proposed use are compatible with applicable Federal, tribal, state, and local planning and zoning standards and consistent with federally-approved state coastal management programs,
- o (b) The site is in a developed area and/or a previously-disturbed site,
- o (c) The proposed use will not substantially increase the number of motor vehicles at the facility or in the area,
- o (d) The site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings, and,
- o (e) The construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.).

ECF 34-1, at 3–4; DHS NEPA Instruction Manual, app. A, table 1 (list of categorical exclusions), at A-1 through A-27.

The State first interprets the Defendants' invocation of *three* categorical exclusions as an attempt to "stack" the categorical exclusions together to cover the proposed action. *See* ECF 37, at 10. The State then argues that such an approach is inconsistent with NEPA, as the Ninth Circuit held in *Friends of the Inyo v. United States Forest Service*, 103 F.4th 543 (9th Cir. 2024). *See id.* at 10–11. In *Friends of the Inyo*, the parties agreed that neither categorical exclusion applied by the Forest Service could cover the project alone. 103 F.4th at 553. The Ninth Circuit thus had to decide whether the Forest Service could combine categorical exclusions to approve a proposed action when neither alone would be sufficient. *See id.* The Ninth Circuit evaluated the text, history, structure, and purpose of the Forest Service's regulation governing categorical exclusions. *See id.* at 555–56. In so doing, it also invoked the "purpose of NEPA." *Id.* at 556. As the court explained, categorical exclusions "are designed to streamline" the process of review under NEPA "when a class of proposed actions has been found to have little to no effect on the environment." *Id.* "But when an agency applies [categorical exclusions] in a way that circumvents NEPA's

procedural requirements and renders the environmental impact of a proposed action unknown, the purpose of the exclusions is undermined."[18] *Id.*

To the extent that Defendants have attempted to stack categorical exclusions to cover the proposed action, the Court finds the reasoning of *Friends of the Inyo* persuasive. However, Defendants' opposition memorandum does not appear to suggest, let alone concede, that any one of the categorical exclusions invoked are incapable of covering the entirety of the proposed action. *See* ECF 34, at 17–22. Rather, Defendants argue that the proposed action meets each requirement of all three categorical exclusions. Thus the motion cannot be decided solely by addressing the issue of stacking. However, in addition to its "stacking" argument, the State challenges the application of each categorical exclusion individually. *See* ECF 27, at 11–14. The Court will address each argument in turn but pauses to make two points at the outset.

First, the Court takes a step back from its assessment of the particular categorical exclusions invoked and emphasizes the animating text of NEPA. The claim that the conversion of a commercial warehouse equipped with four toilets and two water fountains and designed for cargo storage into a detention center capable of housing over 500 people is the type of action that would not "normally . . . significantly affect the quality of the human environment" is, bluntly, absurd. *See* 42 U.S.C. § 4336e(1); *see also* ECF 15-1, at 16; ECF 15-13, at 4; ECF 34, at 10; ECF 15-4, at 66. As such, even before the Court examines the text of those exclusions, Defendants'

---

[18] This analysis closely parallels case law related to "segmentation." In complying with NEPA, "[a]gencies may not engage 'in segmentation, which involves an attempt to circumvent NEPA by breaking up one project into smaller projects and not studying the overall impacts of the single overall project.'" *Defs. of Wildlife*, 762 F.3d at 394 (internal quotation marks omitted) (quoting *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012)). Here, however, a challenge based on segmentation is not a perfect fit, since Defendants have not attempted to characterize their undertakings at the Williamsport Warehouse as multiple related proposals. *See* ECF 34, at 22–26; ECF 34-1, at 22.

application of categorical exclusions to this proposed action raises a red flag that this is a "decision that is so implausible that it cannot be ascribed to a difference in view." *Ergon-W. Virginia, Inc.*, 980 F.3d at 410 (quoting *F/V Alice Amanda*, 987 F.2d at 1085).

Second, the Court has serious concerns about the timing of Defendants' decision-making in this case in relation to the record regarding when Defendants actually applied the categorical exclusions. As discussed, federal courts have consistently held that agency application of a categorical exclusion is arbitrary and capricious where there is no indication in the record that the agency "considered the application of the categorical exclusion prior to its decision" or where it "only provided its justification for the categorical exclusion after making its determination." *Mainella*, 375 F.3d at 1095; *Perry*, 412 F. Supp. 3d at 845–46. The only evidence of that determination is the REC and its supporting documentation, and the REC itself is a 5-page, undated document in Exhibit 1 digitally signed by three signatories on January 15, 2026, all after 4:00 p.m. *See* ECF 34-1, at 21–25.

Defendants' manual requires preparation of a REC after a determination is made that a categorical exclusion with an asterisk applies to the proposed action (here, E2*). *See* DHS NEPA Instruction Manual, at II-1; *see also id.* at V-3 (flow chart). The first page of the REC's supporting documentation suggests that it was completed in just one day—although letters sent on January 12th to two Native American Tribes perhaps indicate that its creation took three days. *See* ECF 34-1, at 2 ("In Preparation (01/15/2026)," "Environmental Review (01/15/2026)," "Senior Environmental Review (01/15/2026)," "Proponent Review (01/15/2026)," and "Project Approved (01/15/2026)"); *see also id.* at 17, 20. It is true that a review of the U.S. Fish and Wildlife Service "Information for Planning and Consultation (IPaC) tool was conducted on December 15, 2025, to identify potential impacts to federally protected species and critical habitats within the Project

50

site," which is referenced in the REC's supporting documentation, *see, e.g.*, ECF 34-1, at 8, but it is unclear how that review relates to Defendants' original determination to apply the categorical exclusions.

Thus, beyond the existence of the REC itself, the Court has little indication of when Defendants first determined that categorical exclusions applied to the proposed action.[19] Further, although the general warranty deed for the property is dated January 16, 2026, ECF 15-5, at 3, it is notarized on January 15, 2026, *id.* at 5, suggesting that the REC was completed the *very same day* Defendants proceeded with their proposed action and purchased the Williamsport Warehouse for over a hundred million dollars. To be sure, the purpose of a categorical exclusion "is to reduce the administrative burden of approving certain projects." *See Muldoon*, 82 F.4th at 636. But it is not meant to eliminate that burden altogether. The agency still must make the determination that the categorical exclusions apply, and must do so at the appropriate time. *See Edmonds Inst.*, 42 F. Supp. 2d at 18 ("As a preliminary matter, it is significant (practically determinative, in fact) that, while defendants have relied on a categorical exclusion before this Court, they have provided no evidence whatsoever of such a determination being made before the CRADA was finalized. . . . [A] post hoc invocation of a categorical exclusion during litigation cannot justify a failure to prepare an EA or EIS."). The existence of a REC provides some evidence that the determination occurred, but the timing of this REC suggests that the determination that categorical exclusions applied was a farce made without any serious consideration since the timeline leads little to no room for Defendants to back out of the deal if, somehow, the review memorialized in the REC came down differently. More generously, the Court has serious concerns that Defendants actually

---

[19] At the hearing, Defendants' counsel was unable to provide the Court with any details regarding the timeline of Defendants' process of preparing the REC or applying the categorical exclusions. ECF 34-1, at 2.

determined the categorical exclusions applied to the proposed action before making the final decision to take such action.

Regardless, the Court need not find the point determinative of the State's likelihood of success on the merits. Even assuming Defendants actually determined that the categorical exclusions applied to the proposed action, their application here was clearly arbitrary. Starting with exclusions C1 and D1, both categorical exclusions apply only if the proposed action does not result in a "change in the functional use of the" property. *See* ECF 34-1, at 3–4. The State argues that the phrase "functional use" bars their application here. C1 falls under the header "real estate activities" in the DHS NEPA Instruction Manual. *See* DHS NEPA Instruction Manual, at A-6. D1 lives under the heading "repair and maintenance activities." *Id.* at A-7. D1 uses the same "functional use" phrase, but with respect to "real" property in particular. *Id.* Unlike C1, D1 includes examples, such as "realigning interior spaces of an existing building, adding a small storage shed to an existing building, retrofitting for energy conservation, or installing a small antenna on an already existing antenna tower that does not cause the total height to exceed 200 feet and where the FCC would not require an EA or EIS for the installation." *Id.*

The State argues that "a logistics warehouse does not have the same 'functional use' as a detention facility for human beings." ECF 37, at 14. Defendants argue that "functional use" refers to whether modifications to the property will occur primarily within previously disturbed areas, such that no wildlife will be impacted, attempting to graft NEPA's general definition of categorical exclusions onto the phrase "functional use." *See* ECF 34, at 20. The Court does not read C1 or D1 to accommodate Defendants' proposed meaning. Most applicably, "[r]egulations, like statutes, are interpreted according to canons of construction." *Black & Decker Corp. v. Comm'r*, 986 F.2d 60, 65 (4th Cir. 1993). "When interpreting a statute, we first consider the plain meaning of the

52

statutory language." *Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 601 (4th Cir. 2017). "The Court 'must also consider the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. Tunis*, Crim. No. 25-243-ABA, 2026 WL 237457, at *3 (D. Md. Jan. 29, 2026) (quoting *United States v. Spirito*, 36 F.4th 191, 204 (4th Cir. 2022)).

NEPA defines "categorical exclusion" to mean "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of section 4332(2)(C) of this title." 42 U.S.C. § 4336e(1). In light of that definition and statutory context, Defendants posit that, because "the property and its preexisting 'mega warehouse' were built to be used for an endeavor requiring a massive space and many people and vehicles coming in and out," ECF 34, at 19, the functional use of a big warehouse is identical to that of a big jail and thus will have no significant environmental impact under NEPA. In essence, Defendants ask the Court to read the phrase "functional use" in C1 and D1 to simply mean "environmental impact." *See* ECF 34, at 19 ("As CEs are a type of NEPA review, the proper focus for this inquiry on functional use is environmental impact."). But in making this argument, Defendants appear to miss the forest for the trees.

First, interpreting an agency's articulations of specific categorical exclusions as essentially coextensive with the meaning of NEPA's general definition of such exclusions risk rendering the specific articulations superfluous. *See Black & Decker Corp.*, 986 F.2d at 65 ("Regulations, like statutes, are interpreted according to canons of construction. Chief among these canons is the mandate that 'constructions which render regulatory provisions superfluous are to be avoided.'" (quoting *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976))). Defendants essentially ask the Court to read "change in the functional use" as meaning an action that has no environmental impact

as defined in NEPA—i.e., a change that would not "significantly affect the quality of the human environment." *See* ECF 34, at 19; 42 U.S.C. § 4336e(1).  Doing so runs contrary to the nature of agency-specific categorical exclusions, which identify particular *types* of actions that do not "normally . . . significantly affect the quality of the human environment."  *See* 42 U.S.C. § 4336e(1); *see also Alaska Ctr. for Env't*, 189 F.3d at 859 ("Categorical exclusions, by definition, are limited to situations where there is an *insignificant* or *minor* effect on the environment." (emphasis added)).  DHS's enumeration of these specific actions in its manual would be of no use to the agency if it meant no more than the statutory text itself.

Second, the ordinary meaning of the adjective "functional" suggests something "[s]erving, or designed to serve, a function." *Functional*, Oxford English Dictionary (rev'd 2017).  It is true that "functional use" could reasonably be interpreted to refer to both the originally intended function of something or the function that thing is serving now.  But either interpretation compels the conclusion that Defendants' proposed action creates a fundamental change in the "functional use" of the Williamsport Warehouse.  Defendants have acquired a commercial warehouse, which was never intended to house human beings.  It was built to house cargo and to facilitate its transportation.  Currently, it stands vacant.  Defendants seek to convert it into a detention and processing center capable of jailing hundreds, perhaps thousands of people, and holding many more if one accounts for staff and visitors.  It strains credulity to argue that such a conversion does not represent a massive change in the "functional use" of the property.  *Cf. Sierra Club*, 255 F. Supp. 2d at 1183 (considering the application of a categorical exclusion "limited to DOE actions which transfer property where the use of that property is unchanged such that the type and magnitude of impacts would remain essentially unchanged" and concluding that there was " no

rational basis to conclude that constructing a private mining road on this land is the same land use as researching wind energy").

Moreover, C1's limitation to an "[a]quisition of an interest in real property" also compels that conclusion. Defendants' proposed action involved far more than mere acquisition. Indeed, all categorical exclusions falling under the heading of "real estate activities" concern the acquisition, transfer, conveyance, or assignment of an interest in real property or (more recently) a property's temporary use for inspections or the transfer of use from one agency to another under an existing permit. *See* DHS NEPA Instruction Manual, at A-5 through A-7. The other exclusions in the category thus exemplify why C1 is facially inapplicable here. Even if the Court were to adopt Defendants' understanding of the term "functional use," Defendants' proposed action is *more* than just the "[a]cquisition of an interest in real property," or some other banal conveyance of land. ECF 15-4, at 64. The proposed action, according to its own description, seeks "to acquire *and retrofit*" the facility, meaning a major renovation will occur, as it must, to transform this cargo hold into a detention facility fit for human habitation. ECF 34-1, at 2 (emphasis added); *see also* March 6 Contract, https://perma.cc/2H9A-RJDP.

Defendants' attempt to apply D1, the categorical exemption for "repair and maintenance activities," fairs even worse. As examples of "[m]inor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property," D1 identifies one example as "realigning interior spaces of an existing building" and another as "adding a small storage shed to an existing building." ECF 15-4, at 65. But here, Defendants' proposed action will not just involve any one of those examples— it contemplates multiple such improvements (and more significant ones), in addition to the acquisition of the real property itself. *See* ECF 34-1, at 2 (describing the proposed action). Yet

55

Defendants cannot stack categorical exclusions in that way, accounting for both acquisition and "[m]inor renovations" by only relying on an exclusion that covers the latter. *See Friends of the Inyo*, 103 F.4th at 555–56. Moreover, Defendants cannot now piecemeal their proposed action into multiple minor renovations and additions covered by D1, since the record reflects that they considered their undertakings at the Williamsport Warehouse as a single proposed action. *See, e.g.*, ECF 34-1, at 9 ("Is the Proposed Action a piece of a larger action or connected to another action? – No"); *Nat'l R.R. Passenger Corp. v. Bos. & Maine Corp.*, 503 U.S. 407, 420 (1992) ("We recognize the well-established rule that an agency's action may not be upheld on grounds other than those relied on by the agency."); *Friends of the Inyo*, 103 F.4th at 552–53 (holding that because "the agency considered only the combined effect of the action, we must accept the agency's treatment of the entire Project as the proposed action" in the analysis of whether the categorical exclusions invoked by the agency applied).

Textually, E2* suffers for similar reasons—it is a categorical exclusion relevant to "construction, installation, and demolition activities" that covers only "[n]ew construction upon or improvement of land where" certain conditions are met, including that "[t]he construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.)." ECF 15-4, at 66. But even assuming that E2* could textually encompass this entire proposed action, including the acquisition of the property, as an "improvement of land," the Court would still find E2*'s *application* here to be arbitrary and capricious. As the Supreme Court has instructed, the Court "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys. Inc.*, 419 U.S. 281, 286 (1974)); *Muldoon*, 82 F.4th at 637. The Supreme Court's recent decision

in *Seven County*, in addition to "the purpose behind 'the abbreviated categorical exclusion process,'" guides the Court's highly deferential review of Defendants' application of the categorical exclusions to the proposed action. *Muldoon*, 82 F.4th at 637 (quoting *Salazar*, 706 F.3d at 1097).

As Defendants pointed out at the hearing, agencies have a low bar to clear. But here, there is a strong likelihood Defendants did not clear it. The REC and its supporting documentation, which purportedly justifies Defendants' decision to continue applying E2* to the proposed action in light of the heightened chance of extraordinary circumstances accompanying its application,[20] expressly *did not* determine that "[t]he construction or improvement will not result in uses that exceed existing support infrastructure capacities," specifically with respect to sewer capacity. *See* DHS NEPA Instruction Manual, at A-8. Instead, the REC and its supporting documentation repeatedly state that a determination regarding "sanitary sewer connection improvements" would be made "if required by final engineering review." ECF 34-1, at 2, 6, 21. The project's description states that "[n]o . . . capacity related improvements are included in the Project." *Id.* at 2. Yet, the REC later states that despite "[p]reliminary engineering reviews," the "Project may require upsizing or modification of the existing sanitary sewer lateral and/or point of connection to accommodate projected facility wastewater flows," and that "[f]inal confirmation of capacity and compliance would be completed through coordination with the local municipal sewer authority and would be subject to detailed engineering design and permitting." *Id.* at 9–10. The determination that a condition of a categorical exclusion may not be met in the implementation of a proposed action is contrary to a determination that "*all* of the following conditions are met," including that the proposed action "*will not result* in uses that exceed existing support

---

[20] *See* DHS NEPA Instruction Manual, at II-1.

infrastructure capacities." ECF 15-4, at 66 (emphasis added); *see Solar Energy Indus. Ass'n*, 80 F.4th at 995 ("[W]hen an agency is uncertain about the possible environmental effects of a proposed action, the proper course is to prepare an EA to the best of the agency's ability, not to avoid environmental analysis altogether.").[21]    When pressed about this inconsistency at the hearing, Defendants' counsel had no answer for what analysis was done to reach the determination that E2* applied, what was meant by "[p]reliminary engineering reviews," nor when any such analysis was completed.

Accordingly, the Court concludes that there is a strong likelihood Defendants' application of the three invoked categorical exclusions to the proposed action was arbitrary and capricious.[22] The State has thus shown a likelihood of success on the merits favoring a preliminary injunction.

### D.    Irreparable Harm

To establish irreparable harm, a plaintiff "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (2019) (citation omitted).    Although this standard mirrors that of injury for purposes of Article III standing, the State faces a higher burden to satisfy this prong of the preliminary injunction standard. *See id.*

---

[21] E2* also states that the proposed action must be "compatible with applicable . . . local planning . . . standards." DHS NEPA Instruction Manual, at A-8. The Court observes that the State's notice of administrative action with respect to the County's Water and Sewerage Plan, which now must be updated before any increase in sewage flow can be authorized, may mean that this categorical exclusion is soon inapplicable for another reason. *See* ECF 38.

[22] Because the Court concludes that the categorical exclusions are incapable of covering the proposed action as a matter of law, it does not reach the State's arguments about whether Defendants adequately considered the presence of "extraordinary circumstances" as negating the application of a categorical exclusion. *See* ECF 15-1, at 35–36; ECF 37, at 14–15. The State may raise those arguments again at a later stage of the litigation.

Additionally, the harm "must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (quotations and citations omitted).

The State argues that the "limited information Defendants have provided indicates that construction activity to convert the warehouse into an immigration detention facility will result in irreparable harm to the State's environmental interests." ECF 15-1, at 22. The State points to Defendants' NHPA letters, which indicate that construction activities at the facility "may include, but are not limited to, installing, upgrading, or rehabilitating existing parking areas, fencing, site lighting, landscaping, drainage/stormwater, recreation areas, and camera," and that "[t]entage and a guard shack may also be installed." ECF 15-10, at 2. Similarly, Defendants' Floodplain Notice suggests that Defendants "may" install a security checkpoint structure and exterior lighting, replace an existing emergency generator, and possibly modify the existing sanitary sewer. *See* ECF 15-11, at 4–5. Defendants' REC reflects the same possibilities. *See* ECF 34-1. The crux of the State's concern, however, flows from what the State contends are necessary implications of converting a commercial warehouse into a detention center capable of humanely housing several hundreds of human beings. The State argues that "converting the warehouse into a detention facility will likely require far more construction activity than Defendants have disclosed, and if Defendants fail to undertake that significant construction, the facility will pose an even greater risk to the environment and health of the local community." ECF 15-1, at 22.

The State attaches to its motion a declaration from Walid Saffouri, a program manager with the Maryland Department of the Environment. *See* ECF 15-16, at 2 ¶ 1. Saffouri states that based on his review of Defendants' plans and his knowledge of the Williamsport Warehouse, there are "significant concerns that the existing infrastructure is insufficient to support a population of 1500 detainees." *Id.* at 3 ¶ 8. Saffouri explains that "the facility is connected to the City of Hagerstown's

59

drinking water distribution system through a 2-inch service line," which "can generally deliver from 65,000 to 120,000 gallons per day of water." *Id.* at 4 ¶ 11. However, "[a] 1500 person detention facility would be expected to require around 187,500 gallons of water per day." *Id.* Saffouri also states that "the warehouse is serviced by an 8-inch lateral sewer line which transitions to a 6-inch lateral sewer line shortly after leaving the warehouse's footprint." *Id.* at 6 ¶ 18. The 6-inch lateral line serves "as a bottleneck for the facility's wastewater prior to reaching the 8-inch sewer main." *Id.* ¶ 19. "A 6-inch sewer line can have the capacity to handle approximately 63,500 gallons per day of flow." *Id.* ¶ 21. But "a 1500 bed detention facility yields an estimated flow of 187,500 gallons of wastewater per day." *Id.* at 7 ¶ 30. Saffouri asserts that "[u]pgrading the system so that it has the capacity to meet expected needs would require significant excavation along the length of the 6-inch lateral line and likely the 8-inch sewer main as well," and failure to upgrade the system "will likely result in sewage backups and overflows creating public health hazards and environmental harm." *Id.* at 10 ¶ 45.

In a declaration attached to the motion provided by Josh E. Kurtz, the current Secretary of the Maryland Department of Natural Resources, these environmental risks are discussed at length. *See* ECF 15-8, at 2–16. Secretary Kurtz states that "[c]onstruction at the scale necessary to convert the warehouse into an immigration detention facility without the necessary environmental reviews, poses a serious risk to the nearby watersheds and the ecosystems therein." *Id.* at 3 ¶ 7. Secretary Kurtz identifies several state-listed endangered species, species in need of conservation, and rare species which stand to be harmed by pollution to the waterways if significant construction were to occur at the property or if sewage overflows resulted from a lack of necessary improvements.[23]

---

[23] Maryland officials are not alone in fearing that irreparable environmental harm will follow from continued work at the warehouse. For example, ICE bought a massive warehouse in Social Circle," Georgia and the city "is so concerned about the strain on its water supply that it put a lock

*See id.* at 7–16.  Additionally, the State points to infectious disease as a potential effect on the environment flowing from Defendants' proposed course of action, substantiated in a declaration submitted by Dr. David Blythe, a doctor employed by the Maryland Department of Health as the State Epidemiologist and Director of Infectious Disease Epidemiology and Outbreak Response Bureau.  *See* ECF 15-18, at 2 ¶ 1.  Dr. Blythe asserts that "[c]ongregate detention facilities are well documented as having higher risk for infectious disease outbreaks, as compared to non-congregate settings."  *Id.* at 4 ¶ 8.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  "If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Id.* Because of that well-established principle, the Fourth Circuit's "decisions have favored injunctions when a NEPA review is required and has not been conducted."  *State of N.C.*, 951 F.2d at 603 (citing *Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323, 1326 (4th Cir. 1972), *cert. denied*, 409 U.S. 1000 (1972)).  However, "[t]he rule barring consideration of remote or speculative injury for purposes of a preliminary injunction applies despite the degree of injurious consequences." *Hodges v. Abraham*, 253 F. Supp. 2d 846, 864 (D.S.C. 2002), *aff'd* 300 F.3d 432 (4th Cir. 2002). "In the Fourth Circuit, . . . it is especially important that a plaintiff show the current proposed *stage* of an action will cause irreparable injury to the environment."  *Id.* (emphasis added) (citing *S.C.*

---

on the warehouse's water meter."  *See* Heather Hollingsworth, *How US communities have responded to plans to convert warehouses into immigration detention centers*, AP News (updated 10:29 AM, Apr. 9, 2026), https://apnews.com/article/immigration-detention-warehouses-backlash-states-d2f4cfd885f013d51477b5926d4d2c3c.    Pennsylvania's  Department  of Environmental Protection also barred water and sewage from being supplied to the warehouses purchased in two of its townships, and Michigan and New Jersey have brought suit over warehouse plans under NEPA citing similar concerns about sewage and other environmental harms. *See id.*

*Dep't of Wildlife & Marine Resources v. Marsh*, 866 F.2d 97, 100 (4th Cir.1989) (refusing to enjoin agency from installing generators for pump and treatment project, holding that only by operating and testing the generators would the agency be irreparably harming the environment)).

When the State filed its motion for a TRO, the imminent irreparable harm it articulated corresponded precisely with the stage of Defendants' action, since Defendants' immediate next steps were construction and retrofitting the warehouse for operation as a detention and processing center, presumably with an end date on construction of May 4. *See* March 6 Contract, https://perma.cc/2H9A-RJDP. That largely remains true. Defendants argue, in their opposition and at the hearing, that the State's allegation of imminent irreparable harm is too attenuated because the State is assuming that excavation, sediment runoff, and significant traffic are likely to occur at the site.[24] *See* ECF 34, at 30. But the State is not assuming.[25] The extensive exhibits and declarations of Maryland environmental and public health experts that support the State's motion thoroughly explain the likelihood of imminent irreparable environmental harm flowing from Defendants' proposed course of action. *See, e.g.*, ECF 15-16 (declaration of Saffouri); ECF 15-8 (declaration of Kurtz).

---

[24] In this respect, Defendants' arguments place too much focus on the retrofitting of the warehouse, and not enough on its operation. *See* ECF 34, at 24 ("The irreparable harm section below explains that the environmental impacts from the agency's *work on the facility* will not be significant." (emphasis added)). It is the imminent operation of the warehouse as a detention center for hundreds of people that also compels the Court's conclusion as to the likelihood of irreparable harm, not just the impending construction and renovation.

[25] To the extent the State is forced to make assumptions about the work that will proceed at the Williamsport Warehouse, the Court notes that any lack of certainty flows from the very violation alleged under NEPA—a failure to thoroughly analyze what will need to be done to the property and its surrounding area to effectuate the significant undertaking Defendants intend.

Although these declarations assume a 1,500-person detention center, the Court finds that a likelihood of imminent irreparable harm exists with respect to a 542-person detention center for the majority of harms alleged.[26] Even a 542-person detention center would require significant improvements in sewage capacity. *See* ECF 15-16, at 10–11 (table estimating wastewater flows). For example, using the Eastern Correctional Institution's average flows for January 2026, which were projected at 238.45 gallons per person per day, the projected gallons per day for a 542-bed facility would be approximately 129,224 gallons. *See id.* at 10. "A 6-inch sewer line can have the capacity to handle approximately 63,500 gallons per day of flow." *Id.* at 6 ¶ 21. If no work is pursued to increase capacity, Saffouri suggests that an overflow could occur at the external cleanout valve, inside the property, and outside the property, "create[ing] public health hazards for the immigrants, ICE agents, and others at the facility" as well as "adverse environmental impacts, including to neighboring streams and their aquatic life." *See id.* at 8 ¶ 39. On the other hand, if renovation is pursued, "[u]pgrading the system so that it has the capacity to meet expected needs would require *significant excavation* along the length of the 6-inch lateral line and likely the 8-inch sewer main as well," and it "would also require significant upgrades to the Wright Road Pumping Station including excavation to expand the facility's wet well." ECF 15-16, at 10 ¶ 45 (emphasis added). The Court need not engage in any logical leaps to conclude that such construction "activity is likely to increase sediment runoff to nearby waters."[27] *Id.*

---

[26] Except with respect to the warehouse's drinking water capacity. On that front, it appears that the difference between 542 and 1,500 people would make a difference such that the former would not require major excavation in the ground surrounding the warehouse.

[27] On April 13, 2026, the State filed a notice apprising the Court of a recent administrative action taken by the State and its Department of Environment related to the Williamsport Warehouse. *See* ECF 38. The state agency's order found that the Williamsport Warehouse's projected volume exceeds existing capacity of the County's sewage system and does not comply with the County's Water and Sewage Plan, which is itself out of compliance with State standards. *Id.* at 1–2.

However, Defendants now represent that ICE is "reconsidering the precise scope of and plans for the facility and will not engage in any construction activities to retrofit the facility or any operations at the facility until it engages in further NEPA analysis and makes a final decision on its plans for the facility." ECF 34, at 26–27. Because Defendants "will not be imminently pursuing any retrofitting work for detention purposes," they argue that the imminence requirement of irreparable harm is not met. *See id.* at 32; *Direx Israel, Ltd. V. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991) (emphasizing that "where the harm is admittedly not present or immediate but merely problematic," injunctive relief is unavailable). The State responds that Defendants' new assertions give "the State no comfort and should give this court no pause in granting the requested preliminary injunction." ECF 37, at 5. Further, the State reminds the Court that "[t]he pertinent question . . . is not whether the State will be irreparably harmed tomorrow, but whether the State will be irreparably harmed during the pendency of this litigation absent the requested relief." *Id.* at 21 (citing *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 726 (D. Md. 2018)). "[G]iven Defendants' contractual plan to have the detention center operational by May 4, the harm to the State is imminent." *Id.* (internal citation omitted).

---

Accordingly, the order requires the County to submit a comprehensive revision of the plan which, until approved, will prevent the County from authorizing, allocating, or facilitating any increase in sewage flow to the pumping station beyond 400 gallons. *Id.* at 2; ECF 38-1, at 13. It is unclear how long this process will take based on the face of the notice, although the attached order indicates the County has 10 days to seek review of the order itself. *Id.* at 14.

The Court observes that the administrative order does not, on its face, restrain Defendants from proceeding with construction at the Williamsport Warehouse or from attempting to operate the warehouse as a detention facility. To that extent, the order may actually increase the likelihood of imminent irreparable harm, if it means Defendants would have to use the sewage capacity in the warehouse as-is, effectively guaranteeing a sewage overflow. Regardless, neither party was able to identify a particular or projected length of time the order might delay work at the Williamsport Warehouse. Accordingly, the Court does not view the order as impacting its analysis on the State's likelihood of suffering imminent irreparable harm in the absence of a preliminary injunction.

"To be sure, a defendant's representation that it has voluntarily ceased challenged conduct is an important factor to consider in evaluating a plaintiff's contention of irreparable harm." *Gilead Scis., Inc. v. Meritain Health, Inc.*, Civ. No. 1:24-03566-JRR, 2025 WL 1745669, at *29 (D. Md. June 24, 2025) (citing *JTH Tax, Inc. v. ITS Fin., LLC*, No. 2:08cv271, 2008 WL 11512368 (E.D. Va. Dec. 15, 2008); *Lance Mfg., LLC v. Voortman Cookies Ltd.*, 617 F. Supp. 2d 424 (W.D.N.C. 2009)). Although it is "well established that a voluntary discontinuance of challenged activities by a defendant does not necessarily moot a lawsuit," "[o]ne exception to this well-established rule is that a request for injunctive relief may be rendered moot where 'there is no reasonable expectation that the wrong will be repeated.'" *Lance Mfg., LLC*, 617 F. Supp. 2d at 431 (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001)).

The Court is not persuaded that Defendants' representations of voluntary cessation for an unstated period of time until some additional, unspecified NEPA analysis can be conducted negate the State's clear showing of irreparable harm absent issuance of preliminary injunctive relief. *Cf. Gilead Scis., Inc.*, 2025 WL 1745669, at *30. The Court is not concluding that Defendants' assertions that additional NEPA analysis will occur are necessarily disingenuous. But those assertions do not identify what NEPA analysis Defendants plan to conduct or how long such an analysis will take. *See* ECF 34-2, at 5 ¶ 11; ECF 34-3, at 6 ¶ 13. And, as the State points out, the REC demonstrates the speed at which Defendants may be able to conduct additional environmental review and begin construction and operation. *See* ECF 37, at 21; ECF 34, at 11–12 (explaining that the REC was completed within one month, during January 2026); *cf. Child Trends, Inc. v. United States Dep't of Educ.*, 787 F. Supp. 3d 81, 95–96 (D. Md. 2025) (concluding that because the alleged injury—loss of opportunity to bid—was set to occur *several months* in the future, and because defendants had stated they planned to enter into new contracts, where the harm

65

complained of was loss of opportunity to bid, plaintiffs had not clearly shown imminent irreparable injury to warrant issuance of a preliminary injunction).[28]

Nevertheless, the State's showing of irreparable harm does warrant a narrowing of the *scope* of preliminary injunctive relief awarded. The Court finds the Fourth Circuit's decision in *South Carolina Department of Wildlife & Marine Resources v. Marsh* to be particularly instructive on this point. In that case, "[t]he South Carolina Department of Wildlife and Marine Resources, joined by the South Carolina, Georgia, and National Wildlife Federations (Plaintiffs), brought suit against the United States Army Corps of Engineers (the Corps) alleging violations of" NEPA. 866 F.2d at 98. The district court issued a preliminary injunction prohibiting the Corps " from proceeding with the installation of pumped storage facilities at the Richard B. Russell Dam (the Dam)." *Id.* The Corps sought "to install and ultimately to operate pumped storage generators at the Dam, which is located between South Carolina and Georgia on the Savannah River." *Id.* The generators could be used "to refill the upstream reservoir following the release of water for the generation of electricity." *Id.* However, pumped storage posed "a major environmental concern

---

[28] There is also the issue of notice. Defendants correctly point out that the application of categorical exclusions to a proposed action do not require public notice. If Defendants' voluntary cessation of construction and retrofitting for an unspecified period of time can negate the State's motion for a PI now, then the State's only way of knowing the right time to a re-file a PI motion would be to actually incur the irreparable harm it fears. But the standard for preliminary injunctive relief does not require a plaintiff to wait until irreparable harm has already occurred. *See Lowe v. Frame*, No. 2:25-CV-00272, 2025 WL 1490168, at *10 (S.D.W. Va. May 23, 2025) ("A party 'does not have to await the consummation of threatened injury to obtain [injunctive] relief.'" (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Co.*, 204 F.3d 149, 160 (4th Cir. 2000))); *see also Texas v. United States*, 809 F.3d 134, 173 n.137 (5th Cir. 2015), as revised (Nov. 25, 2015) (noting that "a fundamental principle of preliminary injunctions" is that "[a]n injunction is of no help if one must wait to suffer injury before the court grants it"). At the hearing, Defendants stated that it would provide the State with 14 days' notice before beginning additional work. But as noted, nothing obligates Defendants to keep that promise absent a Court order, and the promise of 14-day notice is not in the sworn declarations attached to Defendants' opposition.

because of the risk that while operating in the pumping mode the turbines may 'entrain,' or kill, large numbers of fish and fish eggs." *Id.* at 99.

Although the Corps prepared a detailed analysis under NEPA before construction of the Dam began, pumped storage generators were specifically prohibited by Congress at that time, so the original impact statement did not address the possible environmental effects of pumped storage. *See id.* Later, that prohibition was removed, and "the Corps awarded its first contract for construction of pumped storage facilities at the Dam." *Id.* Although "the Corps announced that it intended to prepare a supplemental environmental impact statement (SEIS) regarding mitigation of the adverse effects of pumped storage," the Corps did not want to delay installation of the pumped storage facilities for the two years it would take to complete the SEIS, and awarded the final installation contract" soon thereafter. *Id.* The plaintiffs instituted their lawsuit a few days before the award of the final installation contract and "moved for a preliminary injunction to prevent the Corps from installing the pumped storage facilities prior to completion of an environmental impact statement that adequately considers the potential entrainment problem and addresses the various options for mitigating this and any other environmental risks." *Id.* Although the plaintiffs " did not contend that the installation of pumped storage generators alone would have any adverse environmental impact," they argued that "once the money is spent and the pumped storage equipment is installed, the economic considerations in favor of operating it in both the generating and pumping modes will be too high to resist regardless of the environmental impact." *Id.*

The Fourth Circuit concluded that "the district court properly found that *operation* of pumped storage generators at the Dam prior to the completion of the SEIS by the Corps may create a substantial risk of harm to the environment." *Id.* at 100 (emphasis added). And it cited with

favor the United States Supreme Court's observation in *Amoco Production Co.*, emphasizing that environment injury, if "sufficiently likely," favors the issuance of an injunction. *See id.* (quoting 480 U.S. at 545). But it concluded that the remedy imposed by the district court was "broader than necessary to protect against the environmental risk." *Id.* "Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Id.* (quoting *Consolidation Coal Co. v. Disabled Miners of Southern West Virginia*, 442 F.2d 1261, 1267 (4th Cir.), *cert. denied*, 404 U.S. 911 (1971)). "This is particularly so," the Fourth Circuit observed, "when preliminary injunctive relief is granted." *Id.* There, the plaintiffs had "conceded at oral argument that installation alone of the already purchased pumped storage generators will cause no environmental damage," and because "restraining the installation of the generators is not reasonably required to protect the environment," the Fourth Circuit "vacate[d] that part of the injunction which prohibits the Corps from installing the pumped storage generators at the Dam." *Id.* The court observed that "even if the pumped storage facilities are installed, they may never be allowed to operate" based on the results of future NEPA analysis. *See id.* "Nonetheless, installation alone will cause no environmental damage, and while the potential for financial waste may prove more real than the financial savings gained by simultaneously proceeding with installation and environmental study, this decision is one Congress has charged the Corps with making." *Id.* at 100–01.

In many ways, the case before this Court mirrors that of *South Carolina Department of Wildlife & Marine Resources v. Marsh*. Specifically, Defendants here and the Corps there decided to forge ahead with a proposed action via the award of a contract, despite acknowledging that some additional NEPA analysis was necessary. Moreover, it is true of both cases that at least some of the proposed undertaking at issue has no chance, by itself, of imminently bringing about the

68

irreparable harm alleged. *See id.* Accordingly, the State's request for a preliminary injunction is only granted in part.

Here, the alleged harm flows from the potential for significant construction at the site related to capacity infrastructure and also from environmental harms flowing from the facility's ultimate operation as a detention and processing center. *See, e.g.*, ECF 15-18, at 3 ¶ 2, at 6 ¶ 17. However, some actions Defendants seek to engage in now do not immediately relate to the imminent environmental harm alleged include installing security cameras and security lighting, laying fiberoptic cable within the warehouse for a building alarm system, repairing the warehouse's existing HVAC system, repairing leaks in the roof and walls, installing communications wiring within the warehouse, and internal drywall demolition and installation. *See* ECF 34-2, at 4 ¶ 9; ECF 42, at 1–2; *see also id.* at 2 n.1 (noting that Defendants may install "an eight-foot security fence for the purpose of preventing vandalism, arson, and graffiti at the Williamsport Warehouse"). In sum, the State has met its burden of showing a clear likelihood of imminent irreparable harm should Defendants be allowed to proceed with their proposed course of action at the Williamsport Warehouse, but the Court has tailored the enjoined actions in light of the harm alleged.

### E.    Balance of the Equities/Public Interest

As discussed, "[w]hen a plaintiff seeks preliminary injunctive relief against the Government, the balance of the equities and the public interest factors merge." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009); and then citing *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020)). This is so because "the government's interest *is* the public interest" in such a case. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (emphasis in original) (quoting *Pursuing Am. Greatness*

*v. Fed. Elec. Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). The Court concludes that these factors weigh in favor of the State.

The Court recognizes Defendants' legitimate interest in the enforcement of federal immigration law. *See* ECF 34, at 32–33. But the issuance of a preliminary injunction in this case will not change how Defendants are enforcing those laws—instead, it will preserve the status quo in Maryland. *See* ECF 37, at 23. Moreover, the Court observes that the increase in detentions nationwide does not necessarily reflect lawful enforcement of United States immigration law. One of Defendants' declarations notes that there are "42,442 individuals in Maryland that have final orders of removal 5,614 of whom have criminal records. ECF 34-3, at 5 ¶ 12. But an order of removal does not necessarily mean an individual must be, or even can be, lawfully detained. Indeed, over the past year several federal courts throughout the country, including this District, have consistently found that ICE had unlawfully detained individuals without prior removal orders. *See, e.g.*, *Ailon-Lopez v. Bondi*, Civ. No. 26-160-BAH, ECF 8 (D. Md. entered Jan. 21, 2026); *Vicente Romero v. Bondi*, Civ. No. 26-219-BAH, ECF 8 (D. Md. entered Jan. 23, 2026); and *Aguirre Aguirre v. Baker*, Civ. No. 26-319-BAH, ECF 7 (D. Md. entered Jan. 29, 2026). Additionally, individuals ordered removed may have nevertheless received some sort of immigration benefit, such as withholding or deferral of removal. In certain circumstances, this Court has also found detention of such individuals to be unlawful. *See, e.g.*, *Portela-Hernandez v. Trump*, Civ. No. 25-1633-BAH, 2026 WL 74042, at *1 (D. Md. Jan. 9, 2026); *Abreu v. Baker*, Civ. No. 25-3088-BAH, ECF 18 (D. Md. entered Dec. 12, 2025); *Bonilla Martinez v. Liggins*, Civ. No. 25-2027-BAH, ECF 41 (D. Md. entered Jan. 16, 2026).

Further, "[t]he public interest is not served by compromising environmental due process and proceeding with a project that later may be found to be in violation of NEPA." *Washington*

*Cnty. v. U.S. Dep't of Navy*, 317 F. Supp. 2d 626, 637 (E.D.N.C. 2004).  Rather, if environmental injury "is sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Marsh*, 866 F.2d at 100 (quoting *Amoco Production Co.*, 480 U.S. at 545).  Given the imminent and irreparable environmental injury if the Williamsport Warehouse is allowed to operate as a detention facility without NEPA compliant decision-making, the Court concludes that these two final factors favor the State.

## VI.    **CONCLUSION**

For the foregoing reasons, the Court granted the State's motion for a PI and entered a PI on April 15, 2026.  *See* ECF 42.  Defendants are enjoined during the pendency of this lawsuit from construction and renovation at the warehouse located at 16220 Wright Road, Williamsport, Maryland 21795 for the purposes of operating the warehouse as a detention and processing facility. The injunction does not prevent Defendants from installing security cameras and security lighting, laying fiberoptic cable within the warehouse for a building alarm system, repairing the warehouse's existing HVAC system, repairing leaks in the roof and walls, installing communications wiring within the warehouse, and internal drywall demolition and installation.

All improvements excluded from this preliminary injunction must be narrowly tailored toward securing the warehouse from vandalism, arson, and/or graffiti as well as facilitating minor renovations related to increasing office space.[29]

Until further notice, the parties have been ordered to file a joint status report every twenty-one (21) days from the date of the Court's order confirming compliance with the injunction and

---

[29] As indicated in the order at ECF 42, the preliminary injunction also does not prevent the installation of an eight-foot security fence for the purpose of preventing vandalism, arson, and graffiti at the Williamsport Warehouse.  However, the parties are conferring about specific fencing options and will inform the Court of the outcome of their discussions.

raising any concerns to the Court. The State has also been ordered to pay a nominal security bond of $100.

Dated: <u>April 17, 2026</u>

Brendan A. Hurson
United States District Judge